IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

ASHLEY LYNDOL JONES,       )
      Petitioner,         )
                          )
vs.                       )      Civil Case No. 5:02-CV-116 (WTM)
                          )
WARDEN,                )
Georgia Diagnostic Prison,     )
      Respondent.        )

## PETITIONER'S BRIEF IN SUPPORT
## OF PETITION FOR WRIT OF HABEAS CORPUS

Brian S. Kammer (Ga. 406322)
Marcia A. Widder (Ga. 643407)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, Georgia  30307
404-222-9202
Fax: 404-222-9212
grc@garesource.org

COUNSEL FOR PETITIONER

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

I.     PROCEDURAL HISTORY. .................................................................3

II.    APPLICATION OF 28 U.S.C. § 2254(D) TO MERITS REVIEW.
......................................................................................................10

III.   FACTUAL BACKGROUND. ..............................................................20

    A.   The Crime. ...................................................................................20

    B.   Pretrial Proceedings. ...................................................................22

        1.   Motion for Investigative Funding: ...................................23

        2.   Motions for Independent Mental Health Evaluation and
Funding: .......................................................................24

        3.   Motion for Change of Venue: ..........................................28

    C.   The Culpability Phase Of Trial. ..................................................34

        1.   Mr. Holland's murder was preceded by a night of drinking
and bedlam. ...................................................................35

        2.   Had Mr. Thigpen competently examined the state's
eyewitnesses, he could have shown that the evidence is
wholly equivocal about which defendant inflicted the fatal
injuries and had a more culpable mental state. ................38

        3.   Additional prosecutorial evidence at the guilt phase. .......50

        4.   The defense case in the culpability phase. .......................51

    D.   The Sentencing Phase of Trial. ...................................................56

    E.   State Habeas Proceedings. ...........................................................72

CLAIMS FOR RELIEF........................................................................................73

i

I.    BOTH OF PETITIONER'S ATTORNEYS WERE HAMPERED BY ACTUAL CONFLICTS OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION (CORRECTED PETITION, CLAIM TWO) ............................................73

   A.   Mr. Jones Is Entitled To Habeas Relief Because His Attorneys' Conflicting Interests Adversely Affected Their Representation Of Him. ................................................................75

   B.   Public Defender Martin Eaves Took Steps To Advance The Interests Of His Client Allen Bunner At The Expense Of His Other Client, Mr. Jones. ......................................80

   C.   Mr. Thigpen's Concurrent Representation Of Mr. Bunner On An Open DUI Charge At The Time He Accepted The Appointment To Represent Mr. Jones Was A Disqualifying Conflict Of Interest. ..............................................82

   D.   Mr. Thigpen's Cross-Examination of Former Client Sally Kimbrell Suffered as a Result of his Prior Representation of Her..................................................................85

   E.   Mr. Thigpen Was Prevented by an Actual Conflict of Interest from Questioning His Former Client J.J. Cunningham Regarding Her Drug Use and the Use of Drugs at her House the Night of the Crime. ..............................................90

II.   MR. JONES WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS (CORRECTED PETITION, CLAIM ONE) ............................................93

   A.   The State Habeas Court's Resolution Of Mr. Jones's Sentencing Phase Ineffective Assistance Of Counsel Claims Is Based On Unreasonable Fact Determinations And Contravenes, Or Involves An Unreasonable Application Of, Established Supreme Court Law. ..............................................94

      1.   The *Strickland* standard as to defense practice at sentencing. ........101

a.    As to *Strickland*'s first prong, prevailing professional norms establish the objective standard of reasonableness by which counsel's performance is judged. ...............................102

b.    The Supreme court has endorsed applicable ABA standards as guidelines to reasonable performance. ...................102

c.    As to *Strickland*'s second prong, clearly established precedent holds that prejudice results where available mitigation evidence might have influenced one juror's determination as to sentencing. ...................................108

2.    Trial counsel rendered prejudicially deficient performance in failing to conduct a meaningful investigation into mr. jones' background. .......................................................................................109

3.    Trial counsel unreasonably failed to obtain investigative or expert assistance. ......................................................................115

a.    Social worker/mitigation investigator .........................................116

b.    Mental health experts ...............................................................121

4.    Counsel failed to present available evidence pointing to alcoholic poisoning of Mr. Jones's brain during adolescence or highlight the mitigating ramifications of Mr. Jones's youthful status in any way. ..............................................................126

a.    Youth is inherently mitigating. ...................................................130

b.    The habeas court unreasonably discounted to irrelevance expert testimony regarding the impact of alcohol addiction on Mr. Jones's adolescent brain. ...............................................136

5.    Trial counsel unreasonably failed to place the co-defendant's jury-imposed life sentence before Mr. Jones's sentencing jury. ................................................................................................142

B.    Mr. Thigpen's Deficient Performance In Failing To Conduct An Adequate Cross-Examination Of The State's Key Witness Sally Kimbrell Prejudiced Mr. Jones At Penalty. .........................................148

C.   Mr. Thigpen's Failure To Present Readily Available Evidence That Mr. Bunner Was The Driver Of The Victim's Truck As The Defendants Fled The Scene And, As Such, Was More Culpable Than Mr. Jones, Was Prejudicially Deficient; Had Jurors Been Presented With Concrete Evidence To Support The Almost Entirely Unsupported Defense That Mr. Bunner Was The More Culpable Defendant, There Is A Reasonable Likelihood That Mr. Jones Would Not Have Received The Death Penalty. ....................................................................................150

1.   Mr. Thigpen performed deficiently in failing to present evidence that Mr. Bunner had admitted to being the driver of Mr. Holland's truck. .......................................................................152

D.   Mr. Thigpen Failed To Investigate And Present Evidence Of Co-Defendant Bunner's Propensity For Violence, Which Would Have Given Support To Mr. Jones's Testimony That It Was Mr. Bunner Who Was The Driving Force Behind The Theft Of Mr. Melton's Truck And The Robbery And Murder Of Mr. Holland And Would Have Countered The Prosecutor's Contrary Spin On What Happened. ...................................................157

E.   Mr. Thigpen Performed Deficiently in Failing to Object to the Prosecutor's Improper Sentencing Phase Summation, to Mr. Jones's Great Detriment. .................................................................162

1.   The Prosecutor's Contention that Mr. Jones Was Inherently "Evil" Was Highly Improper. ........................................................166

2.   The prosecutor improperly argued that Mr. Jones's "evil" could only be contained by killing him. ..........................................168

3.   The prosecutor's efforts to align his desire for a death sentence with the wishes of the victim's family and the citizens of Georgia were highly inflammatory and improper. ........170

4.   The prosecutor unfairly condemned Mr. Jones for exercising his constitutional rights. ................................................................172

5.   The prosecutor's repeated contention that Mr. Jones was 21 at the time of the crime was false. ...................................................173

iv

F.   Mr. Thigpen Provided Ineffective Representation In Giving A Lackluster Closing Argument Divorced From The Mitigation Presented At Trial And Unresponsive To The State's Impassioned Argument For Death. ....................................................175

G.   Mr. Thigpen Provided Ineffective Representation In Failing To Properly Litigate His Motion To Change Venue. ...............................178

H.   Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Conduct Adequate Voir Dire Of Potential Jurors To Ensure That Mr. Jones Was Tried By A Fair And Impartial Jury. ................179

I.   Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Strike For Cause Certain Venire Persons. ....................................................186

J.   Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Rehabilitate Or Attempt To Rehabilitate Potential Jurors Who Expressed Qualms About Imposing A Death Sentence.....................190

K.   Additional Instances Of Ineffective Representation. ..........................192

III.   THE PROSECUTOR'S PRESENTATION OF MAMIE HOLLAND'S VICTIM IMPACT EVIDENCE VIOLATED DUE PROCESS AND THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION FOR A MISTRIAL (CLAIM FIVE). .........194

IV.   THE TRIAL COURT'S REFUSAL TO GRANT MR. JONES'S REQUEST FOR A CHANGE OF VENUE VIOLATED MR. JONES'S RIGHTS TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (CORRECTED PETITION, CLAIM FIVE)...........................................196

A.   Local Papers Saturated The Community With Prejudicial News Accounts That Highlighted Mr. Jones's Alleged Admissions Of

Guilt, The Brutality Of The Crime, The Grief Of The Victim's Family, The Strength Of The State's Case, And The Community's Need For Safety And Security. ....................................201

B.   Voir Dire Revealed That Coffee County Had Been Saturated With The Same Pretrial Publicity And Gossip As Ware County And That Prospective Jurors Openly Discussed Their Opinion That Mr. Jones Was Guilty And Deserving Of The Death Penalty..............................................................................................210

C.   The Overwhelming Pretrial Publicity And Evidence Of Widespread Juror Bias Necessitated A Change Of Venue. ................220

D.   The Trial Court's Anemic Questioning Of Prospective Jurors Was Insufficient To Protect Mr. Jones's Right To Be Tried By A Fair And Impartial Jury. ...............................................................224

E.   Mr. Jones Is Entitled To A Presumption Of Prejudice. ....................230

F.   This Court Should Review Mr. Jones's Claim *De Novo*. ..................231

V.   TRIAL COUNSEL'S AGREEMENT TO CHANGE VENUE TO AN ADJACENT COUNTY IN THE SAME JUDICIAL DISTRICT THAT WAS SATURATED WITH THE VERY SAME INFLAMMATORY PRETRIAL PUBLICITY AS WARE COUNTY DEPRIVED MR. JONES OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ...................................................235

VI.   MR. JONES WAS DENIED HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF HIS CAPITAL TRIAL UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL JUDGE EXCUSED TWO SEATED JURORS OUTSIDE OF MR. JONES'S PRESENCE. ...........................241

VII.   MR. JONES WAS DENIED HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL

COURT FAILED TO MAKE APPROPRIATE INQUIRIES BEFORE EXCUSING TWO JURORS. ..................................................249

VIII.  TRIAL COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S DISMISSAL OF TWO JURORS WITHOUT A PROPER INQUIRY AND OUTSIDE MR. JONES'S PRESENCE DEPRIVED MR. JONES OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ....................................................................253

IX.  MR. JONES WAS DENIED HIS RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY WHEN HIS JURY INCLUDED AN INCOMPETENT, MENTALLY ILL JUROR. ...............................256

NOTICE OF ELECTRONIC FILING AND CERTIFICATE OF SERVICE ......261

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

ASHLEY LYNDOL JONES,            )
     Petitioner,                )
                                )
vs.                             )        Civil Case No. 5:02-cv-116 (WTM) _
                                )
WARDEN,                         )
Georgia Diagnostic Prison,      )
     Respondent.                )

## PETITIONER'S BRIEF IN SUPPORT
## OF PETITION FOR WRIT OF HABEAS CORPUS

Comes now the Petitioner, ASHLEY LYNDOL JONES, by and through undersigned counsel, and submits this brief in support of the claims he has raised in his Petition for Writ of Habeas Corpus, filed in this Court on December 6, 2002 (Dkt. No. 5).

## INTRODUCTION

Mr. Jones's attorney, John Thigpen, Sr., could have declined the appointment to represent Mr. Jones on the ground that he was already representing the co-defendant, Harry Allen Bunner, in a separate criminal matter and had previously represented many of the State's key witnesses, but he nonetheless chose to accept the appointment, remaining silent about his numerous conflicts of interest.  Mr. Thigpen could have had co-counsel to assist him in representing Mr. Jones, but he

never asked for help.  Mr. Thigpen could have had the assistance of an investigator to locate evidence and interview witnesses, but he opted not to after the trial court had granted him funds to hire one.  Having chosen to go it alone, as the sole defender of Mr. Jones's freedom and life, it was incumbent upon Mr. Thigpen to tighten his belt and get to work.  He did not.

Mr. Thigpen's time records reflect that during the more than two years between his appointment and the start of trial, he had spent a grand total of four hours interviewing witnesses and 17.5 investigating the case, each amount less than the time he billed for travel (19.5 hours).  And his performance at trial reflected his complete lack of preparation and care, as well as his numerous conflicts of interest.  In voir dire, he failed to question jurors regarding critical issues such as their exposure to prejudicial pretrial publicity and its impact on their views, or their attitudes towards the death penalty, leading to the empanelment of a jury predisposed towards guilt and death.  In the culpability phase, he was unprepared to examine the State's witnesses with readily available evidence that would have impeached the reliability of testimony promoting the State's theory that Mr. Jones was the primary culprit, and would have affirmatively advanced the defense Mr. Thigpen had chosen, to show that co-defendant Bunner was the more culpable of the two young defendants.  And, at penalty, Mr. Thigpen presented only a handful of hastily assembled witnesses, who provided bland and superficial testimony about Mr.

2

Jones's former good qualities, while Mr. Thigpen ignored the red flags that any competent lawyer would have readily discovered of the significant damage to Mr. Jones's mental health caused by serious substance abuse and the disturbing and psychologically damaging underbelly of his seemingly perfect, middle-class upbringing.

Had Mr. Thigpen met his constitutional obligations as counsel, there is a more than reasonable likelihood that Mr. Jones, like his co-defendant Allen Bunner, would not have been sentenced to death.

## I.    PROCEDURAL HISTORY.

Mr. Jones and his co-defendant Allen Bunner were indicted by a Ware County, Georgia, grand jury on April 7, 1993, on charges of malice and felony murder for the death of Carlton Keith Holland on March 31, 1993, and assorted other non-capital charges.  Dkt. No. 96-1 at 13-17.  The State noticed its intent to seek the death penalty against  both defendants on July 22, 1993. Dkt. Nos. 96-1 at 36-37; 97-2, at 4-5.  Following a jury trial conducted in Coffee County,[1] Mr. Jones was convicted on all charges on June 10, 1995, and the jury unanimously voted to

---

[1] On May 18, 1995, the trial court granted a change of venue due to prejudicial pretrial publicity, ordering the case transferred to neighboring Coffee County.  Dkt. No. 96-2 at 77.

3

sentence him to death on June 13, 1995.[2]  Dkt. No. 96-2 at 133, 135.  On March 10, 1997, the Georgia Supreme Court affirmed the convictions and death sentence. *Jones v. State*, 267 Ga. 592 (1997).  The Supreme Court of the United States denied a petition for writ of certiorari on November 3, 1997.  *Jones v. Georgia*, 522 U.S. 953 (1997).

Mr. Jones filed his initial Petition for Writ of Habeas Corpus in the Superior Court of Butts County on February 20, 1998, in response to an execution warrant that had been signed by the trial court.  *See* Dkt. No. 99-6 at 8.  The state habeas court issued a stay of execution and granted Mr. Jones indigency status.  *See* Dkt. No. 126-7, 126-8.  On October 22, 1998, he filed a first amended habeas corpus petition, Dkt. No. 99-9, and, at hearings conducted on November 23, 1998, and March 15, 1999, he presented live and documentary proof in support of his petition, Dkt. Nos. 99-12 through 102-3.  On May 14, 1999, Mr. Jones filed a second amended habeas corpus petition raising claims based on newly discovered evidence.  Dkt. Nos.102-4; 105-19.   The parties submitted post-hearing briefs, and Petitioner

---

[2]  Allen Bunner proceeded to trial in December 1994 before a Tift County jury after a previous voir dire demonstrated that a fair and impartial jury could not be selected in Ware County.  *See* Dkt. Nos. 102-1 at 224-25, 102-3 at 45-46.  The jury unanimously voted to sentence him to life without parole.  Dkt. No. 102-1 at 310-15.

objected to the submission of proposed orders and filed objections to the 26-page proposed order Respondent submitted.  Dkt. Nos. 102-5, 102-6, 105-22, 105-24. Unknown to Mr. Jones, the state habeas court solicited *ex parte* a second proposed order from Respondent, which the court signed verbatim the day after it had been filed.  *See* Dkt. Nos. 103-1; 103-3 at 119-272; 103-4 at 15-16.[3]

Petitioner sought a certificate of probable cause ("CPC") to appeal in the Georgia Supreme Court, which summarily denied CPC on February 11, 2002.  *See* Dkt. Nos. 103-2, 103-3, 103-4, 103-5, 103-6, 103-7.  The Supreme Court of the United States denied certiorari on October 15, 2002.  *Jones v. Head*, 537 U.S. 960 (2002).

Mr. Jones's timely petition for writ of habeas corpus was filed in this Court on December 6, 2002.  Dkt. No. 5.  This Court granted Mr. Jones indigency status, Dkt. No. 7, and granted *pro hac vice* admission to attorneys who had represented

---

[3]  Respondent conceded in his brief in opposition to the CPC application that "[f]ollowing the filing of Petitioner's post-hearing brief and Respondent['s] post-hearing brief and proposed order, the habeas corpus court instructed Respondent's counsel to draft an order, in accordance with Respondent's post-hearing brief, denying Petitioner's state habeas corpus petition," which Respondent did.  Dkt. No. 103-4, at 9-10.  That the state habeas court improperly solicited *ex parte* the order it ultimately signed, without providing Mr. Jones notice or an opportunity to respond, has implications for this Court's review of Mr. Jones's claims.

Mr. Jones in state habeas proceedings, *pro bono* counsel Jeffrey Gans and Georgia Resource Center ("GRC") attorney Therese Piazza, to appear on Mr. Jones's behalf, Dkt. Nos. 8, 10.   Thereafter, on August 29, 2003, the Court denied Mr. Jones's motion to have attorneys Gans and Piazza appointed under the Criminal Justice Act ("CJA"), and instead appointed Michael Garrett, who had agreed to serve as local counsel but who was wholly unfamiliar with the case.   Dkt. Nos. 2, 21.   Mr. Jones moved for reconsideration of the Court's order denying the appointment of Mr. Gans and Ms. Piazza on September 15, 2003.   Dkt. No. 23.   On March 12, 2007, this Court appointed Ms. Piazza to assist Mr. Garrett in his representation of Mr. Jones.   Dkt. No. 39.   In the interim, pursuant to the Court's scheduling order, Dkt. No. 21, at 5, the parties filed amended pleadings, Dkt. Nos. 24, 25, 26, 27, 28, 30, and Mr. Jones moved for and was denied discovery, Dkt. Nos. 31, 32, 33, 36, 37.

In November 2008, Ms. Piazza moved to withdraw from representing Mr. Jones following her departure from GRC's employ and the practice of law in Georgia and, on December 4, 2008, undersigned counsel Brian Kammer was appointed as counsel in her place.   Dkt. Nos. 45, 47.[4]

---

[4]  As a matter of inter-office allocation of resources, another attorney in the office, Kirsten Salchow, began working on Mr. Jones's case under Mr. Kammer's supervision.   Although never officially enrolled as counsel, Ms. Salchow continued

6

On January 13, 2009, the Court issued a new scheduling order, pursuant to which Mr. Jones moved for an evidentiary hearing on March 2, 2009. Dkt. Nos. 49, 50. On March 30, 2010, this Court ordered rebriefing of the motion in light of *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), and *Ward v. Hall*, 592 Fed. 3d 1144, 1158-59 (11th Cir. 2010), Dkt. No. 54, and the parties complied over the course of the next few months, Dkt. Nos. 58, 59, 63, 64. Thereafter, this Court administratively closed the case on March 29, 2011, pending its consideration of the Renewed Motion for Evidentiary hearing. Dkt. No. 66.

Nothing of consequence happened in the case for the next several years, other than the periodic substitution of counsel for Respondent. *See* Dkt. No. 71, 78, 80, 91. On September 15, 2015, the Court reopened the case and requested briefing on the impact of *Cullen v. Pinholster*, 536 U.S. 170 (2011), on Petitioner's request for an evidentiary hearing, which the parties filed on October 26, 2015, Dkt. Nos. 79, 87, 88. Thereafter, on September 22, 2016, the Court asked for additional briefing to address Respondent's argument that certain claims were either unexhausted or procedurally defaulted. Dkt. No. 94. *See* Dkt. Nos. 107, 110. On May 25, 2017,

--------------------

to have primary responsibility for this case, and researched and drafted the various pleadings filed in this matter until her departure from GRC in January 2017.

the Court denied the motion for evidentiary hearing.  Dkt. No. 112.  The Court's

ruling triggered the 90-day deadline for filing the merits brief in this matter pursuant

to the Court's scheduling order, *see* Dkt. No. 49, making the merits brief due on

August 23, 2017.

This Court denied Mr. Jones's several motions to stay proceedings pending

the Supreme Court's adjudication, in *Wilson v. Sellers*, Sup. Ct. No. 16-6855, of a

critical issue regarding federal habeas corpus review directly applicable to Mr.

Jones's case.  *See* Dkt. Nos. 108, 109, 113, 114, 115, 116.[5]

_____

[5]  The initial request for a stay of proceedings (Dkt. No. 108) was filed before
the Supreme Court had granted certiorari review in *Wilson* to address whether the
Eleventh Circuit erred in ruling that, under *Harrington v. Richter*, 562 U.S 86 (2011),
a federal court may no longer presume that a summary denial of review by the
Georgia Supreme Court rested on the reasons set forth in the state habeas court's
detailed order denying postconviction relief.  *See Wilson v. Sellers*, 137 S. Ct. 1203
(Feb. 27, 2017) (granted certiorari to address this question).  Although Mr. Jones's
initial stay request was arguably premature, it was prompted by Respondent's heavy
reliance on the *en banc Wilson* decision now under review by the Supreme Court.
*See* Dkt. No. 107, at 4-5, 13, 15, 18, 32, 36, 38.  Stays pending the Supreme Court's
ruling in *Wilson* have been granted in numerous other Georgia habeas cases pending
in district court, as well as in the Eleventh Circuit.  *See Tollette v. Warden*, No. 16-
17149 (11th Cir. Apr. 21, 2017) (Jordan, J.) (order staying briefing pending Supreme
Court's decision in *Wilson v. Sellers*); *Pace v. Warden*, No. 16-10868 P (11th Cir.
Mar. 15, 2017) (Tjoflat, J.) (Order staying briefing pending Supreme Court's
decision in *Wilson*); *Esposito v. Warden*, No. 15-11384-P (11th Cir. Mar. 7, 2014)
(Jill Pryor, J.) (same); *Perkinson v. Chatman*, No. 4:15-cv-00101 (N.D. Ga. Mar. 3,
2017) (Muphy, J.) (order staying briefing until the United States Supreme Court
decides *Wilson*), Dkt. 68; *King v. Warden*, No. 2:12-cv-00119-LGW (S.D. Ga. Dec.
17, 2015) (Wood, J.) (order staying proceedings pending outcome of *en banc*

The Court granted Mr. Jones an extension of 30 days in which to file his merits brief, from August 23, 2017, to September 22, 2017, after denying Mr. Jones's unopposed motion for a 120-day extension of time in light of undersigned counsel's unfamiliarity with this case, and conflicting briefing and argument responsibilities in *Wilson* and the anticipated issuance of a warrant setting execution of another client, Keith Tharpe, in late September 2017. *See* Dkt. Nos. 122, 124, 130, 131, 132, 33. On September 15, 2017, this Court granted Petitioner's unopposed motion for a two-week extension of time in light of the work interruptions occasioned by Hurricane Irma, setting October 6, 2017, as the date the brief is due. Dkt. No. 137. This brief follows. [6]

––––––––––––––––––––

proceedings in *Wilson*), Dkt. 52; *Heidler v. Warden*, No. 6:11-cv-00109-LGW (S.D. Ga. Nov. 19, 2015) (order staying briefing pending outcome of *en banc* proceedings in *Wilson*) (Wood, J.), Dkt. 101.

[6]   Counsel for Mr. Jones reasonably sought 120 additional days in which to prepare the merits brief in this case. None of the attorneys currently appointed to the case were familiar with the record at the time this Court finally ruled on the evidentiary hearing motion and the new attorney assigned to the case in February 2017, following Ms. Salchow's departure from GRC in January 2017, left the office in July 2017 for a better paying job without having produced *any* work product relevant to the merits brief. Undersigned counsel have done their best to learn the lengthy record in this matter (the state record alone is 8,269 pages long), research the issues and write a reasonably cogent and competent brief in the period of time this Court has allowed them. Nonetheless, this merits brief has been written without any lawyer on the case having reviewed the entire record, and without sufficient time

## II.    APPLICATION OF 28 U.S.C. § 2254(D) TO MERITS REVIEW.

To determine whether this Court may grant relief on the claims presented in Mr. Jones's Corrected Petition for Writ of Habeas Corpus (Dkt. No. 26), the Court must consider those claims that were adjudicated on the merits pursuant to the provisions of 28 U.S.C. §2254(d).  As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the federal habeas statute provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).  As the Supreme Court has explained, AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's

_____

for counsel to present all of the claims in this case in a complete and well-supported fashion.

application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 529 U.S. 362, 413 (2000).

Pursuant to the statute, a state court must have "adjudicated" a claim "on the merits" in order for a reviewing federal court to be constrained by the terms of § 2254(d)(1) and (2) from granting relief. For example, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court assessed the prejudice prong of Wiggins's *Strickland* ineffectiveness claim *de novo* because "neither of the state courts below reached this prong of the *Strickland* analysis." 539 U.S., at 534. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 472 ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings,'" and the claim, instead "is reviewed *de novo*") (citations omitted); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice . . . and so we examine this element of the *Strickland* claim *de novo*") (citing *Wiggins*, 539 U.S., at 534)).

A state court decision is "contrary to" clearly established Federal law[7] under § 2254(d)(1) when it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams*, 529 U.S., at 405-06.

A state court decision "involve[s] an unreasonable application of" clearly established Federal law under § 2254(d)(1) "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or if it "either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S., at 407; *see, e.g.*, *id.* at 391-95 (finding that the Virginia Supreme Court unreasonably relied on language in *Lockhart v. Fretwell*, 506 U.S.

---

[7] The U.S. Supreme Court has held that "'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court'" in a decision or series of decisions "at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

364 (1993), in deciding prejudice prong of *Strickland*'s ineffective-assistance-of-counsel determination).[8]   An unreasonable application may also occur "if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  As the Supreme Court explained in *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007):

> AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied."  Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts "different from those of the case in which the principle was announced."  The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

In addition, the Supreme Court has held that where a state court "ignore[s] or overlook[s]" evidence presented by the petitioner, or fails to "evaluate the totality of the available mitigation evidence" in making its findings, the court has unreasonably applied *Strickland*.  *Williams*, 529 U.S., at 373 n.5, 397.

———————————

[8] As the Court in *Williams* recognized, it may be "difficult to distinguish a decision involving an unreasonable extension of a legal principle from a decision that 'arrives at a conclusion opposite to that reached by this Court on a question of law.'"  *Williams*, 529 U.S., at 408 (quoting earlier language in the text).

13

This Court may also grant relief where the state court decision is based on an unreasonable determination of fact.   28 U.S.C. § 2254(d).   Where the record contradicts a state court fact-finding or the state court "ignore[s] or overlook[s]"[9] or mischaracterizes evidence presented by the petitioner in making its findings, the fact-finding deserves no deference and is unreasonable.  *See, e.g.*, *Wiggins*, 539 U.S. at 528 (state court's finding that counsel were aware, through records in their possession, that Wiggins had been sexually abused contradicted by the evidence and therefore state court decision was not entitled to deference); *Williams*, 529 U.S., at 372, 373 n.5 (state court's fact-findings unreasonable where court "ignored or overlooked" evidence of petitioner's deprived childhood and limited mental capacity, and mischaracterized the additional testimony as coming from "mostly relatives").  The unreasonable fact-finding on which the state court bases its decision denying a claim permits the federal courts to review on a *de novo* basis, and grant relief on, the petitioner's claim for relief.  *See* 28 U.S.C. § 2254(d)(2); § 2254(e)(1); *Wiggins*, 529 U.S., at 531 (where state court fact-finding is clearly in error, *de novo* review of the facts and claim based on those facts is mandated); *Miller-El v. Dretke*, 545 U.S. 231, 240-66 (2005) (engaging in exacting scrutiny of state court

---

[9] *Williams*, 529 U.S., at 373 n.5, 397.

14

record to conclude that state courts' rejection of racial discrimination claim unreasonable and erroneous).

In this case, it must be observed, the state habeas court signed a revised, greatly expanded proposed order submitted by Respondent in response to the state habeas court's improper *ex parte* request[10] a mere day after Respondent had submitted it. The improperly solicited order was adopted and signed without providing Mr. Jones with notice and an opportunity to object.[11] Under these

---

[10] *See* Respondent's *Response to Application for Certificate of Probable Cause to Appeal* (Dkt. No. 103-4, at 15) ("Following the filing of Petitioner's post-hearing brief and Respondent['s] post-hearing brief and proposed order, the habeas corpus court instructed Respondent's counsel to draft an order, in accordance with Respondent's post-hearing brief, denying Petitioner's state habeas corpus petition. Thereafter, Respondent's counsel submitted a second proposed order to the habeas corpus court. The habeas corpus court adopted Respondent's second proposed order as its own.").

[11] As counsel for Mr. Jones explained in the Reply Brief in support of the CPC application:

> Until receiving Respondent's most recent filing, the Petitioner had assumed that Respondent had filed its second proposed order in an attempt to cure the first proposed order in light of Petitioner's objections. However, in its Response, Respondent admitted that its second proposed order was the direct result of an *ex parte* communication between Respondent and the court, in which the court disclosed to Respondent that relief would be denied and ordered Respondent to submit a second proposed order. Petitioner is now forced to "appeal" the propriety of an order that was never the source of litigation before the habeas court.

15

circumstances, the verbatim state habeas order should be afforded no deference under 28 U.S.C. § 2254(d)(2).  *See Jefferson v. Upton*, 560 U.S. 284, 294 (2010) (remanding for consideration, in pre-AEDPA case, whether state court fact findings should be presumed correct where "(1) a judge solicits the proposed findings *ex parte*, (2) does not provide the opposing party an opportunity to criticize the finding or to submit his own, *or* (3) adopts findings that contain internal evidence suggesting that the judge may not have read them"); *Jefferson v. Sellers*, 2017 U.S. Dist. LEXIS 66035, No. 1:96-CV-0989 (N.D. Ga. Apr. 10, 2017) (on remand, district court holding that state habeas court's order was not entitled to a presumption of correctness and granting sentencing relief on the petitioner's ineffective assistance of counsel claim); *see also Jones v. GDCP Warden*, 746 F.3d 1170, 1184-85 (11th Cir. 2014) (holding that *Jefferson* did not preclude AEDPA deference because "the facts of this case are critically different from *Jefferson*" where "the state court

---

This latest *ex parte* communication undermines the reliability and constitutionality of the court's order and casts significant doubt on the neutrality of the habeas tribunal.  Indeed, the cooperation between the court and the Respondent coupled with the purposeful exclusion of Petitioner from the "adversarial process" undermines the integrity and impartiality of the entire process.

Dkt. No. 103-5, at 2-3.

requested that both Jones and the State prepare proposed orders" and "took a year and a half to consider the party's submissions" after it had conducted an evidentiary hearing involving petitioner's presentation of several witnesses and more than 5,000 pages of documentary evidence).

If the petitioner establishes that the state court's decision was based on an unreasonable application of governing Supreme Court law or an unreasonable determination of the facts, a federal habeas court is no longer constrained by AEDPA deference and must review the federal claim *de novo*. *See, e.g.*, *Panetti*, 551 U.S., at 953 ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); *Jones v. Walker*, 540 F.3d 1277, 1288, n.5 (11th Cir. 2008) (*en banc*) ("[W]hen a state court's adjudication of a habeas claim 'result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' . . . this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them") (citations omitted).

Mr. Jones is entitled to relief under both prongs of § 2254(d).

As an initial matter, several claims that were not procedurally defaulted have not been adjudicated on the merits and thus this Court must review these claims *de*

*novo*, including a number of sub-claims of sentencing phase ineffective assistance that the state habeas court did not reach, such as trial counsel's failure to impeach the state's key witness.

The Georgia courts, in denying relief, relied on legal analysis that was contrary to and involved an unreasonably application of governing Supreme Court law and unreasonable determinations of fact which the state court record refutes by clear and convincing evidence. Mr. Jones's claims are meritorious under decisions from both the Supreme Court of the United States and the Eleventh Circuit. Habeas relief must accordingly be granted.

A few words about the focus of this brief are in order given the unsettled nature of federal habeas practice in this Circuit at this juncture. As noted above, as of the time this brief is being filed, an issue critical to this Court's review of Mr. Jones's claims is set to be decided by the Supreme Court of the United States. In *Wilson v. Sellers*, No. 16-6855, *cert granted* 137 S. Ct. 1203 (2017), the Supreme Court will determine whether a slim majority of the Eleventh Circuit *en banc* Court properly held that a federal habeas court may not grant relief on any claim decided on the merits if there exists any reasonable basis to deny relief on the claim,

irrespective of any showing that the state court in fact relied on that reason,[12] or whether federal courts should instead analyze the reasonableness *vel non* of the last reasoned state court decision to address each claim decided on the merits, in this case, the state habeas court's reasoned order.[13]

Although the *Wilson en banc* decision – the governing circuit law at this moment – requires this Court to affirm if any reasonable basis exists to support the state courts' denial of relief on the merits, this brief will nonetheless focus on the analysis and factual findings in the state habeas court's reasoned decision.  As the Supreme Court explained in *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), "[o]ur cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did."  The best evidence of what the Georgia Supreme Court knew and did when

---

[12]  *Wilson v Warden*, 834 F.3d 1227, 1235-42 (11th Cir. 2016) (en banc).

[13]  Specifically, the question presented to the Court is:

Did this Court's decision in *Harrington v. Richter*, 562 U.S. 86 (2011), silently abrogate the presumption set forth in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991) – that a federal court sitting in habeas proceedings should "look through" a summary state court ruling to review the last reasoned decision – as a slim majority of the en banc Eleventh Circuit held in this case, despite the agreement of both parties that the *Ylst* presumption should continue to apply?

*See*  https://www.supremecourt.gov/qp/16-06855qp.pdf  (question presented in *Wilson*, Sup. Ct. No. 16-6855).

it denied the CPC application are the arguments presented to the state habeas court and Georgia Supreme Court in Respondent's post-hearing brief, the expanded proposed order solicited *ex parte* and signed by the state habeas court without modification, and Respondent's arguments against the grant of CPC (Dkt. Nos. 102-6, 103-1, 103-4). Inasmuch as Respondent defended the state habeas order, in its entirety, as the proper application of legal standards to the factual findings that were not clearly erroneous, *see* Dkt. No. 103-4, at 12-14, the state habeas order remains the appropriate starting point for determining what the state courts "knew and did."

## III.   FACTUAL BACKGROUND.

### A.   The Crime.

Mr. Jones and his co-defendant Allen Bunner were convicted of killing Carl Keith Holland in the early morning hours of March 31, 1993, in order to steal his pickup truck. At the time of their crime, the boys were 19 and 18 years old respectively. Although their actions were fueled by a night spent drinking (and, as brought out in state habeas proceedings, doing drugs), Mr. Jones's trial counsel presented only cursory and vague information about his client's intoxication on the night of the offense and the downward spiral his adolescent substance abuse had caused. Mr. Bunner, who went to trial first, faced the death penalty, but his jury unanimously voted to impose a sentence of life without parole, a fact Mr. Jones's jury never learned.

20

The critical issue was which of the boys had wielded the sledgehammer that inflicted the fatal blows and which had inflicted a few non-lethal blows with a ratchet wrench.  This issue was critical.  Eyewitness testimony described actions by the person who wielded the sledgehammer that reflected a more culpable mental state because, after beating the victim and getting into the driver's seat to drive away, that person got out of the vehicle and returned to strike Mr. Holland with the sledge hammer additional times.  Mr. Jones testified at trial that he had struck the victim with the ratchet wrench a few times with the intent to disable him.  Although information that would have supported Mr. Jones's testimony was readily available – including prior testimony by state witnesses at co-defendant Bunner's earlier trial – the jury heard none of it.   Indeed, rather than considering the Bunner trial as a critical part of trial preparation, Mr. Jones's sole attorney, John Thigpen, did not order a complete transcript of the trial or even attend the entire test run of the prosecutor's case.  Instead, he requested transcripts of only two of the many witnesses the prosecutor called at both trials and failed to order the transcripts of additional witnesses who were called by the prosecutor in the Bunner trial but omitted as prosecution witnesses at Mr. Jones's trial – presumably because the testimony these witnesses had given against Mr. Bunner would have provided exculpatory and mitigating evidence at Mr. Jones's trial.

## B.    Pretrial Proceedings.

Allen Bunner and Ashley Jones were arrested on March 31, 1993, and were indicted by a Ware County grand jury on April 7, 1993.  The indictment charged them with two counts of theft by taking (for stealing four cases of beer from a convenience store and a pickup truck owned by Mr. Bunner's former employer, Rudolph Melton[14]); one count of interference with government property, for driving a truck through the gate to a wildlife management area, one count each of felony and malice murder for killing Carlton Keith Holland, and one count of armed robbery for taking Mr. Holland's pickup truck by use of the offensive weapons of a sledgehammer and a ratchet wrench.  Dkt. No. 96-1, at 13-17.

On April 2, 1993, the Ware County Public Defender's Office was assigned to represent both Bunner and Jones.  Dkt. No. 96-1, at 20-21.  On April 14, 1993, Martin Eaves, the county public defender, moved to be relieved as counsel for Mr. Jones due to the obvious conflict of interest that arose from his appointment to represent both defendants, Dkt. No. 96-1, at 22, but that motion was filed only after Mr. Eaves had assisted Mr. Bunner in making a "hypothetical" statement to police incriminating Mr. Jones and providing information about the whereabouts of

---

[14]  *See* Dkt. No. 98-2, at 101-02.

evidence.  *See* Dkt. No. 96-1 at 299; Dkt. No. 100-2, at 222.  John Thigpen was appointed to replace the public defender as Mr. Jones's lawyer and remained the sole attorney representing Mr. Jones through the direct appeal.  Dkt. Nos. 96-1, at 22; 98-9.

On August 4, 1993, Mr. Thigpen filed thirty-four motions in advance of a pretrial hearing set for early September, 1994, most of which were form motions not specifically tailored to Mr. Jones's case.  *See* Dkt. No. 96-1 at 2-3, 41-42. These included a motion for funds for an investigator, Dkt. No. 96-1 at 76-78, motions for an independent psychiatric evaluation and for psychiatric assistance, Dkt. No. 96-1 at 138-50, and a motion to change venue and corollary motion for funding for a community opinion and prejudice survey to support a venue change, Dkt. No. 96-1 at 83-88.

### 1. Motion for Investigative Funding:

The motion for investigative funding asked for "reasonable funds to employ and use an investigator," explaining that funds were needed for investigation at both phases of trial because:

- Counsel lacked "the expertise in criminal investigation work to investigate the facts and witnesses surrounding the [charged] crime," given counsel's lack of formal training in criminal investigation and counsel's "physical[ ] inability to interview all the potential witnesses that will be essential to providing the defendant with an adequate defense or to testify at the sentencing phase of defendant's trial if necessary," particularly in light of

23

counsel's obligations to brief "the large number of legal issues that must be reached."

● Given counsel's location outside of Ware County, Georgia, where Mr. Jones was from, counsel "cannot adequately investigate and locate witnesses who could be used in the sentencing phase of defendant's trial without the help of a skilled outside investigator."

Dkt. No. 96-1 at 77-78.

At the arraignment conducted on August 4, 1993, the trial court addressed the motions for investigative funds filed by both Mr. Jones and his co-defendant Allen Bunner, and granted each $1,000 to hire their own investigators. *See* Dkt. No. 126-1 at 11-14; *see also* Dkt. No. 96-3 at 16-17 (noting that the court had already entered an order granting investigative funds). Despite this grant of funds and counsel's stated inability to conduct an adequate investigation on his own, Mr. Jones's attorney, John Thipgen, never hired an investigator. *See* Dkt. No. 100-2 at 15-16; Dkt. No. 100-2 at 59. His time records reflect that over the course of more than two years, Mr. Thigpen spent a total of 17.5 hours investigating the case and another four hours interviewing witnesses other than his client. Dkt. No. 10-2 at 227.

## 2.   Motions for Independent Mental Health Evaluation and Funding:

Mr. Jones's Motion for Independent Psychiatric Evaluation stated that the charged crime "is indicative of a severe mental illness which will require extensive psychoanalysis and clinical evaluation in order to determine its cause and extent"

and requested "reasonable funds to employ a psychiatrist whose specialty is criminal psychopathic behavior to conduct a clinical evaluation of defendant's capacity for criminal responsibility in order to enable the defendant to properly defend himself" at both phases of the trial.  Dkt. No. 96-1 at 138-39.  The motion further requested "the right to have a complete psychiatric evaluation by a psychiatrist of his choice" and the necessary funds to pay for such evaluation.  Dkt. No. 96-1 at 139.  In his brief supporting the motion, counsel observed that "defendant's counsel's has determined that the alleged viciousness of the crime itself is so at odds with the defendant's personality that a thorough and searching psychiatric examination may well be necessary to determine why the alleged act occurred."  Dkt. No. 96-1 at 142. He further observed that "the request for psychiatric assistance made in this case specifically refers to the need to develop mitigating evidence that would cast light on the defendant's future dangerousness and to examine other facts of which may have lead [sic] to the defendant allegedly committing the act in question."  Dkt. No. 96-1 at 143.  In a separate Motion for Psychiatric Assistance, counsel requested "adequate funds to have psychiatric and psychological experts of their choosing consult with their counsel and make such examinations and investigations as necessary to determine" whether Mr. Jones was able to form the necessary intent to be responsible for the charged crimes and for the development of "mitigating circumstances should [he] be convicted."  Dkt. No. 96-1 at 148.

25

At the motions hearing conducted on September 1, 1993, Mr. Thigpen did not insist on having an independent mental health expert and instead acquiesced to the suggestion of the court and prosecutor that a forensic team from Georgia Regional Hospital examine Mr. Jones.  Dkt. No. 97-3 at 37-39.  The court asked the prosecutor to draft an appropriate order, which the prosecutor agreed to do, and the prosecutor asked counsel for Mr. Jones if he could furnish Mr. Jones's school records as "that would facilitate our examination of the Defendant," a request the trial court endorsed.  Dkt. No. 97-3 at 38-39; *see* Dkt. No. 96-1 at 182-92 (package provided by the prosecutor to Dr. Nic D'Alesandro at Georgia Regional Hospital, including signed order for mental evaluation,[15] the indictment and school records).  Mr. Thigpen asked the court to reserve ruling on his motion until he had received the forensic team's report.  Dkt. No. 97 at 39.

The report, dated September 24, 1993, and authored by Nic D'Alesandro, Ph.D., and Jack W. Burbach, M.D., was based on an evaluation of Mr. Jones

---

[15]   The order drafted by the prosecutor directed Georgia Regional Hospital to conduct an evaluation of Mr. Jones, provide necessary treatment and provide a report to the court, prosecutor and Mr. Jones's counsel, addressing Mr. Jones's (1) competency to stand trial; (2) degree of criminal responsibility or mental competence at the time of the act and (3) "Any recommendations for disposition." Dkt. No. 96-1 at 183-84.  It did *not* request the forensic team to evaluate possible mitigating circumstances.

26

conducted at the Ware County Detention Center on September 21, 1993.  Dkt. No.

96-2 at 63-64.  Although the report indicated that Mr. Jones was competent and

showed "no evidence which would indicate Mr. Jones has either historically or

currently suffered from a psychiatric dysfunctioning of either mood or thought,"

evaluators repeatedly noted that Mr. Jones's conduct and mental state were

deleteriously impacted by substance abuse:

- "While he admits to ongoing use and sometimes abuse of alcohol, Mr. Jones denies any prior involvement with or current need for mental health treatment. . . .  While there is evidence to suggest Mr. Jones' prior behaviors have been adversely affected by a combination of characterological defect and excessive use of alcohol, at this time we see no indication he requires inpatient psychiatric hospitalization."

- "As noted, our examination finds no evidence which would indicate Mr. Jones has either historically or currently suffered from a psychiatric dysfunctioning of either mood or thought.  We do see however indications suggestive of a personality disorder and impulse control dysfunctioning, both conditions being at times exacerbated by his use and abuse of alcohol."

- "While he functions within the average to high average range intellectually, he does manifest traits suggestive of a personality dysfunctioning, a condition which apparently becomes exacer-bated through his abuse of alcohol."

Dkt. No. 96-2 at 63-64.  The report also stated that Mr. Jones achieved an IQ score

of 115, Dkt. No. 96-2 at 63, which, when compared to school records reflecting Mr.

Jones' placement in the gifted program and an IQ score of 130, should have, but did

not, prompt counsel to investigate further.  Instead, counsel dropped the ball on

pursuing an *independent* mental health expert who could have developed mitigating evidence regarding Mr. Jones's substance abuse and the deleterious impact it had on his mental state and cognitive abilities.

### 3.    Motion for Change of Venue:

Mr. Jones filed a motion for change of venue alleging that a fair and impartial jury could not be selected in Ware County due to prospective jurors' exposure to "highly prejudicial and erroneous pre-trial publicity since the date of the crime" and that "[t]here is a danger of violence being attempted to be committed on defendant if he is tried in Ware County, Georgia." Dkt. No. 96-1 at 86.  He separately sought funds to conduct a survey on community attitudes.  Dkt. No. 96-1 at 83-84.  Counsel did not, however, at the time he filed the motions, in advance of the motions hearing or at any time thereafter, proffer any of the media (newspapers or television or radio news) to which jurors were exposed.

At the September 1, 1993, hearing on the motion, the court denied funding to conduct a survey and pretermitted the venue question to voir dire.  97-3 at 18-20. Later on at the same hearing, when addressing co-defendant Bunner's separate motion to change venue, his attorney observed that this was not a "normal case" and that both that day and at the prior arraignment hearing "the small courtroom was packed."  Doc 97-3 at 51.  He noted there "has been tremendous publicity.  There was a tremendous love and devotion for the victim," and observed that the court had

28

been required "to go out of town, out of county, to get lawyers" in the case. Dkt. No. 97-3 at 51-52.

Subsequently, in co-defendant Bunner's case, the court attempted to select a jury from Ware County, but was unable to do so because "over thirty percent of the jurors [were] falling by the wayside because of fixed opinions as to either guilt, innocence, or sentence." Dkt. No. 102-3 at 46 (deposition of prosecutor, Richard Currie). The court declared a mistrial and the prosecutor agreed to change venue in the cases of both Mr. Bunner and Mr. Jones. *Id.* Following trial before a jury selected in Tift County in December 1994, Mr. Bunner was convicted on all charges and his jury unanimously voted to impose a sentence of life without parole. Dkt. No. 100-1 at 66; 102-1 at 310-15.[16]

It appears that, starting in early January, following the conclusion of Mr. Bunner's trial, the prosecutor and the defense began to search for a venue that would accept Mr. Jones's case for trial. On January 4, 1995, the prosecutor wrote to Mr. Thigpen asking if he and Mr. Jones would agree to selecting an out-of-county jury

---

[16]   Although Georgia amended its capital sentencing statute to include life without parole as a sentencing option after Mr. Holland's murder had occurred and thus it was not a statutorily available sentence, Mr. Bunner took advantage of his right to waive in to the new sentencing scheme and avoided the death penalty in that manner. *Jones v. State*, 267 Ga. 592, 592 n.3 (1997).

and bringing it back to Ware County for trial.  Dkt. No. 101-4 at 173.  A few days

later, on January 9, 1995, the prosecutor confirmed that Mr. Jones would not agree

to having the jury return to Ware County, and suggested Glynn County and Charlton

County as possible venues.  *Id.* at 174.  A letter dated March 1, 1995, from the

prosecutor to Danny DeLoach, court administrator for the First Judicial

Administrative District and copied to Mr. Thigpen, Dkt. No. 126-2 at 6, indicated

that the prosecutor "spoke with John Thigpen on Monday in Folkston and he advised

me that both he and Ashley Jones agree for the change of venue to Glynn County,

which is acceptable to me."[17]  Dkt. No. 96-2 at 65.  When Glynn County was not

available because it was, at the time, fully booked with six scheduled capital trials

and two other pending requests for a change of venue, Dkt. No. 101-4 at 232, the

prosecutor and defense counsel "agree[d] on the following counties: (1) Emmanuel;

(2) Toombs; (3) Dodge," and requested that the court schedule trial in advance of or

following the Holland family's planned vacation to Alaska from 6/19 to 9/1/95.  Dkt.

No. 96-2 at 66 (Letter from prosecutor to Court Administrator DeLoach, dated

---

[17]  Mr. Thigpen apparently forgot that Glynn County had been an acceptable
venue change for him, as he testified in state habeas proceedings that he "didn't want
to go to Glynn County because that is notorious for death penalty."  Dkt. No. 100-1
at 66.

3/17/95).   A message note dated April 5, 1995, indicates that the requests to Emmanuel and Dodge Counties were turned down and Toombs County had three pending capital trails at the time.  Dkt. No. 101-4 at 178.  A few days later, on April 10, 1995, prosecutor Richard Currie memorialized his conversation with defense counsel expressing his frustration with finding an alternate venue and asking whether Coffee County would be agreeable to Mr. Thigpen and Mr. Jones.  Dkt. No. 101-4 at 179.  On April 18, 1995, Mr. Currie wrote to court administrator DeLoach that Coffee County was agreeable to everyone.  Dkt. No. 101-4 at 180.  At a hearing conducted on May 12, 1995, the trial court signed an order granting the change of venue to Coffee County.  Dkt. No. 96-2 at 77; Dkt. No. 126-2 at 4.  Mr. DeLoach, testifying at the hearing, noted that "[t]ransferring it within [our] own circuit is quite easier than outside." Dkt. No. 126-2 at 7.

Voir dire in Mr. Jones's case began on Monday, June 5, 1995, and ended on Wednesday, June 7, 1995.  *See* Dkt. No. 97-5 at 1.  During voir dire of the first panel, one panelist, Michael Maxwell, mentioned that prospective jurors had been discussing the case in the jury room, indicating that "everyone in there expressed an opinion, possibly, from what was being said," Dkt. No. 97-5 at 144, and that he had formed an opinion based on what was said "in a joking manner back there," Dkt. No. 97-5 at 135, and believed that the death penalty was appropriate if the charges were proven, Dkt. No. 97-5 at 145, 147.  *See* Dkt. No. 97-5 at 134-35, 137, 141-42,

144-47. Defense counsel moved for a mistrial, renewed the motion to change venue and asked to excuse the juror for cause. Dkt. No. 142-43. The court refused the mistrial and venue motions, and initially denied defense counsel's cause challenge to the juror, Dkt. No. 97-5 at 144, 145, though the court ultimately excused him, Dkt. No. 97-5 at 147. Defense counsel requested that the court "inquire into that jury room as to whether or not it's being discussed that my client is guilty before they come in here and take this stand, and, if that's so, that they be instructed not to discuss this case." Dkt. No. 97-5 at 147-48. The court called some jurors back into the courtroom[18] and, in accordance with the defense's request, the court admonished jurors not to discuss the case. Dkt. No. 97-5 at 147-48. The court also instructed the bailiff to round up all absent jurors and bring them back to the courtroom. Dkt. No. 97-5 at 149. Those jurors were questioned again by the parties at the conclusion of voir dire. Dkt. No. 97-9 at 134-45. Although the examination was brief and insufficient, it revealed that the prejudicial comments cultivated bias against Mr. Jones in at least two other jurors. *Id.*

---

[18] It is unclear which jurors were returned to the courtroom. Juror Maxwell testified that "they're gone" from the jury room, referring to unknown prospective jurors. Dkt. No. 97-5 at 142.

As voir dire of the remaining panels proceeded, the trial court, the district attorney, and defense counsel received further confirmation that Coffee County had been saturated with the same pretrial publicity and gossip that had necessitated a change of venue from Ware County. *See* Dkt. No. 97-5 at 66-67, 76-78, 92, 99-101, 103-104, 108, 111-13, 123, 170-72, 177-78, 182-183, 134, 137, 141-148, 177-178, 182-183, 134, 137, 141-148, 157, 134; Dkt. No. 97-6 at 51, 98-99, 105, 111, 113, 119,-120, 158, 160, 185; Dkt. No. 97-7 at 52-53, 102, 108, 124-125; Dkt. No. 97-8 at 68-71, 75-76, 92-94, 150-152, 158; Dkt. No. 97-9 at 49, 52-54, 62-63, 82-86, 91, 94, 101, 107, 112, 135-139. Nonetheless, neither the trial court nor defense counsel asked the prospective jurors any probing questions to discern the precise type and extent of their pretrial media exposure, nor did they ask the prospective jurors if they had engaged in or overheard any improper discussions as had occurred with the first panel. Most shockingly, trial counsel sat on his hands for much of voir and failed to ask a single question of twenty-four of the prospective jurors. *See* Dkt. No. 97-6 at 105, 135, 146, 182; Dkt. No. 97-7 at 58, 69, 111, 119, 132, 136; Dkt. No. 97-8 at 36, 66, 83, 91, 98, 106, 119, 132, 150, 154; Dkt. No. 97-9 at 62-63, 80, 112, 124. Of these twenty-four prospective jurors, eight of them ended up serving on the jury that convicted Mr. Jones and sentenced him to death.

Death qualification of the venire was similarly deficient.  Although the prosecutor successfully ended Mr. Thigpen's brief attempt to question jurors in the

33

first panel about their attitudes about the death penalty on the ground that the court alone was supposed to death qualify the jury, *see* Dkt. No. 97-5 at 81, the prosecutor himself routinely questioned jurors about their ability to impose the death penalty, without a single objection from the defense that such questioning was the court's responsibility. *See, e.g.,* Dkt. No. 97-5 at 71, 72, 93, 110, 122-23, 130, 140-41, 163,180-181; Dkt. No. 97-6 at 32-33, 43-44, 55, 64-65, 74-75, 83-84, 93, 100, 107-08, 122, 134-35, 145-46, 152, 160, 170-71, 180-81. The court, however, engaged in such bland and superficial questioning on the topic that jurors' attitudes toward capital punishment were mostly impossible to discern.

## C.    The Culpability Phase Of Trial.

The culpability phase of the trial began on Thursday, June 8, 1995, and ended with Mr. Jones's conviction on all counts of the indictment on Saturday, June 10, 1995.[19] The prosecutor gave an opening statement, explaining the state's case in detail, *see* Dkt. No. 98-1 at 15-39, and presented the testimony of thirty-five witnesses, many of whom were not cross examined by the defense. *See* Dkt. No. 97-5 at 9-15. The defense reserved opening statement until after the prosecution

---

[19]   On the morning of the first day of trial, the prosecutor nol prossed Count Three of the indictment, which charged Mr. Jones with interference with government property. *See* Dkt. No. 96-1 at 14; 6-2 at 128; 98-1 at 11.

rested, Dkt. No. 98-1 at 40; after the State rested, defense counsel gave a 60-word opening sentence.  Dkt. No. 98-3 at 129-330.  The defense then presented the testimony of only one witness, Mr. Jones, Dkt. No. 98-4 at 28-71.

Testimony from the state's witnesses tended to show the following.

### 1.    Mr. Holland's murder was preceded by a night of drinking and bedlam.

On the evening of March 30, 1993, Ashley Jones and Allen Bunner were hanging out with a bunch of other teenagers/young adults, including Jerri Cunningham Eunice (a/k/a JJ Cunningham), a former client of Mr. Thigpen's in a messy contested divorce.[20]  JJ testified that Allen's father had dropped him off at her house around 8:30 or 9:00 p.m.  Allen was wearing a dark bandana on his head and a white tee shirt; he had been drinking Lord Calder pretty heavily and was messed up, and was pretty rowdy.  Dkt. No. 98-2 at 162-63.  Later, they all left to pick up Mr. Jones where he was staying at Adam O's house.  Dkt. No. 98-2 at 146.  They stopped at Scooter Walker's house and stayed about half an hour, then left there and rode around a while in Buck Adam's car.  *Id.* at 147.  After driving around for a while, they stopped at the Flash Food in Jamestown.  Allen and Mr. Jones went in

---

[20]    *See* Dkt. No. 98-2 at 158; Dkt. No. 100-3 at 2-84.

the store and, about five minutes later, came running out of the store with four cases of beer, got in the car and told them to go. *Id.* at 148-49. They left fast and drove the long way back to JJ's house. *Id.* at 150. They were all drinking beer while driving around. They all returned to JJ's house and sat around drinking beer. *Id.* at 151-52. While they were hanging out, Michael Jones, Danny Strickland and Donnie Bennett came over. *Id.* at 152-53. They stayed maybe 30 minutes and drank beer, then left in Donnie's car, taking Allen and Mr. Jones with them. *Id.* at 152-53. Allen mentioned wanting to go to the beach. *Id.* at 154. JJ tried to get Allen and Mr. Jones to stay at the house because she didn't want them to get into trouble, but they left anyway, probably after 2:00 a.m. *Id.* at 154-55. *See also* Dkt. No. 98-2 at 111-15 (Danny Strickland testifying that they were partying with beer at JJ's house in the early morning hours of March 31, 1993, and then left to go to Danny Hiott's house).

Michael Jones testified that he had gone to JJ Cunningham's house in the early morning hours of March 31, 1993, with friends Donnie Bennett and Danny Strickland in Donnie's mother's car. Dkt. No. 98-2 at 175-76. When they arrived, JJ was there with some of her friends, including Mr. Jones and Allen. Dkt. No. 98-2 at 176. They arrived around 1 or 1:30 and left with Donnie, Danny, Mr. Jones and Allen around 2:30 or 3:00, going to Danny Hiott's house. Dkt. No. 98-2 at 179. They drove the car into a water hole and got stuck, and they woke up Danny Hiott to help get the car out. Dkt. No. 98-2 at 180. Mr. Jones and AJ were pushing and

36

pulling the car in the mud, and Allen had taken his white tee shirt off and wrapped it around his head to keep it from getting muddy. Dkt. No. 98-2 at 183-85. Mr. Jones and Allen left before Danny had pulled the car out, with one of them saying they were going to get a truck. Dkt. No. 98-2 at 181, 184-85. Michael saw them messing with a car on the side of the road, then walking off and later he heard a loud, old white Ford truck crank up and saw it drive away. Dkt. No. 98-2 at 181-82.

Rudolph Melton, another former client of Mr. Thigpen's, Dkt. No. 100-3 at 96-99, testified that his white Ford truck was stolen from the front yard around 5:00 a.m. on March 31, 1993, Dkt. No. 98-2 at 99. Mr. Melton would leave his key in the ignition, so anyone could crank it and drive off. Dkt. No. 98-2 at 100. It had an exhaust leak and was a little loud. *Id.* While he did not know Mr. Jones, he had known Allen Bunner about seven years; Mr. Bunner had worked for him trimming trees and knew he left his key in the truck. Dkt. No. 98-2 at 101-02, 109. He did not give either Mr. Jones or Mr. Bunner permission to take his truck. Dkt. No. 98-2 at 101. When he got the truck back two to three weeks later, it was drivable, but needed a battery charge for four to five minutes. Dkt. No. 98-2 at 101-102. It was missing a sledge hammer and a half-inch ratchet wrench and four chain saws, though two of the chain saws were returned by the Ware County Sheriff's Office. Dkt. No. 98-2 at 105.

37

Donna Turner Hill[21] testified that she was staying at the home of Christina and Adam Q. French on the night of March 31, 1993, sleeping on the couch, when she was awakened by a knock on the door and someone coming in.  Dkt. No. 98-2 at 187-88.  She claimed that it was Ashley Jones, whom she had met that day, and that she had "heard that he was going to change clothes, went back there to change clothes" for some reason, and said she saw him wearing different clothes when he left.  Dkt. No. 98-02 at 188-89.  Ms. Hill testified that she heard him say he needed identification and that another guy was with him, whose name, she was told, was Allen.  Dkt. No. 98-2 at 189.  This was after 2:30 in the morning.  *Id.*  Their vehicle was loud, but she did not see it.  *Id.*   Although Ms. Hill had testified on direct examination that Mr. Jones was wearing different clothes when he left, she testified on cross examination that she could not tell what anyone was wearing because she was asleep and could not remember.  Dkt. No. 98-2 at 192-93.  Allen and Mr. Jones were there only a few minutes.  Dkt. No. 98-2 at 193.

> **2.**     **Had Mr. Thigpen competently examined the state's eyewitnesses, he could have shown that the evidence is**

---

[21]   Mr. Thigpen had represented Ms. Hill's father in his divorce case.  Dkt. No. 98-2 at 190.

**wholly equivocal about which defendant inflicted the
fatal injuries and had a more culpable mental state.**

Keith Holland's murder occurred after this evening of drinking and mayhem, shortly after 5:00 a.m., on March 31, 1993. *See* Dkt. No. 98-3 at 120. The cause of death was blunt force facial, cranial and cerebral injuries inflicted by two different weapons consistent with a sledge hammer and a ratchet wrench, with the fatal injuries inflicted by the sledge hammer. *See* Dkt. No. 98-1 at 166-74. There were a total of six blows from the two instruments, with the fatal injuries being the non-survivable injuries to the jaw, the side of the face and the left side of the head caused by the sledge hammer. *Id.* at 173-74.

At the time of the assault, it was dark outside and the only illumination came from the Holland's front porch and the headlights of the victim, Keith Holland's pickup truck. *See, e.g.*, Dkt. No. 98-1 at 79, 84, 125; *see also* Dkt. No. 98-2 at 65-66 (testimony from detective sergeant Carl James that it was still dark when he arrived at the scene around 5:20 a.m.). All but one of the witnesses had just been woken up by sounds associated with the perpetrators' actions – a knock at the Holland's front door and the barking of neighbor Sally Kimbrell's son's dog. Dkt. No. 98-1 at 69-70 (Mamie Holland's testimony that she was awakened by knocks on the front door); Dkt. No. 98-1 at 116 (Donald Holland's testimony that loud knocking on the door woke him up); Dkt. No. 98-2 at 29-30 (Sally Kimbrell's testimony that the barking of her son's dog woke her up).

39

The eyewitness accounts at trial were not entirely consistent regarding which individuals were attacking the victim and who was doing what, perhaps because events were seen in the dark by witnesses abruptly awakened, and were recalled after both the passage of time and dissemination of significant publicity and gossip surrounding the case.  Suggestions from some of the witnesses that one of the perpetrators had blond hair, for instance, is illustrative of the confusion surrounding what the witnesses actually saw, as both Mr. Jones and Mr. Bunner have dark hair, although Mr. Bunner's hair was shorter.  *See, e.g.*, Dkt. No. 98-6 at 108-09 (mug shots of the defendants, introduced as State Exhibits 117 and 118).  *See* Dkt. No. 98-4 at 92-93 (prosecutor's closing argument conceding equivocal nature of evidence regarding hair color and whether perpetrator seen at the Holland's front door was Mr. Jones wearing a white cap or Mr. Bunner wearing a white t-shirt on his head).

The state presented eyewitness testimony from several members of the victim's family – his wife, Mamie Holland,[22] his father-in-law Johnny Hickox,[23] and

────────────────────

[22] Mrs. Holland testified that she was awakened earlier than normal by a loud knock on the door, and that the "short, stocky white boy" she saw through the peephole told her he needed a jump for his truck. Dkt. No. 98-1 at 69-71. She returned to the bedroom at 5:05 a.m. to wake her husband, who dressed and went outside, and then she went about doing other things. Dkt. No. 98-1 at 71-72. After about ten minutes, she looked outside, saw her husband standing by the driver's side of a white truck looking under the hood the engine, and watched as someone came from behind him from her husband's truck and struck him with a sledge hammer, causing her husband to fall to the ground. Dkt. No. 98-1 at 73. Mrs. Holland said she saw the man's face, that he was tall and lanky, had dark hair, and was almost as tall as her husband, who was 6'3.5" tall. Dkt. No. 98-1 at 73, 76. According to Mrs. Holland, the man on the porch, seen only through the peep hole, was short and stout, and seemed to have something white on his head or was blond, while the one on the road was tall and lanky. Dkt. No. 98-1 at 77. The man kept hitting her husband, and then everything went dark. Dkt. No. 98-1 at 77-78. She called 911, and both her children woke up. Dkt. No. 98-1 at 78. Although her son wanted to go outside, she would not let him. Dkt. No. 98-1 at 78. Later, her father, Johnny Hickox came over and, because it was still dark, she asked her father to shine the light where she had seen her husband fall. Dkt. No. 98-1 at 79. Her husband's truck was not there. Dkt. No. 98-1 at 80. Her father and son Donald attempted to assist her husband until an ambulance came and transported him to the hospital. Dkt. No. 98-1 at 80-81. Ms. Holland identified Mr. Jones as the individual who struck her husband with the sledge hammer. Dkt. No. 98-1 at 81-82.

[23] Mr. Hickox, who lived 100 feet from the Holland's home, testified that he saw a chunky young fellow on his daughter's porch who seemed to have something white on his head. Dkt. No. 98-1 at 95-97. That did not raise any suspicions as the Hollands had a lot of visitors. Dkt. No. 98-1 at 98. He went to check when he heard the sound of metal on metal and saw one truck with its lights on headed to the other one. Dkt. No. 9801 at 99. In the lights of the one truck, he a young, kind of slender man, come around the truck with a long-handled object like an axe or stick and swing it. Dkt. No. 98-1 at 100-01. He thought the man was knocking a chain off the

41

his son, Donald Holland,[24] but only one witness, neighbor Sally Kimbrell testified to seeing the entire attack and both of the perpetrators striking the victim.  Although Ms. Kimbrell's testimony was the most critical, trial counsel's conflict left him ill prepared to examine his former client,[25] or the remaining eyewitnesses.

---

bumper or something.  *Id.*  Then he heard his daughter start screaming and called 911, which advised it had already been called in, then got his flashlight and headed to the truck. Dkt. No. 98-1 at 102-03.  Mr. Holland's red truck was gone.  *Id.*  He attempted to assist Mr. Holland by turning him on his side and sent his grandson to fetch a towel to keep him away.  Dkt. No. 98-1 at 104.  On cross, Mr. Hickox testified that he saw two people out there and could tell there was someone else in between the two trucks.  Dkt. No. 98-1 at 108.  Although he had not recognized his son-in-law until he went out to the truck, he thought Mr. Jones looked like the person doing the swinging because he was "tall and lanky."  Dkt. No. 98-1 at 108.

[24] Donald Holland testified about being awakened and seeing through the blinds "a real shorter person, stocky" he did not know, but who was not Mr. Jones. Dkt. No. 98-1 at 117, 121-22. After being awakened, he kind of dozed off until he heard his mother screaming.  Dkt. No. 98-1 at 122.  He jumped out of bed, ran to the living room and then to his parents' room to get the gun because his mother was screaming that someone had hit his father.  *Id.*  He was unable to bullets, while his mother was on the telephone with 911, screaming hysterically.  Dkt. No. 98-1 at 123.  He was on the phone with 911 but does not know what he said.  *Id.*  He went outside right after he got off the phone, met his grandfather on the carport and they went out to where his father was.  Dkt. No. 98-1 at 122-23.

[25]  That Mr. Thigpen labored under a conflict of interest due to his prior representation of Ms. Kimbrell was readily apparent in his lackluster efforts to impeach her.  Not only did the cross-examination lack the solemnity that should attend a capital trial, as Mr. Thigpen and the witness repeatedly referred to each other by first name and spoke as though they were having a casual interaction, *see, e.g.*, Dkt. No. 98-2 at 48 (explaining that she now referred to the victim as Keith, but "[a]t that time I did not know who he was, John. . . .  I don't know that, John"); *id.* at 50

Ms. Kimbrell testified that on the morning of March 31, 1993, she was awakened by her son's dog, who was barking and growling at the window.  Dkt. No.

_____

(explaining that she associated one of the perpetrators with her son's size and height "and you know his size and height, John"), but the witness expressly construed Mr. Thigpen's tepid cross-examination as a personal attack on her:

A.     He looked bigger because of his size.  I didn't go out and measure neither one of them.

Q.     Well, I understand that, I understand that, I know that, and I'm not trying to pick on you, Sally, okay?

A.     Yes, you are, John.  You're being mean to me.

Q.     I'm just trying to defend my client, Ms. Kimbrell.

A.     I know that, but have some pity's sake for the people that watched it, too, John.  Have sympathy for us, too.

Q.     I apologize if you think I'm being mean to you, but I'm not, really.  I'm just trying to determine – because this is a critical point here –

A.     It is.

Q.     – and you are the critical witness, okay?

A.     But you can't stop the truth of what happened.

Q.     Well, I'm not trying to.

Dkt. No. 98-2 at 51.  Within a few lines, while describing the person who got out of the truck to beat the victim, Ms. Kimbrell was in tears, *see* Dkt. No. 98-2 at 52, though whether this was due to the trauma of her memory or her frustration at being questioned by her former attorney is unclear.

43

98-2 at 29-30.  When she looked out, she saw a white Ford truck with its hood raised.[26]  Dkt. No. 98-2 at 30.  She did not see anyone out there at the time, but continued to watch as headlights appeared from another vehicle, which pulled up in front of the truck about 8-10 feet away.  Dkt. No. 98-2 at 31.  She did not recognize either vehicle.  Dkt. No. 98-2 at 30, 31.  Two people she did not recognize got out of the truck that drove up and went directly to the Ford, leaving the smaller truck's lights on.  Dkt. No. 98-2 at 31-32.  While the two were looking under the hood of the truck, she saw someone hit the tall one from behind.  Dkt. No. 98-2 at 32.  She could not tell what the man was using to hit or how many times, but it was several. Dkt. No. 98-2 at 32-33.  The victim wobbled between the two men – the one who had gotten out of the truck with him and the one who struck him from behind.  Dkt. No. 98-2 at 33.  The one who had gotten out of the truck with the victim reached for something under the white truck and started hitting too, once again an unknown

---

[26]   State's Exhibit 4 (Dkt. No. 98-6 at 49), shows a frontal view of the white Ford truck with its hood open.  At trial, Detective Sergeant Carl James explained that he took the photograph with US 1 to his back, and that Ms. Kimbrell's driveway and residence were to the left while the Braganza Loop looped around to the right behind the truck.  Based on this description, the passenger side of the white Ford pickup truck would have been facing Ms. Kimbrell as she watched events from her home while, conversely, the driver's side of Mr. Holland's truck, which was facing the front of the white truck, would have been facing Ms. Kimbrell.

number of times, but it was several.  *Id.*  The one who hit first was shorter than the person he was hitting and appeared the size of Kimbrell's son, who is 5'7" and weighs about 140 or 145 pounds.  *Id.*  The other man who was hitting was stouter and looked a little shorter, but probably was not.  Dkt. No. 98-2 at 34.

When the first blows were struck, Ms. Kimbrell called 911 and got through. Dkt. No. 98-2 at 34.  The operator had her describe exactly what she was seeing and she did, the whole time.  *Id.*  When the men stopped hitting him, the stouter one went to the passenger side of the small truck and the taller one went to the driver's side but, for some reason, turned around and hit the victim several more times.  Dkt. No. 98-2 at 34-35.  The man turned around before getting back in the truck and looked at Ms. Kimbrell, or the house, and then got in the truck and backed out and left.  Dkt. No. 98-2 at 35.

On cross examination, Mr. Thigpen attempted to impeach Ms. Kimbrell's testimony with some, but not all of her prior inconsistent statements, but was unable to do so in a coherent manner.[27]  On the morning of the crime, Ms. Kimbrell had

---

[27]  In Georgia, "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes."  *Gibbons v.* State, 248 Ga. 858, 862 (1982).

spoken with Cpl. Jack Bennett, who wrote in the Initial Report that she had seen "what she thought were 2 W/M's getting into Holland's truck and driving up Braganza Lp. Towards US 1" and that "one of the W/Ms got back out of the truck and went back to Holland and hit him 2 or 3 more times with an unknown object." Dkt. No. 100-2 at 199.  Nonetheless, at trial, Ms. Kimbrell insisted that she had only given the sheriff's office her name and address and probably her phone number that day and testified that she did not give any statement until a couple of weeks later when she returned to town and provided a tape-recorded statement, Dkt. No. 98-2 at 35-36.  Mr. Thigpen made no effort to refresh her memory with the report authored by Cpl. Bennett, nor did he call Cpl. Bennett (who was not called by state) to testify regarding his initial interview of Ms. Kimbrell the morning of the crime.[28]

---

[28]  Cpl. Bennett was one of the first officers at the scene and was the first to speak with both Ms. Kimbrell and Donald Holland.  Dkt. No. 98-1 at 46-47; Dkt. No. 102-2 at 9.  In co-defendant Bunner's trial, he testified that he spoke with Ms. Kimbrell the morning of the crime because she had made the original 911 call and that he "got just as much information as [he] could as far as the kind of truck that Mr. Holland had owned, and which way they had left, and [he] got as much information on the suspects as [he] could."  Dkt. No. 102-2 at 12-13, 17.  He passed her name along.  Dkt. No. 102-2 at 17-18.  When recalled by Mr. Bunner's attorney, Cpl. Bennett admitted that all he could remember of what Ms. Kimbrell had told him about the suspects was that they were two white males and that one of them had gotten back out of the truck and hit Mr. Holland two or three more times with an unknown object.  Dkt. No. 102-2 at 58.  He further agreed with defense counsel Mr. Solomon that he was trained to take statements while they were fresh "because the

Mr. Thigpen also read into the record Ms. Kimbrell's recorded statement to Sgt. Carl James, taken on April 20, 1993.[29]  Dkt. No. 98-2 at 36-42.  After he had read the lengthy statement, Mr. Thigpen did not ask her any questions about what she had said in the statement and how it differed from her testimony on direct examination, even though there were material differences between her trial testimony and her prior recorded statement.

In the statement she gave on April 20, 1993, Ms. Kimbrell stated that she "never" could see "the other one on the other side of the truck . . . that good," because he "was hid on this side of the [white] truck, standing back to where he was into the dark," and that she now knew "it was Keith and the blond headed one that went up there because *they said the blond headed one was the one that went to their door*." Dkt. No. 100-2 at 195 (emphasis added).  According to this statement, the one with the dark hair was driving and, before getting into the truck, came back to beat the victim again. Dkt. No. 100-2 at 195-97.  When the dark-haired one "turned around to walk to the driver's side, that put him facing my bedroom . . . and the truck lights

_____

passage of time not only makes us forget, but then other people and what they say sometimes interferes with what we think we saw . . . ." Dkt. No. 102-2 at 60-61.

[29]  A copy of the statement is in the record at Dkt. No. 100-2 at 193-97.

was right onto him." Dkt. No. 100-2 at 195.  Ms. Kimbrell stated that she could not tell if both were beating the victim because she "couldn't' tell what was happening from the other side," but she knew there were two.  Dkt. No. 100-2 at 195-96.  She was focused on the one who was driving, with the dark hair, and "assum[ed]" the other who got in the passenger side had blond hair but "I don't even know that" because "they said that a blonde headed one come up to the door."  Dkt. No. 100-2 at 96.  She knew that the dark-haired one was hitting the victim but her view was blocked on the other one and "you couldn't see if the other one was actually hitting or holding or what. I couldn't tell you."  Dkt. No. 100-2 at 197.

Mr. Thigpen made no effort to elicit from Ms. Kimbrell that her statement on April 20, 1993, indicated that she only got a good look at one of the men, the one who drove the truck away, and that her report that the other man had "blond hair" was based on hearing from others that the person on the porch had blond hair.   Since neither Mr. Jones, nor Mr. Bunner, has blond or light hair, the hearsay nature of her knowledge was a critical fact to elicit, but Mr. Thigpen left it buried in his lengthy rendition of Ms. Kimbrell's recorded statement. Nor did Mr. Thigpen point out that Ms. Kimbrell's view of what was happening was obscured by the truck, Dkt. No. 100-2 at 195-96, or that Ms. Kimbrell's ability to see in the dark was so impaired that she had not recognized her neighbor, Keith Holland, and only afterwards learned who the victim was – important details that could well have been lost on the jury.

48

Mr. Thigpen made no attempt to inform the jury, during Ms. Kimbrell's testimony or otherwise, that Ms. Kimbrell had reported, in a tape-recorded interview dated May 13, 1994, that she had seen Mr. Bunner in court shortly before and recognized him as one of the perpetrators:

> Lt. O'Neal:  Okay Mrs. Kimbrell you was starting to tell me that when you was in court the other day that you saw Bunner come into the courtroom.
>
> Mrs. Kimbrell – Yes.  It was just like I was watching all of it again out there.  I didn't know if I'd even recognize him or anything – not audible- and he was hitting with something and he had reached under the hood of the truck and picked up something and started hitting on the guy. – not audible –

Dkt. No. 100-2 at 192.  Although Ms. Kimbrell, in her May 13, 1994, recorded statement, identified Mr. Bunner as the individual who reached for something under the hood for the object he used to strike Mr. Holland after the other boy came up behind and started hitting Mr. Holland, she had previously stated, in her April 20, 1993 statement, that she only got a good look at one of the perpetrators, the dark-haired driver, who "went back and hit [Mr. Holland] because see whenever he turned around to walk to the driver's side that put him facing my bedroom . . . [a]nd the truck lights was right onto him."  Dkt. No. 100-2 at 195.  The inconsistencies in these statement would have given Mr. Thigpen a solid basis to suggest, through a competent cross-examination of Ms. Kimbrell, that when she had identified Mr. Bunner after court, she was likely identifying the only perpetrator she had actually

49

seen well, the person she viewed in the truck's headlights as he walked in her direction to the driver's side of Mr. Holland's vehicle after he had returned to hit Mr. Holland again.  Instead, Mr. Thigpen did not even mention the statement in which Ms. Kimbrell had identified Mr. Bunner as one of the perpetrators.

### 3. Additional prosecutorial evidence at the guilt phase.

The State presented an assortment of witnesses who spoke about Mr. Jones's and Mr. Bunner's arrests in Florida later that day and collecting evidence at the scene of the crime and elsewhere.  No forensic evidence connected either Mr. Jones or Mr. Bunner to the crime, although four small specks of some type of blood were found on Mr. Jones's shoe; the sample was too small even to determine whether the blood was human.  Dkt. No. 98-3 at 102-05.  The prosecutor also was permitted, over objection, to present evidence that Mr. Jones and another inmate had briefly escaped from the exercise yard at the Ware County Sheriff's Department around 4:00 p.m. on December 9, 1994, and were captured nearby shortly thereafter.[30]  Dkt. No. 98-3 at 105-119.  The prosecutor closed its case with testimony of the 911 dispatcher and

---

[30] Mr. Thigpen objected at the bench to testimony regarding the escape on the ground that it occurred at least 18 months after the crimes for which Mr. Jones was on trial.  *Id.* at 107.  The court overruled the objection, observing that "an escape is a form of flight."  *Id.* at 107-08.

playing of the 911 audiotape over Mr. Thigpen's hearsay objection. *Id.* at 119-24.

Subject to tendering all its exhibits, the State rested. *Id.* at 124.

### 4. The defense case in the culpability phase.

After the state had rested, Mr. Thigpen gave the following opening statement, in its entirety:

> Ladies and gentlemen, there weren't but two people out there on March the 31st, 1993, who really know what went on. When we come back after we take a recess, you're going to get to hear the rest of the story, because my client is going to get on the stand and tell you what his version of it is.

Dkt. No. 98-3 at 129-30. Mr. Thigpen presented the testimony of one witness, Mr. Jones, and then rested. Dkt. No. 98-4 at 28-72.

Mr. Jones testified that on the evening of March 30, 1993, JJ Cunningham and others, including Allen Bunner, had come to the home of his friends Adam O and Christina French, where Mr. Jones was staying at the time. Dkt. No. 98-4 at 29-30. He was wearing a green Miami Hurricane tee-shirt, some white shorts and, as he typically did, a white Miami Hurricane hat turned around backwards. *Id.* at 31. They all stayed at the house for a while, drinking and talking, and then Mr. Jones left in Bucky's car with JJ and Mr. Bunner, whom Mr. Jones had must met. *Id.* They drove to a Jiffy Store in Jamestown, where Mr. Jones and Mr. Bunner stole four cases of beer, and then they all drove to JJ's house, taking the long route. *Id.* at 31-33. They all stayed at JJ's for a while, drinking, and then were joined by Donnie Bennett,

51

Michael Jones and Danny Strickland, who wanted to ride to the home of another friend, Danny Hiott. *Id.* at 33. Everyone was drinking. *Id.* at 34. In the drive at Danny's house, the car they were in got stuck in a big mud hole at the entrance, and they had to get out. *Id.* Mr. Jones and Mr. Bunner got in the mud hole and tried to lift the car out, and Mr. Bunner took his shirt off and had a bandana on his head. *Id.* They could not get the car out, and Mr. Jones and Mr. Bunner decided to leave and go back to JJ's house. *Id.* at 35. They ended up taking a truck from Rudolph Melton, whom Mr. Jones did not know. *Id.* Mr. Bunner, however, told him that he used to work for Mr. Melton and that he usually left his keys in the vehicle. *Id.* They took the truck, which had the keys in it, and AJ drove it back to town, where they stopped at Adam O's house so he could change out of his muddy clothes. *Id.* at 36. Mr. Bunner did not have clothes and did not change. *Id.*

Mr. Bunner drove the truck when they left. *Id.* at 37. They did not drive through town, thinking that perhaps the truck would have been reported missing, and decided to go on back ways to take chainsaws they saw in the back of the truck to Florida to sell, as Mr. Bunner wanted to go to the beach. *Id.* At some point, the truck shut off when they were in the middle of a dirt road after they had come up off the tracks. *Id.* at 38. Mr. Jones knocked at the door of the house that had the light on, wearing a dark long-sleeved shirt and a pair of blue jeans and his Miami hat, while Mr. Bunner went to the base of the steps. *Id.* at 38-39. He told the woman

52

who responded to his knock that they needed help with their truck and she said she would get her husband. *Id.* at 39-40.

Mr. Jones and Mr. Bunner did not wait at the door and started walking to the white truck, which was 60-70, maybe 100 feet from the house, down the road a little. *Id.* at 40.  While waiting on Mr. Holland at the truck, Mr. Bunner told Mr. Jones he didn't think the truck would crank and said that if it would not, they should take the other truck from Mr. Holland, and Mr. Jones agreed.  *Id.*  Mr. Jones prepared to do so by getting a ratchet wrench from the truck.  When Mr. Holland pulled up in front of the truck, Mr. Jones hit him with the ratchet wrench and Mr. Holland fell down. *Id.* at 41.  The blow was not hard enough to hurt him and Mr. Jones hit him once again until he fell down, giving Mr. Jones enough time to get in his truck and leave. *Id.*  Mr. Jones threw the ratchet wrench on the ground.   *Id.* at 44.[31]

While Mr. Holland was on the ground, Mr. Jones and Mr. Bunner got the four chain saws out of the back of the white truck and put them in Mr. Holland's truck. *Id.* at 42.  Mr. Jones got in the passenger side and Mr. Bunner started to drive away, but slammed on the brakes, jumped out, and grabbed a sledge hammer from the back

--------------------

[31]   The ratchet wrench was found at the Braganza Loop scene about 12 inches from the right front wheel of the white Ford pickup truck, and taken into evidence. Dkt. No. 98-2 at 71-72.

of the truck.  *Id.*  Mr. Jones saw that Mr. Holland had gotten back up and was standing, bracing himself on the other truck, apparently addled.  *Id.* at 43.  Mr. Jones saw Mr. Bunner hit him with the hammer one time, and Mr. Holland fell; then Mr. Bunner hit him a couple more times and ran back, throwing the hammer in the back of the truck.  *Id.*  Mr. Jones did not know that Mr. Bunner planned to jump out and hit Mr. Holland, but agreed the two had an agreement to take the truck and that he hit Mr. Holland with the wrench.  *Id.*  Mr. Bunner drove the truck as they left the scene, and they went to a wooded area where Mr. Bunner threw out the sledge hammer, and then drove to Fernandina Beach, Fl.  *Id.* at 44-45.  Mr. Jones's testimony about calling JJ Cunningham and Mr. Bunner's father, pawning some of the chain saw and being arrested was consistent with the evidence the state had elicited at trial.  *See id.* at 45-48.  Mr. Jones denied beating Mr. Holland with the sledge hammer and testified that he was in Claxton at the time Donald Holland stated he and his father had helped to pull Mr. Jones out of a ditch in the fall of 1992.[32]  *Id.* at 48-49.

_____

[32] Mr. Jones's testimony about his commitment to Claxton at the time Donald Holland testified that he and his father had helped pull his vehicle out of a ditch in the fall of 1992 was in fact corroborated by evidence the State introduced at sentencing.  Donald Holland had testified that sometime during the fall the year prior to his father's death, *i.e.* the fall of 1992, Mr. Jones had knocked on the door of his house sometime after midnight seeking help, and that Donald and his father, Keith

Following Mr. Jones's testimony, the defense rested. Dkt. No. 98-5 at 138. The charge conference addressed the state's proposed instructions, as defense counsel had not proffered any. Dkt. No. 98-4 at 17. The parties agreed to recess for the evening and court resumed the following day, June 10, 1995, with the state's closing argument, Dkt. No. 98-4 at 85-117, followed by the defense summation, Dkt. No. 98-4 at 118-29.

───────────────────

Holland, had helped pull Mr. Jones's vehicle out of the mud. Dkt. No. 98-1 at 119-21. At trial, Mr. Jones's mother, Brenda Jones, testified in the sentencing phase that she and her husband had made arrangements with the lawyer representing Mr. Jones on truck-theft charges to have him sent to Claxton, a boot camp, for a period of time, but Mr. Thigpen did not elicit when this occurred. Dkt. No. 98-5 at 122-23.

In the sentencing phase of trial, however, the State introduced records from the theft case (State's Exhibit 145) indicating that on July 2, 1992, Mr. Jones and a co-defendant were indicted on three counts of theft for stealing three used pickup trucks from George Dempsey Ford on March 18, 1992, and that on August 21, 1992, he was allowed to plead guilty as a first offender. *See* Dkt. No. 98-7 at 18-20. That same day, Mr. Jones was sentenced to serve at least five years on probation, fined and required "to be admitted to Claxton Detention Center for 90 to 120 days and receive Drug and Alcohol counseling while at center." *Id.* at 22. Although Mr. Thigpen was on notice that the prosecutor intended to introduce evidence of the thefts at sentencing and had been given an (incomplete) package of materials related to that offense, *see* Dkt. No. 96-1 at 243-60, Mr. Thigpen did not obtain records of Mr. Jones's sentence and did not make any effort to put this evidence before the jury, even though it corroborated his client's testimony.

The jury retired to deliberate after the court's instructions, Dkt. No. 98-4 at 130-145.  Shortly after deliberations began, the jury sent out a note asking about the legal status of co-defendant Bunner and whether "Allen and Ashley [are] both right-handed or left-handed?" and requesting the 911 tape and a tape player.  Dkt. No. 98-4 at 151-52.  The court instructed the jury they were not to consider Bunner's legal status and had to rely on their own memories about the evidence.  *See* Dkt. No. 98-4 at 151-54.  With respect to the request for the 911 tape, the prosecutor had no objection to the jury getting the tape and a means to view it, and the defense "request[ed] that you do it," Dkt. No. 98-4 at 152, but the court withheld providing the tape at the time because of confusion about whether additional material was on the tape that had not been played to the jury.  Dkt. No. 98-4 at 152-55.  The jury again asked about the 911 tape, and the court agreed to replay it in the courtroom.  Dkt. No. 98-4 at 158.  After deliberating approximately 4.5 hours, the jury returned with verdicts of guilty on all counts.  Dkt. No. 98-4 at 149-59.

### D.    The Sentencing Phase of Trial.

Court resumed on Monday, June 12, 1995, for the start of the sentencing phase of trial. Before the jury was brought in, the trial judge announced that the number of jurors had dropped to eleven and two alternates because Juror Angela Blevens "was excused by Dr. Steven Burke at the emergency room of Coffee Regional Memorial Hospital on June the 10th, 1995, and the excuse simply says, 'Excuse above person

from jury duty since it will be detrimental to her mental health.'"  Dkt. No. 98-5 at 28.  The court explained that it had "acted upon that advice from the doctor, and . . . told the sheriff of Coffee County to excuse that juror."  *Id.*  That happened five minutes after the court arrived home Saturday evening "so her problems occurred shortly after she left the jury box."  *Id.*

The court announced that Alternate No. 1, Mr. Batten, would take her place and had the note filed into the record.  *Id.*, Dkt. No. 96-2 at 114.  Mr. Thigpen did not comment on or object to the court's announcement in any fashion.  The court addressed various evidentiary and administrative matters before the newly constituted jury was brought in.  Dkt. No. 98-5 at 29-49.  Among other matters, the trial court overruled Mr. Thigpen's objections to both the State's intended introduction of Mr. Jones's first offender plea to charges he stole three trucks from a used car lot in March 1992 and the State's intent to introduce a custodial statement Mr. Jones made about the crime to a detective, and brushed aside the prosecutor's suggestion that perhaps the court should conduct a *Jackson/Denno* hearing regarding the statement's admissibility, noting that "I will let you offer anything you want to offer . . . in connection with this charge."  Doc. 98-5 at 31-35.  The court also overruled other objections to the admission of other crimes evidence.   Doc. 98-5 at 36-38.  The prosecutor noted that he would not be calling Jeremy White or Craig Gaskins to testify about statements Mr. Jones had allegedly made to them because

57

"Jeremy White requested that I offer him some consideration for his testimony in this courtroom, and I refused to do that,"  as had another jailhouse snitch, Craig Gaskins.  Dkt. 98-5 at 38-40.  The court noted that a couple of prisoners, Jerome Wilkins and Allen Bunner, had been brought to court, and the prosecutor explained that he planned to call Mr. Wilkins and that Mr. Thigpen had indicated he would be calling co-defendant Buner to testify; Mr. Thigpen had no objections to either inmate appearing before the jury in prison garb and leg and/or hand irons.  *Id.* at 40-42.  The court further had the prosecutor make a proffer of Mamie Holland's anticipated victim impact testimony.  *Id.* at 47-49.

The jury was brought in at 9:33 a.m. and Mr. Batten was made a regular member of the jury.  *Id.* at 49-50.  The court gave preliminary instructions and then the State proceeded to present evidence, without either party making an opening statement.  *Id.* at 50-51. The State presented several witnesses in aggravation, who testified regarding Mr. Jones's prior conviction for theft of three vehicles, his non-violent escape from the exercise yard at the jail in December 1994, around 4:00 p.m., with another inmate, Jerome Wilkins, and a couple of incidents at the jail where Mr. Jones had gotten into physical altercations with guards when he refused to comply with their orders.  *Id.* at 51-86.  During Mr. Thigpen's cross-examination of Jerome Wilkins, who briefly escaped from jail with Mr. Jones, the prosecutor interrupted

Mr. Thigpen's efforts to impeach the witness, asking to approach, and the following exchange took place at the bench:

> Mr. Currie: The proper way to impeach this witness is by certified copy –
>
> The Court: He knows that.
>
> Mr. Currie: I have no objection to him going into what he was in jail for, –
>
> The Court: I'm not going to let him –
>
> Mr. Currie: – but any other prior record –
>
> The Court: I'm not going to let you replay the sentence for which he's been convicted.  You've got your documents to impeach him.
>
> Mr. Thigpen: No, sir.
>
> The Court:  You don't?  Okay.

Dkt. No. 98-5 at 36.  The court observed that it would "let him go into what he's in prison for even without – * * * – even though impeachment requires the introduction of a certified copy of the documents of conviction, *and he knows that,* but he is entitled to let this jury know the present occupation of this witness."  *Id.* at 64.  Mr. Thigpen made no effort to demonstrate how unsuccessful the escape attempt had been, as the inmates were recaptured within minutes.  *See* Dkt. No. 98-03 at 115-19; *see also* Dkt. No. 96-2 at 2 (Investigative Report reflecting that escape was called in at "approx. 1610 hrs on 12-9-94" and that Jerome Wilkins was caught "at 1615 hrs,"

while Mr. Jones "was apprehended at 1616 hrs behind the City Water Department 512 Alice Street").

The State completed its penalty phase presentation with the emotional victim impact testimony of Mamie Holland, who was largely led through her testimony by the prosecutor during her direct examination, which the court reporter described at times as "sobbing" or "WITNESS CRYING." Dkt. No. 98-5 at 88-90. Her testimony ended with the prosecutor's question, "Do you have any fear?" and her response:

> A.    Yes, I do.  I fear for my family's life.  I fear for my daughter and my son and myself (sobbing)
>
> Q.    Do you fear he will return?
>
> A.    Yes, sir.

Id. at 90. Although defense counsel had no questions, Mr. Thigpen did move for a mistrial at the close of her testimony, arguing that "the statements as made by Mrs. Mamie Holland went far and beyond that which the law says can go" and was far more "out of hand" than it had been during her earlier proffer. Id. at 91. He also argued that her testimony was largely in the prosecutor's words. Id. at 92. The court denied a mistrial and the prosecutor indicated the state planned to rest. Id. at 92-93.

Mr. Thigpen presented the testimony of six lay mitigation witnesses and his client. All told, the direct examination of the witnesses other than Mr. Jones occupies less than 21 pages of transcript, while the prosecutor's cross examination

takes up another 13 transcript pages.  *See* Dkt. No. 98-05 at 93-128.  Faye Mosely testified that when Mr. Jones was 14, he had volunteered at the nursing home where she worked and that he was worth saving.  *Id.* at 93-94.  Sharon Coleman testified that she had been Mr. Jones's Sunday School teacher and worked with him in the "gifted" program when he was in 5th and 6th grade, and stated he was worth saving. *Id.* at 97-99.  Gail Guill testified that she had known Mr. Jones for years through his involvement in church programs and mission trips to help inner-city children, that he had stayed with her for a time after he moved out of his parents' house, that he was in the "gifted" program and "one of the brightest kids I know," and that he was worth saving as "a fine young man" who "maybe got channeled in the wrong direction" but has good in him.  *Id.* at 101-05.  Leon Thigpen (no relation to defense counsel) testified that he had known Mr. Jones his whole life through family friendships and church, and that Mr. Jones had been involved in several church activities, such as youth group, drama and choir, and that he was worth saving and could do good in a prison setting working with other inmates; he begged the jury not to impose the death penalty.  *Id.* at 108-11.   Robert Blankenship, Mr. Jones's maternal uncle and a minister, testified that he had known Mr. Jones since birth and noted that he gives "human worth to every individual" and believed Mr. Jones "has a deep personhood," that Mr. Jones "has latent potential" that "should be given the

opportunity to be fulfilled" and that justice should be blended with mercy." *Id.* at 114-16.

Mr. Jones's mother, Brenda Jones, was the only mitigation witness who did not provide essentially perfunctory testimony, though her testimony was far from detailed or in depth. She testified that she had been married to Mr. Jones's father Randy Jones almost 27 years; that the couple has two children, Mr. Jones and a 17-year-old daughter, Lindsay; that she worked for the Ware County Board of Education, while her husband had been principal of an elementary school in Waycross for over 20 years; that they had brought their children up in the church and Mr. Jones had attended since he was old enough to walk and talk, and was an active participant in its youth group, choir, musicals and summer camp as he got older. *Id.* at 119-122. She further testified that he had been a good and smart child, and a gifted student without any problems until he reached high school. *Id.* at 120. He played piano and did volunteer work. When asked by Mr. Thigpen, "what happened," she responded that "I think the main thing that happened with Ashley is that the alcohol became his – the evil undoing of him." *Id.* at 121. She explained that neither she nor her husband drink and they have no alcohol in their house, and warned their children never to take the first drink "because you don't know what statistic you'll end up being." Her son "didn't want to listen to that, and the alcohol consumed him, and then after it got to a certain point where it was overwhelming

and consuming in his life, it was almost that – you know, we just couldn't do anything with him." *Id.* at 122. She agreed that there came a time when she made him leave the house and that he had stolen three trucks. *Id.* He pleaded first offender and was going to get probation, but Mrs. Jones and her husband felt that was too easy and that he should be confined; so they made arrangements without Mr. Jones's knowledge to have him sent to a boot camp for a certain period of time "and they came up with Claxton, and that's where he was sent." *Id.* at 122-23. Mr. Jones "always asked us, you know, why did the other guy not get sent off and he did, but we thought this might could be a changing point in his life." *Id.* at 123. Later they "sent him off for alcohol rehab . . . against his will, which was, today, a mistake, because until you're ready to be helped for alcoholism, you know –" *Id.* She wrote Mrs. Holland a card because of the "horror" of what had happened, which was almost more than Mrs. Jones could take, and she could not imagine how Mrs. Holland must have felt; she had no peace in her heart and felt like she could not move forward without saying something to her. *Id.* Mr. Thigpen read the card into the record and Mrs. Jones indicated it was the note she had sent. *Id.* at 123-24. Her mother sent a card as well. *Id.* at 124. Mrs. Jones testified that there is some good still in her son, that "the foundations of goodness are there," though he has done wrong and she cannot excuse that, but he has good leadership ability and can be very loving and she does not feel he needs to be put to death. *Id.* Asked if she would beg

the jury not to kill "him," she said, "I would beg you not to kill him.  I do beg you."
*Id.* at 124-25.

   The prosecutor cross-examined each of these witnesses, eliciting from many
of them that they had not had any meaningful contact with Mr. Jones for several
years.  *See* Dkt. 98-5 at 95 (Ms. Mosely had last seen him when he worked at Piggly
Wiggly about three years ago, before he left high school); *id.* at 99-100 (Ms.
Coleman testifying that she had not seen him since he graduated high school and did
not know he had dropped out of the church); *id.* at 117 (Mr. Blankenship testifying
that he had limited contact with Mr. Jones from before he got kicked out of his house
and stole trucks in March 1992) ; *see also id.* at 112 (Mr. Thigpen still thinks of Mr.
Jones as the teenager with a lot of potential and was not aware that he had struck a
jailer because his Bible fell on the floor or that he wanted to flee south to Florida).
He also got several witnesses to agree that Mr. Jones was someone with a lot of
benefits and skills he had squandered.  *See, e.g.*, *id.* at 99-100 (Ms. Coleman
testifying that Mr. Jones was a very good student who was college bound and had
the world at his door, excellent parents and "opportunities that every American
hopes to have"); *id.* at 106-07 (Ms. Guill agreeing that Mr. Jones "was a bright child"
with "extremely good grades" who "had everything going for him" and "could have
been anything he wanted to be," and "was brighter than most of the other children"
and stood out); *id.* at 127 (Mrs. Jones testifying that she and her husband taught Mr.

64

Jones to respect authority and the rights of others, and the difference between right and wrong; that he did well in school and had enrolled at Waycross College, but could only think about drinking).

Mr. Jones also took the witness stand, for the second time in the trial. Mr. Thigpen asked him some questions about the schools he went to, the musical productions he was in, a mission trip he took to Detroit to teach vacation Bible school for a few weeks, and his volunteer work one summer at a nursing home when he was 14 years old. Dkt. No. 98-5 at 128-31. He identified his school records from grades 6-12, testified about an academic award he received in 8th grade, and indicated that he started working while in school when he was 15 during the summer. *Id.* at 131-33. He had not gotten into trouble at school or suspended, and never stopped believing in God, but had stopped obeying and doing what he was supposed to. *Id.* at 133. In response to Mr. Thigpen's question, "What happened?" he responded: "I started drinking." *Id.* at 133-34. Mr. Thigpen asked no more questions about this topic. Mr. Jones admitted that he had messed up the lives of many people and stated that he could not begin to express how sorry he is for what happened and that he hoped one day the Holland family could forgive him. *Id.* at 134. He told the jury he very much wanted to live and, prompted by Mr. Thigpen, said that he begged the jury for his life, noting "there's so much that I could do." *Id.* at 134-35. On cross-examination, the prosecutor elicited from him that his parents gave him everything

65

they could and did not abuse him, that his parents tried to help him by hiring a lawyer when he stole and destroyed the trucks, that he was at Claxton for "60 – 90 days" (although the actual sentence indicates he was committed for 90-120 days, Dkt. 98-7 at 22), that he was right-handed, but did not know what Mr. Bunner was; that he had done well in school, but only went to a few weeks of college, and that all he could say was that alcohol was the start of it. *Id*. at 135-37. Although the alcohol did not make him forget God, it clouded what was in there. *Id.* at 137-38. Asked if it was "just alcohol," Mr. Jones responded, "That's it." *Id.* at 138.

After the prosecutor completed his cross, the defense rested. Dkt. No. 98-5 at 138. The State had no rebuttal. All told, the defense portion of the sentencing hearing lasted just over an hour. *See* Dkt. 98-5 at 93 (noting before commencement of sentencing phase defense that it was 10:40 a.m.); 98-5 at 139 (transcript noting that the jury withdrew at 11:45 a.m. following the defense witnesses).

From the very start of his sentencing phase summation, the prosecutor engaged in a host of improper argument. He opened with the statement that "the State of Georgia and the family of the victim are confident that you have the wisdom, the courage, the strength, and the desire to impose the proper punishment in this case to see that justice is finally done and that the proper punishment is imposed," and emphasized that, while the crime did not occur in Coffee County, "it happened to members of our state, to people that are a family of Georgians . . . ." Dkt. No. 98-5

66

at 143-44.  He called Mr. Jones "evil" several times, *see id.* at ***,[33] and argued that this was the "worst" and "most sinister" case that could possibly be, *id.* at 145-46. The prosecutor repeatedly misrepresented that Mr. Jones was 21 years old at the time of the crime, when he was only 19.  *Id.* at 149, 158.  He argued that the "only punishment in this case that can be proper is death, because that is the only sentence that will properly insure that society is made safe. . . . He escaped once, and I submit to you, based on the evidence, he will attempt to escape again," *id.* at 150, and told jurors that if they imposed the improper sentence of life "it will be one that will not protect society," because "no one will be safe unless you issue the proper punishment in this case of death.  Only the death penalty can put this terror to a stop, to an end. He must be stopped, and a life sentence will not and cannot do it," *id.* at 160.  The prosecutor further urged jurors to impose the death penalty because Mr. Jones had

---

[33]   At one point, the prosecutor argued that the crime could not be attributed to alcohol alone because

> It is something beyond mere alcohol that does that.  It is an *evil* that had to exist inside him even while he was going to church, even while he was doing good things as a child.  There was *some evil* that was brought out when he turned 17, when he turned 18, and it's not alcohol.  That's an easy crutch of one to grasp.  *It is something evil inside him, and we must stop it.*

Dkt. No. 98-5 at 146-47 (emphasis added).

enjoyed "rights throughout this trial," including "an attorney appointed to represent him" and the requirement that the State prove his guilt. *Id.* at 151. Mr. Jones had all these rights and more, but on March 31, 1993, he trampled on Keith Holland's rights. *Id.* at 155. The prosecutor ended his summation urging that "[t]he list of victims of Ashley Jones is endless" and declaring that the "family of the victim's" "peace of mind" was in the jury's hands. *Id.* at 161-62.

Although Mr. Thigpen had represented that, consistent with his obligations as counsel, he would object to improper argument "as soon as the words leave his mouth," Dkt. No. 98-5 at 141, Mr. Thigpen in fact objected to the prosecutor's closing argument only once, when the prosecutor indicated that Mr. Jones's attorney had been appointed by the court. *See id.* at 151-54 (reflecting that Mr. Thigpen objected, asked for a mistrial and, when denied and offered a curative instruction, declined the offer).

Mr. Thigpen, in turn, gave a brief, 4.5-page, lackluster closing argument in which he mused about the unreal and awesome power the jury had to kill, and how killing Mr. Jones might impact jurors, that all the jurors had expressed beliefs in God, so those who might vote against the death penalty would protect that vote to protect their souls, and that, despite the number of lives ruined that night, there is "some foundation to work with" as who is to say that Mr. Jones would not one day be a soldier for the Lord and there's some good and some talent in him. *Id.* at 164-

66.   He closed with the admonishment that "[l]egal killing is something you'll have to deal with psychologically from now on.   Make peace with your God, and let Ashley Jones live." *Id.* at 166.

The judge then instructed the jury and the jury withdrew at 2:12 p.m. and began deliberating at 2:15 on June 12, 1995, the same day the sentencing phase had commenced.   Dkt. No. 98-5 at 167-76.   At 5:45 p.m., the judge called the jury back to the courtroom because it had been a long day and the jury was obviously divided on punishment. *Id.* at 179.   The court asked and the foreperson advised that the jury was split nine to three. *Id.* at 179-80.   The court recommended calling it a day, and asked the foreman to talk with the rest of the jury about what they would like to do with respect to continuing deliberations that day or retiring for the day. *Id.* at 180. After speaking with the rest of the jury, the foreman reported that they wanted to stop for the day and return the next. *Id.* at 181.   The court admonished the jury to avoid publicity and not to discuss the case, and the jury retired at 6:00 p.m. *Id.* at 181-82.   Court recessed at 6:03 p.m and reconvened at 9:00 a.m. on June 13, 1995. *Id.* at 182.

When the court reconvened the next morning, the record states that the court and counsel conferred off the record, but no record was made of what was discussed during the off-the-record conference. Dkt. No. 98-5 at 182-83. When the court went back on the record, the judge announced to the jurors that "something has developed

69

with respect to one of your fellow jurors that requires me to bring you into the jury box. . . . I am instructing you not to resume your deliberations until this matter is resolved, at which time I will call you back into the jury box and announce to you that it is then time for you to resume your deliberations." Dkt. No. 98-5 at 183. The court and counsel then had another off-the-record conference in the judge's chambers. Dkt. No. 98-5 at 183. When they returned to the courtroom, the bailiff brought the jury into the courtroom for the court to make an announcement: "Let the record show that juror number eleven, Martha J. Douglas, has been excused by the Court based upon the following memorandum of Dr. Steve Anderson dated 6/13/15 [sic] – that's this morning – who examined the patient when taken for his examination by the bailiff, and the memorandum says, 'This patient is medically unable to participate on jury duty.' With that kind of medical advice, I have excused the juror, and that necessitates installing Lynn G. Dockery, alternate juror, as one of the regular members of the jury." Dkt. No. 98-5 at 184. After informing the other jurors of the replacement, the judge told the jurors: "It will be necessary for the jury to begin anew your deliberations as to the punishment in this case for the simple reason that Ms. Dockery, the alternate who is just now joining you, did not have the benefit yesterday of participating with the rest of you in your deliberations yesterday. She will be brand new to the process of deliberations, so please begin your deliberations anew so that she can be brought up to par with the rest of you insofar

70

as the deliberations are concerned." Dkt. No. 98-5 at 185. The jury then resumed deliberations with the new juror at 9:45 that morning. Dkt. No. 98-5 at 186.

At noon, the court called the jurors back into the courtroom and asked how the jury was divided. When the foreman said that it was 9 to 3, the judge told the jurors, "Now you are aware that you are not limited to one vote. I mean, how recently have you taken a poll of the jury?" Dkt. No. 98-5 at 186. The foreman informed the court that they had just voted twenty minutes earlier. Dkt. No. 98-5 at 186. The jury then recessed for lunch until 1:15. Dkt. No. 98-5 at 188. When the jury returned, it took them just over an hour to reach their final verdict to sentence Mr. Jones to death. Dkt. 98-5 at 188.  On June 14, 1995, the trial court formally imposed sentence.  *Id.* at 196-200.

Mr. Thigpen appealed to the Georgia Supreme Court raising three issues:  (1) whether the trial court erred by failing to grant a change of venue after it was learned that prospective jurors had joked and commented on Mr. Jones' guilt and punishment; (2) whether the court erred by allowing Mamie Holland's victim impact testimony and (3) whether the court erred in failing to grant a mistrial when the prosecutor told jurors in his sentencing phase summation that Mr. Thigpen had been appointed to represent Mr. Jones.  Dkt. No. 98-9.  The Georgia Supreme Court affirmed the conviction and the United States Supreme Court denied certiorari.  Dkt. Nos. 99-2; 99-5.

71

### E.     State Habeas Proceedings.

On February 19, 1998, Mr. Jones filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia.  He filed an amended petition on October 22, 1998.  The habeas court held an evidentiary hearing on March 15, 1999.

During investigation pursuant to the petition, Mr. Jones's attorneys interviewed jurors in an attempt to discover the circumstances around the dismissal of jurors during the capital trial.  One juror displayed symptoms of severe mental illness.  Because jurors would not agree to discuss these details, Mr. Jones's attorneys attempted to obtain court intervention, which was denied.  Mr. Jones was prohibited from deposing the jurors.

Mr. Jones presented ample testimony from family members, friends, neighbors, teachers, and expert witnesses, as well as documentary evidence including school and mental health records, substantiating his claim that trial counsel failed adequately to investigate, prepare and present a competent case at the sentencing phase of Mr. Jones's trial, to his detriment.

Pursuant to the state habeas court's scheduling order (Dkt. No. 105-20), Mr. Jones filed a post-hearing brief on or about October 25, 1999, addressing many of the claims raised in his first and second amended habeas corpus petitions, Dkt. No. 102-5, and Respondent filed a post-hearing brief addressing Petitioner's claims on or about November 29, 1999, Dkt. No. 102-6.  Petitioner objected to the state habeas

court's request for the parties to submit proposed orders, *see* Dkt. No. 105-21, which the state habeas court overruled, using a draft order provided by Respondent, Dkt. No. 105-23. Respondent submitted a 26-page proposed order. Dkt. No. 105-22. Apparently, the state habeas court was dissatisfied with the proposed order, as the court, without notice to Mr. Jones, contacted Respondent *ex parte* and "instructed Respondent's counsel to draft an order, in accordance with Respondent's post-hearing brief, denying Petitioner's state habeas corpus petition." Dkt. No. 103-4 at 15-16. That second proposed order was submitted to the court by Respondent on January 6, 2000. Dkt. No. 103-3 at 119. It was signed verbatim by the state habeas court on January 7, 2000. Dkt. No. 103-1.

Mr. Jones filed an Application for Certificate of Appealability, which the Georgia Supreme Court denied on February 11, 2002. Dkt. Nos. 103-3, 103-7. Mr. Jones's petition for writ of certiorari to review the state habeas rulings was denied on October 15, 2002. Dkt. No. 103-12.

## CLAIMS FOR RELIEF

**I.    BOTH OF PETITIONER'S ATTORNEYS WERE HAMPERED BY ACTUAL CONFLICTS OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION (CORRECTED PETITION, CLAIM TWO)**

On April 2, 1993, the trial court found Mr. Jones and his co-defendant Allen Bunner indigent and appointed the Ware County Public Defender, Martin Eaves, to

73

represent them both.  Dkt. No. 96-1 at 21.  Twelve days later, Mr. Eaves moved to withdraw from Mr. Jones's representation due to the conflict of interest that had arisen pretty much immediately.  *Id.* at 22.  Indeed, within days of the initial appointment, on April 6, 1993, Mr. Eaves accompanied his other client, Mr. Bunner, to give a "hypothetical" statement to Chief Dep. Arney Herrin and Det. Carl James, in which Mr. Bunner implicated Mr. Jones in various actions related to the charges and assisted investigators in locating evidence.  *See id.* at 299.  In advancing Mr. Bunner's cooperation with authorities, Mr. Eaves was acting directly contrary to the interests of his other client, Mr. Jones.

The trial court subsequently permitted Mr. Eaves to withdraw from Mr. Jones's case on the basis of this conflict, although it appears that Mr. Eaves, together with appointed counsel Theodore Solomon, continued to represent Mr. Bunner for some period of time.[34]  *See, e.g.*, *id.* at 22, 34. In his place, the court appointed John Thigpen to represent Mr. Jones.  Not only did Mr. Thigpen, at that very time, also

---

[34]   Mr. Eaves, in turn, later represented Jerome Wilkins, a key state witness against Mr. Jones, on charges regarding which Mr. Wilkins testified against Mr. Jones regarding their joint escape from the Ware County jail.  *See* Dkt. 96-2 at 54. The prosecutor who presented Mr. Wilkins' testimony against Mr. Jones later wrote to the pardon and parole board on Mr. Wilkins' behalf.  Dkt. Nos. 101-4 at 184, 102-3 at 18-20.

represent Allen Bunner in a DUI matter, *see* Dkt. No. 100-3 at 85-95, but he also had conflicts of interest arising from his prior representation of other key state witnesses, among them, Sally Kimbrell and J.J. Cunningham.[35]   Mr. Thigpen's representation of Mr. Jones was adversely affected by these numerous legal entanglements.  As a result of Mr. Thigpen's actual conflicts of interest, Mr. Jones was denied his right to effective representation.

A.   **Mr. Jones Is Entitled To Habeas Relief Because His Attorneys' Conflicting Interests Adversely Affected Their Representation Of Him.**

"Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."  *United States v. Cronic*, 466 U.S. 648, 654 (1984) (citation omitted). "[T]he right to counsel is the foundation for our adversary system. Defense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012).

---

[35]   Mr. Thigpen had previously represented a third State witness, Rudolph Melton as well, but, given Mr. Melton's limited importance in Mr. Jones's trial, the impact of this conflict on Mr. Thigpen's representation of Mr. Jones appears to have been less consequential.

As the Supreme Court has long recognized, the right to counsel "is the right to the effective assistance of counsel." *McMann v. Richardson*, 379 U.S. 759, 771 n.14 (1970) (citations omitted).  Although typically the Sixth Amendment right to counsel is infringed only when challenged conduct demonstrably impacts the reliability of the trial process, "[t]here are . . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658.  One such instance is where "counsel 'actively represented conflicting interests.'" *Id.* at 661 n.27 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 692 (1984) (explaining the presumption of prejudice applied "when counsel is burdened by an actual conflict of interest").  "It is well established that 'the Sixth Amendment assures a criminal defendant the right to effective assistance of counsel which includes the right to counsel who is unimpaired by conflicting loyalties." *Burden v. Zant*, 24 F.3d 1298, 1304 (11th 1994) (quoting *Duncan v. Alabama*, 881 F.2d 1013, 1016 (11th Cir. 1989)).  "A lawyer who represents multiple defendants with conflicting interests cannot provide sufficient legal assistance to satisfy the Sixth Amendment's command." *Ferrell v. Hall*, 640 F.3d 1199, 1241 (2011).

To establish a Sixth Amendment violation, a criminal defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 350.  If that test is met, prejudice is presumed.

76

*See, e.g.*, *Strickland*, 466 U.S. at 692.  "To prove adverse effect, a defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties."  *Reynolds v. Chapman*, 253 F.3d 1337, 1342 (11th 2001).

Mr. Jones's appointed attorneys labored under conflicts of interest that adversely affected their representation of Mr. Jones.  Both Martin Eaves and John Thigpen simultaneously represented Mr. Jones and Mr. Bunner, co-defendants with unambiguously antagonistic interests, as each claimed the other was the more culpable of the two.   "'Blame-shifting' defenses among co-defendants are a reflection of inconsistent interests . . . ."[36]  Both Mr. Thigpen and Mr. Eaves  took actions or failed to take actions that advanced the interests of Mr. Bunner at the

---

[36]  *See, e.g.*, *Reynolds*, 253 F.3d at 1344 ("The circumstances surrounding [counsel's] representation of Reynolds in the pre-trial stage were sufficient to create a substantial risk of a conflict of interest.  [Counsel's] professional colleagues in the public defender's office were representing Reynold's co-defendants, and those co-defendants happened to be the very persons whom Reynolds blamed for the crime. The possibility that the interest of one of the three co-defendants would be sacrificed for the benefit of the others was considerable in such a situation.  Reynolds has successfully demonstrated that a potential conflict of interest existed in the representation of these three co-defendants by the same public defender's office, given the factual posture of this case.").

expense of Mr. Jones – Mr. Eaves assisted his other client in meeting with law enforcement agencies and providing information at Mr. Jones's expense, while Mr. Thigpen failed to put Mr. Bunner on the witness stand to testify both about the life-without-parole sentence he had received and his more culpable actions.   Mr. Thigpen, moreover, had previously represented important State witnesses and failed to subject them to a thorough and impeaching cross-examination due to his continuing legal obligations to former clients.  Under these circumstances, Mr. Jones's critical right to the effective representation of counsel was eviscerated.

This claim is reviewed *de novo*.  The state habeas court held that the claim that Mr. Jones's first attorney, Martin Eaves, labored under a conflict of interest was procedurally defaulted because Mr. Jones failed to raise this claim on direct appeal, and did not address the claim on the merits.  Dkt. No. 103-1 at 4.  However, the default of this claim may be excused because Mr. Jones's next-appointed attorney, John Thigpen failed to raise the conflict and did not seek to prevent the admission of evidence derived from it on that basis.

Moreover, the state habeas court, in addressing the merits of the remainder of Mr. Jones's conflict-of-interest claim unreasonably applied the law.  Although the state habeas court correctly identified *Cuyler v. Sullivan*, 446 U.S. 335 (1980), as the governing Supreme Court law, it applied that law unreasonably.  Once a defendant has shown that "an actual conflict of interest adversely affected his lawyer's

performance," *Sullivan*, 446 U.S. at 350, prejudice is presumed and the defendant is entitled to relief.   *See Strickland*, 466 U.S. at 692.   Nonetheless, the state habeas court repeatedly superimposed an additional, outcome-based prejudice analysis in concluding that relief should be denied.   *See, e.g.*, Dkt. No. 103-1 at 7 ("Petitioner has still failed to establish that this effectively 'procedural' difference would have changed the outcome in Petitioner's case"); *id.* at 8 ("This Court finds that even [if] Mr. Thigpen had been able to force Mr. Bunner to take the stand and if counsel had been able to get Mr. Bunner to testify according to his April 6, statement, the outcome of Petitioner's trial would not have been changed as Mr. Bunner could have been impeached by his numerous prior statements . . . .");[37] *id.* at 11 ("Petitioner has

---

[37]   The state habeas court also incorrectly asserted that Mr. Jones had not established adverse effect because evidence of Mr. Bunner's life sentence would have been inadmissible under Georgia law to mitigate punishment. Dkt. No. 103-1 at 9. Under the facts of this case, where a critical issue was which of the defendants engaged in the most culpable acts, that assertion is incorrect as a matter of both state and federal law. *See, e.g.*, *Allen v. State*, 253 Ga. 390 (1984) ("noting that "our statutorily mandated proportionality review of death sentences includes special consideration of the sentences received by co-defendants in the same crime") (citing *Hall v. State*, 241 Ga. 252 (1978) (vacating death sentence as disproportionate where triggerman co-defendant received life sentence)); *see generally Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value") (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

failed to establish that he has been adversely affected by any 'conflict of interest' as Mr. Melton's testimony was minor, uncontested, supported by overwhelming evidence and the offenses committed by Mr. Melton were minor"). The state habeas court's analysis, moreover, was marred by unreasonable findings of fact, such as the court's assertion that that "Ms. Kimbrell's testimony and her statements . . . were consistent" and "not conflicting," and that Mr. Thigpen "thoroughly cross-examined M. Kimbrell," Dkt. No. 103-1 at 12, given his obvious failure to confront her with the numerous inconsistencies in her prior statements. *See, supra* at Section III(C)(2).

## B. Public Defender Martin Eaves Took Steps To Advance The Interests Of His Client Allen Bunner At The Expense Of His Other Client, Mr. Jones.

Mr. Eaves' patent conflict of interest should have prompted him to get off the case immediately, but instead led him first to "sacrifice the interests of [Mr. Jones] for the benefit of [Mr. Bunner]." *Reynolds*, 253 F.3d at 1345. Mr. Eaves surely knew at the time of his appointment, or very shortly thereafter, that his client Mr. Bunner, from the time of his arrest, had been cooperating with authorities and making statements to law enforcement officers that incriminated Mr. Eave's other client, Mr. Jones. That knowledge should have prompted Mr. Eaves to refuse the appointment for one or both of them. Instead, within days of his appointment, on April 6, 1993, Mr. Eaves accompanied Mr. Bunner to an interview with law enforcement at which Mr. Bunner provided "hypothetical" answers to questions

posed by detectives and gave them information that enabled them to locate evidence

against the co-defendants.  *See* Dkt. No. 96-1 at 299; Dkt. No. 102-2 at 137-40.  It

took another eight days for Mr. Eaves to move to be excused from representing Mr.

Jones, although Mr. Eaves' conflict was readily apparent and the damage had already

been done.  *See, e.g.*, *Burden*, 24 F.3d at 1306 (finding actual conflict of interest

"when Burden's pretrial counsel, while representing two persons under suspicion for

a murder, reached an informal understanding with the prosecutor that one of his

clients would not be prosecuted in exchange for his testimony against the other.");

*Ruffin v. Kemp*, 767 F.2d 748, 751 (11th Cir. 1985) ("[I]t is clear beyond cavil that

in offering the testimony of Brown against Ruffin in exchange for the lesser penalty

for Brown, [the attorney's] conflict 'would significantly benefit one defendant . . .

[while] damaging the defense of another defendant whom the same counsel is

representing'") (internal citation omitted).

Mr. Eaves's successor, John Thigpen, should have raised the conflict of

interest prior to trial and moved to exclude any evidence that was tainted by it but,

instead, his representation was itself hampered by numerous conflicts of interest that

should have prompted him to refuse appointment to Mr. Jones's case.  Not only was

Mr. Thigpen, at the time, the attorney representing Mr. Bunner in an open DUI case,

but he also had represented several important state witnesses.  Due to his conflicting

obligations, Mr. Thigpen failed to call Mr. Bunner to the stand and conducted wholly inadequate cross-examinations of his former clients, all to Mr. Jones's detriment.

### C. Mr. Thigpen's Concurrent Representation Of Mr. Bunner On An Open DUI Charge At The Time He Accepted The Appointment To Represent Mr. Jones Was A Disqualifying Conflict Of Interest.

Mr. Thigpen should never have accepted the appointment to represent Mr. Jones on April 12, 1993, following the withdrawal of Mr. Jones's first lawyer based on the conflicting interests of the two co-defendants, as Mr. Thigpen was already representing Mr. Jones's co-defendant Allen Bunner at the time. *See* Dkt. No. 100-3 at 86 (reflecting Mr. Thigpen's court appearance on Mr. Bunner's behalf on December 21, 1992, in *State v. Harry A. Bunner*, Ware County No. 92-4272, in which Mr. Bunner was charged with misdemeanor DUI); *id.* at 89 (reflecting Mr. Thigpen's presence when Mr. Bunner entered not-guilty plea on December 21, 1992). Mr. Bunner's DUI case was not finally disposed of until well after Mr. Jones' trial, when it was *nol prossed* on June 26, 1996. *Id.* at 89, 94. There is no evidence in the record that Mr. Thigpen ever moved to withdraw from his representation of Mr. Bunner, that Mr. Thigpen advised the court that he was representing Mr. Bunner at the time he was appointed to represent Mr. Jones, or that Mr. Thigpen's representation of Mr. Bunner was ever terminated prior to the completion of Mr. Jones's trial and the *nol prossing* of the DUI case against Mr.

82

Bunner.  Nor is there any proof that Mr. Jones made a knowing, intelligent and voluntary waiver of his right to conflict-free counsel.  Mr. Thigpen had no specific knowledge of advising his client of the conflict, Dkt. No. 100-2 at 49-50, and the record is devoid of any indication that Mr. Jones was advised, much less that he affirmatively waived the conflict.

As a result of this conflict of interest, Mr. Thigpen went through the motions of using Mr. Bunner's statements to assist his other client, Mr. Jones, defend himself against the state's capital charges, but in the end Mr. Thigpen simply dropped the ball.  When the State filed a motion in limine seeking to preclude the defense from questioning any State witnesses about Mr. Bunner's "hypothetical" admission to being the driver as the defendants left the scene of the attack in Mr. Holland's truck, Mr. Thigpen advised that "I certainly intend to put [Mr. Bunner] on that stand.  I don't know what he'll say, or if he'll say anything after having conferred with his lawyer, but at that point, if he doesn't then I intend to try to introduce any statement that he has made while in custody."  Dkt. No. 98-1 at 5.  Yet, although Mr. Bunner was brought to the courthouse and available to the defense to call in the penalty phase of trial, Mr. Thigpen made no effort to put his other client on the stand.  *See, e.g.*, Dkt. Nos. 98-1 at 5, 9; 989-2 at 94; 98-5 at 40.  As a result, Mr. Jones's jury never learned that Allen Bunner had "hypothetically" admitted to being the driver – *i.e.*, the more culpable of the defendants, whom the State's witnesses testified

83

returned from the truck to inflict the final fatal blows with the sledge hammer –
information that would have been critical to Mr. Jones's defense against the death
penalty and important information the jury should have heard in order to make an
informed sentencing decision.[38]   Nor did they learn that Mr. Bunner had received a
life sentence for his role in the crime or that he had a history of violent acts prior to

--------------------------

[38]   The state habeas court's conclusion that Mr. Thigpen could not have
introduced the hypothetical statement is incorrect as a matter of law.  First, a
witness's prior inconsistent statements are admissible as substantive evidence, as
well as impeachment.  *See, e.g.*, *Gibbons v. State*, 248 Ga. 858, 862 (1982) ("[A]
prior inconsistent statement of a witness who takes the stand and is subject to cross-
examination is admissible as substantive evidence, and is not limited in value only
to impeachment purposes"); *see also McNair v. State*, 330 Ga. App. 478, 482
(2014) (OCGA §§ 24-6-613 and 24-8-801 (d) (1) (A) of Georgia's new Evidence
Code, which "pertain[] to examining witnesses on their prior inconsistent statements
and using those statements for impeachment purposes or as substantive evidence …
retain Georgia's (former) approach to a testifying witness's out-of-
court statements.  Such statements are not hearsay") (citing *Gibbons*, 248 Ga. at
862) (citation and punctuation omitted).  Moreover, the statement was made in the
presence of Mr. Bunner with Mr. Bunner's obvious authorization and consent, *see*
Dkt. No. 102-2 at 139-40), and, as an authorized statement, was not hearsay.  *See*
O.C.G.A. § 24-8-801(d)(1) and (d)(2)(C).  Finally, even if considered hearsay, the
statement had sufficient indicia of reliability, *see* Dkt. No. 102-2 at 139-40, to require
its admission as mitigating evidence.  *See, e.g.*, *Sears v.* Upton, 561 U.S. 945, 950
n.6 (2010) ("[W]e have recognized that reliable hearsay evidence that is relevant to
a capital defendant's mitigation defense should not be excluded by rote application
of a state hearsay rule) (citing *Green v. Georgia*, 442 U.S. 95, 97 (1979) (*per
curiam*).

the night of Mr. Holland's murder – subjects that reasonable, unconflicted counsel would have called him to stand to address before the sentencing jury.

Because Mr. Thigpen's representation of Mr. Jones was adversely affected by his concurrent representation of Mr. Jones's co-defendant, habeas relief should be granted.

### D. Mr. Thigpen's Cross-Examination of Former Client Sally Kimbrell Suffered as a Result of his Prior Representation of Her.

As the only individual who purportedly witnessed most, if not all, of the attack on Keith Holland, Ms. Kimbrell was the star of the State's case. Reasonably competent counsel would have focused their energy on developing a cross-examination strategy of her that would have entailed, at a minimum, parsing her several statements and prior testimony for inconsistencies and confronting her with her prior inconsistent statements. This would not have been a difficult task inasmuch as review of her prior statements reflects that the details of Ms. Kimbrell's accounts grew considerably from the time of the crime until her testimony in Mr. Jones's case. The details also grew in a way that undermined the reliability of her account at trial and made it far more questionable that the prosecutor was correctly targeting Mr. Jones as the more culpable of the defendants.

Although this would have been a reasonable strategy – indeed, *the* likely strategy of any competent attorney – Mr. Thigpen was operating at a considerable

disadvantage. He had previously represented Ms. Kimbrell in an uncontested divorce, Dkt. No. 100-1 at 75, and was further hampered by a personal relationship with the witness that rendered his cross-examination unsettlingly casual and bizarre.

Mr. Thigpen's cross-examination lacked the solemnity that should attend a capital trial,[39] as Mr. Thigpen and the witness repeatedly spoke to each other by first name and interacted as though they were having a casual conversation. *See, e.g.*, Dkt. No. 98-2 at 48 (explaining that she now referred to the victim as Keith, but "[a]t that time I did not know who he was, John. . . . I don't know that, John"); *id.* at 50 (explaining that she associated one of the perpetrators with her son's size and height "and you know his size and height, John"). Despite this repartee, Ms. Kimbrell expressly construed Mr. Thigpen's tepid cross-examination as a personal attack on her:

> A.    He looked bigger because of his size. I didn't go out and measure neither one of them.
>
> Q.    Well, I understand that, I understand that, I know that, and I'm not trying to pick on you, Sally, okay?
>
> A.    Yes, you are, John. You're being mean to me.

---

[39] "From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect." *Wellons v. Hall*, 558 U.S. 220, 220 (2010).

Q.     I'm just trying to defend my client, Ms. Kimbrell.

A.     I know that, but have some pity's sake for the people that watched it, too, John.  Have sympathy for us, too.

Q.     I apologize if you think I'm being mean to you, but I'm not, really.  I'm just trying to determine – because this is a critical point here –

A.     It is.

Q.     – and you are the critical witness, okay?

A.     But you can't stop the truth of what happened.

Q.     Well, I'm not trying to.

Dkt. No. 98-2 at 51.  Within a few lines, while describing the person who got out of the truck to beat the victim, Ms. Kimbrell was in tears, *see* Dkt. No. 98-2 at 52, though whether this was due to the trauma of her memory or her frustration at being placidly questioned by her former attorney and friend is unclear.

Regardless, Mr. Thigpen utterly failed to elicit the information he needed from this witness to show that her trial testimony was unreliably adorned with details she had gleaned from others, whether through gossip or publicity, over the passage of time, and that her initial statements indicated far less certainty than her trial testimony that Mr. Jones was the more culpable defendant.  *See supra* Section III(C)(2) (detailed description of trial testimony and prior inconsistent statements).

As a result of his conflict of interest, Mr. Thigpen failed to take the following steps that most any reasonable attorney would have taken:

87

●     He did not confront Ms. Kimbrell with proof that her trial testimony that when questioned by law enforcement on the morning of the crime, she told the officer nothing other than her name and address and perhaps her phone number, *see* Dkt. No. 98-2 at 35-36, was inaccurate, as she had told Cpl. Bennett that morning, at the very least, that she saw "2 W/M's getting into Holland's truck and driving up Braganza Lp. towards US 1" and that "one of the W/Ms got back out of the truck and went back to Holland and hit him 2 or 3 more times with an unknown object." Dkt. No. 100-2 at 199.  Had she denied saying these things, he could have called Cpl. Bennett to the stand to question him about the initial report he authored.

●     After reading into the record the five-page transcript of an interview of Ms. Kimbrell by Sgt. Carl James on April 20, 1993, *see* Dkt. No. 98-2 at 36-42; Dkt. No. 100-2 at 193-197, as Mr. Thigpen did, he should have questioned Ms. Kimbrell directly about inconsistencies between her testimony and her interview statements, her admission in the interview that she "never" could see "the other one on the other side of the truck . . . that good" because he "was hid on this side of the [white] truck, standing back to where he was into the dark," Dkt. No. 10-2 at 195, and would have questioned her about the source of her belief the person someone else saw on the Holland's porch that morning had blond hair, *id*. at 195, 196.  Instead, the jury was left to fathom what the purpose of counsel's lengthy monologue was without being given any roadmap to direct their consideration of the evidence.  Ms. Kimbrell's

88

admission that her ability to see what was happening was extremely limited by darkness, the inconsistencies between her testimony and interview, and the hearsay nature of her evidence about blond hair were particularly significant.  Yet, Mr. Thigpen made no effort to elicit from her that on April 20, 1993, she had said she only got a good look at one of the men, the one who drove the truck away, and that her report that the other man had "blond hair" was based on hearing from others that the person on the porch had blond hair.  Since neither Mr. Jones, nor Mr. Bunner, has blond or light hair, the hearsay nature of her knowledge was a critical fact to elicit, but Mr. Thigpen left it buried in his lengthy rendition of Ms. Kimbrell's recorded statement. Nor did Mr. Thigpen point out that Ms. Kimbrell's view of what was happening was obscured by the truck, Dkt. No. 100-2 at 195-96, or that her ability to see in the dark was so impaired that she had not even recognized her neighbor, Keith Holland, at the time and only afterwards learned who the victim was – important details that could well have been lost on the jury.

- Unconflicted counsel reasonably would have questioned Ms. Kimbrell about the statement she made to Lt. O'Neal on May 13, 1994, about recognizing co-defendant Bunner when she had seen him in court a few days before.  Dkt. No. 100-2 at 192.  Given that she had previously told Sgt. James, on April 20, 1993, that she only got a good look at the driver, as he was returning to the truck after beating Mr. Holland again, such evidence – never heard by the jury – would have provided a

strong argument that Ms. Kimbrell had in fact identified the driver when she identified Mr. Bunner as one of the perpetrators.

Mr. Thigpen took none of these reasonable steps to defend his client Mr. Jones.   Because his representation was adversely affected both by his prior representation of Ms. Kimbrell and his continuing relationship with her, Mr. Jones is entitled to relief.

### E.   Mr. Thigpen Was Prevented by an Actual Conflict of Interest from Questioning His Former Client J.J. Cunningham Regarding Her Drug Use and the Use of Drugs at her House the Night of the Crime.

Mr. Thigpen represented Jerri Cunningham Eunice (a/k/a "J.J. Cunningham") in a contested divorce and custody battle that raised allegations of moral unfitness against her.  *See* Dkt. No. 100-3 at 2-84.  Among other things, Ms. Cunningham's husband at the time, George Cunningham Jr., alleged that their separation was caused by "the cruel treatment of the defendant [Ms. Cunningham] willfully inflicted upon the plaintiff," *id.* at 7; and presented evidence that Ms. Cunningham had been unfaithful, that her parents' home, where she planned to live with the couple's children, was unsafe, *id.* at 18-21, and that Ms. Cunningham and friends of hers had made threats of violence to her husband and his family, *id.* at 22-29.  In a Temporary Order issued by Judge Holton, the court awarded temporary custody of the children to their father, George Cunningham, and ordered both parties to refrain from

"harassing, molesting, injuring, or interfering with each other in any manner." *Id.* at 30-31.

In a pretrial order submitted by counsel for the parties Ben Smith, Jr. (who represented George Cunningham) and John R. Thigpen, Sr., and signed by the judge on October 30, 1992, Mr. Cunningham alleged that "[t]he cause of the separation was the adultery of the defendant which was conclusively proved at the temporary hearing" and "that the defendant has continued her dissolute existence since the separation and has been evicted from her home at Smitty's Trailer Park because of misbehavior (a fight)" and that "[s]he had resided there with three men and four children." *Id.* at 34. This was corroborated by the statement Mrs. Ozell Smith, the trailer park operator, gave to Social Services Specialist Peggy M. Couch, of the Department of Family and Children Services, in the course of the home evaluation she conducted in early 1992. Mrs. Smith reported that "the sheriff's department was constantly being called" to the trailer where Mrs. Cunningham had lived with "her two children" and "four other adults" "because of fighting" and that Mrs. Smith "finally made everyone leave" and that "Mrs. Cunningham was 'not fit to raise children.'" *Id.* at 61. The social services specialist further noted that Mrs. Cunningham has "lived in at least four different places during the past year" and "[n]either her home life nor her finances have been stable." *Id.*

91

A separate home evaluation report by social services specialist Couch on the husband's circumstances, dated March 3, 1992, indicated that while both parents cared for their children, "Jerri Cunningham has not shown a great deal of stability in her lifestyle until the past few months" and "is currently expecting another child and is having some financial difficulties." *Id.* at 45. The social worker recommended placing the children with their father. *Id.* In a separate home evaluation, the social worker noted that Mrs. Cunningham "denies allegations of Mr. Cunningham that she 'parties,' uses cocaine, or other illegal drugs" and denied being involved in any harassment of the Cunningham family." *Id.* at 59.

Mr. Thigpen represented Mrs. Cunningham from at least as early as April 1991 when he filed papers on her behalf in the divorce proceedings, *see id.* at 13-18, until, at least, December 22, 1992, when the court granted a divorce to the couple and awarded custody of one child to each parent, with visitation rights with the other child, *id.* at 69-73.

Mr. Thigpen made no effort at Mr. Jones's trial to impugn her reliability, develop evidence that she and her friends partied with drugs or to question whether she got any kind of deal from the prosecutor, even though she was in the car at the time Mr. Jones and Mr. Bunner stole beer under circumstances suggesting that the car's other occupants knew what was going to happen. Indeed, in state habeas proceedings, Ms. Cunningham (at the time, Eunice) stated under oath that "Carl

92

James, a detective with the Ware County Sheriff's Department, when he went over my testimony with me prior to the trials told me I didn't have to worry about any charges from the Flash Foods incident.  I definitely was under the impression that I wouldn't be prosecuted because I was willing to testify."  Dkt. No. 99-12 at 109.[40]

Individually and collectively, Mr. Thigpen's numerous legal entanglements should have prompted him to get off Mr. Jones's case.  Having proceeded with his representation, however, the adverse effect of these conflicts on his representation of Mr. Jones demand relief.

## II.    MR. JONES WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS (CORRECTED PETITION, CLAIM ONE)

At all stages of pretrial and trial proceedings, Mr. Jones's sole attorney, John Thigpen, Sr., performed deficiently, to Mr. Jones's great detriment.  Although many of counsel's numerous failings may not have prejudiced Mr. Jones in the culpability

---

[40]   In state habeas proceedings, another teenager in the car during the Flash Foods robbery, stated in her sworn affidavit that she had testified in Mr. Bunner's trial and "was on call to testify in [Mr. Jones's] trial and was even in the witness room in Douglas, but was never called to the stand.  Before I testified, both Rihar Carrie [sic], the district attorney, and Detective Carl James told me that I wouldn't have to worry about being charged in the Flash Foods robbery if I testified."  Dkt. No. 99-12 at 186.

phase, counsel's pretrial and guilt-innocence-phase performance had a direct and deleterious impact on Mr. Jones at sentencing.[41]   Had Mr. Jones received the minimum representation to which he was entitled under the Sixth Amendment, there is a more than reasonable probability that one or more of his jurors would not have voted to impose the death penalty.

### A.   The State Habeas Court's Resolution Of Mr. Jones's Sentencing Phase Ineffective Assistance Of Counsel Claims

_____

[41]   The Supreme Court has clearly recognized that errors that may have no prejudicial effect on the culpability determination may nonetheless prove prejudicial at sentencing.  In the context of a prosecutor's wrongful suppression of favorable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), for instance, the Supreme Court has recognized that suppressed evidence that may not be material at guilt can nonetheless prejudicially impact sentence. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 474 (2009) (finding that appellate court had not erred in finding suppressed evidence of petitioner's drug use immaterial to the jury's finding of guilt, but rejecting the appellate court's dismissal of the materiality of the evidence at sentence, noting that "[t]here is a critical difference between the high standard Cone was required to satisfy to establish insanity as a matter of Tennessee law and the far lesser standard that a defendant must satisfy to qualify evidence as mitigating in a penalty hearing in a capital case"); *United States v. Bagley*, 473 U.S. 667, 674-75 (1985) ("'A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." The evidence suppressed in *Brady* would have been admissible only on the issue of punishment and not on the issue of [guilt, and therefore could have affected only Brady's sentence and not his conviction.").  Indeed, like the suppressed evidence in *Brady*, which demonstrated that the co-defendant was the trigger man, evidence that supported the defense that Mr. Bunner was the perpetrator who returned to strike Mr. Holland with the sledge hammer and who accordingly inflicted the fatal blows, would have had significant mitigating value at penalty, even though it would not likely have impacted the jury's guilty verdict.

**Is Based On Unreasonable Fact Determinations And Contravenes, Or Involves An Unreasonable Application Of, Established Supreme Court Law.**

At Mr. Jones' sentencing phase, "[t]he jury . . . heard almost nothing that would humanize [Mr. Jones] or allow them to accurately gauge his moral culpability." *Porter v. McCollum*, 558 U.S. 30, 41 (2009). The transcript of the direct examination testimony of the six defense witnesses other than Mr. Jones spans less than 21 pages and consists of trial counsel's utterly cursory, ill-informed, and unprepared questioning of the witnesses. The habeas court found that the witnesses had been "chosen for what they would say as Mr. Thigpen wanted to bring out the 'good qualities' of Petitioner." Dkt. No. 103-1 at 42. The witnesses had volunteered themselves or appeared at Mr. Jones' or his parents' last-minute requests, and had no contact with trial counsel until just before they testified. *See* Dkt. No. 100-2 at 17, 19, 21, 24, 25; Dkt. No. 99-12 at 55, 60-61, 111, 125-27, 132-33, 173, 207. On cross-examination, the witnesses were forced to acknowledge that they did not know the extent of trouble Mr. Jones had recently gotten into, that they had not had recent contact with him and could not explain how he had come to this point.[42] Having

---

[42] *See*, *e.g.*, *Turpin v. Christenson*, 269 Ga. 226, 237-38 (1998) (counsel's failure to investigate and prepare was prejudicial where, at sentencing, mitigation witnesses were revealed on cross-examination to know little about the extent of the defendant's criminal background, to have had little recent contact with him, and

elicited brief testimony that a young Ashley Jones was intelligent, got good grades, volunteered at a nursing home, and had sung in church musicals, trial counsel stated, "Well, you know, it's kind of strange.  We have a kid that comes from such a good family, does so well in school and does so well in church, and then we have this calamity." Dkt. No. 98-5 at 121-22.[43]  Counsel could offer no insights because he had done nothing to prepare.  The only testimony which purported to offer a semblance of explanation came from Mr. Jones and his mother, who testified conclusorily and generically that alcohol was Mr. Jones' problem.

The prosecution predictably exploited the vacuum left by counsel's disastrous performance to argue that Mr. Jones -- whom the prosecutor repeatedly and erroneously told the jury was 21 years old at the time of the crime (Mr. Jones was

------

were "forced to admit that . . . Christenson had been given many opportunities in life but had decided to squander them.").

[43] This is as emblematic an illustration as any that trial counsel failed to perform according to prevailing norms of capital defense representation.  *See*, *e.g.*, ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), Guideline 11.8.3 (A): "[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case. Counsel should seek information to present to the sentencing entity or entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case."

96

only 19) -- had had a good life but consciously squandered his opportunities as an

"adult":

> This is not a defendant who has not had choices, who's not had chances
> over his lifetime.  Mr. Thigpen cannot argue that his client comes from
> a family where he was abused, where he had nothing, and had nothing
> going for him.  He's had chances, many chances. . . . He had two parents
> who loved him.  There's no allegation of sexual abuse and there's no
> allegation of physical abuse by either of his parents.  They both loved
> him.  They gave him a home, a place where he could live and grow up
> to be an adult.  They provided schooling for him, and you heard he was
> an excellent student, scored high enough on SAT's to get into college,
> had an IQ of 115.  His parents made sure that he went to church and
> lived a good life.  They taught him respect for the family, and they
> taught him respect for authority.  Ashley Jones had choices. . . .
>
> But one day children grow up, and Ashley Jones grew up, and one day,
> as an adult, you have to stand on your own feet and you make your own
> choices, and Ashley had his choices to make when he graduated from
> high school.  He, however, chose to rebel against authority.  He chose
> to rebel against his parents by disrespecting them, by drinking in the
> house and taking his little sister home from school while he was drunk.
> Those were choices that he made and that no one else made.  He chose
> not to continue his college.  He chose not to go.  He chose not to obey
> the law.  He chose to steal trucks. . . . He chose to drink, and . . . . he
> chose to rob Keith Holland, and he chose to murder him.

Dkt. No. 98-5 at 149-50.

However, despite the facts of the crime and the state's evidence in

aggravation, this jury struggled with its sentencing decision.  On the first day of

deliberations, after having worked for three and a half hours, jurors indicated that

they were deadlocked 9-3.  Dkt. No. 98-5 at 179-80.  After calling it a day, the jury

resumed on June 13, 1995, and deliberated for two hours and fifteen minutes before

again becoming deadlocked 9-3. *Id*. at 186. After another hour and fifteen minutes, the jury voted to sentence Mr. Jones to death. *Id*. at 188.

The jury that sentenced Mr. Jones to death was wholly unaware of the pervasive lack of care and nurturing he endured during his childhood[44] or the extraordinarily strict, almost militaristic atmosphere maintained at home by his emotionally abusive parents, culminating in his early teens in his virtual imprisonment in his room for months at a time over a period of roughly three years, for no more serious an offense than getting a few C grades. Although he had been a gifted student and a well-behaved child who loved performing in musicals, during this critical period in his adolescence, Mr. Jones understandably struggled with

---

[44] For example, his parents withheld physical affection and actively discouraged family members from touching or hugging him. Dr. Conner Walters testified in state habeas proceedings: ". . . Ashley Lyndol Jones was deprived of touch, warmth, and affection as an infant. In addition, the parental style of Mr. and Mrs. Jones, one of rigidity, and inappropriate and inordinate punishment, further retarded Ashley's social and emotional growth. The result of these factors led to Ashley suffering from an insecure attachment phenomenon which manifested itself in substance abuse, decreased (almost non-existent) self-esteem and self-concept, and a belief that he could not succeed in the adult world his parents aspired for him. The result was that Ashley abused drugs and alcohol, abandoned a promising yet difficult academic path because he could not live up to parental expectations, and because he felt he could not succeed in the world his parents had anticipated for him, associated with a "peripheral" peer group where his drug and alcohol abuse would be tolerated and he could attain a sense of "success" that was not available otherwise." Dkt. No. 99-12 at 224.

intense feelings of isolation, anger, insecurity, abandonment, and betrayal, which he attempted to quell as early as age 13 by turning to alcohol and self-mutilation.[45]  By the time he finished high school, he had become a full-blown alcoholic, his personality had changed, and his behavior decompensated when he was intoxicated.[46] He experienced regular blackouts and consumed upwards of a case of beer per day.  He was ultimately expelled from his home, spent time living under a highway overpass, and was later taken in for a time by caring neighbors.  Ultimately, he could not escape his addiction and, while associating with other young people who had similar troubles and substance abuse problems,  his substance abuse led to involvement in the criminal justice system, unsuccessful inpatient addiction treatment,[47] and ultimately his arrest for murder.  Witnesses from among Mr. Jones' family, neighborhood, teachers, as well as the young people with whom he found himself on the night of the crime, were available to trace Mr. Jones's development

---

[45] *See*, *e.g.*, Dkt. No. 100-3 at 156-86; Dkt. No. 100-4 at 1-45; Dkt. No. 101-1 at 1-48.

[46] *Id.*

[47] *Id.* As social worker Dr. Lee Norton noted, "Medical and psychiatric staff [at Humana Hospital] felt Ashley's risk for relapse was substantial because of the 'family dysfunction' that could not provide the support necessary to maintain sobriety."  Dkt. No. 101-3 at 24; *see also* Dkt. No. 100-3 at 166.

99

as a young person through to his deteriorated, addicted and highly intoxicated state at the time of the crime.[48]   Compelling mental health expert testimony could also have been secured in order to interpret the testimony and documents pertaining to Mr. Jones's background and behavior up to and including the time of the crime,[49] as well as demonstrate Mr. Jones's significantly diminished cognitive functioning and organic brain damage as a result of his ingestion of so much alcohol as a young adolescent, through the time of the crime.[50]

The jury's ignorance of these circumstances was *not* the result of trial strategy but of neglect and inattention on the part of trial counsel. To the extent counsel's tack at sentencing was, in part, to offer testimony from Mr. Jones and his mother about his history of alcohol abuse as some semblance of an explanation for his actions, counsel's utter failure to make any meaningful further inquiry into such issues represents abject abandonment of counsel's duty to his client in a capital case. Even a cursory investigation would have uncovered numerous witnesses who could have testified about Mr. Jones's troubled adolescence, as well as documentary

---

[48] *See*, *e.g.*, Dkt. No. 99-12 at 51-54, 59-69, 99-134, 159-179, 183-207.

[49] *See*, *e.g.*, Dkt. No. 99-12 at 135-158, 213-227; Dkt. No. 101-3 at 20-34.

[50] *See* Dkt. No. 99-12 at 70-98.

corroboration. Ample Supreme Court precedent supports a finding that counsel rendered ineffective assistance with regard to his investigation and presentation of mitigation evidence. The state habeas court's rejection of Mr. Jones's claims rest on unreasonable factual determinations and unreasonable application, or contravention, of established federal law. Relief is warranted.

> **1.   The *Strickland* standard as to defense practice at sentencing.**

To establish deficient performance under *Strickland*, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness," defined as "reasonableness under prevailing professional norms." *Id.* at 688; *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009). The test for prejudice is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same). Said another way, prejudice exists when there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694.

The *Strickland* Court emphasized the case-specific and non-mechanistic nature of this inquiry: "[A] court should keep in mind that the principles we have

stated do not establish mechanical rules." *Strickland*, 466 U.S. at 696.  Rather, the habeas court "must conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688, 689).

### a. As to *Strickland*'s first prong, prevailing professional norms establish the objective standard of reasonableness by which counsel's performance is judged.

"It is unquestioned that under the prevailing professional norms" that governed at the time of Mr. Jones's trial, counsel "had an 'obligation to conduct a thorough investigation of the defendant's background,'" *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396), or make "a reasonable decision that made conducting a background investigation unnecessary," *Johnson v. Secretary, DOC*, 643 F.3d 907, 931 (11th Cir. 2011) (citing *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)).

### b. The Supreme court has endorsed applicable ABA standards as guidelines to reasonable performance.

The Supreme Court has emphasized that the American Bar Association Standards for Criminal Justice and the ABA Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases ("ABA Guidelines") establish "[p]revailing norms of [defense] practice," *Strickland*, 466 U.S. at 688, and are "'guides to determining what is reasonable,'" *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting *Wiggins*, 539 U.S. at 524). Those norms include the duty to conduct a thorough investigation of potential mitigation evidence from a variety of sources. *Wiggins*, 539 U.S. at 524-25. The *Wiggins* Court noted the ABA Guidelines' recommendation that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'" and "that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* at 524 (emphasis omitted) (quoting and citing ABA Guidelines 11.4.1(C), p. 93 and 11.8.6, p. 133 (1989)). The *Wiggins* Court made clear that in referring to ABA and local standards as guides to attorney performance, it was applying "the same 'clearly established' precedent of *Strickland*." *Wiggins*, 539 U. S. at 522.

It is also clearly established that if counsel makes a decision not to present certain mitigating evidence, the question "[i]n light of these standards" is "whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Wiggins*,

539 U. S. at 522-23 (citing *Strickland*, 466 U.S. at 691).  Performance standards such as the ABA Guidelines are guides to answering that question.  The Court in *Wiggins* explained that "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* at 528 (quoting *Strickland*, 466 U.S. at 690-91). And "[a] decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

In *Rompilla*, a 2005 decision finding capital defense counsel ineffective for their performance in a late 1980s trial, the Supreme Court again turned to the ABA Standards for Criminal Justice, including the language that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387 (internal quotation marks and citation omitted).  In a footnote, the Court also discussed the ABA Guidelines, citing *Wiggins* for the proposition that "[t]he ABA Guidelines provide that investigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be

104

introduced by the prosecutor." *Id*. at 387 n.7 (internal quotation marks and citation omitted).[51]

The 1989 ABA Guidelines provide that counsel's duty to investigate in a capital case "is intensified (as are many duties) by the unique nature of the death penalty and is broadened by the bifurcation of capital trials into two phases." ABA Guideline 11.4.1 commentary (footnotes omitted). Investigation relating to guilt/innocence and sentencing phase issues "should begin immediately upon counsel's entry into the case and should be pursued expeditiously." ABA Guideline 11.4.1(A)); *see also* ABA Guideline 11.8.3(A) (emphasizing that sentencing phase investigation should begin immediately upon the attorney's entry into the case). Moreover, "[u]nless a plea bargain has resulted in a *guarantee* on the record that the

───────────────

[51] The 1989 ABA Guidelines were effective throughout the pendency of Mr. Jones' case in Superior Court and were updated again in February 2003. The Supreme Court in *Rompilla* cited both the 1989 and 2003 guidelines when addressing an ineffective assistance claim based on a 1989 trial that took place prior to the guidelines' promulgation. 545 U.S. at 387 n.7. As the Sixth Circuit has noted, in a case tried before the 1989 guidelines had issued, "the [1989] standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases" and the "[n]ew ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence" and "do not depart in principle or concept from *Strickland,* [or] *Wiggins*. . . ." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

death penalty will not [be] imposed, full preparation for a sentencing trial must be made in every case." ABA Guideline 11.8.6 (commentary).

According to the ABA Guidelines, counsel's investigation must include interviews with the defendant and corroborative witnesses in which counsel should seek information concerning the circumstances of the crime, the defendant's mental state at the time of the crime, potential aggravating circumstances, and information related to sentencing phase issues. ABA Guideline 11.4.1(D)(2)-(3). Sentencing phase information to be investigated and considered for presentation includes, but is not limited to, medical/mental health history, education and special needs, military history, employment and training history, family and social history, prior criminal history and experience in correctional institutions, and rehabilitative potential of the defendant. ABA Guidelines 11.4.1(D)(2)(C), 11.8.6(B).[52]

The ABA Guidelines further provide that "counsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and

---

[52] "Counsel should consider all potential methods for offering mitigating evidence to the sentencing entity or entities, including witnesses, affidavits, reports . . ., letters and public records." ABA Guideline 11.8.6(C). "Counsel should seek to ensure that the client is not harmed by improper, inaccurate or misleading information being considered by the sentencing entity or entities in determining the sentence to be imposed." ABA Guideline 11.8.2(C).

background" and "cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistants."  ABA Guideline 8.1 commentary.  Resources such as funds for investigators and experts "that counsel needs to pursue a proper investigation should be sought early in the case."  ABA Guideline 11.4.1 (commentary).  The role of such experts and investigators is to help prepare the defense, to provide an adequate understanding of the prosecution's case, to provide rebuttal to the prosecution's case at both guilt and sentencing, to present mitigating testimony about the impact on the defendant's life of events in any of the areas described above, and to relate "the client's potential at the time of sentencing."  ABA Guidelines 11.4.1(D)(7), 11.8.6(B)(8).  "The assistance of one or more experts (e.g., social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to outcome" of the sentencing phase.  ABA Guideline 11.8.6 (commentary).

The ABA Guidelines explicitly warn that "even counsel experienced in non-capital cases . . . may underestimate the importance of developing meaningful sources of mitigating evidence [for presentation at sentencing]," ABA Guideline 11.4.1 (commentary) (internal quotation marks omitted), and that "[e]xperienced criminal counsel familiar with sentencing practices in non-capital cases may not recognize the different form of advocacy required at a death penalty sentencing trial," ABA Guideline 11.8.6 commentary.  Therefore, underlying all other standards

107

is the requirement that defense counsel be experienced in defending death penalty cases and undergo specific training for that purpose. *See* ABA Guidelines 5.1(1)(A)(vi), 5.1(1)(B)(ii)(d)) (requiring that lead counsel and co-counsel have completed within one year of their appointment at least one training or educational program on criminal advocacy that focused on the trial of cases in which the death penalty is sought); Georgia Unified Appeal Rule II(A) (containing similar requirements).[53]

### c.    As to *Strickland*'s second prong, clearly established precedent holds that prejudice results where available mitigation evidence might have influenced one juror's determination as to sentencing.

In addition to demonstrating deficiency, *Strickland* also requires a finding of prejudice. *Strickland*, 466 U.S. at 687. A defendant is prejudiced at capital sentencing by counsel's failure to effectively investigate mitigation evidence if "there is a reasonable probability that at least one juror would have struck a different balance" at sentencing. *Wiggins*, 539 U.S. at 537; *id.* at 538 (prejudice occurs where

---

[53] In addition to relying on the various ABA standards and guidelines, the Supreme Court has cited local norms of professional practice in evaluating ineffective assistance claims. *See Wiggins*, 539 U.S. at 524 (citing testimony regarding "standard practice in Maryland in capital cases at the time of Wiggins' trial").

"mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [defendant's] moral culpability") (quoting *Williams*, 529 U.S. at 398). Phrased another way, prejudice exists where "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694) (finding prejudice where habeas proceedings revealed "a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury"). The petitioner's burden in an ineffective assistance claim is to show only "a reasonable probability" of a different outcome, *not* that a different outcome would have been certain or even "more likely than not." *Strickland*, 466 U.S. at 693.

> **2.  Trial counsel rendered prejudicially deficient performance in failing to conduct a meaningful investigation into mr. jones' background.**

In *Carr v. Schofield*, 364 F.3d 1246 (11th Cir. 2004), an AEDPA case, the Eleventh Circuit explained that competent defense counsel must present the jury with the totality of the available mitigation evidence:

> Ineffective assistance of counsel is established when counsel has failed to provide the jury with the "totality of the available mitigation evidence . . . [to] []weigh[] . . . against the evidence in aggravation," including a "graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' [which] might well . . . influence[ ] the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. at 397-98. . . . Counsel must present "more than a hollow shell of the testimony necessary" for the jury's "'particularized consideration of relevant aspects of the

> [defendant's] character and record.'" [*Collier v. Turpin*, 177 F.3d 1184, 1201-02 (11th Cir. 1999)] (quoting *Woodson* [*v. North Carolina*, 428 U.S. 280, 303 (1976)]). Counsel's failure to demonstrate available evidence of the defendant's upbringing, disposition, history of providing needed assistance to his family and others, acts of compassion and heroism, and circumstances at the time of the crime, especially his health, employment history, and economic status, "brings into question the reliability of the jury's determination that death was the appropriate sentence." *Id.* at 1202.

*Carr*, 364 F.3d at 1265 (parallel citations omitted). The scraps of evidence concerning Mr. Jones's upbringing that trial counsel were able to present to the jury in this case fall well short of this kind of comprehensive review. In particular, the jury was given no opportunity to understand Mr. Jones's alcohol abuse and the behaviors in which it resulted as having mitigating significance or stemming from a mitigating context. This allowed the State to argue with more force than should have been permitted that Mr. Jones "had wasted his opportunities and become a career criminal and a drug addict." *Christenson*, 269 Ga. at 238.

There can be no credible argument that counsel complied with prevailing local and national norms of capital defense representation, which require counsel to utilize available time and resources to secure necessary expert and investigative assistance early in the pendency of the case in order to commence the inquiry into a defendant's background and mental health status. Counsel failed to avail himself of any available assistance, choosing instead to go it alone, and then did nothing. Counsel failed to seek the assistance of a second chair attorney, failed to use any of the funds

that had been allotted for an investigator, and failed to seek out independent mental health expertise.[54] *See Wiggins*, 539 U.S. at 534 (failure to utilize available funds to commission mitigation investigation fell below prevailing norms) (citing 1989 ABA Guidelines); *id.* ("ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'") (quoting 1989 ABA Guidelines). Counsel did nothing to affirmatively search out potential mitigation witnesses and made little pretense of preparing those whom Mr. Jones and his parents had themselves recruited.

As the habeas court found, Dkt. No. 103-1 at 42, counsel was aware of the content of the testimony of the witnesses he presented at sentencing, including Mr. Jones' mother's testimony, in which she stated, without elaboration, that she had hospitalized her son for his alcoholism. Dkt. No. 98-5 at 123. Counsel thus also knew of his client's troubling history of alcohol dependence and abuse as a teenager. These were "red flags" which would have prompted a competent capital defense attorney in the mid 1990s to explore further. Instead, "counsel abandoned [his]

_____

[54] The only records counsel obtained -- Mr. Jones' school records -- were given to counsel by Mr. Jones's mother. Dkt. No. 100-2 at 16.

investigation of petitioner's background after having acquired only rudimentary knowledge of his [client's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524.

For example, counsel never even obtained records of Mr. Jones's inpatient hospitalization at Humana Hospital for alcohol addiction treatment and therapy. *See* Dkt. No. 100-3 at 156-86; Dkt. No. 100-4 at 1-45; Dkt. No. 101-1 at 1-48. These records contained a plethora of information regarding Mr. Jones's troubled childhood and adolescence, and the origin of his alcoholism in a lengthy, roughly 3-year episode of what turned out to be virtual imprisonment in his room by his parents for getting C grades. *See*, *e.g.*, Dkt. No. 100-4 at 2. Mr. Jones was isolated in his room, not allowed to come out, not allowed to see friends, and at one point, as witnesses described, he was moved to a room with a toilet so that he would not even be able to leave his room to go to the bathroom. During this time, as the records show, Mr. Jones's sense of isolation and emotional disturbance grew intense, and he began to engage in self-harm, such as punching his fist into walls and cutting his chest. *See*, *e.g.*, Dkt. No. 101-1 at 37. He became hopeless, felt that life was not worth living, and contemplated suicide. Dkt. No. 100-4 at 18, 43. His Global Assessment of Functioning (GAF) was rated at 30, Dkt. No. 100-3 at 169, indicating "serious impairment in communications or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost

112

all areas. . ."  Dkt. No. 101-3 at 24.  Hospital staff believed that the dysfunction at home necessitated the protective environment of a recovery residence in order to have a chance of avoiding relapse.  Dkt. No. 100-3 at 166.  The Humana records provided graphic context for the development of Mr. Jones's emotional disturbance as an adolescent who suffered from severe alcohol dependency after starting to drink at the age of 13.  *See*, *e.g.*, Dkt. No. 100-3 at 170; Dkt. No. 100-4 at 44.  Armed with these records and the testimony of numerous witnesses to Mr. Jones's deterioration and decompensation, a qualified expert like Dr. Barry Crown, Dr. Conner Walters, Dr. Jonathan Lipman, and/or a social worker like Dr. Lee Norton could have offered powerful interpretive testimony setting out a mitigating context for Mr. Jones's adolescent development and his decompensation around the time of the crime. Counsel's inaction is inexcusable.

The state habeas court attempts to characterize counsel's sentencing strategy as merely presenting Mr. Jones's "good qualities," as opposed to evidence of his troubled home life and alcoholism, which the court posits is inconsistent with counsel's approach.  *See* Dkt. No. 103-1 at 46.  In fact, in attempting to justify counsel's failure to present evidence regarding Mr. Jones's alcohol dependence, the court goes so far as to assert that counsel would not and *did not* tender any evidence relating to alcohol.  *See id.* at 51. This is an unreasonable determination of fact insofar as trial counsel *presented testimony from both Mr. Jones and his mother that*

*alcohol was the source of Mr. Jones's problems*. *See*, *e.g.*, Dkt. No. 98-5 at 94, 133-34. Again, without more, this conclusory testimony utterly failed to convey the depth and gravity of Mr. Jones's downward spiral. Mr. Jones did not merely "drink" alcohol, he was a severe alcoholic whose personality and behavior changed when he was in the midst of an alcoholic and drug-fueled binge. The addiction stemmed from lifelong issues with neglect and mistreatment at home about which the jury needed to know.

The record shows that trial counsel could not make a reasonable strategic decision as to sentencing phase mitigation because he had not done the investigation to inform himself of the available options. The habeas court's wholesale rejection of the ineffectiveness claim because of purported inconsistencies in the witness testimony or potential negative attributes contained in the Humana records (*see*, *e.g.*, Dkt. No. 103-1 at 48-51) contravenes *Strickland* in that it "discounts to irrelevance" ample, first-hand witness and documentary descriptions of an extremely troubled upbringing in a case where the jury heard almost literally nothing about the defendant whose fate they held in their hands. *See Porter*, 558 U.S. at 41, 43 (state court was "unreasonable to discount to irrelevance" the potential impact of evidence of defendant's troubled childhood where the "jury at [defendant]'s original sentencing heard almost nothing that would humanize [defendant] or allow them to accurately gauge his moral culpability."). Moreover, "competent counsel should

114

have been able to turn some of the adverse evidence into a positive-perhaps in support of a [mental health] mitigation theory." *Sears v. Upton*, 561 U.S. 945, 951 (2010). Indeed, as discussed further *infra*, many of the negative aspects of Mr. Jones's behavior documented in the Humana Records, for example, could be effectively attributed to Mr. Jones's youth.

### 3. Trial counsel unreasonably failed to obtain investigative or expert assistance.

Trial counsel utterly failed to utilize available resources to obtain appropriate expert and investigative assistance in order to develop and craft the best possible defense for Mr. Jones at his capital sentencing. In Mr. Jones's case, defense counsel made his client's troubled adolescence, alcohol consumption and substance abuse history (through his and his mother's testimony) the only nominally viable semblance of an explanation for his actions, yet counsel failed altogether to support that strategy by diligently investigating his client's social and mental health background, obtaining records from Mr. Jones's inpatient hospitalization for drug and alcohol addiction, and obtaining the assistance of competent, independent mental health experts in order to impress on the jury the full ramifications of Mr. Jones's history, even though obtaining such assistance was eminently feasible. Given the trajectory of counsel's "strategy," such as it was, counsel "had every reason to develop the most powerful mitigation case possible" along the thematic

115

lines counsel had chosen.  *Wiggins*, 539 U.S. at 526.  Counsel's performance fell far below prevailing professional norms for both Georgia and national capital defense practice, which provided for the retention of mental health experts and/or social workers to assist in developing mitigating evidence and themes for presentation at capital sentencing.

### a.    Social worker/mitigation investigator

A social worker/mitigation investigator has been a staple of the capital defense legal team for decades, including at the time of trial counsel's representation of Mr. Jones.  The importance of a complete social history as part of sentencing phase preparation has been well-understood since the 1980s:

> A complete social history consists of a life history that explores in detail *every event of any significance* in the client's life and every relationship that the client has had with virtually anyone throughout his life.  This information is often difficult to obtain because of the passage of time, the concomitant lapses of memory, and the often sensitive nature of the information sought.  Social workers/social investigators are trained in this type of investigation, in probing into the depths of people's minds for past information and often painful memories.  An astonishing number of people in these situations have experienced childhoods that are, at best, bizarre.  Physical, mental, and sexual abuse are often rampant.  Neglect, either physical or emotional, is common. . . .

> Often the types of abuse and neglect have to be discovered and proven through extrinsic sources, *i.e.*, social agencies, neighbors, teachers, friends, or relatives who were close to the family but have less reason to protect them.

> Very often these types of abuse and neglect are extremely subtle.  There may be no marks or broken bones or evidence of sexual abuse - but this

does not mean that abuse or neglect has not occurred.  Lack of emotion and support can be as devastating on the development of a child's psychological makeup as actual physical abuse.  Often these problems are not overt, but are the result of the makeup of the family. . . .

Only by investigating every aspect of the client's life history can these subtle influences be detected.  The team cannot hope to understand and explain the client and the crime without this type of a history.  The psychologist - who is most likely to be doing the explaining from the stand- is much better prepared to develop that explanation if he or she is not only provided with a social history but has also helped direct its preparation.

During the preparation of the social history, the social investigators will try to uncover and collect virtually every record from every type of institution with which the client has had contact.  These will include medical and psychological records as well as records from every social agency, juvenile institution, and prison with which the client has been in touch.  Many of these institutions have extensive records and have conducted intensive tests on the client.  These will often reveal a history of medical or psychological problems that are extremely helpful to a psychologist's present evaluation of the client and his or her explanation of the client and the crime.   The results of past psychological testing can be relevant to showing deterioration of psychological conditions, deterioration of I.Q., and other developing problems, as well as support the present diagnosis.  A client who was diagnosed as a developing schizophrenic at the age of 16 is not likely to be faking paranoid schizophrenia at the age of 32.  A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological makeup and of how the crime occurred.

David C. Stebbins, "Psychologists and Mitigation: Diagnosis to Explanation," *The Champion* (NLADA April 1988) at 37 (emphasis in original).[55]

Here, trial counsel had funds for an investigator but failed to use them, and indeed failed to obtain any records other than school records provided by Mr. Jones's mother.  Counsel's performance fell well below prevailing norms of capital defense representation.  *See Wiggins*, 539 U.S. at 524 (failure to use available funds to commission mitigation investigator held unreasonable attorney performance).

In state habeas proceedings, Mr. Jones presented the report of a social worker, Dr. Lee Norton, who demonstrated the kind of social history which could have been utilized by a competent attorney and/or mental health expert, or through testimony of the social worker him or herself, to convey a mitigating history of Ashley Jones to the jury.  *See* Dkt. No. 101-3 at 20-27.   The habeas court completely rejected, *i.e.*, "discount[ed] to irrelevance"[56] Dr. Norton's report for reasons that are either insufficient under Supreme Court precedent such as *Porter* or constitute

---

[55] *The Champion* is a long-standing journal published by the National Association of Criminal Defense Lawyers (NACDL) with national circulation.  For decades, it has regularly publishes articles featuring practical guidance and advice for defense lawyers trying capital cases.

[56] *Porter*, 558 U.S. at 43.

118

unreasonable fact determinations.  For example, the habeas court bases its rejection of her report because she is a social worker.  Dkt. No. 103-1 at 58.  In fact, the Georgia Supreme Court has long endorsed social workers as appropriate vehicles for conveying mitigating information.  *See*, *e.g.*, *Head v. Carr*, 273 Ga. 613, 618 (2001) (social worker testified about defendant's history, conveying information others told her).  The habeas court also asserts that the affidavit testimony on which Dr. Norton based her conclusions "are filled with hearsay."  Dkt. No. 103-1 at 58.  They are not filled with hearsay but instead are comprised almost solely of first-hand observations.  To the extent some hearsay is present, such testimony is permitted in capital sentencing under Georgia's permissive and broad scope of mitigation.  *See*, *e.g.*, *Barnes v. State*, 269 Ga. 345 (1998) (evidentiary rules are relaxed in Georgia capital sentencing, and scope of admissible evidence is broader than under Eighth Amendment).

The habeas court also faults Dr. Norton's report for "rel[ying] on factual inaccuracies," *i.e.*, according to the court, Dr. Norton "finds that Petitioner began drinking at 18 . . . . [h]owever, the numerous records, including those from Humana Hospital, show that Petitioner himself stated that he began drinking at age 13 or 14."  Dkt. No. 103-1 at 58.  The problem with this finding is that it is, itself, completely factually inaccurate, insofar as Dr. Norton's report states as follows:

119

> Accounts by Ashley noted in his treatment records indicate that the prolonged isolation caused him to feel rejected by his parents and led to enduring depression that he 'medicated' with alcohol. He reported to several sources that he began drinking at *about the age of thirteen* to cope with feelings of low self-esteem, loneliness, and embarrassment associated with his long periods of confinement. His serious drinking problem appears to have escalated rapidly while he was still a teen and to have caused significant emotional and behavioral problems which the family was unable to effectively resolve.

Dkt. No. 101-3 at 22 (emphasis supplied). The habeas court's rationale thus rests on an unreasonable fact determination. In addition, the court quibbled with Dr. Norton's suggestion that Mr. Jones had stolen trucks prior to the murder during an alcoholic blackout, because Mr. Jones had given a statement in which he recalled events involving the trucks. *Id.* at 58. Again, the court unreasonably discounts to irrelevance Dr. Norton's report merely because one can plausibly dispute her blackout finding as to the truck incident, which is by no means central to her overall narrative and conclusions.[57] *Porter*, *supra*. Relief is warranted.

―――――――――――

[57] Dr. Norton's conclusions were substantiated in part by the Humana Hospital records, which detail that by the time he was 18, Mr. Jones was a "full blown alcoholic" (Dkt. No. 100-3 at 169) who was constantly preoccupied with drinking, used alcohol and drugs to alleviate emotional and physical pain, frequently binged on drugs and alcohol for days at a time, on several occasions had experienced alcoholic blackouts and had "lost control of [his] drinking" at the time he stole the trucks and was arrested. Dkt. No. 100-3 at 170, 186; 100-4 at 44. With regard specifically to the truck theft incident, Dr. Norton also relied in part on the testimony of Mr. Jones's former guidance counselor, Charlotte Taylor, who testified that "[Mr. Jones] said he did remember being at his apartment with another guy; they were

### b.      Mental health experts

In capital cases,

> presenting psychological evidence to explain the life of the defendant
> and explaining how and why he was in a situation where he could kill
> another human being is the essence of the defense attorney's case in
> mitigation.  The psychologist needs to be made part of the team from
> the very beginning – just as various law enforcement personnel are part
> of the prosecutor's team from the very beginning.

Stebbins, "Psychologists and Mitigation," *The Champion* (NLADA April 1988) at

34.

Indeed, "courts have 'long recognized a particularly critical relation between

expert psychiatric assistance and minimally effective assistance of counsel.'" *Blake*

*v. Kemp*, 758 F.2d 523, 529 (11th Cir. 1985) (quoting *United States v. Edwards*, 488

F.2d 1154, 1163 (5th Cir. 1974)).  The Supreme Court has explained that mental

health experts, "[b]y organizing a defendant's mental history, examination results

and behavior, and other information, interpreting it in light of their expertise, and

then laying out their investigative and analytic process to the jury, [thus] enable the

---

drinking beer, and, before he could stop, he'd drunk a whole case of beer.
Apparently, they then thought about going for a ride, and the next thing Ashley
remembers was waking up in jail.  He was extremely upset and remorseful when he
was telling me this story; it was not at all a bragging kind of recounting."  Dkt. No.
99-12 at 205.

jury to make its most accurate determination of the truth on the issue before them." *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985).

Psychiatric mitigating evidence has long been held to be critical in death penalty cases, both in Georgia and across the country, in effectively conveying the reality of a defendant's diminished moral culpability. Psychiatric mitigating evidence "has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior. 'Thus, psychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors.'" *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988) (citations omitted); *see also*, *Christenson*, 269 Ga. at 241 ("psychiatric evidence, if properly investigated and presented, [can] totally change the evidentiary picture.").

In Georgia capital defense practice, experts are critical in helping to tie the various aspects of a defendant's life history, as well as instances of mental health treatment, into a coherent picture of the defendant's state of mind throughout his life path leading up to the crime. The Georgia Supreme Court has repeatedly held that the average capital juror is hindered in her sentencing deliberations when available psychiatric opinion testimony or other psychiatric mitigating evidence is not presented in court. In *Bright v. State*, 265 Ga. 265 (1995), the Georgia Supreme Court held that "a psychiatrist could have evaluated, in terms beyond the ability of

122

the average juror, Bright's ability to control and fully appreciate his actions in the context of the events that arose on the night of the murders, given his severe intoxication, his history of substance abuse, his troubled youth, and his emotional instability." *Bright*, 265 Ga. at 276.  Similarly, in *Turpin v. Lipham*, 270 Ga. 208 (1998), the Court found counsel ineffective for failing to present the testimony of a mental health expert to help the jury understand the mitigating significance of Lipham's troubled upbringing and mental disorders: "*[T]he average juror is not able, without expert assistance, to understand the effect [the defendant]'s troubled youth, emotional instability and mental problems might have had on his culpability for the murder.*"  *Lipham*, 270 Ga. at 219 (emphasis supplied).

Well before Mr. Jones was arrested for murder, the Georgia Supreme Court had set the standard in Georgia for competent defense performance in the utilization of independent mental health experts in capital cases.  *See Curry v. Zant*, 258 Ga. 527 (1988).  In *Curry*, the petitioner (Curry) had undergone a court-ordered evaluation at Central State Hospital to determine whether he was competent to stand trial.  The report resulting from that evaluation "was not favorable to the defense." *Curry*, 258 Ga. at 528.  The trial court advised trial counsel that he would provide funds for an independent evaluation, but trial counsel did not seek the funds.  Curry's trial counsel testified in post-conviction proceedings that no independent evaluation of the defendant's mental status was requested "based on his [the defense attorney's]

123

own observations and the report" from Central State Hospital.  *Id*. at 529.  Curry

entered a plea of guilty to murder, and he was sentenced to death by the jury after a

sentencing proceeding.   In post-conviction proceedings, Curry presented the

testimony of independent mental health experts who had evaluated him and found

that he suffered from debilitating mental diseases and defects, and that he had at the

time of the offense, plea and sentencing.   The court, while finding that Curry's

attorney had been diligent and conscientious, nevertheless found that counsel had

been ineffective:

> We find that although trial counsel met with Curry on many occasions, consulted with Curry and with Curry's family on the decision to enter a guilty plea, and conscientiously prepared for the sentencing phase of trial, his failure to take the crucial step of obtaining an independent psychiatric evaluation of Curry deprived his client of the protection of counsel.  Conscientious counsel is not necessarily effective counsel. The failure to obtain a second opinion, which might have been the basis for a successful defense of not guilty by reason of insanity and would certainly have provided crucial evidence in mitigation, so prejudiced the defense that the guilty plea and the sentence of death must be set aside.

*Curry*, 258 Ga. at 528.

The facts in *Curry* track those in Mr. Jones's case.  Here, the habeas court

found, as in *Curry*, that trial counsel abandoned any effort to obtain independent

124

expert assistance "based on his own observations and the report"[58] from Dr. D'Alesandro at the state hospital.  Dkt. No. 103-1 at 41.  This was unreasonable, because D'Alesandro's evaluation was for competency and criminal responsibility, not mitigating circumstances, and it did not incorporate background information a competent defense attorney would have obtained.  Just as in *Curry*, trial counsel's failure to retain an independent expert of any kind, at least in order to obtain a second opinion, fell below prevailing norms and was prejudicial to Mr. Jones's defense.

Nevertheless, the habeas court rejected Mr. Jones's expert proffer in toto by stating:

> "A clear overtone to [Petitioner's] argument is the proposition that if a defense attorney has not produced a witness who would agree with the after-the-fact diagnosis presently presented, then the attorney is ineffective." *Poyner v. Murray*, 964 F2d 1404, 1418 (4th Cir. 1992). "[The courts have] reject[ed] this proposition." *Id*. "Counsel is not required to search for a psychiatrist who will testify in a particular way." *Elledge v. Dugger*, 823 F2d 1439 (11th Cir. 1987).

> This Court finds that the expert affidavits tendered by Petitioner are not persuasive and would not have changed the outcome of Petitioner's trial.

Dkt. No. 103-1 at 60-61.

---

[58] *Curry*, 258 Ga. at 529.

The problem with the reliance on *Poyner* in particular is that it is factually completely inapposite.  In *Poyner*, the defendant presented a mental health expert at his trial, but did not like the expert's performance.  Here, on the other hand, Mr. Jones' counsel did not have him evaluated by anyone.  Again, the court unreasonably discounts to irrelevance the ample expert testimony proffered by Mr. Jones, in a case where the jury heard nothing in the way of expert testimony whatsoever.  *See Porter*, 558 U.S. at 43.

Had counsel obtained any of the experts proffered by Mr. Jones in state habeas proceedings and presented their testimony along with the fruits of a competent background investigation to the jury, there is clearly a reasonable probability that at least one of the jurors – perhaps one of the three holdouts on Mr. Jones' jury – would have voted for a sentence less than death.  By discounting to irrelevance the potential impact on the jury of any of the proffered expert testimony, on the basis of what amount to minor quibbles, the habeas court unreasonably applied or contravened *Strickland*.  *See*, *e.g.*, *Porter*, 558 U.S. at 43.

> ### 4.    Counsel failed to present available evidence pointing to alcoholic poisoning of Mr. Jones's brain during adolescence or highlight the mitigating ramifications of Mr. Jones's youthful status in any way.

Trial counsel repeatedly let slide the prosecutor's efforts to mislead the jury by inflating Mr. Jones's age (telling the jury on at least two occasions that Mr. Jones

was 21 at the time of the crime, *see* Dkt. No. 98-5 at 149, 158), failing to alert the jury that Mr. Jones was only 19 years old at the time of the crime and, in general, failing to highlight in any way his youthfulness as a mitigating circumstance, particularly in terms of the consequences of Mr. Jones's alcohol dependence from a young age through adolescence.  This lackluster performance clearly stemmed from counsel's failure to conduct anything resembling meaningful investigation or preparation which resulted in a total lack of familiarity with his client's background. Counsel effectively surrendered the field to the prosecutor, who told the jury that Mr. Jones was a grown adult filled with evil intent.

In state habeas proceedings, Mr. Jones presented testimony of family members, teachers, friends and other witnesses who highlighted Mr. Jones's life as a boy and youth.  They told a detailed and tragic story of a talented and outgoing boy who loved church musicals and did well in school, but who was literally imprisoned in his room for months at a time by his parents over nothing more serious than having received C grades in school.  Mr. Jones turned to alcohol when he was as young as age 13 to cope with the sense of failure and abandonment engendered by this strict treatment, and this was his downfall.  As the evidence and records showed, Mr. Jones was deeply physically dependent on alcohol by the time he had finished high school.

127

Although trial counsel presented evidence at trial and sentencing that Mr. Jones was drinking alcohol at the time of the crime and that alcohol had been the cause of the deterioration of his life up to the time of the crime (*see*, *e.g.*, Dkt. No. 98-4 at 30-34; Dkt. No. 98-5 at 94, 133-34), no details were presented to the jury. Nothing more than a "hollow shell" of information pertaining to Mr. Jones's youth was presented to the jury.  Instead, counsel stated: "Well, you know, it's kind of strange.  We have a kid that comes from such a good family, does so well in school and does so well in church, and then we have this calamity."  Dkt. No. 98-5 at 121-22.  The prosecutor exploited the lack of any meaningful mitigating context, noting that Mr. Jones had obtained an IQ of 115 (*id*. at 149) and attributing his behavioral decompensation to "evil":

> It is something beyond mere alcohol that does that.  It is an *evil* that had to exist inside him even while he was going to church, even while he was doing good things as a child.  There was *some evil* that was brought out when he turned 17, when he turned 18, and it's not alcohol.  That's an easy crutch of one to grasp.  *It is something evil inside him, and we must stop it*.

Dkt. No. 98-5 at 146-47 (emphasis added).

Had counsel obtained the services of a mental health expert like Dr. Barry Crown, a neuropsychologist who tested Mr. Jones during state habeas proceedings, counsel could have provided crucial psychiatric mitigating evidence regarding the impact of extensive exposure to alcohol during Mr. Jones's youth.  Dr. Crown

emphasized the severe damage that alcohol can do to the brain as it develops during

youth and adolescence, as it did in Mr. Jones' case:

> Ashley's alcohol abuse began right at the point that the frontal lobe of
> his brain was being developed.  Ingesting intoxicants of any fashion
> during this time period can have severe consequences on the brain, and
> as in Ashley's case, cause permanent organic brain damage.  Ingesting
> alcohol in the quantities Ashley did when he was 12 - 14 years old had
> the effect of chemically or metabolically poisoning his brain.

Dkt. No. 99-12 at 82.  Dr. Crown found that Mr. Jones had sustained organic damage

to his brain, evidenced in a significant drop in IQ:[59]

> In 1982, Ashley achieved a 130 on a standardized IQ test and was thus
> eligible for the gifted program.  A score of 130 represents a variation of
> 2 standard deviations from the norm, the norm being a score of 100.
> This test was administered when Ashley was approximately 9 years old.
> In 1993, the year he was tested by Dr. D'Alesandro, he "achieved an
> IQ rating of 115." This score, while within normal range reflects a
> significant drop in intellectual functioning.  When I tested Ashley in
> 1998, some 5 years later, his intellectual functioning had decreased still
> more as reflected by his score of 112 on the Gama test.   All told,
> Ashley's level of intellectual functioning has decreased in excess of 15
> points since adolescence.  He has gone from being among the few
> people who are incredibly bright to among the many who are slightly
> more than average.  This drop in intellectual functioning is further

---

[59] Mr. Jones had obtained a 130 IQ on a 1982 Slosson Intelligence Test (SIT)
(Dkt. No. 101-3 at 42), but he obtained a 115 IQ during testing by state clinicians in
1993 (Dkt. No.100-2 at 141), and a 112 IQ score in Dr. Crown's testing in 1998
(Dkt. No. 99-12 at 10).

indication of organic brain damage, specifically, organic brain damage centered in the frontal lobe of the brain. . . .

Mr. Jones suffers from organic brain damage to the frontotemporal sub-cortical portion of the brain.  Organic brain damage located in this area is manifested by substantial impairment in memory, concentration and attentional skills.  Further, this type of brain damage predisposes the subject to impulsivity and seriously compromises the subject's ability to engage in sound judgment.  A person with Ashley's condition cannot efficiently process information even when calm and relatively organized.  Under stress, such a person tends to lose context and is rendered unable to identify, much less adopt, an appropriate course of action.  Moreover, the consumption of alcohol would tend to aggravate these effects of permanent brain dysfunction.

Dkt. No. 99-12 at 81.  Testimony like the above would have provided important context and rebuttal to the prosecutor's cavalier citation of Mr. Jones's IQ score and a reality-based understanding of the impact of substance addiction on Mr. Jones's brain development and on the ability of a young person in Mr. Jones's circumstances to conform his conduct to the law in the time leading up to and during the crime. Counsel would not have had to speculate idly, and destructively, as to what could have happened to this "kid" to cause such a "calamity."  And at least one juror may have rejected the prosecutor's theory of "evil" and held out for a sentence less than death.

### a. Youth is inherently mitigating.

Much could have been said about the ramifications of Mr. Jones's status as a young person. The United States Supreme Court has long recognized the significance of youth as a mitigating circumstance in death penalty cases:

> [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults.

*Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982) (quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979)); *see also Hardwick v. Crosby*, 320 F.3d 1127, 1173 (11th Cir. 2003) (mitigating factors in defendant's youth were mitigating "because [they were] formative in [the defendant's] development as a young man; yet [counsel] failed to present this evidence to the judge and jury at the sentencing phase.").

For these reasons, in 1987, the American Society for Adolescent Psychiatry (ASAP) submitted an amicus brief in *Thompson v. Oklahoma*, U.S. Supreme Court Case No. 86-6169,[60] advocating that juvenile defendants be exempt from capital punishment. The ASAP offered the following critical insights into the characteristics of adolescence:

--------------------------------

[60] *See Thompson v. Oklahoma*, 487 U.S. 815 (1988).

Psychiatrists, psychologists and other child development experts have demonstrated that adolescents are at a stage of development in which they lack the cognitive ability, judgment and fully-formed identity or character of adults. . . .

An adolescent's intellectual growth is incomplete and his or her reasoning skills and logic are immature. . . . These new cognitive skills develop continuously and "most adolescents *cannot be shown to have reached the stage of formal reasoning by the end of high school*." Formal, abstract reasoning is a complex ability that is influenced by training and experience.  Therefore, although adolescents begin to acquire a broader awareness, *they lack the judgment necessary to choose carefully among various possibilities and to appreciate the future consequences of their actions*.

Behaviorally, the effects of an adolescent's developing cognitive ability include increased impulsiveness, experimentation, and risk-taking. An adolescent's newly forming capacity to reason abstractly, coupled with his or her "fascination with the possible," results in a desire to explore various behaviors.  However, because of an adolescent's limited experience and lack of ability to assess future consequences, he or she is unable to conceptualize realistically the potential negative outcomes of certain actions. This difficulty contributes to a young person's feelings of invulnerability to personal risk.  *Hence adolescents often engage in alcohol and drug use/abuse, sexual experimentation, reckless use of motor vehicles, and other potentially destructive behaviors*. . . .

Adolescent cognitive development is also characterized by a high degree of egocentrism. . . . Moreover, adolescents come to regard themselves, and their own feelings, as particularly special and unique. This belief further contributes to an adolescent's lack of understanding regarding death. . . . *Adolescent egocentrism thus results in a general impairment of adolescent judgment*.

Adolescence is also a period during which youths struggle to develop a certain measure of independence and personal identity or character.  An adolescent engages in this developmental task in a number of ways, such as trying out various roles, separating from his or her parents, and seeking affirmation from a peer group. Throughout this process,

adolescents remain emotionally dependent on other people.  They are *vulnerable to influences from both parents and peers, and are less capable of independent, self-directed action than adults.* The character structure of adolescents, though developing, remains in flux and does not represent the final level of maturity found in adults. Adolescents are by nature capable of significant and spontaneous change. . . .

Adolescence is . . . generally characterized by emotionality rather than rationality.  Adolescents tend to show a special intensity of feeling and tend to seek out emotional experience.   Moreover, it has been demonstrated consistently that "adolescents experience a greater fluctuation of mood than adults."

Finally, adolescents lack the capacity for mature, principled moral judgment which is characteristic of normal adult thought. Moral judgment emerges through the maturation process as a result of cognitive and emotional growth and an adolescent's interaction with his or her environment. *An adolescent lacks a fully formed value system against which to evaluate his or her behavior and decisions.* . . .

Adolescents must undergo an array of significant changes prior to adulthood. Before these many developmental tasks are achieved, adolescents are vulnerable in a variety of ways. They have difficulty appreciating the future consequences of their acts, generally lack mature judgment, are *easily influenced by family members and peers* and often engage in experimentation and risk-taking. Adolescents tend to be guided by emotions rather than reason. Furthermore, adolescents *lack a fully formed identity or character, and generally do not have the capacity for principled moral judgment.*

Adolescence is a critical developmental stage through which young persons must pass prior to entering adulthood. *The clinical literature confirms what we all generally know and what the law has always recognized -- adolescents are not adults.  Adolescents are less capable and less responsible than adults, and more in need of protection and support.*

1987 U. S. S. Ct. Briefs LEXIS 436 at *12 - *19 (italics supplied) (citations omitted).

There is a societal consensus that youth is an inherently mitigating factor when considering punishment in capital cases. State statutes reveal that "youth" is a statutory mitigating factor in most states with capital punishment, and it is only rarely circumscribed by specific reference to age.[61] While Georgia does not have

_____

[61] *See, e.g.*, Ala.Code 1975 § 13A-5-51(7)  ("the age of the defendant at the time of the crime"); Ariz. Rev. Stat. § 13-702(D) ("the age of the defendant"); Ark. Code Ann. § 5-4-605(4)("the youth of the defendant at the time of the commission of the capital murder"); Cal. Penal Code § 190.3(i) ("the age of the defendant at the time of the crime"); Colo. Rev. Stat. § 18-1.3-1201(4)(a)("the age of the defendant at the time of the crime"); Fla. Stat. ch. 921.141 (6)(g)("the age of the defendant at the time of the crime"); I.C. § 35-50-2-9(c)(7) (Indiana) ("the defendant was less than eighteen (18) years at the time the murder was committed"); K.S.A. § 21-4626(7) ("the age of the defendant at the time of the crime"); Ky. Rev. Stat. Ann. § 532.025(2)(b)(8) ("the youth of the defendant at the time of the crime"); L.S.A.-C.Cr.P. Art. 905.5(f) ("the youth of the offender at the time of the offense"); Md. Code Ann., Crim. Law § 2-303(h)(2)(v) ("the defendant was of a youthful age at the time of the murder"); M.G.L.A. 279 § 69(b) (Massachusetts) ("the defendant was over the age of seventy-five at the time of the murder or any other relevant consideration regarding the age of the defendant at the time of the murder"); Miss. Code Ann. § 99-19-101(6)(g) ("the age of the defendant at the time of the crime); MT § 46-18-304(1)(g) ("the defendant, at the time of the commission of the crime, was less than 18 years of age"); Neb. Rev. Stat. § 29-2523(2)(d) ("the age of the defendant at the time of the crime); N.H. Rev. Stat. Ann. § 630:5(VI)(d) ("the defendant was youthful, although not under the age of 18"); N.M. Stat. Ann. § 31-20A-6(I) ("the defendant's age"); N.C. Gen. Stat. § 15A-2000 (f)(7) ("the age of the defendant at the time of the crime"); Ohio Rev. Code Ann. § 2929.04(B)(4) ("the youth of the offender"); Or. Rev. Stat. §§ 163.150(1)(c)(A) ("the defendant's age"); 42 Pa. Cons. Stat. Ann. § 9711(e)(4) ("the age of the defendant at the time of the crime"); S.C. Code Ann. § 16-3-20(C)(b)(7) and (8) ("the age or mentality of the defendant at the time of the crime" and "the defendant was below the age of eighteen at the time of the crime"); Tenn. Code Ann. § 39-13-204(j)(7) ("the youth or advanced age of the defendant at the time of the crime"); Utah Code Ann. § 76-3-

statutory mitigating circumstances, the youth of the defendant is one of the designated mitigating circumstances listed in the pattern trial judge's report.  See GA R Unif A, "Report of Trial Judge," Item (5) (listing "youth of the defendant at the time of the crime" as a mitigating circumstance).

In *Roper v. Simmons*, 543 U.S. 551 (2005), further, the United States Supreme Court, in finding an Eighth Amendment prohibition on capital punishment for offenders under age 18, described adolescents as inherently prone to poor judgment and impulse dyscontrol because their personalities are as yet immature in comparison to adults:

> "[A] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions." [Quoting *Johnson v. Texas*, 509 U.S. 350, 367.] . . . It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior."[62] . . .
>
> [J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.  [Citing *Eddings*, 455 U.S. at 115].  This is explained in part by the prevailing circumstance

---

207(4)(e) ("the youth of the defendant at the time of the crime"); W.S. 1977 § 6-2-102(j)(vii) (Wyoming) ("the age of the defendant at the time of the crime").

[62] Quoting Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Review 339 (1992).

that juveniles have less control, or less experience with control, over
their own environment. . . .

[T]he character of a juvenile is not as well formed as that of an adult.
The personality traits of juveniles are more transitory, less fixed. . . .
The susceptibility of juveniles to immature and irresponsible behavior
means "their irresponsible conduct is not as morally reprehensible as
that of an adult." [Quoting *Thompson*, 487 U.S. at 835.] Their own
vulnerability and comparative lack of control over their immediate
surroundings mean juveniles have a greater claim than adults to be
forgiven for failing to escape negative influences in their whole
environment. . . .

The reality that juveniles still struggle to define their identity means it
is less supportable to conclude that even a heinous crime committed by
a juvenile is evidence of irretrievably depraved character. From a moral
standpoint it would be misguided to equate the failings of a minor with
those of an adult, for a greater possibility exists that a minor's character
deficiencies will be reformed. . . .

*Simmons*, 543 U.S. at 569-70. Moreover, the Court acknowledged that "[t]he

qualities that distinguish juveniles from adults *do not disappear when an individual*

*turns 18*." *Id*. at 574 (emphasis supplied).

<blockquote>

**b.**     **The habeas court unreasonably discounted to
irrelevance expert testimony regarding the
impact of alcohol addiction on Mr. Jones's
adolescent brain.**

</blockquote>

In state habeas proceedings, Dr. Barry Crown discussed how in Mr. Jones'

developing adolescent brain was profoundly impacted by his severe alcoholism. On

top of the kinds of judgement and impulse control problems inherent among

adolescents, as described by the Supreme Court above, Mr. Jones's addiction to

136

alcohol did further damage to the parts of the brain which control such executive functioning and which are under construction during the formative adolescent years.

However, the state habeas court flatly declared Dr. Crown's testimony to be unreliable. This finding was patently unreasonable. The habeas court's peremptory treatment of Dr. Crown's testimony consisted of highlighting minor quibbles with the evidence and otherwise discounting it to irrelevance, in its entirety, by finding it to be "not substantiated." *See* Dkt. No. 103-1 at 58. The habeas court's assessment of Dr. Crown's testimony is based on unreasonable fact determinations and contravenes *Strickland* in its wholesale condemnation. *See*, *e.g.*, *Porter*, 558 U.S. at 43 (where jurors hear virtually no evidence bearing on defendant's mental health, it was unreasonable for state court to "discount entirely the effect that [defendant's habeas expert's] testimony might have had on the jury or the sentencing judge.").

Here, the habeas court usurped the prerogative of the jury in concluding that Dr. Crown's testimony was entirely unreliable and unworthy of consideration. In particular, the habeas court rejected Dr. Crown's conclusion that Mr. Jones showed a profound loss of cognitive ability over the course of his adolescence, during which Mr. Jones had become addicted to alcohol. Dkt. No. 103-1 at 59. The court accused Dr. Crown of improperly adding the standard error of measurement to a 1985 Slosson IQ score of 121 in order to obtain the 130 IQ Dr. Crown cited in his

testimony (*see* Dkt. No. 99-12 at 80).   Dkt. No. 103-1 at 59.[63]   In making this

accusation, the habeas court was actually looking at the wrong IQ score.  Mr. Jones

*did* obtain a Slosson IQ of 121 in a 1985 test,[64] but Dr. Crown clearly stated in his

testimony that Mr. Jones had obtained a Slosson IQ score of 130 in *1982*, not 1985.

Dkt. No. 99-12 at 80.   And this statement is directly corroborated by the school

records, which show a Slosson IQ of 130 obtained in 1982 testing.  Dkt. No. 101-3

at 42.   The habeas court's determination that Dr. Crown's conclusion was "not

substantiated" and therefore lacked credibility is based on an unreasonable

determination of fact.

The habeas court also discounted the entirety of Dr. Crown's testimony as

unreliable because the court saw inconsistency between Dr. Crown's discussion of

the extent of Mr. Jones's level of intoxication at the time of the crime as compared

with other evidence, including the fact that Mr. Jones could remember details of the

night of the crime.  Dkt. No. 103-1 at 59.  In addition, the court quibbled with Dr.

———————————

[63] "Clearly, Dr. Crown has chosen to add the numbers of Petitioner's IQ test and find that Petitioner scored 130 on his IQ test in 1985.  However, if Dr. Crown had subtracted the nine, Petitioner's 1Q score would be 112 as Dr. Crown has now found in his testing."

[64] *See* Dkt. No. 101-3 at 43 (school records).

Crown's suggestion that Mr. Jones had stolen trucks prior to the murder during an alcoholic blackout, because Mr. Jones had given a statement in which he recalled events involving the trucks. *Id*. at 58, 59.[65]

These are minor quibbles given that the thrust of Dr. Crown's testimony related to the results of neuropsychological testing he conducted and his conclusion, based on that and past testing, as well as school and mental health records, that Mr. Jones had sustained significant impairments as a result of having become severely addicted to drugs and alcohol during his adolescence. The jury heard none of this information. If competent counsel had presented testimony like this, the prosecutor

---

[65] Dr. Crown's conclusions were substantiated in part by the Humana Hospital records, which detail that by the time he was 18, Mr. Jones was a "full blown alcoholic" (Dkt. No. 100-3 at 169) who was constantly preoccupied with drinking, used alcohol and drugs to alleviate emotional and physical pain, frequently binged on drugs and alcohol for days at a time, on several occasions had experienced alcoholic blackouts and had "lost control of [his] drinking" at the time he stole the trucks and was arrested. Dkt. No. 100-3 at 170, 186; 100-4 at 44. With regard specifically to the truck theft incident, Dr. Crown relied in part on the testimony of Mr. Jones' former guidance counselor, Charlotte Taylor, who testified that "[Mr. Jones] said he did remember being at his apartment with another guy; they were drinking beer, and, before he could stop, he'd drunk a whole case of beer. Apparently, they then thought about going for a ride, and the next thing Ashley remembers was waking up in jail. He was extremely upset and remorseful when he was telling me this story; it was not at all a bragging kind of recounting." Dkt. No. 99-12 at 205.

may have echoed the habeas court's quibbles, but the defense could have pushed back and made the jury grapple with a mental health expert's conclusions.

The United States Supreme Court has held that where substantial mitigating evidence was available but not presented to the original jury, as in this case, it is unreasonable for a state court to discount it simply because contradictory evidence could potentially have emerged upon its presentation. *See Porter v. McCollum*, *supra*. In Florida post-conviction proceedings, Porter presented a forensic psychologist who testified that Porter suffered from "a mental condition that substantially impaired his ability to comply with the law." *Porter v. State*, 788 So.2d 917, 922 (Fla. 2001). However, the state produced a rebuttal expert who "specifically disagreed with [Porter's expert]'s testimony and testified that this mitigation was not present," and whom the state post-conviction court explicitly credited over Porter's expert, whose testimony the court found to be without foundation. *Id.* at 923. The Eleventh Circuit, reviewing Porter's claims in federal habeas proceedings, found the state courts' stance reasonable, given that Porter's manifestation of symptoms of mental illness appeared to be lacking in credibility: "The questionable accuracy of the test results and Porter's failure to manifest mental problems during his competency evaluations provided substantial evidence for the

trial court to conclude that Porter was not suffering from a mental illness." *Porter v. Attorney General*, 552 F.3d 1260, 1275 (11th Cir. 2008).[66]

However, the Supreme Court rejected the state courts' and the Eleventh Circuit's approach, finding that the lower courts had "unreasonably discounted" the testimony of Porter's expert: "While the State's experts identified perceived problems with the tests that [Porter's expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge." *Porter*, 558 U.S. at 43. Thus, the Court found that where the original jury "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability," *id.* at 41, potential conflicts in the post-conviction evidence did not justify the failure to present *any* of it at trial, or render that failure non-prejudicial. The Court noted that, "'there exists too much mitigating evidence that was not presented to now be ignored.'" *Id.* at 44 (quoting *Porter*, 788 So.2d at 937 (Anstead, J., dissenting)).

---

[66] The Eleventh Circuit noted in particular that the state expert had found "the methodology of . . . [the habeas expert to be] unreliable," and the Florida habeas court had found his test results to be of "questionable accuracy" and his overall conclusions to be "speculative and not supported by the evidence." *Porter*, 552 F.3d at 1271, 1275.

The same is true in Mr. Jones' case.  In Georgia, the Georgia Supreme Court has explicitly recognized that an informed expert in a capital case can "evaluate[], in terms beyond the ability of the average juror, [a defendant]'s ability to control and fully appreciate his actions in the context of the events that arose on the night of the murders, given his severe intoxication, his history of substance abuse, his troubled youth, and his emotional instability."  *Bright v. State*, 265 Ga. 265, 276 (1995).  Thus, per *Porter*, it was unreasonable for the state habeas court to "discount to irrelevance," 558 U.S. at 43, the potential impact of testimony like Dr. Crown's.

Mr. Jones' state habeas court thus unreasonably applied clearly established federal law in discounting the effect the available evidence would have had on the jury.  Under these circumstances, where the jurors heard virtually nothing meaningful or humanizing about Mr. Jones's background, and were nevertheless struggling with their verdict, it is reasonably probable that at least one juror would have held out for life.  *Wiggins*, 539 U. S. at 537.  Relief is warranted.

## 5.   Trial counsel unreasonably failed to place the co-defendant's jury-imposed life sentence before Mr. Jones's sentencing jury.

Mr. Jones was tried in June 1995, roughly six months after co-defendant Bunner was convicted of malice murder and sentenced to life without parole by a capital sentencing jury in December 1994.  Mr. Thigpen made no attempt to place the fact of Mr. Bunner's life sentence before Mr. Jones's jury at sentencing, despite

the fact that it had obvious mitigating value in a case where the respective roles of either co-defendant were far from clear and where the jury evinced clear concern about the disposition of Mr. Bunner's case.

After the close of the culpability phase of Mr. Jones's trial, but before the jury had rendered a verdict as to guilt, it sent a note to the trial judge asking as to "the present legal status of Mr. Allen Bunner." Dkt. No. 98-4 at 150-51. The court informed the jury it had "no need to know" about Mr. Bunner's status. *Id*. at 154. Nevertheless, thereafter, Mr. Thigpen never attempted, at sentencing, to place the fact of Mr. Bunner's life sentence before the jury. Counsel's omission was patently unreasonable under the circumstances, and it harmed Mr. Jones's chances for a sentence less than death.

The state habeas court denied this ineffectiveness claim by finding that Georgia law deemed evidence of a codefendant's life sentence to be inadmissible at sentencing, citing *Crowder v. State*, 268 Ga. 517 (3) (1997) and *Barnes*, 269 Ga. at 354. *See* Dkt. No. 103-1 at 8-9. These cases were completely misapplied by the habeas court as they do *not* hold that a co-defendant's life sentence is inadmissible at a capital sentencing trial. The basis of the habeas court's ruling is thus an unreasonable determination of fact, *i.e.*, that Georgia law prohibits this kind of evidence at sentencing. In fact, the cases cited by the habeas court strongly support

the admissibility of testimony regarding Mr. Bunner's life sentence at Mr. Jones's sentencing.

In *Crowder*, after noting that the scope of mitigation evidence admissible at sentencing is very broad, the Georgia Supreme Court explicitly left open the question of whether "a *certified copy* of the codefendant's life sentence is a mitigating circumstance for the jury to consider," especially given Crowder had been sentenced to life, himself. *Crowder*, 268 Ga. at 519 (emphasis supplied). The Court acknowledged that in another death penalty case, a trial court had allowed the defendant at sentencing to cross-examine a codefendant about his 15 year sentence on the same facts, which, the court noted, apparently succeeded in garnering a life sentence for the defendant. *Id*. (citing *Kimbrough v. State*, 254 Ga. 504, 505 (1985)).[67]

Turning to *Barnes*, the portion cited by the habeas court holds essentially the opposite of what the habeas court (or rather, what Respondent's counsel, who drafted the order) thinks it holds. In *Barnes*, the *state* presented the co-defendant as a

_____

[67] The Court also cited (*id*. at 519) *Allen v. State*, 253 Ga. 390 (1984) ("noting that 'our statutorily mandated proportionality review of death sentences includes special consideration of the sentences received by co-defendants in the same crime'") (citing *Hall v. State*, 241 Ga. 252 (1978) (vacating death sentence as disproportionate where triggerman co-defendant received life sentence)).

witness and elicited information about his life sentence in order to argue that Barnes should get the more severe punishment -- death. *Barnes*, 269 Ga. at 354. The Georgia Supreme Court rejected Barnes' claim that this was error, much less harmful error, since he had not taken advantage of the opportunity to cross-examine the codefendant or asked for a limiting instruction. *Id.* at 355. The statute Barnes cited, O.C.G.A. § 24-3-52, prohibits admission of a co-indictee's guilty plea as *against the defendant*. *Id.* at 354-55.

There is simply no reason why Allen Bunner, whom the state had made available to Thigpen to testify at Mr. Jones' trial, *see*, *e.g.*, Dkt. No. 98-1 at 5, 9; 98-2 at 94, could not have been called to the stand by Thigpen at least for the purpose of eliciting straightforward information regarding his life sentence.

The *Barnes* case cited by the habeas court is, itself, a full-throated affirmation of the broad scope of evidence admissible in mitigation of punishment in Georgia capital cases, including evidence which might not comport with culpability phase trial evidentiary rules:

> Georgia law is also permissive with regard to the scope of mitigating evidence that a jury may consider in the sentencing phase. O.C.G.A. § 17-10-30 is wholly silent on the definition of mitigating circumstances, and the "conclusion is inescapable that the legislature meant to empower the jury to consider as mitigating anything they found to be mitigating, without limitation or definition." [Quoting *Spivey v. State*, 241 Ga. 477(2) (1978)]. *Georgia provides a defendant with more protection than that provided under Lockett* [*v. Ohio*, 438 U.S. 586 (1978)], and a trial court "'should exercise broad discretion in

allowing any evidence reasonably tending toward mitigation.'"
[Quoting *Cofield v. State*, 247 Ga. 98(7) (1981) (quoting *Brooks v. State*, 244 Ga. 574(5) (1979), vacated on other grounds *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985)).  In fact, this Court has held that evidentiary rules may be trumped by a defendant's need to introduce mitigation evidence.  [Citing *Collier v. State*, 244 Ga. 553(11) (1979) (inadmissible hearsay may be admissible in sentencing phase if offered as mitigation evidence), overruled on other grounds *Thompson v. State*, 263 Ga. 23 (1993)]. . . . *All doubt should be resolved in favor of admissibility* given the enormity of the penalty in a case such as this.

*Barnes*, 269 Ga. at 358-59, 360 (emphasis supplied).  The Georgia Supreme Court has reiterated that in Georgia:

[m]itigating evidence, "anything that might persuade the jury to impose a sentence less than death,' (*Head v. Ferrell*, 274 Ga. 399, 405, 554 S.E.2d 155 (2001)), is critical in the sentencing phase of a death penalty trial since "the [jury] *may withhold [imposition of] the death penalty for any reason, or without any reason*." *Smith v. Francis*, 253 Ga. 782, 787, 325 S.E.2d 362 (1985).

*Head v. Thomason*, 276 Ga. 434, 436 (2003) (emphasis supplied).

Of course, while Georgia's scope of admissible mitigating evidence is *broader*, clearly established federal law mandates an extremely broad scope of permissible mitigating evidence at sentencing.  *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value") (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (". . . the Eighth and Fourteenth Amendments require that the sentence . . . not be precluded from

146

considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (in capital case, Georgia trial court erred in disallowing hearsay admission of culpability by codefendant at sentencing because Due Process mandates that in capital sentencing phase proceedings, "'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'") (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

Under the circumstances of this case, no reasonable defense attorney would have failed to present testimony or evidence regarding Mr. Bunner's life sentence. Counsel *knew* the jury was concerned about Mr. Bunner's legal status but made not even a gesture toward getting that information into the courtroom. Mr. Bunner was available to be placed on the stand and questioned. Informed of Mr. Bunner's life sentence, at least one fair-minded juror, specifically concerned as to the co-defendant's comparative sentencing outcome, would within reasonable probability have opted to hold out for a sentence less than death for Mr. Jones. *See Wiggins*, 539 U. S. at 537 (test for *Strickland* prejudice is whether "at least one juror would have struck a different balance" at sentencing.").

The state habeas court's resolution of this claim rested on an unreasonable factual determination -- a blatant misrepresentation that Georgia law would not have

permitted this evidence at sentencing,[68] as well as an unreasonable application or contravention of clearly established federal law.  Review is *de novo*, and relief is warranted.

**B.   Mr. Thigpen's Deficient Performance In Failing To Conduct An Adequate Cross-Examination Of The State's Key Witness Sally Kimbrell Prejudiced Mr. Jones At Penalty.**

Even if the Court does not find that Mr. Thigpen's prior representation of, and friendship with, the State's star witness, Sally Kimbrell, created an actual conflict of interest that was presumptively prejudicial under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), counsel's failure to impeach Ms. Kimbrell with her inconsistent prior statements and to introduce those statements as substantive evidence, as Georgia law permits, was deficient and prejudiced Mr. Jones at sentencing.

As set forth more fully above, Mr. Thigpen had a wealth of information at his disposal to conduct an effective cross-examination of Ms. Kimbrell that would have undermined the reliability of the evidence inculpating Mr. Jones as the more culpable driver.  *See supra* at Sections III(C)(2), IV(D).  Counsel's failure to conduct such an examination was clearly deficient and, given the importance of Ms.

---

[68] An artifact, no doubt, of the Attorney General's having drafted the habeas court's final order.

Kimbrell's non-cumulative testimony regarding which of the perpetrators did what, that deficiency clearly harmed Mr. Jones at sentencing. *See, e.g.*, *Nixon v. Newsome*, 888 F.2d 112, 115-16 (11th 1989) (finding counsel ineffective for failing "to follow up on his cross-examination by confronting" witness with prior inconsistent statements, thereby "sacrific[ing] an opportunity to greatly weaken the star witness's inculpatory testimony" regarding "the crucial identity of who shot the victim"); *Smith v. Wainwright*, 799 F.2d 1442, 1444-5 (11th Cir. 1986) (finding counsel ineffective for failure to impeach key witnesses with inconsistent prior statements); *see generally Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006) (citing cases finding deficient performance for failure to impeach critical state witness).

This claim is reviewed *de novo*, as the state habeas court does not appear to have addressed it on the merits.[69]  Mr. Jones raised the claim that Mr. Thigpen

---

[69]  In rejecting Mr. Jones's conflict of interest claim as to Ms. Kimbrell, the state habeas court relied *inter alia* on unreasonable findings of fact, concluding that Mr. Thigpen was not ineffective because Ms. Kimbrell's testimony and prior statements "are not conflicting and . . . her testimony was consistent from almost the immediate time of the murder until Petitioner's trial" and concluded that Mr. Thigpen's cross-examination of her was "thorough[]."  Dkt. No. 103-1 at 12-13. Those factual findings were patently unreasonable given the obvious inconsistencies between Ms. Kimbrell's trial testimony and her earlier statements.  Even assuming that the state habeas court addressed the merits of the claim that counsel was ineffective under *Strickland* in his failure to use her prior inconsistent statements effectively at trial, the state habeas court's finding of fact that there were no prior

provided ineffective representation under *Strickland* in failing to impeach Ms. Kimbrell in his first amended habeas corpus petition in state court, *see* Dkt. No. 99-9 at 30; and addressed it in his post-hearing brief, *see* Dkt. No. 102-5 at 228-32.  Mr. Thigpen's failure to impeach Ms. Kimbrell's testimony with readily available evidence of her prior inconsistent statements, and, as Georgia law permits, to present them as substantive evidence in defense, significantly damaged Mr. Jones's chances to obtain a life sentence.  Individually and in conjunction with other instances of Mr. Thigpen's deficient performance, such error was prejudicial at sentencing and Mr. Jones is entitled to relief.

**C.** **Mr. Thigpen's Failure To Present Readily Available Evidence That Mr. Bunner Was The Driver Of The Victim's Truck As The Defendants Fled The Scene And, As Such, Was More Culpable Than Mr. Jones, Was Prejudicially Deficient; Had Jurors Been Presented With Concrete Evidence To Support The Almost Entirely Unsupported Defense That Mr. Bunner Was The More Culpable Defendant, There Is A Reasonable Likelihood That Mr. Jones Would Not Have Received The Death Penalty.**

The critical issue in Mr. Jones's case was which of the two boys drove the truck from the scene, as the driver of the truck was identified by eyewitness Sally

---

inconsistent statements renders the adjudication unreasonable and thus this claim is appropriately reviewed *de novo*.

Kimbrell as the individual who returned from the victim's truck, before driving off in it, to again strike Mr. Holland with the sledge hammer and who, based on the eyewitness and medical examiner testimony, was the person who inflicted the fatal blows.  The State sought to establish at Mr. Jones's trial, through the testimony of witnesses Mamie Holland, Donald Holland, Johnny Hickox and Sally Kimbrell, that the more culpable driver was in fact Mr. Jones, based largely on insinuations about which of the two men was taller, which one was stockier, and which one may have been blond, even though both of the boys had brown hair.

The views of all the eyewitnesses, of course, were obscured by darkness and the fog of recent awakening, facts that Mr. Thigpen failed to stress.  Instead, he sought to prove that Mr. Bunner was the more culpable driver, ineptly, by suggesting Mr. Jones was the person who knocked on the door that morning, whom Mamie Holland testified was not the driver and whom she described as blond or having something white on his head, based solely on testimony that he often wore a white baseball cap backward on his head.

Had Mr. Thigpen taken reasonable steps to prepare for trial by (1) investigating and (2) thoughtfully reviewing the evidence, he would have been in a position to present compelling proof that Mr. Bunner was, in fact, the driver.  His failure to do so cost Mr. Jones dearly at sentencing.

1.     **Mr. Thigpen performed deficiently in failing to present evidence that Mr. Bunner had admitted to being the driver of Mr. Holland's truck.**

Compelling evidence that Mr. Bunner was the more culpable driver was in Mr. Thigpen's hands long before trial, but he failed to make any effort to use it, despite contending he would.  On April 6, 1993, Mr. Bunner, accompanied by the attorney appointed to represent both Mr. Bunner and Mr. Jones, met with the lead investigator, Chief Deputy Arney Herrin, and Det. Carl Jones, to answer a "series of hypothetical question[s]" about the crimes.  *See* Dkt. 96-1 at 299.  This statement was provided to Mr. Thigpen as part of the State's discovery disclosures on September 30, 1994.  *Id.* at 283.  As Dep. Herring explained outside the jury's presence at Mr. Bunner's trial, on April 6, 1993, Mr. Bunner and his attorney, Martin Eaves, came to the office to meet with Dep. Herrin and Det. James.  Dkt. No. 102-2 at 137-38.  Dep. Herrin had advised Mr. Bunner of his rights, and Mr. Bunner signed a waiver of these rights, while his attorney sat next to him.  *Id.* at 137-38.  The lawyer advised the officers "that he would not allow Harry Allen Bunner to answer any questions" and instructed Dep. Herrin to "ask the questions to Harry Allen Bunner and [Mr. Eaves] would confer with Harry Allen Bunner and then he would answer" Dep. Herrin.  *Id.* at 139.  "And all his answers were placed to [Dep. Herrin] as if they were hypothetical answers; however, there were several answers that proved to be truthful."  *Id.* at 139-40.

152

Through this process, Mr. Bunner, using his attorney as a mouthpiece, told Dep. Herrin and Det. James about the phone number he used to call J.J. Cunningham, a witness who, at Mr. Jones's trial, testified about phone calls made to her by Mr. Bunner and Mr. Jones after they had left the state following the crimes. *See* Dkt. No. 98-2 at 167-69 (Cunningham testimony); Dkt. No. 102-2 at 140. Mr. Bunner, through his attorney, also advised that he had been driving in a black Firebird owned by a friend of Mr. Jones's, Bucky, at the time they stole beer from a convenience store, another fact to which witnesses at Mr. Jones's trial testified. *See* Dkt. No. 989-2 at 85, 147; Dkt. No. 102-2 at 140.

During this interview, Mr. Bunner, through his attorney, told the officers "that he was the driver of the vehicle as it was driven away from Mr. Holland's residence after the incident occurred at Mr. Holland's residence on Braganza Loop." Dkt. No. 96-1 at 299. Mr. Thigpen was in possession of this vital piece of evidence more than a year and a half prior to Mr. Jones's trial. *Id.* at 283. Nonetheless, he took no real steps to present this evidence to the jury, even though it was admissible as a prior statement if Mr. Bunner took the stand, was independently admissible as a statement against interest by a co-defendant, and constituted reliable hearsay admissible under the Eighth Amendment as relevant mitigating evidence. The information that Mr. Bunner had admitted to being the driver was highly relevant to the jury's sentencing decision, but the jury never heard it.

153

Although the State filed a motion in limine seeking to prevent the defense from "propounding and asking any question or questions intended to elicit answers from witnesses for the State that co-defendant Harry Allen Bunner made certain in-custody statements," Dkt. No. 96-2 at 116, that motion was neither challenged by defense counsel nor adjudicated by the court.  The prosecutor addressed the motion first thing on the morning June 8, 1995, when the evidentiary portion of the trial began, advising the court of the motion and explaining:

> [The motion] simply asks for the Court to order, *in limine*, to prevent Mr. Thigpen from propounding any question or questions of any State's witnesses *other than Harry Allen Bunner*, eliciting information as to statements he may have made.  We're simply trying to keep out any hearsay evidence of Harry Allen Bunner from this trial, because the State also is entitled to a fair trial.

Dkt. No. 98-1 at 4.  The court suggested that an effort to bring this evidence out "would be hearsay, Mr. Thigpen." *Id.* at 5.   Mr. Thigpen responded that "it won't be hearsay if I put Harry Allen Bunner on that stand," and the court agreed, noting that Mr. Thigpen "could show any prior statement that he made so long as he is present and subject to confrontation and cross-examination." *Id.*  Mr. Thigpen indicated his "certain[] inten[t]" to put Mr. Bunner on the stand and observed that if Mr. Bunner wouldn't testify after conferring with counsel "then I intend to try to introduce any statement that he has made while in custody." *Id.*  When the prosecutor began to suggest he had case law to prevent that, the court stated that the parties were getting ahead of themselves and ruled that before any questions on the

subject were made, the State would have an opportunity to argue, outside the jury's presence, why the questions should not be allowed. *Id.* at 5. This issue never came up again, although occasionally during the trial the prosecutor would advise the court that Mr. Bunner was available to testify, and Mr. Thigpen would indicate his intent to put Mr. Bunner on the witness stand. *See, e.g.*, Dkt. No. 98-2 at 94 (prosecutor confirmed to court that Mr. Bunner was nearby, at the Ware County Jail, and available to testify, and Mr. Thigpen indicated that he was "damn sure going to put him up"); Dkt. No. 98-5 at 40-41 (prosecutor indicating that the two prisoners who are currently at Ware County jail include Mr. Bunner and Mr. Thigpen stating that he has no objection to the witnesses appearing before the jury in prison clothes and leg and/or hand irons).

Mr. Thigpen could and should have called Mr. Bunner to the stand to question him about his admission on April 20, 1993, to being the driver of the truck. Even if Mr. Bunner had refused to answer (and Mr. Bunner's sworn affidavit, presented in state habeas proceedings, indicates to the contrary that he was willing to and would have testified, *see* Dkt. No. 99-12 at 56-57), Mr. Thigpen would have been authorized to present his prior statement as both impeachment and substantive evidence. *See, e.g.*, *Gibbons v. State*, 248 Ga. 858, 862 (1982) ("A prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is

admissible as substantive evidence, and is not limited in value only to impeachment purposes.").

Moreover, the contents of the April 20, 1993, statement were admissible both as exceptions to hearsay and as admissible hearsay admissible under the Eighth Amendment. The statement was a statement against interest, made in Mr. Bunner's presence by his appointed attorney, who was authorized to make it. The statement, moreover, was made under conditions that indicated its reliability, as Dep. Herrin testified that information Mr. Bunner presented through his attorney, was corroborated by the investigation. Dkt. No. 102-2 at 139-40.

As an authorized statement, Mr. Bunner's admission that he was the driver was not hearsay. *See* O.C.G.A. § 24-8-801(d)(1) and (d)(2)(C). Moreover, even if considered hearsay, the statement had sufficient indicia of reliability, *see* Dkt. No. 102-2 at 139-40, to require its admission as mitigating evidence. *See, e.g.*, *Sears v. Upton*, 561 U.S. 945, 950 n.6 (2010) ("[W]e have recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule) (citing *Green v. Georgia*, 442 U.S. 95, 97 (1979) (*per curiam*).

Mr. Thigpen's failure to present Mr. Bunner's admission to being the driver and, by implication of the trial evidence, the more culpable of the two defendants, was patently deficient and obviously prejudicial, given the centrality of the issue

about which defendant had inflicted the fatal blows.  Moreover, it is clear from the guilt phase deliberations, that the jury was particularly interested in this question, asking about the dominant hands of the co-defendants and, perhaps prompted by Mr. Thigpen's suggestion at closing, seeking to listen to the 911 tape during deliberations.  *See* Dkt. No. 98-4 at 119 (Mr. Thigpen arguing in culpability-phase summation that Donald Holland "had to ask his mother who she saw at the door, and then he relayed it to 911.  That's on the tape.  You heard the tape.  You may want to hear it again, I don't know, but it's there"); *id.* at 152 (jurors ask for 911 tape); *id.* at 158 (jury again requests 911 tape and court allows it to be replayed in courtroom).  The failure to provide this critical evidence to the jury prejudiced Mr. Jones at sentencing, as there is a reasonable likelihood that, had jurors learned that Mr. Bunner had admitted to being the driver, one or more of them would not have voted to impose Mr. Jones's death sentence.

**D.   Mr. Thigpen Failed To Investigate And Present Evidence Of Co-Defendant Bunner's Propensity For Violence, Which Would Have Given Support To Mr. Jones's Testimony That It Was Mr. Bunner Who Was The Driving Force Behind The Theft Of Mr. Melton's Truck And The Robbery And Murder Of Mr. Holland And Would Have Countered The Prosecutor's Contrary Spin On What Happened.**

Evidence of Mr. Bunner's history of violence was readily available to counsel. Mr. Thigpen, of course, knew Mr. Bunner inasmuch as he was representing him on DUI charges at the time he was appointed to represent Mr. Jones in this case.  Dkt.

157

No. 100-3 at 85-95.  As such, Mr. Thigpen was surely aware of Mr. Bunner's prior scraps with the law but, even if his representation had not provided him with that information, it was surely incumbent upon Mr. Thigpen, as Mr. Jones's lawyer in a capital case, to learn as much as possible about the co-defendant he purported to blame.  Mr. Thigpen could, for instance, have obtained a Georgia Crime Information Center (GCIC) report on Mr. Bunner, or any other potential witness at trial, pursuant to O.C.G.A. § 35-3-34(a)(2), which authorizes the disclosure of criminal history records of the defendant and witnesses to defense counsel in a criminal matter.

A reasonable investigation of Mr. Bunner would have involved obtaining such a report and talking to some of the witnesses the State had identified in its original and supplemental witness lists about Mr. Bunner's actions and character.  Had Mr. Thigpen investigated Mr. Bunner's criminal history, he would have discovered, for instance, that in August 1991, Mr. Bunner was charged with underage drinking and "wreckless" endangerment for shooting a shotgun out a car window after having words with another boy, a charge corroborated by the presence of a shotgun a few feet in front of the car Mr. Bunner was standing by when apprehended.  *See* Dkt. No. 100-3 at 127-31.  Counsel would have learned that, less than a year later, in June 1992, Mr. Bunner, while "highly intoxicated," had taken a pipe and smashed in the front windshield of a car in which the complainant had driven him home, and slammed the passenger side door so hard he broke the car window.  *Id.* at 133.  On

158

April 10, 1992, Mr. Bunner was charged with driving under the influence after causing an automobile accident by driving head-on into a tractor trailer. *Id.* at 135, 140  Despite having his license suspended, Mr. Bunner continued to drive, resulting in another DUI arrest in October 1992, in which he was also charged with driving with a suspended license – the charge for which Mr. Thigpen entered his appearance on Mr. Bunner's behalf. *Id.* at 142-47; *see also id.* at 85-94 (court records showing Mr. Thigpen's role in case). *See also id.* at 148-55 (reflecting additional criminal charges against Mr. Bunner for underage drinking).

Competent counsel, moreover, would have spoken with State witnesses, who were identified well before trial, regarding Mr. Bunner's character and conduct, both in general and on the night of the crime. Macy Price, for instance, a person listed on the State's witness list and who was with Mr. Bunner and Mr. Jones the night of the crime, would have told Mr. Thigpen, had he approached her and asked, that she had known Mr. Bunner for years and that, on the night of the crime, he had a fifth of Lord Calvert with him, was hyped and jittery and likely high on crack, and that he was trying to talk Mr. Jones into robbing a convenience store, although Mr. Jones kept saying he did not want to. Dkt. No. 99-12 at 183-84. Ms. Price also would have testified that Mr. Bunner, that night, had said that he wanted to kill someone and seemed to be looking for trouble that night. *Id.* at 186-87. Ms. Price "had hung out with Allen a lot and had seen him get violent many times. In fact, that night at

159

JJ's house, Allen grabbed [her] and threw [her] against a wall in one of the bedrooms of [the] apartment." *Id.* at 187.  Another time, Ms. Price reported, she saw "Allen try to start a fight with a boy at the skating rink" before she and her friends dragged him out and "[a] couple of weeks before the murder, Allen and Joey Andreoli had gone down on Oak Street and Allen grabbed a black boy by the arm and dragged him down the street as he drove away in his car.  The boy ended up with a broken arm." *Id.* at 187.

Other available witnesses would have reported similar information.  Joey Andreoli, for instance, testified in state habeas proceedings that one evening, a couple weeks before the crime, Mr. Bunner drove him "to Oak Street, which is in a part of town where you can buy drugs" and asked Mr. Andreoli "to 'watch his back'"; while in the car, Mr. Bunner called over a black man who was selling crack, grabbed the drugs from his hand and then floored the gas in the car, taking off "while he was still holding onto the man's arm," and "dragging this guy with the car." *Id.* at 51.  Donnie Ray Bennett, Jr., who drove the group over to Danny Hiott's house and got stuck in the mud at the base of his driveway, reported that he knew Mr. Bunner "to get violent and start fights while he was drunk" and that he was "drunk that evening, and was hyper and acted weird," and told Mr. Bennett "that he was going to 'get me a nigger,'" prompting Mr. Bennett to think "he was going to beat someone up or kill someone." *Id.* at 53.  JJ Cunningham testified in state habeas

160

proceedings that "when Allen gets drunk, he often talks of committing crimes or hurting people" and that she had heard him say he was going to hurt someone on numerous occasions. *Id.* at 107.

Information regarding Mr. Bunner's propensity for violence and his stated intent to commit violent acts the night that Mr. Holland was killed was critical information the jury never heard. Such information would both have bolstered the defense that Mr. Bunner was the more culpable individual and countered the prosecutor's narrative that Mr. Jones was the driving force behind Mr. Holland's murder and the most culpable of the co-defendants. *See, e.g.*, Dkt. No. 98-4 at 90 (prosecutor arguing in culpability phase closing that "I submit to you, between these two, that it was Ashley who was the leader and Allen Bunner who was the follower").[70] Mr. Thigpen's failure to investigate and present such evidence was deficient performance that prejudiced Mr. Jones at sentencing.

––––––––––––––––––––

[70] Mr. Thigpen also performed deficiently in failing to investigate and present evidence showing that, contrary to the prosecutor's position that Mr. Jones was the leader, it was Mr. Bunner who was the driving force behind the crime spree. A hint of such evidence came in at trial, as Rudolph Melton's testimony made clear that Bunner had known him for years, had worked for him, and knew that he kept his keys in his vehicle, *see* Dkt. No. 98-2 at 101-02, and J.J Cunningham testified that it was Mr. Bunner who said he wanted to go to the beach, Dkt. No. 98-2 at 154. Had counsel conducted a reasonable investigation by talking to the witnesses the State had identified, he would have discovered that J.J. Eunice heard Mr. Bunner say that he planned to steal a truck and drive to the beach that night. Dkt. No. 99-12 at 107.

**E.    Mr. Thigpen Performed Deficiently in Failing to Object to the Prosecutor's Improper Sentencing Phase Summation, to Mr. Jones's Great Detriment.**

The prosecutor turned his closing argument into a plebiscite on crime, engaging the jurors as avengers for the "endless" list of victims Mr. Jones harmed, and urging that the only way to contain Mr. Jones's innate "evil" was to kill him. The prosecutor opened with the statement that "the State of Georgia and the family of the victim are confident that you have the wisdom, the courage, the strength, and the desire to impose the proper punishment in this case to see that justice is finally done and that the proper punishment is imposed," and emphasized that, while the crime did not occur in Coffee County, "it happened to members of our state, to people that are a family of Georgians . . . ."  Dkt. No. 98-5 at 143-44.  He called Mr. Jones and his actions "evil" multiple times, *see id.* at Dkt. No. 98-5 at 144, 146, 147, 159, and argued that this was the "worst" and "most sinister" case that could possibly

---

*See also, e.g., id.* at 53 (Donnie Ray Bennett's testimony that "Allen said they were going to steal a truck, and he told Ashley to go with him").

be, *id.* at 145-46.  The prosecutor's declaration of Mr. Jones's "evil" nature and actions was not a simple generic reference to the opposite of good.  Rather, the portrait the prosecutor painted was of internal corruption that had tainted Mr. Jones from birth and overtook him in his teens, which could only be contained and destroyed by killing its host:

> It is something beyond mere alcohol that does that.  It is an *evil* that had to exist inside him even while he was going to church, even while he was doing good things as a child.  There was *some evil* that was brought out when he turned 17, when he turned 18, and it's not alcohol.  That's an easy crutch of one to grasp.  *It is something evil inside him, and we must stop it.*

Dkt. No. 98-5 at 146-47 (emphasis added).

The prosecutor repeatedly misrepresented that Mr. Jones was 21 years old at the time of the crime, when he was only 19.  *Id.* at 149, 158.  He argued that the "only punishment in this case that can be proper is death, because that is the only sentence that will properly insure that society is made safe. . . .  He escaped once, and I submit to you, based on the evidence, he will attempt to escape again."  *Id.* at 150.  Essentially, the prosecutor insinuated that jurors who voted for a life sentence would be accomplices in Mr. Jones's future crimes, because, if they imposed the improper sentence of life "it will be one that will not protect society"'; rather, "no one will be safe unless you issue the proper punishment in this case of death.  Only the death penalty can put this terror to a stop, to an end.  He must be stopped, and a life sentence will not and cannot do it," *id.* at 160.

163

The prosecutor further urged jurors to impose the death penalty because Mr. Jones had enjoyed "rights throughout this trial," including "an attorney appointed to represent him" and the requirement that the State prove his guilt.  *Id.* at 151.  Mr. Jones had all these rights and more, but on March 31, 1993, he trampled on Keith Holland's rights.  *Id.* at 155.  The prosecutor ended his summation urging that "[t]he list of victims of Ashley Jones is endless" and declaring that "family of the victim's" "peace of mind" was in the jury's hands.  *Id.* at 161-62.

"The constitutional right to a fundamentally fair trial prevents the prosecutor from urging a jury to impose a sentence of death for improper or irrelevant reasons." *Tucker v.* Francis, 723 F.2d 1504, 1506 (11th Cir. 1984).  All of the arguments referenced above were improper and prejudicial.[71]  Yet, while Mr. Thigpen had

---

[71]  As the United States Supreme Court has explained:

The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, *while he may strike hard blows, he is not at liberty to strike foul ones.* It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater

represented that, consistent with his legal obligations, he would object to improper

argument "as soon as the words leave [the prosecutor's] mouth," Dkt. No. 98-5 at

141, he in fact objected to the prosecutor's closing argument only once, when the

prosecutor indicated that Mr. Jones's attorney had been appointed by the court. *See*

*id.* at 151-54 (reflecting that Mr. Thigpen objected, asked for a mistrial and, when

denied and offered a curative instruction, declined the offer).  Mr. Thigpen's failure

to object and seek corrective action to other, far more egregious instances of

inflammatory rhetoric jeopardizing his client's right to a fair trial and reliable

determination of punishment was deficient and that deficiency prejudiced Mr.

Jones.[72]

---

> or less degree, has confidence that these obligations, which so plainly
> rest upon the prosecuting attorney, will be faithfully observed.
> *Consequently, improper suggestions, insinuations, and, especially,*
> *assertions of personal knowledge are apt to carry much weight against*
> *the accused when they should properly carry none.*

*Berger v. United States,* 295 U.S. 78, 88 (1935) (emphasis added).

[72]  Under that well-settled law, habeas relief is due to be granted for improper
prosecutorial argument at sentencing where there has been a violation of due
process, and that occurs where the improper argument rendered the sentencing stage
trial fundamentally unfair.  *See Romine v. Head*, 253 F.3d 1349, 1366 (11th 2001)
(citing cases); *see also* Darden v. Wainwright, 477 U.S. 168, 181 (1986) ("The
relevant question is whether the prosecutors' comments 'so infected the trial with
unfairness as to make the resulting conviction a denial of due process.'") (quoting
*Donally v. DeChristoforo,* 416 U.S. 637 (1974).

### 1.   The Prosecutor's Contention that Mr. Jones Was Inherently "Evil" Was Highly Improper.

"It is improper to characterize a defendant as 'evil' or to cast the decision of the jury as a choice between 'good and evil.'" *People v. Johnson*, 803 N.E.2d 405, 421 (Ill. 2004) (quoting *People v. Hudson*, 626 N.E.2d 161 1993); *see, e.g.*, *Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) ("As to the prosecutor's use of the terms "animal" and "unadulterated evil" to describe Mr. Wilson, we find the pejoratives unprofessional, inappropriate, and unworthy of an officer of the court").

The prosecutor's description of Mr. Jones and his actions as "evil," on their own improper, became more inappropriate and inflammatory by virtue of their placement in a broader, religious context in which the prosecutor alluded to the battle between "good" and "evil." According to the prosecutor, the testimony of mitigation

———————————————

"An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, . . . which is to say that absent the argument the defendant would not have received a death sentence. A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Romine*, 253 F.3d at 1366.

Mr. Jones here raised the improper argument as an independent claim (Dkt. No. 26 at 83-84), as well as an aspect of trial counsel's ineffective representation in failing to object to the prosecutor's improper remarks (Dkt. No. at 43), and does so here as well.

witnesses described a "child of innocence, a child of God" who "does not exist any more," if he ever did, as "[i]t is an evil that had to exist inside him even while he was going to church, even while he was doing good things as a child.  There was some evil that was brought out when he turned 17, when he turned 18, and it's not alcohol . . .  It is something evil inside him, and we must stop it."  Dkt. No. 98-5 at 145, 146-47.  The case was about Mr. Jones, a man who "has no heart and no soul," and who "forgot who God was," *id.* at 148, 160, and "the evil side of man that none of us want to acknowledge even exists," *id.* at 159.

The prosecutor's "request for the jury to 'combat and destroy' the "evil one," amounted to the use of biblical passages that the Court repeatedly has held to be improper and inflammatory."  *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998) (citing cases); *see, e.g.*, *Romine*, 253 F.3d at 1366-69 (prosecutor's reliance on religious-based arguments against mercy improper and prejudicial).  The prosecutor's inflammatory rhetoric, charging the jury with dispatching the "evil" in Mr. Jones by killing him was highly improper and rendered the sentencing phase fundamentally unfair.  Reasonably competent counsel would have objected to the prosecutor's argument and the failure to do so prejudiced Mr. Jones's defense at the sentencing phase.

### 2. The prosecutor improperly argued that Mr. Jones's "evil" could only be contained by killing him.

The prosecutor further played on juror's fears by improperly proclaiming, from his position of authority and expertise, that this was "the worst" and "most sinister" case that could possibly be,[73] Dkt. No. 98-5 at 145-46, and arguing, repeatedly, that imposing the death penalty was the only way to prevent Mr. Jones from committing future acts of violence – in effect, making jurors accomplices to future crimes if they voted to impose life:

> No one will be safe unless you issue the proper punishment in this case of death. Only the death penalty can put this terror to a stop, to an end. He must be stopped, and a life sentence will not and cannot do it.

*Id.* at 160.

A prosecutor's argument "impl[ying] that the death penalty would be the only guarantee against a future similar act" is "undoubtedly . . . improper" and "deserv[ing of] condemnation." *Darden*, 477 U.S. at 180. *See, e.g.*, *Bates v. Bell*,

---

[73] "The prosecutor's . . . expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985) (citing *Berger*, 295 U.S., at 88-89).

402 F.3d 635, 644 (6th Cir. 2005) (vacating death sentence due to improper argument and finding prejudicially improper the prosecutors' "appeal to the fears of individual jurors and to emotion. They repeatedly argued that the jurors would be responsible for the murders that Bates would inevitably commit unless sentenced to death. The prosecutors suggested that failing to support the death penalty for Bates would make them 'accomplices' to his crime and to future crimes"); *id.* at 648 ("[T]he [prosecutors'] remarks . . . almost certainly prejudiced the defendant. The jury was told they would be accomplices to the crime unless they executed him. The prosecutors made it a theme of their summation that the jury's failure to sentence Bates to death would be akin to ordering the execution of Bate's next victim. Voting for a life sentence . . . was equivalent to putting a gun in his hand. This type of appeal to fear and emotion clearly poisoned the hearing."); *Wallace v. Kemp*, 581 F. Supp. 1471, 1481-82 (M.D.Ga. 1984) ("The adverse effect that a recommendation of mercy (as opposed to death) will have on third parties, such as prison guards, youthful offenders incarcerated with the defendant, or the citizenry at large in the event of parole or escape, is an improper argument in a death penalty case. Such considerations do not focus upon the characteristics of the defendant himself or the circumstances of his crime."), *rev'd on other grounds*, *Wallace v. Kemp*, 757 F.2d 1102 (11th Cir. 1985) (granting guilt-phase relief). *See also*, *e.g.*, *Sinisterra v. United States*, 600 F.3d 900, 910 (8th Cir. 2010) (holding that urging "the jury to

send a message with its verdict' is improper because it 'impinge[s] upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant'); *People v. Holman*, 469 N.E.2d 119, 174 (Ill. 1984) ("Unsupported predictions as to the kind of crimes the defendant will commit if not executed are even more to be condemned than references to the possibility of parole, for they convey more directly to jurors the vivid, but misleading, message that the death penalty is the only way to protect society from the defendant and forestall his violence"); *State v. Clark*, 220 So. 3d 583, 659 (La. 2016) ("[T]his court has 'repeatedly held that it is highly improper and prejudicial for a prosecutor to turn his argument to the jury into a plebiscite on crime or to refer to the consequences to society of the jury's verdict.'" (quoting *State v. Smith*, 554 So.2d 676, 684 (La. 1989) (further citations omitted)).

> ### 3. The prosecutor's efforts to align his desire for a death sentence with the wishes of the victim's family and the citizens of Georgia were highly inflammatory and improper.

The prosecutor framed his sentencing phase summation with the argument that the victims' family and society were aligned in wanting the death penalty. Right off the bat, he urged the jury to vote for the death penalty on behalf of "the State of Georgia and the family of the victim" who "are confident that you have the wisdom, the courage, the strength, and the desire to impose the proper punishment in this case

to see that justice is finally done and that the proper punishment is imposed." Dkt. No. 98-5 at 143-44. He emphasized that, even though the crime took place outside of Coffee County, where the jurors resided, "it happened to members of our state, to people that are a family of Georgians . . . ." *id.* at 144. After arguing that the death penalty was the only proper punishment and the only way to protect society from Mr. Jones's "evil" nature, the prosecutor returned to his theme that the victim's family and society awaited the jury's assistance, declaring that "the family of the victim's" "peace of mind" was in the jury's good hands." *Id.* at 162.

When the Supreme Court, in *Payne v. Tennessee*, 501 U.S. 808 (1991), overruled prior decisions holding that victim impact evidence was inadmissible in a capital sentencing hearing, it left undisturbed the prohibition set forth in *Booth v. Maryland*, 482 U.S. 496 (1987), that admission of "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *See Payne*, 501 U.S., at 830 n.2. That prohibition remains the law. *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016). What a prosecutor is forbidden from presenting in evidence, he is doubly prohibited from arguing in summation.

The purported expectations of society were likewise irrelevant and prejudicial. The prosecutors' arguments were "an improper plea for [the death

penalty] because of community expectations" which "inject[ed] a new and harmful fact into evidence" by urging "that the wishes of the community mandated a particular result." *Whittington v. Estelle*, 704 F.2d 1418, 1423 (5th Cir. 1983). *See, e.g.*, *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (noting impropriety of prosecutorial argument urging jurors to sentence on the basis of community expectations)

These arguments were improper. *See United States v. Johnson*, 713 F. Supp. 2d 595, 638 (E.D.La. 2010) (granting new sentencing proceeding based on prosecutor's improper argument and observing that "[t]he [prosecutor's] exhortation that justice 'demands' the death penalty and that the [victim's] family "all wait for you to give them some justice' were improper" ).

### 4.    The prosecutor unfairly condemned Mr. Jones for exercising his constitutional rights.

The prosecutor's arguments urged the jury to punish Mr. Jones for the exercise of his right to trial, with its accompanying constitutional protections. *See* Dkt. No. 98-5 at 151 (urging jurors to impose death penalty because Mr. Jones had enjoyed "rights throughout this trial," including "an attorney appointed to represent him" and the requirement that the State prove his guilt). This was grossly improper. "'No right is more fundamental than the right of an accused to plead not guilty and put the state to its proof.' . . . When an accused asserts a constitutional right, it is

172

impermissible for the state to comment upon or argue in favor of guilt or punishment based upon his assertion of that right." *State v. Johnson*, 360 S.E.2d 317, 324 (S.C. 1987)(citations omitted).  "It is improper for a prosecutor to argue the victim's rights and to compare those rights to the rights of the defendant." *Brown v.* State, 11 So. 3d 866, 918 (Ala. Crim. App. 2007).  *See, e.g., Goodin v. State*, 787 So. 2d 639, 652-53 (Miss. 2001) (prosecutor impermissibly argued that the victim "didn't have the protection of the law that [the defendant] has got . . . He didn't have the Constitution out there to protect him that night, didn't have a judge to hear his case.") *Perdue v. Commonwealth*, 916 S.W.2d 148 (Kt. 1996)("It is flatly improper to refer to the 'time and trouble' occasioned by a plea of not guilty and the resulting trial.").

### 5.    The prosecutor's repeated contention that Mr. Jones was 21 at the time of the crime was false.

"A material misstatement of fact in a closing argument is improper."  *Ruiz v. Fla. Dep't of Corr.*, 439 Fed. Appx. 831, 834 (11th Cir. 2011) (citing *Davis v. Zant*, 36 F.3d 1538, 548 n.15 (11th Cir. 1994)).  Here, the prosecutor twice told the jury that Mr. Jones was 21 years old at the time of the crime and, moreover, his age was irrelevant.  Dkt. No. 98-5 at 149 ("Ashley Jones had choices.  It's a free country. You do what you want to do.  He was free and 21."); *id.* at 158 (This is beyond belief that a man 21 years of age, or whatever he was at the time . . . .").  At the time of the crime, Mr. Jones was a 19-year-old teenager, not a "man" of 21.

The prosecutor misstated evidence of a critical nature.  Mr. Jones's youth should have been considered as a powerful mitigating circumstance.  As the Supreme Court has explained, "a sentencer must have the ability to consider the 'mitigating qualities of youth.'"  *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).  "Youth," the Court has explained, "is more than a chronological fact. . . .  It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness,' [−] a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'"  *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), and *Johnson*, 509 U.S. at 368).  Jurors were required to consider Mr. Jones's youthfulness in mitigation of punishment, yet were told by the prosecuting attorney that Mr. Jones was not a youth.  This manufactured assertion dovetailed with the prosecutor's prior argument in the guilt phase that Mr. Jones, the older defendant, was the leader who had led his younger co-defendant astray, *see* Dkt. No. 98-4 at 90, and impaired the jury's ability to give meaningful consideration to the mitigating aspects of youth.

"Ineffective assistance of counsel may be established where a defense counsel fails to object to the prosecutor's 'very serious instances of prosecutorial misconduct . . . .'"  *Fugate v Head*, 2561 F.3d 1206, 1223 (11th Cir. 2001).  Here, the prosecutor engaged in a continuous stream of improper argument that *inter alia* urged jurors to settle the score on behalf on Mr. Jones's "endess" list of victims by voting for death,

that the death penalty was the only punishment that could be returned without putting future victims in jeopardy, the "evil" that had always contaminated Mr. Jones could only be contained through his death, and dismissing through an outright falsehood one of Mr. Jones's most important mitigating circumstances, his youth. Counsel's failure to object and seek curative action was deficient, and there is a substantial likelihood that, had counsel performed effectively, Mr. Jones would not have been sentenced to death.[74]

### F.   Mr. Thigpen Provided Ineffective Representation In Giving A Lackluster Closing Argument Divorced From The Mitigation Presented At Trial And Unresponsive To The State's Impassioned Argument For Death.

Given Mr. Thigpen's abysmal failure to investigate, develop and present mitigating evidence throughout the trial, including evidence that cast co-defendant Bunner as the more culpable defendant who, nonetheless had received a life sentence, it is hardly surprising that Mr. Thigpen's four-and-a-half page closing argument did virtually nothing to persuade jurors to consider a life sentence. It was almost entirely disconnected to the penalty phase defense counsel had presented,

———————————————

[74]   As well, the prosecutor's improper arguments, singly and together, "so infected the trial with unfairness as to make the resulting [death sentence] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristofero*, 416 U.S. 637 (1974)).

however poorly, and failed to address the prosecutor's inflammatory rhetoric calling for the death penalty. Instead, Mr. Thigpen mused about the unreal and awesome power the jury had to kill, and how killing Mr. Jones might impact jurors, that all the jurors had expressed beliefs in God, so those who might vote against the death penalty would protect that vote to protect their souls, and that, despite the number of lives ruined that night, there is "some foundation to work with" as who is to say that Mr. Jones would not one day be a soldier for the Lord and there's some good and some talent in him. *Id.* at 164-66. He closed with the admonishment that "[l]egal killing is something you'll have to deal with psychologically from now on. Make peace with your God, and let Ashley Jones live." *Id.* at 166.

Mr. Jones had the right to be effectively and zealously represented during closing arguments. *Hunter v. Moore*, 304 F.3d 1066, 1069-70 (11th Cir. 2002). Indeed, "[b]ecause one of the most important functions of the capital sentencing process is the opportunity to humanize the defendant, the importance of the defense's closing argument cannot . . . be overstated." *Lawhorn v. Allen*, 519 F.3d 1272, 1296 (11th 2008). Mr. Thigpen, however, denied him the right to have counsel "make a proper argument on the evidence and the applicable law in his favor.'" *Herring v. New York*, 422 U.S. 853, 858 (1975) (citation omitted).

The entire defense closing argument was about a quarter of the length of the prosecutor's 20-page argument. *See* Dkt. No. 98-5 at 143-62, 162-66. More

176

significant than their disparate length, however, was the substance of those arguments. The prosecutor gave a passionate summation discussing the evidence and enumerating several specific reasons why the jury should sentence Mr. Jones to death. The defense, in comparison, made minimal reference to the mitigating circumstances and only a lukewarm plea to spare Mr. Jones's life. Counsel made no effort to advance his position that Mr. Jones was less culpable than his co-defendant (and thus he did nothing to counter the prosecutor's contrary argument). It gave jurors no cogent basis on which to impose a sentence less than death.

As the Supreme Court has observed, "closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case" as counsel "argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions." *Herring*, 422 U.S. at 862. For the defense, it is "the last clear chance to persuade the trier of fact." *Id.*

"Deficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." *Lawhorn*, 519 F.3d at 1295. Here, that standard is met.

In a criminal trial, "no aspect of [defense counsel's] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring*, 422 U.S. at 862. Mr. Thigpen failed

177

to take advantage of this opportunity and left the jury without any reasoned basis to resist the prosecutor's focused argument for execution.

The habeas court rejected this claim without specifically addressing it, *see* Dkt. No. 103-1, and thus this claim should be reviewed *de novo*. Counsel's failure to give a closing argument addressing the mitigating facts of the case and advancing a cogent basis on which to impose a sentence less than death was the culmination of counsel's many failures up to that point and independently harmful. *Cf. McNabb v. Comm'r Ala. Dep't. of Corr.*, 727 F.3d 1334, 1346 (11th Cir. 2013) ("[T]rial counsel provided an effective closing argument highlighting McNabb's deprived childhood, lack of parental influence, cocaine addiction and absence of past violence, in an attempt to save McNabb's life."). Under the fact of this case, there is a reasonable likelihood that at least one juror would have voted for a sentence less than death had counsel "presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399.

### G. Mr. Thigpen Provided Ineffective Representation In Failing To Properly Litigate His Motion To Change Venue.

Although Mr. Jones was charged with a highly publicized and, in the small South Georgia community, sensational crime, Mr. Thigpen failed to take reasonable steps to ensure that his client was tried by a jury comprised of fair and impartial individuals who could decide his guilt and sentence on the basis of evidence

178

admitted at trial and not pre-conceived notions and biases about both Mr. Jones's culpability and the sentence he deserved. Although Mr. Thigpen moved for a change of venue and, ultimately, both the parties and the court agreed a change of venue was needed, Mr. Thigpen agreed to conduct a trial in a venue that suffered from the very same infirmities that had rendered Ware County an inappropriate venue in the first place. *See infra* at \*\*\*. Although the trial court thereafter denied Mr. Thigpen's subsequent motion, made during questioning of the first 12-juror panel, to change venue due to juror testimony that opinions about the case and appropriate punishment were being discussed in the jury room, Mr. Thigpen thereafter dropped the ball, failing to question numerous prospective jurors about their exposure to pretrial publicity and gossip about the case and failing, ever, to make a record of the prejudicial nature of the pretrial publicity that jurors in Coffee County had been exposed to. *See infra* at \*\*\*.

**H.    Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Conduct Adequate Voir Dire Of Potential Jurors To Ensure That Mr. Jones Was Tried By A Fair And Impartial Jury.**

The constitutional right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To effectuate this right, trial counsel must conduct "an adequate voir

dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Indeed, "[v]oir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)).

Trial counsel here utterly abandoned his obligation to adequately voir dire prospective jurors to ensure the selection of an impartial jury. The unreasonableness of trial counsel's conduct is evident simply by looking at the number of prospective jurors he completely failed to examine. Out of eighty-nine prospective jurors, trial counsel allowed twenty-four of them to be qualified without asking them a single question during voir dire. *See* Dkt. No. 97-6 at 105, 135, 146, 182; Dkt. No. 97-7 at 58, 69, 111, 119, 132, 136; Dkt. No. 97-8 at 36, 66, 83, 91, 98, 106, 119, 132, 150, 154; Dkt. No. 97-9 at 62-63, 80, 112, 124. And of the twenty-four prospective jurors

that trial counsel neglected to voir dire, *eight* of them ended up sitting on the jury that convicted Mr. Jones and sentenced him to death.[75]

It was patently unreasonable for trial counsel to fail to make any effort to discern the attitudes and beliefs of two-thirds of the jurors who were selected to determine Mr. Jones's guilt and punishment. But trial counsel's inattentiveness at voir dire was especially unreasonable here because he knew before voir dire even began that many prospective jurors were already familiar with the case due to Coffee County's proximity to Ware County, the extensive media coverage of the crime, the circulation of the Waycross Journal-Herald and Florida Times Union within Coffee County, and the fact that Mr. Jones's co-defendant had recently been convicted and sentenced after a highly-publicized trial. Dkt. 97-4 at 42; Dkt. 97-5 at 51-52.[76] Trial counsel was also aware that the trial court's generic and perfunctory voir dire was insufficient to uncover prospective jurors' pretrial exposure and biases. *See, e.g.* Doc. 97-5 at 64-65. Nonetheless, trial counsel neglected to ask twenty-four

---

[75] These jurors were Eartha Lee Street, Roosevelt Gowdy, Jr., Betty Thurman, Donna Deen, Dorabeth Knowles, Martha Douglas, Perry Batten, and Lynn Dockery.

[76] The voir dire of the first panel of jurors only confirmed that most of the jurors were familiar with the case through either pretrial publicity or gossip. 97-5:66-135

prospective jurors about their exposure and reaction to the pretrial publicity and gossip.

Even more shocking was trial counsel's failure to thoroughly voir dire prospective jurors after learning that nearly all of the jurors on the first panel had either participated in or overheard improper discussions and jokes about Mr. Jones's guilt and their desire to see him put to death. *See generally* Dkt No. 97-6 at 29-195; Dkt No. 97-7; Dkt. No. 97-8; Dkt No. 97-9 at 28-129. Trial counsel obviously realized the damage of these discussions – he immediately moved for a mistrial and renewed his motion for a change of venue. Dkt No. 97-5:142-43. Trial counsel also knew that the trial judge only instructed the second and third panels to refrain from reading about or having any discussions about the case *after* prospective juror Michael Maxwell divulged the discussions to the court, Dkt. No. 97-5 at 148-49; that panels four through six only received the instruction when they returned to court for the second day of jury selection, Dkt No. 97-7 at 34-35; and that the court waited until the third day of jury selection to give the instruction to panels seven and eight. Dkt. No. 97-9 at 32. Still, trial counsel inexplicably failed to ask *any* of the jurors on the next seven panels if they had spoken about the case with other prospective jurors or had learned anything about the case when they left the courtroom after the first and second days of jury selection. Even when seated juror Kip Griner disclosed that he had heard rumors flashing around the jury room about the case on the first day of

jury selection, trial counsel never followed up to determine the source and content of the rumors.[77] Dkt No. 97-6 at 39-40, 44. And when several jurors expressed strong, fixed opinions about Mr. Jones's guilt, trial counsel did not ask whether those jurors had shared their views with other jurors. *See, e.g.,* Dkt. No. 97-7 at 124-26.[78]

Trial counsel also failed to make any inquiry into jurors' feelings or tendencies towards the death penalty. Although the parties agreed before jury selection that only the judge would be permitted to ask death qualification questions, Dkt. No. 96-2 at 78, the district attorney effectively shut down trial counsel's attempt to question jurors about the death penalty, Dkt. No. 97-5 at 81, but then asked virtually every prospective juror a series of questions that got directly to the issue of whether their views on the death penalty would impair their ability to consider it as a punishment. For instance, the district attorney asked almost every juror if they believed "that all criminals can be rehabilitated," and if they had "any close friends or relatives who are opposed to the death penalty or take some stand against the death penalty." *See,*

---

[77] Trial counsel also ignored Ann Sheppard's admission that she had heard other prospective jurors discussing the case in the courthouse on the first day of jury selection. Dkt. No. 97-6 at 120-125.

[78] Similarly, trial counsel failed to ask prospective juror Douglas Tarver, who knew extensive details of the crime from the victims' perspective, if he had shared any of that information with other prospective jurors. Dkt. No. 97-8 at 71-77.

*e.g.,* Dkt. No. 97-5 at 71, 72, 93, 110, 122-23, 130, 140-41, 163,180-181; Dkt. No. 97-6 at 32-33, 43-44, 55, 64-65, 74-75, 83-84, 93, 100, 107-08, 122, 134-35, 145-46, 152, 160, 170-71, 180-81. Several jurors were also asked if their church had a policy or stance against the death penalty. *See, e.g.*, Dkt No. 97-5 at 180.

Trial counsel not only failed to object to the district attorney's use of death qualification questions, but he also failed to ask any of his own, namely whether any juror would feel compelled to automatically impose the death penalty after convicting a defendant of robbery and murder. For instance, even when Eric Reinholz, who became a seated juror, told the district attorney that almost everyone he knew was for the death penalty and that he would "be hard-pressed to find friends or relatives who would be against it," trial counsel did not ask any follow-up questions to determine whether Reinholz would be able to consider a life sentence after reaching a guilty verdict. Dkt. No. 97-6 at 55-57. Trial counsel also failed to follow up when prospective juror Randle Parker told the judge that he was not opposed to the death penalty because he believed that "the punishment should fit the crime, if the defendant is undoubtedly guilty." Dkt. No. 97-6 at 79, 85-87. And

instead of questioning prospective juror Ralph Gourley[79] about his experience as a prison guard, trial counsel chose to have a friendly and casual discussion about their shared experience of sitting in the electric chair at Reidsville prison for the sheer novelty of doing so. Dkt. No. 97-6 at 188.

Given the fundamental importance of a defendant's right to a trial by an impartial jury, there is no reasonable strategic justification for trial counsel's failure to conduct any examination of eight seated jurors, or for his failure to ask the majority of the venire about gossip in the jury room, their exposure to pretrial publicity, or their feelings on the death penalty. *See Strickland*, 466 U.S. at 691. *See also Virgil v. Dretke*, 446 F.3d 598, 609-11 (5th Cir. 2006). Similarly, trial counsel's failure to rout bias and impartiality from the jury resulted in a breakdown of the adversarial process sufficient to undermine confidence in the outcome of the verdict. *See Virgil*, 446 F.3d at 612-13.

Mr. Jones raised this issue in his first amended state habeas petition. Dkt. No. 99-9 at 29 (trial counsel was ineffective for "failing to conduct an adequate voir dire which would have revealed potential jurors' attitudes towards the death penalty");

---

[79] Trial counsel used his twelfth peremptory strike to disqualify Mr. Gourley. Dkt. No. 97-9 at149-59.

185

Dkt. No. 102-5 at 94. However, the state habeas court clearly overlooked this claim and never adjudicated it on the merits. *See generally* Dkt No. 103-1. This Court should therefore review this claim *de novo*. *See Johnson v. Williams*, 568 U.S. 289, 302 (2013).

Alternatively, should this Court find that Mr. Jones has failed to rebut the presumption that the state habeas court adjudicated the claim on the merits, there was "no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

### I.    Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Strike For Cause Certain Venire Persons.

Trial counsel failed to preserve Mr. Jones's right to a fair trial by an impartial jury when he failed to move to strike for cause several prospective jurors who should have been disqualified from jury service. For instance, trial counsel never moved to strike for cause prospective jurors Johnny Spell and Stanley Smith, even though both admitted to consuming and being influenced by the negative pretrial publicity. Dkt. No. 97-5 at 111-16; Dkt. 97-9 at 142-145. Johnny Spell was familiar with the allegations in Mr. Jones's case because he read about it every week in the paper, had followed the trial of Mr. Bunner in the paper, knew the outcome of Mr. Bunner's trial, and conceded that he would not be able to put out of his mind what he had

learned about the case from the media. Dkt. No. 97-5 at 111-14. And Stanley Smith informed trial counsel that he had overheard the first panel's prejudicial discussion of Mr. Jones's case in the jury room, and that the discussion would probably "taint" him as a juror. Dkt. No. 97-9 at 142-43. Nevertheless, trial counsel never moved to strike either juror for cause, Dkt. No.97-5 at 116; Dkt. No. 97-9 at 145, but instead wasted peremptory strikes on both of them. Dkt No. 97-9 at 159.

Trial counsel also failed to move to strike for cause several prospective jurors who had been victims of violent crimes. In response to questioning from the district attorney, Stanley Smith reported that he had recently been the victim of an armed robbery where the perpetrator was still at large, and that he had taken out warrants on several people accused of shoplifting in his store. Dkt. No. 97-5 at 128-29. Prospective juror Paul Tanner also stated during voir dire that he and his daughter had been the victims of a crime where two men "terrorized" them on the highway.[80] Dkt. No. 97-6 at 72-73. Prospective juror Norman Fletcher owned stores that had been robbed at gunpoint several times, and one of his clerks had recently been shot

---

[80] Trial counsel used a peremptory strike to remove Paul Tanner. Dkt. No. 97-9 at149-59.

and killed in a robbery.[81] Dkt. No. 97-6 at 114. Prospective juror Glenda Phillips divulged that her sister was going through a violent domestic case, and also that she was scheduled to testify in a grand jury proceeding because her daughter had been molested. Dkt. No. 97-7 at 79, 83. Charlie Young disclosed that he had a brother in prison for shooting someone, Dkt. No. 97-8 at 147-50; Billy Waldron stated that his stores had been burglarized several times, Dkt. No. 97-8 at 159; and Anthony Grady reported that one of his cousins had been murdered. Dkt. No. 97-9 at 64-65. In these instances, trial counsel not only failed to move to strike these prospective jurors for cause, but he also failed to examine them about the violent episodes and whether the incidents would affect their ability to serve as a juror. Dkt. No. 97-6 at 76-76; Dkt. 97-7 at 81-83; Dkt. No. 97-8 at 147-50, 161; Dkt. No. 97-9 at 67.

Trial counsel also failed to exercise cause challenges for two other jurors who should have never been qualified to serve on Mr. Jones's jury. Juror Kip Griner disclosed during voir dire that he and his wife had been to the district attorney's office earlier that week to discuss a foster care matter, and that he had heard rumors about the case while sitting in the jury room on the first day of jury selection. Dkt.

---

[81] Trial counsel used a peremptory strike to remove Norman Fletcher. Dkt. No. 97-9 at149-59.

No. 97-8 at 39-40. Juror Donna Deen also disclosed during voir dire that she had high blood pressure, that jury service would make her anxious and exacerbate her blood pressure, and that she would not be able to stand up and announce her verdict in the courtroom. Dkt. No. 97-7 at 117-124. Nonetheless, trial counsel failed to move to strike either juror, and both of them ended up serving on Mr. Jones's jury. Dkt. No. 97-7 at 124; Dkt. No. 97-8 at 45.

Given the fundamental importance of a defendant's right to a trial by an impartial jury, there is no reasonable strategic justification for trial counsel's failure to move to strike for cause jurors who confessed an inability to be impartial, were victims of violent crimes, and/or stated that health problems would interfere with jury service. *See Strickland*, 466 U.S. at 691. *See also Virgil v. Dretke*, 446 F.3d at 609-11. Similarly, trial counsel's failure to remove biased and unqualified jurors from the jury resulted in a breakdown of the adversarial process sufficient to undermine confidence in the outcome of the verdict. *See Virgil*, 446 F.3d at 612-13.

Mr. Jones raised this issue in his first amended state habeas petition. Dkt. No. 99-9 at 29 (trial counsel was ineffective for "failing to move to strike for cause certain venire persons"); Dkt. No. 102-5 at 94. The state habeas court partially adjudicated this claim and denied it because Mr. Jones "failed to show that any juror harbored a bias from pretrial publicity exposure that was so fixed and definite that it could not be changed by the evidence of the charge of the trial court." Dkt. No. 103-

1 at 35. The state habeas court's decision was "contrary to, or involved an unreasonable application" of the United States Supreme Court's ineffective assistance of counsel precedent, and was also "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

J.   **Mr. Jones Was Denied His Right To The Effective Assistance Of Counsel Under The Sixth And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Rehabilitate Or Attempt To Rehabilitate Potential Jurors Who Expressed Qualms About Imposing A Death Sentence.**

As part of counsel's responsibility to protect a defendant's right to a trial by an impartial jury, counsel must ensure that the trial court's death-qualification process does not result in a jury "[c]ulled of all who harbor doubts about the wisdom of capital punishment," and therefore "organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510 at 520-22 (1968). Trial counsel here, however, failed entirely to guard against the selection of a jury "uncommonly willing to condemn a man to die." *Id.* at 521.

The state moved to strike ten jurors for cause on the ground that they would not be able to impose the death penalty. Dkt. No. 97-7 at 49, 61, 73, 140; Dkt. 97-8 at 48, 108, 121-24, 155-56; Dkt. No. 97-9 at 98-99. Defense counsel only objected on one occasion, and otherwise made no effort to rehabilitate any of these jurors.

Dkt. No. 97-7 at 49, 61, 73, 140; Dkt. No. 97-8 at 48, 108, 121-22, 155-56; Dkt. No. 97-9 at 98-99. Indeed, after being instructed by the court not to question jurors about the death penalty, trial counsel never broached the subject again, even though the prosecutor asked nearly every prospective juror a series of death qualification questions.

Trial counsel's failure to make any effort to rehabilitate these jurors was patently unreasonable given that the jury would be entrusted with the decision to either take away or spare Mr. Jones's life. *See Strickland*, 466 U.S. at 691. The failure to rehabilitate these jurors also resulted in prejudice to Mr. Jones because trial counsel's inattentiveness "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *See also Virgil v. Dretke*, 446 F.3d at 609-11.

Mr. Jones raised this claim in his first amended petition for habeas relief in state court. Dkt No. 99-9 at 29; Dkt. No. 102-5 at 95. However, the state habeas court clearly overlooked this claim and never adjudicated it on the merits. *See generally* Dkt No. 103-1. This Court should therefore review this claim *de novo*. *See Johnson v. Williams*, 568 U.S. 289, 302 (2013).

Alternatively, should this Court find that Mr. Jones has failed to rebut the presumption that the state habeas court adjudicated the claim on the merits, there

191

was "no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. at 98.

**K.    Additional Instances Of Ineffective Representation.**

Mr. Thigpen's tepid representation was deficient in numerous other ways that cannot be elaborated upon given the severe time constraints under which this Brief is being written.  These include:

●    Failing to object to the culpability-phase testimony of Jerry Finley, a supervisor at the Georgia police Academy in Forsyth, who gave expert testimony about blood spatter and whether how it indicated the purported direction of blows the victim suffered without ever being qualified as an expert.  *See* Dkt. No. 98-3 at 44-55.  Mr. Thigpen did not seek to voir dire him on his qualifications, did not challenge the State's failure to have him qualified, and did not ask him a single question.

●    Failing to object to inadmissible hearsay.  For instance, Deputy Sheriff Joe Morris testified without a single objection about the information reported to him by the clerk of the Flash Foods.  *See, e.g.*, Dkt. 98-1 at 50-52.  Likewise, Mr. Thigpen never objected to the hearsay testimony of Donna Turner Hill, who testified that Mr. Jones came by the house he was staying at late at night to change clothes, but then admitted that she had "heard that he was going to change clothes, went back there to

change clothes." Dkt. No. 98-2 at 188; yet, Mr. Thigpen did not move to strike her testimony.[82]

● Failing to object to the testimony of the State's serologist who testified that she had tested four small drops of blood on Mr. Jones's shoes, but that the tests did not reveal even if the blood was human, much less that it had any connection to the offenses with which Mr. Jones was charged, thus rendering her testimony wholly irrelevant. *See* Dkt. No. 98-3 at 97-105.

● Failing to object to the trial court's coercive questioning of the jury foreman regarding jury split mid-deliberations. The court asked the foreman twice how the jury was divided, *see* Dkt. No. 98-5 at 179-80, 186. On the second occasion, the court added that jurors should be aware that they were not limited to one vote and asked how recently they had last voted. Id. Just over an an hour after deliberations resumed, the jury returned with a death sentence. id. at 188.

---

[82] In state habeas proceedings, Ms. Turner provided an affidavit in which she stated that she did not understand why she had been called to testify because she had not seen anything or anybody and that had testified about what people had told her and not from direct knowledge. Dkt. No. 99-12 at 208-09. As she explained, "[i]n essence, everthing I testified to was based on information I got from Chrisina and Adamo French. I had no independent knowledge of anything I testified to." *Id.* at 208. Because Mr. Thigpen had never interviewed her, however, *see id.*, he was not aware, prior to trial, that her testimony was wholly inadmissible.

193

### III.   THE PROSECUTOR'S PRESENTATION OF MAMIE HOLLAND'S VICTIM IMPACT EVIDENCE VIOLATED DUE PROCESS AND THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION FOR A MISTRIAL (CLAIM FIVE).

Mrs. Holland gave short, but extremely powerful and emotional victim impact testimony at the close of the State's case at sentencing.  Dkt. No. 98-5 at 87-90.  The bulk of her testimony was elicited through the prosecutor's leading questions.  At the conclusion of her testimony, the prosecutor asked:

> Q.   When you close your eyes at night, do you still see his face?
>
> A.   Yes, sir, because he looked right at me.  I yelled, I yelled for him to stop, and he turned around and looked at me and kept hitting. (WITNESS CRYING)
>
> Q.   Do you have any fear?
>
> A.   Yes, I do.  I fear for my family's life.  I fear for my daughter and my son and myself (sobbing).
>
> Q.   Do you fear he will return?
>
> A.   Yes, sir.

*Id.* at 202.  Mr. Thigpen had no questions but, following Mrs. Holland's testimony and outside the jury's presence, he moved for a mistrial, arguing that Mrs. Holland's testimony "went far and beyond that which the law says can go," and that it had "gotten out of hand" since the prosecutor had made a proffer earlier that day.  *Id.* at 90-91.  He further complained that the prosecutor had put words in her mouth: "Those were his words.  They weren't her words.  They were Mr. Curries words

about the nightmares, and is he going to come back to get you, and everything else. I move for a mistrial." *Id.* at 92.  The court denied the motion.  *Id.*  On appeal, the Georgia Supreme Court affirmed, concluding that the display of emotions was not excessive and that the prosecutor properly could ask leading questions to make sure that the testimony remained within the limits set forth in O.C.G.A. § 17-10-1.2(a)(1). Dkt. No. 99-2 at 5-7.

In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court ruled that the Due Process Clause "erects no *per* se bar."  Thus, a state may present evidence "offering 'a quick glimpse of the life' which a defendant 'chose to extinguish'" or "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide."  *Id.* at 822 (citations omitted).  *See also id.* at 831 (O'Connor, J., concurring) (noting that a state may legitimately decide that the sentencing jury "should know the full extent of the harm caused by the crime, including its impact on the victim's family and community" and may "decide also that the jury should see 'a quick glimpse of the life petitioner chose to extinguish.'") The Court, however, noted that its decision did left undisturbed the prohibition set forth in *Booth v. Maryland*, 482 U.S. 496 (1987), that admission of "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  *See Payne*, 501 U.S., at 830 n.2.  That prohibition remains the law.  *Bosse v. Oklahoma*, 137 S. Ct. 1, 2

195

(2016). Mrs. Holland's testimony, specifically elicited by the prosecutor, that Ms. Holland feared for the safety of herself and her family because she believed Mr. Jones would return to hurt her approached and went over the line into this prohibited territory. The Georgia Supreme Court's rejection of this claim was accordingly an unreasonable application of *Payne.*

## IV. THE TRIAL COURT'S REFUSAL TO GRANT MR. JONES'S REQUEST FOR A CHANGE OF VENUE VIOLATED MR. JONES'S RIGHTS TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (CORRECTED PETITION, CLAIM FIVE).

Ignoring clear evidence that the Coffee County jury pool had consumed the same pretrial publicity and gossip that necessitated a change of venue from Ware County, the trial judge denied Mr. Jones's second motion for a change of venue made during the first day of jury selection. The trial court's decision forced Mr. Jones to be tried by a jury drawn from a community that had been primed through the local papers and gossip to not only secure justice for "a well-known and widely respected Ware County man," but to also send a message that "violence and mayhem" would not be tolerated in their rural, South Georgia community. The trial court's decision deprived Mr. Jones of his rights to a fair trial and impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and entitles him to habeas relief from this Court.

196

On the morning of March 31, 1993, readers of the Waycross Journal-Herald awoke to a front-page story describing the "brutal murder of a well-known and widely respected Ware County man." Myra Johns, *Ware County Man Brutally Murdered Early This Morning*, WAYCROSS JOURNAL-HERALD, Mar. 31, 1993. The community learned that the victim, "an upstanding Christian who loved people and was willing to go the last mile to give help to anyone," had been beaten to death "as his wife and two children watched from inside their home." *Id*. The paper reported that the suspects had driven away in the victim's vehicle, but that law enforcement already had "two suspects in mind" and expected them to be arrested quickly. *Id.*

The intense media and community interest in the case and its potential to disrupt the trial were immediately apparent to the State, defense counsel, and the court. The trial court had to look outside of Ware County to find counsel for Mr. Jones and his codefendant after every local attorney "begged off" the appointment "because . . . they knew and liked the victim a lot." Dkt. No. 97-3 at 45. Mundane, pretrial hearings were packed with members of the media and community, who crowded into the courtroom to learn details about the case. Dkt. NO. 103-14 at 8-9. The close attention and potential for prejudicial publicity compelled the trial court to promptly enter a gag order at the April 7, 1993 initial appearance, Dkt No. 96-1 at 18-19; Dkt. No. 97-2 at14, and counsel for both Mr. Jones and his co-defendant informed the trial court as early as the July 22, 1993, initial pretrial hearing that they

would be seeking a change of venue "because of the extensive publicity in this case and because of the fact that everyone in this community had known the alleged victim in this case . . . . He was well known in this community." Dkt. No. 97-2 at 14. When the court held the arraignment a few weeks later, the extensive media coverage and crowds at hearings compelled Mr. Bunner's trial counsel to ask the court to reinstate the initial gag order:

> [T]here has been extensive news coverage of our last proceeding before this Court, and I would simply ask the Court, we have – I think both of us have gotten motions for change of venue and this Court's aware of the problems that publicity cause in a case like this, and it's obvious from the crowd here today that this is a highly publicized case, and we'd ask the Court to either reinstate the Gag Order to remind those that might be inclined to make publication of what's going on here that there is a Gag Order and define the limits of that Gag Order.

Dkt. No. 103-14 at 8-9. The judge responded by re-reading the terms of the original gag order in open court and issuing a reminder that it was still in effect. Dkt. No. 103 at 14:9.

Counsel for Mr. Jones filed the motion for a change of venue on August 4, 1993, wherein he alleged that Mr. Jones could not receive a fair trial in Ware County due to prospective jurors' exposure to "highly prejudicial and erroneous pre-trial publicity since the date of the crime" and that "[t]here is a danger of violence being attempted to be committed on defendant if he is tried in Ware County, Georgia." Dkt. No. 96-1 at 86. Counsel, however, never proffered to the court any of the

newspaper, television, or radio stories to which prospective jurors had been exposed prior to trial.

Approximately one month later, on September 1, 1993, the trial court heard both defendants on their motions for a change of venue. Dkt. No. 97-3 at 19-20, 49-53. Mr. Jones's counsel argued that "this case has been highly publicized in Ware County, Georgia . . . and it is one that has brought a lot of animosity toward my client, and certainly, I think that out of fairness there would be no way that he could get a fair trial in this county." Dkt. No. 97-3 at 19.[83] Mr. Bunner's trial attorney pointed to the unusual crowds at the pretrial hearings to show the court that "[t]here was tremendous love and devotion for the victim," and argued that the crowds "plus the fact that you had to go out of town, out of county, to get lawyers, should show this Court that there is a problem here that needs addressing which, if it's not addressed, is going to fester into a boil later on." Dkt. No. 97-3 at 51-52.

The trial court initially denied both defendants' motions for a change of venue, explaining that it would "probably wait and see what develops on voir dire before I decide to change venue – or before I decide whether venue should be changed." Dkt.

––––––––––––––––––––

[83] Counsel did not, at the time of the hearing or anytime thereafter, supplement the record with any of the newspaper, radio, or television stories that discussed the crime and/or the trial of Mr. Jones's co-defendant.

199

No. 97-3 at 20. However, by February of 1994, the judge presiding over Mr. Bunner's case declared a mistrial after he was unable to select a jury from Ware County because "over thirty percent of the jurors [were] falling by the wayside because of fixed opinions as to either guilt, innocence or sentence." Dkt. No. 102-3 at 46. The district attorney agreed to change venue in the cases of both Mr. Jones and Mr. Bunner. *Id.* Venue in Mr. Bunner's case was then changed to Tift County, a county located outside the Waycross judicial district and over 70 miles away from Ware County. Dkt. No. 99-9 at 24. The Tift County jury that heard Mr. Bunner's case unanimously rejected the death penalty and sentenced Mr. Bunner to life without parole. Dkt. No. 100-1 at 66, Dkt. No. 102-1 at 310-15.

After Mr. Bunner's trial concluded, Mr. Jones's counsel and the district attorney began looking for a venue to try Mr. Jones's case. *See* Dkt. No. 101-4 at 174-180. The parties initially agreed to change venue to Glynn County, Dkt. No. 101-4 at 174-175, but Glynn County was unable to accommodate a capital trial during the requested time frame. Dkt. No. 101-4 at 176. The parties then agreed to try the case in Emmanuel, Toombs, or Dodge County, but, when these turned out to be unavailable, they ultimately settled upon trying the case in Coffee County, a neighboring county located within the same judicial district as Ware County. Dkt. No. 101-4 at 177, 179, 180; Dkt. No. 99-9 at 24; Dkt. No. 126-2 at 3-4.

The change of venue to Coffee County failed to effectuate Mr. Jones's rights to a fair trial and an impartial jury because Coffee County was not only in close physical proximity to the community where the crime occurred, but its residents also received their news from the same two newspapers, the Waycross Journal-Herald and the Florida Times Union, that provided the most extensive and prejudicial coverage of the crime. Dkt. No. 99-9 at 24; Dkt. No. 97-4 at 42; Dkt. No. 100-2 at 62-64.

> ### A. Local Papers Saturated The Community With Prejudicial News Accounts That Highlighted Mr. Jones's Alleged Admissions Of Guilt, The Brutality Of The Crime, The Grief Of The Victim's Family, The Strength Of The State's Case, And The Community's Need For Safety And Security.

The day after the murder, the Journal-Herald ran a front-page headline announcing that two Waycross teenagers, Ashley Jones and Harry Allen Bunner, had been arrested and charged with the murder of Keith Holland. Myra Jones, *Waycross Teen-Agers Charged in Murder of Holland*. WAYCROSS JOURNAL-HERALD, Apr. 1, 1993. The article explained how law enforcement "worked long hours" and "did a very professional job" to locate the two suspects, who were found hiding in a welcome center restroom in Florida. *Id.* Law enforcement extended its gratitude to the public for helping investigators with the case: "Their assistance enabled our investigators to identify the suspects in the case and bring it together so that we could arrest the suspects as quickly as we did." *Id.*

Local media coverage of the crime was both emotional and extensive as it aimed to convey the community's devastation at losing a beloved "family man with friends throughout the area," "who was lured from his home . . . before dawn . . . and beaten to death by two men as his wife and children watched." Larry Purdom, *Bunner Gets Life Without Parole*, WAYCROSS JOURNAL-HERALD, Dec. 5, 1994; *Two teens charged in man's death returned to Georgia*, ALBANY HERALD, Apr. 2, 1993. Friends and neighbors "expressed sorrow and outrage at hearing of the death" of Keith Holland, someone they described as "a fine young man . . . as good as they come." Myra Johns, *Ware County Man Brutally Murdered Early This Morning*, WAYCROSS JOURNAL-HERALD, Mar. 31, 1993. Newsreaders learned that the victim was "just a good, nice man . . . very active in the PTO . . . . He would do anything for anybody." *Id*. Another family friend told the paper, "This is just awful. . . . I knew him since he was a child. It just gives me chills. His poor children saw him beaten to death right in his front yard." *Id*.

As the case of Mr. Jones's codefendant, Mr. Bunner, proceeded to trial in December of 1994, the Journal-Herald ran more stories and editorials that described

the ongoing impact of the crime on the quiet South Georgia community.[84] For

instance, the victim's father-in-law told the paper:

> I used to leave my keys in my truck so I'd know where to find them.
> Not anymore. . . . Everybody locks their doors now. The worst part has
> been having to hold all this inside.

Larry Purdom, *Bunner Gets Life Without Parole*, WAYCROSS JOURNAL-HERALD,

Dec. 5, 1994. And the day after Mr. Bunner's sentencing, the Journal-Herald ran an

editorial entitled, "Bunner Escapes Death Chair," that elaborated on the

community's feelings of fear and anxiety:

> South Georgians are noted for their Good Samaritan deeds and strong
> sense of hospitality. But this incident has caused many people to have
> second thoughts about helping strangers under such circumstances. . . .
> Each of us is diminished by violence, especially violent acts which have
> no rhyme or reason. The murder of Carl Keith Holland was a crime
> against everyone who calls Ware County home.

*Bunner Escapes Death Chair*, WAYCROSS JOURNAL-HERALD, Dec. 5, 1994. The

same editorial highlighted the "senseless and unnecessary" nature of the crime and

noted that the most "troubling" aspect of the case was the manner in which the victim

died:

----------------------

[84] As discussed below, Mr. Bunner's trial occurred approximately six months
before Mr. Jones's trial. This resulted in a renewed wave of media attention in the
months leading up to Mr. Jones's trial.

> He was awakened at his home by the defendants after their stolen
> pickup truck stalled. While his horror-stricken family looked on from a
> distance, Mr. Holland was struck from behind with a sledgehammer and
> wrench. He was trying to help those who killed him!

*Id*.

Coffee County residents not only consumed the same inflammatory pretrial

publicity that necessitated a change of venue from Ware County, but they also shared

the same sense of loss and outrage that animated the Waycross Journal-Herald's

emotional coverage of the crime. A few days after the murder, a Coffee County

newspaper, the Douglas Herald, published a scathing op-ed entitled "Violent Crime

Moves into the Heartland of America." Max Lockwood, *Violent Crime Moves Into*

*The Heartland of America*, THE DOUGLAS ENTERPRISE, Apr. 14, 1993. The article

warned readers that "[v]iolence and mayhem have moved out from the crowded

tenements of our nations' cities into the heartland of America – first into the metro

suburbs and now into the remotest areas of our nation." *Id*. The article cited the

recent murder of Keith Holland as an example of this chilling trend:

> Reported in the media this week was an instance where an unsuspecting
> family member was lured from his home by a cry for help from
> someone supposedly in distress. His response was met with a personal
> attack which cost him his life.
>
> In an instant of willful malice a life was lost and a family was left
> without a loved one. This is just the beginning of that tragedy, not the
> end.

*Id.* The op-ed went on to lament the nation's ineffective criminal justice system "which seems to favor the criminal as opposed to the rights of the victims," and called upon readers to "Do something about it. Now." *Id.*

> It is apparent that change will come when every citizen takes the time to realize that each of them is involved in the process. Each one is a part of the system. The system can be changed when enough individuals declare that enough is enough.

*Id.*

The decision to move Mr. Jones's case to a county that responded to Keith Holland's murder with the same visceral fear and outrage as Ware County was particularly damaging in this case because Mr. Jones's co-defendant was tried in December of 1994 – approximately six months before Mr. Jones's trial. This provided the media with the opportunity to saturate both Ware County and Coffee County with coverage of Mr. Bunner's trial that was not just emotional, but also littered with prejudicial details that were never presented as evidence in Mr. Jones's trial.

The most damaging stories informed readers that Mr. Jones had allegedly provided a full confession to his cellmates in the Ware County jail. According to the Journal-Herald, witness Jeremy White told the judge in Mr. Bunner's trial that during the month that he had shared a jail cell with Mr. Jones, Mr. Jones "told him he alone had killed Holland." Larry Purdom, *Jail Inmate to be Star Witness for the Defense?*, WAYCROSS JOURNAL-HERALD, Dec. 3, 1994. Readers also learned that

205

Mr. Jones had allegedly threatened to kill Mr. Bunner "if he could get to him," and

that Mr. Bunner was innocent of murder:

> "Jones told me he did it," said White. "He said Bunner didn't do anything. He said this more than once."
>
> Jones told White he'd kill Bunner because "Bunner could testify against him."
>
> He also said Jones told him he had an escape plan.
>
> "He said he wanted to be on 'America's Most Wanted,'" White said.

*Id.* Two days later, the paper informed readers that Mr. Bunner's attorney had called

White and another inmate to testify, and that they "told the jury of jailhouse

conversations with Ashley Jones in which Jones told them he did the killing." Larry

Purdom, *Mr. Bunner Gets Life Without Parole*, WAYCROSS JOURNAL-HERALD, Dec.

5, 1994. This testimony was never introduced against Mr. Jones at his trial. Dkt. No.

98-5 at 38-40.

The Journal-Herald also published several stories that portrayed Mr. Bunner

as extremely cooperative with law enforcement and comparatively less culpable.

Readers learned that Arney Herrin, the chief deputy for the Ware County Sheriff's

Office, testified at Mr. Bunner's trial that Mr. Bunner "started cooperating with

authorities" immediately after his arrest. Larry Purdom, *State Rests: Was Bunner*

*REALLY Innocent Bystander?*, WAYCROSS JOURNAL-HERALD, Dec. 3, 1994. The

paper then went on to describe Herrin's testimony in greater detail:

206

> Bunner immediately told Herrin that he had not done the beating, that Jones had done all the beating. Then he opened up more.
>
> He said the two murder weapons had been a sledgehammer and ratchet wrench and that Jones had wielded both . . . .
>
> He told them after they pulled away from Holland's Braganza Loop home, it was Jones who had stopped and returned to administer several more blows to Holland because he thought Holland was trying to stand up.

*Id.* The article also detailed how Mr. Bunner assisted law enforcement by leading them to the stolen vehicle and providing "details of their Florida spree." *Id.*

The media coverage also explained that Mr. Bunner was "young and impressionable" and had fallen "into league with the older Jones" at the time of the murder. Larry Purdom, *Bunner's Defense; 'Jones Did It,'* WAYCROSS JOURNAL-HERALD, Dec. 5, 1994. According to the Journal-Herald, Mr. Bunner made his first mistake when he drank alcohol on the night of the crime, and "[h]e made his second mistake when he agreed to leave that whiskey-tasting party with Ashley Jones, who now must stand trial for the same charges." *Bunner Escapes Death Chair*, WAYCROSS JOURNAL-HERALD, Dec. 5, 1994. At the end of Mr. Bunner's trial, his attorney told the paper that the jury unanimously rejected the death penalty for Mr. Bunner because "everyone believes the killing blows came from the other guy." Larry Purdom, *Bunner Gets Life Without Parole*, WAYCROSS JOURNAL-HERALD, Dec. 5, 1994. Like the testimony from the two snitch witnesses, none of this evidence was introduced against Mr. Jones at his trial.

207

In addition to the prejudicial accounts of Mr. Jones's alleged confession and Mr. Bunner's lessened culpability, the Journal-Herald also provided extensive and graphic coverage of the State's evidence in Mr. Bunner's trial. Readers learned that the victim's wife, Mamie Holland, gave "emotional testimony" when she described for jurors the assault upon her husband:

> He had a sledge hammer in his hand and he drawed it back . . . I beat on my dining room window, screaming No! I was beating on my window. I yelled at him to stop. He just turned and looked at me then returned to beating.

Larry Purdom, *Witness Testifies Bunner Helped in Attack*, WAYCROSS JOURNAL-HERALD, Dec. 2, 1994. The paper also described how Mrs. Holland "rubbed her forehead, breathed softly and began to cry" while delivering her testimony. *Id*.

The paper then covered the graphic testimony of the victim's father-in-law, who saw Mr. Holland immediately after the attack:

> His head was beat in so bad. . . . It was awfully bloody. I knelt down on the side of him and rolled him over so he could breath. He took two long breaths and that was all. After his breath left him, I called [Mr. Holland's son] Donald for a towel. I didn't want them to see this.

*Id*. Readers also learned that Mr. Holland died from eight to ten "devastating blows" that cracked his skull and shattered his jaw. *Id*.

The Journal-Herald also informed readers that Mr. Holland's neighbor, Sally Kimbrell, provided credible testimony that was "the linchpin of the prosecution's case." *Id*. Readers learned from the paper's coverage of Kimbrell's testimony that

208

two men first assaulted Mr. Holland, and "[w]hen they got in the Toyota to drive off, one got out of the truck and went back and hit Holland a few more times, then turned around and looked straight at the house then got in and drove off." *Id*. The paper described how Kimbrell answered in "a strong voice" when asked if she was sure that two men beat the victim, and that she "stuck to her story" even when Mr. Bunner's defense attorney "tried to shake" her. *Id*.

A few days later, the Journal-Herald ran a front-page story announcing that the jury had sentenced Mr. Bunner to life without parole. Beneath the headline, the paper featured a photograph of Mamie Holland weeping as the jury announced its verdict. The paper also printed her reaction to the jury's finding of guilt:

> Mamie, whose brother Andy is pastor of Racepond Church of God . . . told a reporter between tears that later Saturday night she planned to say a little prayer. She said she was going to let Keith know how it turned out and of all the support she and her two children have had from the community, until they could all be together again in Glory.

Larry Purdom, *Bunner Gets Life Without Parole*, Waycross Journal Herald, Dec. 5, 1994. Readers learned that Mrs. Holland "sobbed on the shoulder of her father, long-time swamp guide Johnnie Hickox," while the verdict was read. *Id.* The paper added that "[i]t was Mrs. Holland, looking out of her dining room window, who had first seen a man raise the large sledgehammer and bring it down on her husband's head." *Id*.

209

The same story also covered the "emotional tumult" of the penalty phase of the trial where the State played the recording of Mrs. Holland's call to 911. *Id.* The paper described how the call started out with "incoherent screaming and crying," after which the victim's two children could be heard asking where their dad was and what happened to him. *Id.* When the recording played, the victim's son held his girlfriend and sobbed; Mamie Holland, also sobbing, had to be escorted out of the courtroom. *Id.* Readers learned that even the victim's father-in-law, Johnnie Hickox, "a man not known to be given to tears, cried quietly" when he listened the 911 recording in court. *Id.*

Finally, the Journal-Herald also provided readers with a laudatory review of the district attorney's performance at Mr. Bunner's trial:

> During the course of presenting his evidence, D.A. Currie had left no item out, even soliciting testimony from his witnesses that at the time did not appear to be significant. But much of it, in retrospect, proved to be extremely vital when it became decision time for the jury. Two such instances include the testimony concerning blood spatters on the stolen white pickup truck belonging to Rudolph Melton and the examination of Holland's wounds.

*Id.* The victim's father-in-law was also quoted as saying that he "was proud" of how the district attorney handled the case. *Id.*

**B.     Voir Dire Revealed That Coffee County Had Been Saturated With The Same Pretrial Publicity And Gossip As Ware County And That Prospective Jurors Openly Discussed**

**Their Opinion That Mr. Jones Was Guilty And Deserving Of
The Death Penalty.**

Even before the start of voir dire, the court, the State, and defense counsel
were aware that trying the case in Coffee County would not eliminate the concerns
with pretrial publicity that prompted the decision to change venue in the first place.
At the pretrial hearing held on May 18, 1995, the trial judge decided to amend the
original gag order to cover Coffee County court personnel. Dkt. No. 97-4 at 41-42.
In making this decision, the judge noted:

> I don't know the number of the circulation of the Journal Herald in
> Coffee County, but there is a substantial circulation of the Waycross
> Journal Herald in Coffee County, and Coffee County has two
> newspapers itself.

*Id*. The district attorney then informed the judge that a local radio station was already
aware that the case had been transferred to Coffee County. *Id*. And when the parties
gathered in court for the first day of voir dire, the trial judge remarked that jury
selection in Mr. Jones's case would be more difficult than it had been in his co-
defendant's case: "We went through 93 [prospective jurors] in Cook County to get
59 qualified jurors, but we'll go through more here, because this is closer to Ware
County." Dkt. No. 97-5 at 51-52.

To conduct jury selection, the trial court divided the prospective jurors into
panels of twelve, and each juror was questioned individually while the remaining
eleven jurors waited together in a separate jury room. Dkt. No. 97-5 at 62-63; Dkt.

No. 99-2 at 3. The first seven jurors to be voir dired were all familiar with the case, either through media accounts or talk about the crime in the local community. Dkt. No. 97-5 at 66-135.[85] The third prospective juror, G.M. Atkinson, stated that he had read about the crime in the Florida Times Union, and as a result, he had already formed the opinion that Mr. Jones was guilty because of "the way that it was written" in the paper. Dkt. No. 97-5 at 99-100.[86] The fifth prospective juror, Johnny Spell, also informed the court that he had read about the case "every week" while it was in the Waycross Journal-Herald, and conceded that it would be difficult for him to put those accounts out of his mind if he were selected as a juror. Dkt. No. 97-5 at 108-116.[87]

By the time the court began its voir dire of the eighth prospective juror, Michael W. Maxwell, it became apparent that Mr. Jones would be unable to receive

---

[85] For example, the first juror to be questioned, Touchton Tarrance, disclosed that he had recently learned about the case through a close friend. Dkt. No. 97-5 at 66. He explained, "Well, I was in Waycross at a continuing education course, and my friend was talking about it and said they was going to move this trial – move a trial . . . to Coffee County, and he hoped I got on the jury." *Id.*

[86] The court excused Atkinson for cause after he told the court that he could not set aside what he had read in the paper. Dkt. No. 97-5 at 100.

[87] Defense counsel never moved to excuse Spell for cause, and the judge deemed him qualified to serve as a juror. Dkt. No. 97-9 at 111-116. Spell, however, was not ultimately selected to serve on the jury. *See* Dkt. No. 97-9 at 159.

a fair trial in Coffee County. When the judge asked Mr. Maxwell if he had already formed or expressed any opinions about the case, Mr. Maxwell replied, "Other than what was said back there." Dkt. No. 97-5 at 134. Instead of inquiring into what was said "back there" and by whom, the judge simply asked again if Mr. Maxwell had already formed an opinion as to Mr. Jones's guilt or innocence. Dkt. No. 97-5 at 135. Mr. Maxwell responded, "Only in a joking manner back there, but not seriously." Dkt. No. 97-5 at 135. The court did not ask any questions to discover Mr. Maxwell's opinion as to Mr. Jones's guilt, nor did the court inquire about the "joking" that had gone on in the jury room. The court simply handed the prospective juror over to the State to conduct voir dire. Dkt. No. 97-5 at 136.

The State followed up with Mr. Maxwell and asked for the precise comment he made in the jury room. Dkt. No. 97-5 at 137. Mr. Maxwell explained that he and the other prospective jurors had already spent some time discussing the case in the jury room, and "based on what was said back there," he told the other prospective jurors: "That if he was as guilty as they said he was, he was guilty." Dkt. No. 97-5 at 137. The trial judge did not ask any follow up questions, and turned voir dire over to defense counsel. Dkt. No. 97-5 at 141.

When defense counsel questioned Mr. Maxwell about the "joking about the guilt of the defendant" that had been going on "back there in that room," Mr. Maxwell responded that he had been talking and joking around with the jurors that

213

came before him. Dkt. No. 97-5 at 141. Mr. Maxwell stated that another prospective juror in the room "explained what had taken place, and . . . referred to the individual in a maroon coat as being the one that committed the crime." Dkt. No. 97-5 at 142. In response, Mr. Maxwell opined to his fellow prospective jurors that "if he's as guilty as they say he is, he's guilty." Dkt. No. 97-5 at 141.

Because Mr. Maxwell admitted that he had discussed media accounts of the crime with other prospective jurors, had already formed an opinion about Mr. Jones's guilt, and had discussed and joked about this opinion with the other jurors, defense counsel moved the court to disqualify Mr. Maxwell and declare a mistrial. Dkt. No. 97-5 at 142-43. Defense counsel also renewed his motion to change venue from Coffee County. Dkt. No. 97-5 at 142-43. The trial court denied all of defense counsel's requests and downplayed the gravity of Mr. Maxwell's admissions by simply asking if Mr. Maxwell could lay the improper discussion aside and decide the case based on the evidence. Dkt. No. 97-5 at 144. The trial court did not probe Mr. Maxwell for more information about the joking in the jury room or whether any other prospective jurors had already concluded that Mr. Jones was guilty.

When defense counsel continued with his examination of Mr. Maxwell, he asked who else had engaged in the conversation about Mr. Jones's guilt. Dkt. No. 97-5 at 144. Mr. Maxwell disclosed that "everyone in there expressed an opinion, possibly, from what was being said." Dkt. No. 97-5 at 144. Most alarming, Mr.

Maxwell informed defense counsel that he had not only expressed an opinion as to Mr. Jones's guilt, but had also informed the other prospective jurors that Mr. Jones should receive the death penalty for his crime. Dkt. No. 97-5 at 144-45. Thigpen then renewed his motion to disqualify Mr. Maxwell. *Id.*

Despite the overwhelming evidence of Mr. Maxwell's bias, the trial judge declined to excuse Mr. Maxwell and instead tried to rehabilitate him with the same generic inquiry he had used earlier. When Mr. Maxwell repeated that he could consider both life and death, the judge was satisfied and refused to disqualify Mr. Maxwell. Dkt. No. 97-5 at 145. Defense counsel persisted, however, and stressed that Mr. Maxwell "has already made an opinion that if he is that guilty, that he thinks he should receive the death penalty." Dkt. No. 97-5 at 146. Mr. Maxwell confirmed that he had told the other jurors "that if he is that guilty, certainly he should receive the death penalty." Dkt. No. 97-5 at 147. The trial judge finally relented and agreed to excuse Mr. Maxwell from jury service. *Id.*

Notwithstanding the substantial evidence that most, if not all, of the jurors on the first panel had been exposed to jokes about the facts of the crime, Mr. Jones's guilt, and opinions about the suitability of the death penalty, the trial judge did not ask any of the remaining jurors from the first panel about these discussions or whether they affected their ability to be impartial. *See generally* Dkt. No. 97-5 at 156-182. Even when prospective juror Nikkisheta Clark confirmed that an older

gentleman in the jury room had talked about the case and Mr. Jones's apparent guilt, the judge did not ask her for more information. Dkt. No. 97-5 at 156-57. Similarly, the trial judge did not ask any follow-up questions when the final prospective juror from the first panel, Jenny McIver, told the district attorney that she had heard other prospective jurors talk about a "hammer, a ratchet, and somebody getting killed." Dkt. No. 97-5 at 177-78. When defense counsel examined Ms. McIver, she confirmed that what she had heard in the jury room had "tainted her" because it had convinced her of Mr. Jones's guilt. Dkt. No. 97-5 at 182-83. The trial court excused Ms. McIver for cause. *Id.*[88]

As voir dire of the remaining panels proceeded, the trial court received further confirmation that Coffee County had been saturated with the same pretrial publicity and inflammatory gossip that had necessitated a change of venue from Ware County. Of the eighty-nine prospective jurors questioned during voir dire, at least thirty-six of them were already familiar with the case from reading local newspapers,

_____

[88] Similarly, even though Ann Sheppard answered during voir dire that she had heard others discussing the case in the courthouse earlier that day, the trial judge never followed up or asked any questions about these conversations. Dkt. No. 97-6 at 120-125. The trial judge also ignored Kip Griner's revelation that rumors were "flashing" around the jury room on the first day of jury selection. Dkt. No. 97-8 at 44.

discussing the case with individuals in Ware County and/or Coffee County, and/or hearing about the case on the radio. *See* Dkt. No. 97-5 at 66-67, 76-78, 92, 99-101, 103-104, 108, 111-13, 123, 170-72, 177-78, 182-183, 134, 137, 141-148, 177-178, 182-183, 134, 137, 141-148, 157, 134; Dkt. No. 97-6 at 51, 98-99, 105, 111, 113, 119,-120, 158, 160, 185; Dkt. No. 97-7 at 52-53, 102, 108, 124-125; Dkt. No. 97-8 at 68-71, 75-76, 92-94, 150-152, 158; Dkt. No. 97-9 at 49, 52-54, 62-63, 82-86, 91, 94, 101, 107, 112, 135-139. Three of these jurors, Eric Reinholz, Eartha Lee Street, and Kip Griner, ended up serving as jurors in the case. Dkt. No. 97-6 at 51, 105; Dkt. No. 97-8 at 40, 44; Dkt. No. 97-9 at 159. Nineteen of the prospective jurors had ties to Ware County either through friends, family, or work. Dkt. No. 97-5 at 66-67, 76, 95, 108, 112, 166; Dkt. No. 97-6 at 31, 51, 98-99, 111, 113, 141, 187; Dkt. No. 97-7 at 78, 102-103, 109, 115; Dkt. No. 97-8 at 40-41, 45, 62, 104-105; Dkt. No. 97-9 at 62-63, 94. And eleven of the eighty-nine were excused for cause because they had already formed an opinion as to Mr. Jones's guilt based on what they had heard in the news, from other prospective jurors, or from others in the community. Dkt. No. 97-5 at 99-101; 134, 137, 141-148, 170-172, 177-178, 182-183; Dkt. No. 97-7 at 126; Dkt. No. 97-8 at 92-94, 150-152; Dkt. No. 97-9 at 82-86, 94, 101, 138.

Indeed, voir dire revealed that Ware County and Coffee County encompassed overlapping rural communities in South Georgia where residents read the same newspapers and regularly crossed between the two counties for work, school, or to

217

visit family and friends. For example, William Souther, a prospective juror from the first panel, went home after the first day of voir dire and talked to friends to gather more information about the case:

> I've talked to some people since I left from here that have read about it and told me some information about it, and someone did say that they felt that this fellow was – I forgot the exact terms they used, but **they felt that he was guilty and he needed to be hung**, and I don't remember if it was exactly in the jury room or if it was somebody I was talking to after I left here.

Dkt. No. 97-9 at135 (emphasis added).

Another prospective juror, Douglas Tarver, informed the court during voir dire, "I'm afraid I knew the story before I arrived here," because one of his students from South Georgia College was a close, personal friend of the victim's family. Dkt. No. 97-8 at 69. Tarver heard the student talk about the crime "[o]n two or three occasions, how upset she was, and [that she] knew the family personally." Dkt. No. 97-8:69. The student shared with him "the reaction of the family," and also that:

> Some of the family members actually witnessed this, looked through their home and saw it; I believe the brother was trying to get a gun to prevent further beating of the gentleman killed . . . .

Dkt. No. 97-8 at 71. Tarver was also aware of "the hurt, the despair, the anguish, just as you would suspect," that the victim's family experienced, and he knew that the victim's family "don't think they've been treated fairly at this point. I've heard that story twice . . . ." *Id.* Tarver conceded that he "was given a somewhat descriptive narrative of the family's impression of what happened . . . prior to even being

218

summoned here." 97-8:76. The trial judge denied defense counsel's motion to excuse Tarver for cause. *Id.*

Voir dire concluded with a reexamination of some of the jurors from the first panel to determine whether they had overheard any of the improper comments about Mr. Jones's guilt and sentence on the first day of jury selection. Dkt. No. 97-9 at 134-145. When defense counsel questioned William Souther, he confirmed that the case "was being discussed" in the jury room on the first day of jury selection, and he "started asking questions because I was interested in what was coming about here." Dkt. No. 97-9 at 135. Souther told defense counsel that he was not sure if someone in the jury room or outside in the community had told him that Mr. Jones "was guilty and he needed to be hung," Dkt. No. 97-9 at 135, but he conceded that it had an effect on his ability to be impartial: "That will certainly play into my decision-making, because of what I heard. I can't forget it. I heard it." Dkt. No. 97-9 at 137. The judge reluctantly excused Souther, but failed to excuse three other jurors who overheard the same improper discussions in the jury room, even though one of them stated repeatedly that the comments would influence him as a juror. Dkt. No. 97-9 at 138-145.[89]

---

[89] When asked if the comments in the jury room would affect his ability to be a fair juror, Stanley Smith responded, "It probably would." Dkt. No. 97-9 at 143. *See*

219

### C.    The Overwhelming Pretrial Publicity And Evidence Of Widespread Juror Bias Necessitated A Change Of Venue.

The constitutional right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This "means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). *See also Irvin*, 366 U.S. at 722 (a juror's verdict "must be based upon the evidence developed at trial"). "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1961).

In determining whether pretrial publicity necessitates a change of venue, the Unites States Supreme Court has noted that published accounts of a defendant's confession are the type of "blatantly prejudicial information . . readers or viewers

―――――――――――――――――――

*also* Dkt. No. 97-9 at 143 (agreeing that the comments in the jury room would probably "taint" him as a juror). Trial counsel failed to request a cause challenge, and the trial judge refused to excuse Smith for cause even when Smith agreed with defense counsel that after hearing the inflammatory comments, "you can't unring your bell . . . ." Dkt. No. 97-9 at 145. Trial counsel ultimately used a peremptory strike on Smith.

could not reasonably be expected to shut from sight." *Skilling v. United States*, 561 U.S. 358, 383 (2010). *See also Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (holding that due process required a change of venue when prospective jurors had seen defendant's televised confession); *Price v. Allen*, 679 F.3d 1315, 1322 (11th Cir. 2012) (singling out a confession as "blatantly prejudicial" pretrial publicity). This is so because "the defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." *Parker v. Randolph*, 442 U.S. 62, 72 (1979). Similarly, a defendant cannot receive a fair trial where the jury has been exposed to news accounts that include information inadmissible at trial because "[t]he prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is part of the prosecution's evidence. It may indeed be greater for it is then not tempered by protective orders." *Marshall v. United States*, 360 U.S. 310, 312-13 (1959).

Notwithstanding the trial judge's (and defense counsel's) failure to adequately voir dire prospective jurors regarding their exposure to pretrial publicity and gossip, *see* Section ** *infra*, the trial court still had before it ample evidence that Mr. Jones could not receive a fair trial in Coffee County. The trial court, the State, and defense counsel agreed that Mr. Jones could not receive a fair trial in Ware County due to the overwhelming pretrial publicity and community interest in the case. They also knew even before voir dire began that Coffee County was similarly saturated with

damaging pretrial publicity because of its proximity to Ware County and because the Waycross Journal-Herald had a substantial circulation in Coffee County. Voir dire revealed that over forty percent of the prospective jurors had some exposure to the case either through news stories, community gossip, and/or comments from other prospective jurors. And, as discussed above, many of these accounts were not "largely factual in nature," *Murphy v. Florida*, 421 U.S. 792, 802 (1974), but were instead of the "blatantly prejudicial" variety that the United States Supreme Court has found to necessitate a change of venue. *See Rideau*, 373 U.S. at 726; *Marshall*, 360 U.S. at 312-13. Prospective jurors who read the Waycross Journal-Herald went into voir dire with information that "was never heard from the witness stand," *Sheppard*, 384 U.S. at 356, namely that Mr. Jones had allegedly confessed to the crime on several occasions and threatened to kill his codefendant, and that Mr. Jones's codefendant was younger, impressionable, cooperative with law enforcement, and overall less culpable than Mr. Jones. The media also "summarized and interpreted the evidence" from Mr. Bunner's trial, *Sheppard*, 384 U.S. at 357, by emphasizing Sallie Kimbrell's credibility, describing the penalty phase as an "emotional tumult" and commending the district attorney for presenting such a solid case.

Prospective jurors were also from the same community that expressed "bitter prejudice" and "public passion" against Mr. Jones. *See Irvin*, 366 U.S. at 727, 728.

222

The local papers highlighted the intense grief and horror suffered by the victim's family, while also emphasizing that Mr. Jones's crime instilled a sense of fear and violation in the wider South Georgia community. Indeed, a Coffee County newspaper urged citizens to "do something" in response to the Holland murder in order to deter criminals from committing future acts of violence in their rural community. Not surprisingly, several prospective jurors entered voir dire with the opinion that Mr. Jones was guilty and deserving of the death penalty, while other prospective jurors were exposed to and developed these views during voir dire.

While most jurors were capable of proclaiming impartiality during voir dire, those statements were not determinative of Mr. Jones's constitutional rights because "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights." *Murphy*, 421 U.S. at 800. *See also Irvin*, 366 U.S. at 728 (jurors often claim impartiality because of "the psychological impact of requiring such a declaration before one's fellows"). Indeed, jurors "can't forget what [they] hear and see . . . ." *Irvin*, 366 U.S. at 728, For that reason, the United States Supreme Court has held that "[w]hen one's life is at stake – and accounting for the frailties of human nature . . . it is not requiring too much that [a defendant] be tried in an atmosphere undisturbed by so huge a wave of public passion . . . ." *Id.*

Given the amount and inflammatory nature of the pretrial publicity in Coffee County, and the compelling proof of juror bias during voir dire, the trial judge should

have granted Mr. Jones's second request for a change of venue and moved the trial to a county outside of the Waycross Judicial District.

### D.   The Trial Court's Anemic Questioning Of Prospective Jurors Was Insufficient To Protect Mr. Jones's Right To Be Tried By A Fair And Impartial Jury.

To uphold the constitutional guarantee of a fair trial before an impartial jury, there must be the opportunity to conduct "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). This responsibility rests with the trial judge, who must be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith*, 455 U.S. at 217. Due process also "requires the trial judge, if he becomes aware of a possible source of bias, to 'determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial.'" *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004) (quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954)).  If the court fails to conduct adequate voir dire, "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow

224

the court's instructions and evaluate evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1982).[90]

Here, the trial judge completely abdicated his responsibility to identify and remove bias from the pool of prospective jurors. The trial judge knew before voir dire even began that many prospective jurors would already be familiar with the case due to Coffee County's proximity to Ware County, the circulation of the Waycross Journal-Herald within Coffee County, and the fact that Mr. Jones's co-defendant had already been convicted and sentenced after a recent, highly-publicized trial. Doc. 97-4 at 42; Doc. 97-5 at 51-52. Nonetheless, the trial court never instructed the prospective jurors to refrain from discussing the case or reading about it until *after* prospective juror Michael Maxwell divulged to the court that the first panel of jurors had laughed and joked about Mr. Jones's guilt and punishment in the jury room. Dkt. No. 97-5 at 148-49.[91] And instead of probing jurors to discern the source, extent, and

---

[90] As discussed in Section ** *infra*, Mr. Jones's trial counsel also failed to conduct an adequate voir dire and was ineffective for his failure to do so. Indeed, trial counsel not only failed to carefully question prospective jurors about their exposure to prejudicial media coverage and their attitudes towards the death penalty, he also failed to ask *any* questions of eight of the twelve jurors that convicted Mr. Jones and sentenced him to death. *See* Section ** *infra*.

[91] The trial judge was also negligent in his timing for giving this instruction to the other jurors. Panels four through six only received the instruction when they returned to court for the second day of jury selection, Dkt No. 97-7 at 34-35; and the

effect of any exposure to the inflammatory publicity and gossip, the judge adhered to the same series of scripted, generic questions with each prospective juror:

> Have you for any reason formed and expressed any opinion in regards to the guilt or the innocence of the accused?

> Have you any prejudice or bias resting in your mind either for or against the accused?

> Is your mind perfectly impartial between the State and the accused?

Dkt. No. 97-5 at 64-65.

These questions were not designed to elicit information regarding jurors' exposure to pretrial publicity. Rather, the court's simplistic and superficial voir dire failed to provide the trial judge with sufficient information to "carefully consider the knowledge and attitudes of prospective jurors and then closely scrutinize the reliability of their assurances of fairness." *Skilling v. United States*, 561 U.S. 358, 441 (2010) (Sotomayor, J., concurring in part and dissenting in part). And although the Supreme Court has repeatedly cautioned that, "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights," *Murphy*, 421 U.S.

---

court waited until the third day of jury selection to give the instruction to panels seven and eight. Dkt. No. 97-9 at 32.

at 800, the trial judge's inquiry into prospective jurors' ability to be impartial started and finished with each juror's self-assessment.

The trial judge did not just fail to adequately question prospective jurors about their exposure to publicity and gossip and their ability to be impartial; he went out of his way to avoid ascertaining this information from jurors even when they explicitly informed the court that they had heard or made jokes and comments about Mr. Jones's guilt and the desire for the death penalty in this case. For example, after prospective juror Michael Maxwell informed the court that he had participated in a discussion about the case in the jury room, the trial judge never asked Mr. Maxwell to tell him precisely what was said or who else had participated in or overheard the discussion. Dkt. No. 97-5 at 135. Instead, the judge proceeded, unfazed, with his standard and generic line of questioning that failed entirely to reveal that Mr. Maxwell had advocated to his fellow jurors that Mr. Jones should be convicted and sentenced to death. Dkt. No. 97-5 at 135-36.

Equally alarming was the judge's failure to ask *any* of the other jurors from the first panel about Mr. Maxwell's comments, whether they made any of their own, or whether the comments had any effect on their ability to be fair and impartial. *See* Dkt. 97-5 at 155-56, 170-176. Similarly, the trial judge failed to follow up when prospective juror Kip Griner divulged that "rumors were flashing" around the audience on the first day of jury selection, Dkt. No. 97-8 at 44, and he also ignored

227

Ann Sheppard's admission that she had heard other prospective jurors discussing the case in the courthouse on the first day of jury selection. Dkt. No. 97-6 at 120-125. Nor did the court's knowledge that jurors had been talking about the case in the jury room prompt it to question subsequent panels to determine whether they, too, had engaged in gossip about the case subsequent to being called for jury duty.

The trial court's complete lack of interest in seating an unbiased jury became most apparent when the court recalled four jurors from the first panel who had been exposed to Mr. Maxwell's prejudicial jokes and remarks. The trial judge did not ask these jurors any questions, and then only inserted himself into the voir dire to minimize the obvious bias of these jurors and to conflate calls for Mr. Jones's execution with neutral factual reporting about the crime. For instance, when defense counsel moved to excuse William Souther after he disclosed that he had not only heard someone say that Mr. Jones was guilty and "needed to be hung," but that he had actively sought out information about the case after the first day of jury selection, the trial judge initially rebuffed defense counsel's request to excuse the juror by claiming that "many jurors . . . hear or read about a case. Your hearing someone talk about it is no different than reading the same thing in a newspaper about it."[92] Dkt.

_____

[92] The trial judge also conflated an emotional description of victim impact with generic factual narratives when he denied defense counsel's request to excuse

No. 97-9 at 136. The trial judge only relented and excused Mr. Souther after additional questioning left no doubt about Mr. Souther's inability to be impartial. Dkt. No. 97-9 at 137-138.

"[A]dequacy is a function of the probability of bias; the greater that probability, the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald*, 374 F.3d at 481. The trial court's failure to conduct even a minimally searching inquiry in response to evidence of bias, combined with its baffling view that inflammatory calls for Mr. Jones's execution were no different from neutral factual newspaper reporting, demonstrated that the trial judge was simply incapable of fulfilling his "responsibility to investigate and take corrective action when the courtroom environment becomes prejudicial to the accused." *Sheppard*, 384 U.S. at 358. *See also Oswald*, 374 F.3d at 481 (granting habeas relief because prospective jurors' comments "poisoned" the jury pool and

_____

Douglas Tarver. 97-8:76. Even though Tarver admitted that he heard of the victim's anguish and received a "descriptive" narrative of the crime from the victims' perspective, the judge dismissed this by saying "that is no different than reading it in a newspaper, and a lot of them have read it in the newspaper, so whether he's read it or heard it is not the point." Dkt. No. 97-8:76.

trial judge's failure to conduct adequate voir dire violated petitioner's right to due process).

### E.     Mr. Jones Is Entitled To A Presumption Of Prejudice.

In cases where "pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held," the petitioner is entitled to a presumption of prejudice from the pretrial publicity. *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (citing *Rideau*, 373 U.S. at 726-27; *Murphy*, 421 U.S. at 798-99). The standard applicable here is: "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, [jury] prejudice is presumed and there is no further duty to establish bias." *Coleman*, 778 F.2d at 1490 (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (internal quotation omitted)).

Mr. Jones has met this standard. The record below shows that the judge, the district attorney, and defense counsel all agreed that Mr. Jones could not receive a fair trial in Ware County due to the extensive and prejudicial pretrial publicity. But the decision to change venue to Coffee County did nothing to remedy this problem because Coffee County was in close proximity to Ware County, and because Coffee County received the same newspapers that necessitated the change of venue from Ware County. The prejudicial pretrial publicity included stories about such

"blatantly prejudicial" matters as: 1) Mr. Jones's alleged confession to the crime and plan to kill his co-defendant; 2) the impressionability and lessened culpability of Mr. Jones's co-defendant; 3) the strength and credibility of the state's witnesses; 4) the district attorney's accomplished performance at trial; and 5) the community's desire to secure justice for the victim and take action to stop the infiltration of violent crime into their rural community. This publicity was particularly prejudicial because none of it was introduced against Mr. Jones at his trial. Because the record includes evidence of both media saturation and inflammatory, inadmissible content, Mr. Jones is entitled to a presumption of prejudice.[93]

### F.   This Court Should Review Mr. Jones's Claim *De Novo*.

On direct appeal to the Georgia Supreme Court, Mr. Jones raised as error the trial court's refusal to change venue "after it was learned that the prospective jurors had joked and commented about the fact that the Appellant was guilty, and that he needed to be sentenced to death." Dkt. No. 98-9 at 7-11. The Georgia Supreme Court rejected this claim, finding that Mr. Jones failed to "show either that the trial setting

---

[93] Should this Court disagree and find that Mr. Jones is not entitled to a presumption of prejudice, Mr. Jones respectfully requests that this Court reconsider its earlier denial of his requests for discovery and an evidentiary hearing so that he may depose the trial jurors and furnish this Court with evidence of prejudice.

was inherently prejudicial as a result of pretrial publicity, or actual bias on the part of individual jurors." Dkt. No. 99-2 at 4. The court further explained:

> Jones does not allege that the trial setting in Coffee County was inherently prejudicial. With regard to the prejudice of individual jurors, Jones offers no proof that a high percentage of jurors had prior knowledge or had formed opinions about the case, based on what they had read or heard, or that there was a relatively high excusal rate. Absent proof of factors such as these, Jones was not entitled to a change of venue, and therefore the trial court did not abuse its discretion by refusing to grant the motion.

*Id.*

In his state habeas proceeding, Mr. Jones modified his venue claim and squarely alleged that he was entitled to a change of venue because Coffee County was inherently prejudicial. In particular, Mr. Jones alleged that trying his case before a Coffee County jury violated his right to a fair trial because Coffee County was within the same judicial district as Ware County, was approximately 30 miles from the scene of the crime, and "covered by the same television, radio and newspapers that Ware County is covered by. Thus, the same media blitz that warranted a change of venue from Ware County, saturated the jury pool in Coffee County." Dkt. No. 99-9 at 24. *See also* Dkt. No. 102-5 at 87-89.

During the state habeas proceedings, Mr. Jones's counsel elicited deposition testimony from trial counsel confirming that Coffee County was "served by nearly the identical media outlets that serve Ware County." Dkt. No. 102-5 at 88. *See also* Dkt. No. 199-2 at 600-64. Mr. Jones's state habeas counsel also placed into evidence

an affidavit from Eleanor Hopkins, an investigator at the Georgia Resource Center, that described her search of newspaper files for all articles pertaining to the murder of Keith Holland and the trials of Mr. Jones and Mr. Bunner. Dkt. No. 99-12 at 114, 182. Ms. Hopkins photocopied the articles she found in the Waycross Journal-Herald, the Douglas Enterprise, and the Albany Herald and provided them to Mr. Jones's state habeas counsel. *Id.* [94]

Although the change of venue claim raised in Mr. Jones's state habeas proceedings was entirely different from the one raised on direct appeal, the state habeas court declined to review the claim because it found it to be *res judicata*. Dkt. No. 103-1 at 5. The state habeas court explained that "issues that have been raised and litigated on direct appeal may not be relitigated by means of a habeas corpus proceeding. Therefore, this Court *will not review the following claims* as the Court finds they are *res judicata*." *Id.* (emphasis added).

Ordinarily, federal courts will not review claims presented in a habeas petition when the state court's decision rests upon a state-law ground that "is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S.

---

[94] While Ms. Hopkins's affidavit was entered into the record at the evidentiary hearing, the actual newspaper articles do not appear to be in the record.

449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The question of adequacy is a federal question, though. *Cone*, 556 U.S. at 465. And when a state court "*wrongly* finds that a claim has already been raised and addressed," then there is no "adequate state ground" to bar federal review of the claim. *Williams v. Alabama*, 791 F.3d 1267, 1275 (11th Cir. 2015) (emphasis in original). Moreover, where, as here, "the state court did not reach the merits of [Mr. Jones's] claim based on some ground that is not adequate to bar federal review, [the federal court] must review the claim *de novo.*" *Williams*, 791 F.3d at 1273 (emphasis in original).

Mr. Jones is entitled to de novo review of his claim because the state habeas court's res judicata determination was factually incorrect. *See Williams*, 791 F.3d at 1275-76. Unlike the claim raised on direct appeal, which was rejected in part due to its failure to "allege that the trial setting in Coffee County was inherently prejudicial," Dkt. No. 99-2 at 4, Mr. Jones made this precise allegation in his state habeas proceedings and presented new factual evidence to support this claim. Mr. Jones alleged that his trial "was the subject of publicity so inherently prejudicial that he could not receive a fair trial," because "the same media blitz that warranted a change of venue from Ware County, saturated the jury pool in Coffee County." Dkt. No. 102-5 at 88-89 (internal citation and quotation omitted). *See also* Dkt. No. 99-9 at 24. Mr. Jones also introduced new evidence that the pretrial publicity was both extensive and prejudicial, Dkt. No. 99-12 at 114; Dkt. No. 100-2 at 60, and that the

newspapers that carried this publicity were also circulated in Coffee County. Dkt. No. 100-2 at 62. *See also* Dkt. No. 102-5 at 87-89. Because no court has ever determined whether those facts demonstrated that Coffee County was an inherently prejudicial venue, the habeas court's res judicata determination was incorrect. This entitles Mr. Jones to de novo review by this court. *Williams*, 791 F.3d at 1274.

V.    **TRIAL COUNSEL'S AGREEMENT TO CHANGE VENUE TO AN ADJACENT COUNTY IN THE SAME JUDICIAL DISTRICT THAT WAS SATURATED WITH THE VERY SAME INFLAMMATORY PRETRIAL PUBLICITY AS WARE COUNTY DEPRIVED MR. JONES OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Trial counsel knew that the pretrial publicity that saturated Ware County was so extensive and inflammatory that Mr. Jones could not receive a fair trial in Ware County. Dkt. No. 96-1 at 86; Dkt. No. 97-2 at 14; Dkt. No. 97-3 at 19, 45; Dkt. No. 100-2 at 60; Dkt. No. 102-3 at 46; Dkt. No. 103-14 at 8-9. In particular, trial counsel knew that the two major newspapers that circulated in Ware County, the Waycross Journal-Herald and the Florida Times Union, carried particularly negative publicity about the case, Dkt. No. 100-2 at 62, and that this negative publicity necessitated a change of venue. Dkt. No. 100-2 at 60. Indeed, because trial counsel read the Waycross Journal-Herald every day, Dkt. No. 100-2 at 63, he knew that the paper published numerous stories about Mr. Jones's alleged confession, Mr. Jones's

235

statements about wanting to murder Mr. Bunner, Mr. Bunner's impressionability and lessened culpability, the strength of the State's case, the emotional turmoil suffered by the victim's family, and the community's sense of outrage – all of which poisoned the jury pool and much, if not all of which would be inadmissible as evidence against Mr. Jones at his trial. Trial counsel also knew that both the Waycross Journal-Herald and the Florida Times Union had substantial circulation rates in Coffee County, and that County Coffee was therefore saturated with the same inflammatory pretrial publicity that necessitated a change of venue from Ware County. Dkt. No. 100-2 at 62-63; Dkt. No. 97-4 at 42. Nonetheless, trial counsel accepted the district attorney's request to try the case in Coffee County before a Coffee County jury. Dkt. No. 101-4 at 180.

The decision to agree to a change of venue in Coffee County was deficient and unreasonable because it was not an "informed strategic choice[]." *Strickland*, 466 U.S. 668, 691 (1984). Although trial counsel claimed during state habeas proceedings that he agreed to Coffee County because his "investigation" revealed that Coffee County, unlike other nearby counties, had very few death verdicts, Dkt. No. 100-2 at 65, the record fails to show that trial counsel did in fact conduct an investigation or exercise any strategic judgment when he agreed to try the case in Coffee County.  For instance, trial counsel claimed during his deposition that he "rejected" Glynn County as a venue because the he believed that Glynn County had

the highest rate of death verdicts and that he chose Coffee County because it had very few death verdicts. Dkt. No. 100-2 at 60-67. However, the trial record reveals that trial counsel had actually agreed with the district attorney's suggestion to try the case in Glynn County, Dkt. No. 101-4 at 175;[95] and during his deposition, trial counsel could not describe what he did to investigate the existence and extent of any bias or prejudice in Coffee County. Dkt. No. 100-2 at 65-66. Thus, trial counsel's claim that his venue selection was motivated by anything other than a desire for convenience is belied by the record.

Moreover, even if trial counsel did take steps to determine the frequency of death verdicts in Coffee County, that inquiry still failed to answer the constitutional question relevant to Mr. Jones's case, namely whether the saturation of inflammatory pretrial publicity in Coffee County created the type of bias and prejudice that would make it impossible to select a jury capable of "render[ing] a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. Accordingly, trial counsel's decision to change venue to an adjoining county that had also been saturated with biased pretrial publicity constitutes deficient

---

[95] The case was not ultimately tried in Glynn County only because Glynn County was unable to accommodate the trial during the requested time period. Dkt. No. 19104 at 176.

performance. *Strickland*, 466 U.S. at 687-91. *See also Virgil v. Dretke*, 446 F.3d 598, 609-10 (5th Cir. 2006) (finding counsel deficient for failing to respond to express statements of bias against his client during voir dire).

The change of venue to Coffee County also resulted in prejudice to Mr. Jones. *Strickland*, 466 U.S. at 691-92. As discussed in Section ** *supra*, the first few minutes of voir dire revealed that Coffee County was just as biased against Petitioner as Ware County. Indeed, the bias was so overwhelming that trial counsel was compelled to seek another change a venue after the court voir dired the eighth prospective juror. Dkt. No. 97-5 at 142-43. This realization arrived too late, though, and Mr. Jones was tried by a jury drawn from a county that possessed a deep and bitter prejudice against him. Because "[i]t is clearly established that the Supreme Court views the denial of the right to an impartial decisionmaker to be such an error that taints any resulting conviction with constitutional infirmity," *Virgil*, 446 F.3d at 607, trial counsel's failure to secure a fair change of venue resulted in prejudice to Mr. Jones.[96]

---

[96] The life sentence secured by Mr. Jones's co-defendant, who was tried in a county outside the Waycross Judicial District, is further proof that trial counsel's failure to secure a meaningful change of venue resulted in prejudice.

Mr. Jones raised this claim of ineffectiveness in his state habeas proceedings. Dkt. No. 99-9 at 28; Dkt. No. 102-5 a5 87-89. The state habeas court denied the claim, finding that counsel was not deficient because "[m]ere proximity to the county in which the crime occurred, in which there was admittedly prejudicial pretrial publicity, does not establish that the setting of the trial was inherently prejudicial." Dkt. No. 103-1 at 31 (citation omitted). The court noted that "Petitioner has still offered no proof that a 'high percentage of jurors had prior knowledge or had formed opinions about the case, based on what they had read or heard, or that there was a relatively high excusal rate.'" Dkt. No. 103-1 at 31. (quoting *Jones v. State*, 267 Ga. 592, 594 (Ga. 1997)).

The state habeas court's finding that counsel was not ineffective for changing venue to Coffee County "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The reasonableness of counsel's decision under *Strickland* must be based on an assessment of the adequacy of the specific decision at issue, which in this case was the decision to change venue to enforce Mr. Jones's right to an impartial jury. *Strickland*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 522-23; *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Here, the state habeas court found trial counsel's justifications – the convenience of Coffee County and the supposed infrequency of death verdicts in Coffee County – to be reasonable.

The court failed to consider record facts that undermine trial counsel's account of his decision. *See, supra,* at ***.  Regardless, however, neither justification answered the strategic inquiry relevant here, which was whether the extensive pretrial publicity had sewn prejudice and bias in Coffee County. *See Irvin*, 366 U.S. at 327-28; *Sheppard*, 384 U.S. at 363. *See also Virgil*, 446 F.3d at 610. Without conducting an investigation into community prejudice and bias – the whole reason for requesting a change of venue – counsel was not in a position to make a reasonable decision about Coffee County. *See Williams v. Taylor*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 525-26. Had the state habeas court reviewed whether trial counsel's inquiry into Coffee County "*was itself reasonable*," the court would have concluded that the decision was the product of "inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 523, 534 (emphasis in original).

Moreover, the state habeas court's finding on prejudice "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As discussed in Section ** *supra*, the factual record below demonstrated that Coffee County was saturated with the same prejudicial media coverage that necessitated the change of venue from Ware County, a significant number of jurors had already read these inflammatory articles prior to jury selection, several jurors arrived at voir dire convinced that Mr. Jones was guilty and deserving of the death penalty, and the jurors holding these prejudicial views

240

shared them freely with other prospective jurors. It is also clear from the voir dire

transcript that the trial judge not only failed to adequately inquire into bias in the

jury pool, but he went out of his way to avoid eliciting evidence of bias from

prospective jurors who had heard prejudicial remarks about Mr. Jones. This was then

exacerbated by trial counsel's failure to voir dire two-thirds of the seated jurors. The

state habeas court, however, never even acknowledged this extensive factual record

of bias when it held that Mr. Jones failed to establish prejudice. *See* Dkt. No. 103-1

at 31.[97] Mr. Jones is therefore entitled to relief from this Court.

**VI.   MR. JONES WAS DENIED HIS RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF HIS CAPITAL TRIAL UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL JUDGE EXCUSED**

---

[97] The state habeas court also prevented Mr. Jones from developing the factual record necessary to demonstrate the prejudice the court found lacking. State habeas counsel attempted to interview Mr. Jones's capital jurors but was unsuccessful because the State sent all of them letters strongly advising them of their right to refuse to speak with state habeas counsel. Dkt. No. 102-3 at 48-53, 71-72. The State also filed a motion for a protective order to prevent Mr. Jones from deposing any of the jurors. Dkt. No. 103-28. The state habeas court granted the State's request for a protective order and denied Mr. Jones the opportunity to either depose or subpoena the trial jurors. Dkt. No. 99-8 at 1-2; Dkt. No. 104-42. This Court also denied Mr. Jones's request for discovery and an evidentiary hearing to further develop the facts to demonstrate prejudice among the trial jurors. Dkt. Nos. 38, 70. Mr. Jones respectfully requests that this Court reconsider its earlier decision and permit Mr. Jones the opportunity to depose the trial jurors.

**TWO SEATED JURORS OUTSIDE OF MR. JONES'S PRESENCE.**

A cloud of secrecy and impropriety hangs over the jury's guilt and sentencing verdicts in this case because the trial court made the extraordinary, and inexplicable, decision to dismiss two seated jurors during deliberations outside of Mr. Jones's presence.

The first dismissal occurred over the weekend between the jury's pronouncement of its guilty verdict and the commencement of the penalty phase. The jury recessed shortly after 5:00 p.m. on the Saturday and returned to court on the morning on Monday, June 12, 1995, for the start of the sentencing phase of trial. Dkt. No. 98-4 at 161-65. Before the jury was brought in, the trial judge announced that the number of jurors had dropped to eleven and two alternates because Juror Angela Wooten Blevins "was excused by Dr. Steven Burke at the emergency room of Coffee Regional Memorial Hospital on June the 10th, 1995, and the excuse simply says, 'Excuse above person from jury duty since it will be detrimental to her mental health.'" Dkt. No. 98-5 at 28. The court explained that it had "acted upon that advice from the doctor, and . . . told the sheriff of Coffee County to excuse that juror." *Id.* The excusal occurred about five minutes after the court arrived home Saturday evening "so her problems occurred shortly after she left the jury box." *Id.* Mr. Thigpen did not comment on or object to the court's announcement in any fashion.

The second juror dismissal and substitution occurred in the midst of the jury's sentencing deliberations. At the conclusion of the sentencing phase presentations, the jury recessed at 2:18 p.m. to begin their deliberations. Dkt. No. 98-5 at 179. At 5:45, the judge called the jury into the jury box to inquire about the progress of the deliberations, and was informed by the foreman that the jury was divided 9 to 3. Dkt. No. 98-5 at 179-80. The jury then decided to conclude for the day and resume their deliberations the next morning. Dkt. No. 98-5 at 181. The jury then retired from the courtroom at 6:00 p.m. *Id.*

When the court reconvened the next morning, the record states that the court and counsel conferred off the record, but no record was made of what was discussed during the off-the-record conference. Dkt. No. 98-5 at 182-83. When the court went back on the record, the judge announced to the jurors that "something has developed with respect to one of your fellow jurors that requires me to bring you into the jury box. . . . I am instructing you not to resume your deliberations until this matter is resolved, at which time I will call you back into the jury box and announce to you that it is then time for you to resume your deliberations." Dkt. No. 98-5 at 183. The court and counsel then had another off-the-record conference in the judge's chambers. Dkt. No. 98-5 at 183. When they returned to the courtroom, the bailiff brought the jury into the courtroom for the court to make an announcement: "Let the record show that juror number eleven, Martha J. Douglas, has been excused by the

Court based upon the following memorandum of Dr. Steve Anderson dated 6/13/15 [sic] – that's this morning – who examined the patient when taken for his examination by the bailiff, and the memorandum says, 'This patient is medically unable to participate on jury duty.' With that kind of medical advice, I have excused the juror, and that necessitates installing Lynn G. Dockery, alternate juror, as one of the regular members of the jury." Dkt. No. 98-5 at 184. After informing the other jurors of the replacement, the judge told the jurors: "It will be necessary for the jury to begin anew your deliberations as to the punishment in this case for the simple reason that Ms. Dockery, the alternate who is just now joining you, did not have the benefit yesterday of participating with the rest of you in your deliberations yesterday. She will be brand new to the process of deliberations, so please begin your deliberations anew so that she can be brought up to par with the rest of you insofar as the deliberations are concerned." Dkt. No. 98-5 at 185. The jury then resumed deliberations with the new juror at 9:45 that morning. Dkt. No. 98-5 at 186.

The selection of a jury is unquestionably a critical stage of a criminal proceeding. *See Gomez v. United States*, 490 U.S. 858, 872-73 (1989) (collecting cases). Mr. Jones's exclusion from two instances where the trial court privately and unilaterally altered the composition of the jury was therefore a violation of Mr. Jones's constitutional rights to due process and to be present at all critical stages of his criminal proceedings. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("a

244

defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."). Moreover, given that Mr. Jones had a "valued right to have his trial completed by a particular tribunal," *Green v. Zant*, 715 F.2d 551, 555 (11th Cir. 1983), the trial court's decision to dismiss two jurors in the midst of deliberations without first consulting with Mr. Jones or his counsel amounts to a constitutional violation.

Mr. Jones raised this claim in his petition for habeas relief in state court, Dkt No. 99-9 at 20; Dkt. No. 102-5 at 40, and made several attempts to develop evidence to support the claim by trying to interview, depose, and subpoena the capital trial jurors. Dkt. No. 99-6 at 11; Dkt. 103-28 at 9-10; Dkt No. 104-41. The State interfered with Mr. Jones's ability to interview the trial jurors by sending all of them letters strongly advising them of their right to refuse to speak with state habeas counsel, Dkt. No. 102-3 at 48-53, 71-72, and also filing a motion for a protective order to prevent Mr. Jones from deposing any of the jurors. Dkt. No. 103-28. The state habeas court granted the State's request for a protective order and denied Mr. Jones the opportunity to either depose or subpoena the trial jurors. Dkt. No. 99-8 at 1-2; Dkt. No. 104-42.

Despite the lack of discovery to investigate this claim in the state habeas proceeding, Mr. Jones's state habeas counsel were able to conduct brief interviews

with both Ms. Wooten (Blevins) and Ms. Douglas. As set forth in Mr. Jones's post-

hearing brief:

> Ms. Wooten told investigators that she was immediately excused after the guilt/innocence phase and never came back to court for any part of the sentencing phase of Mr. Jones's trial. She stated that she had been taking nerve pills during the trial and had run out at the close of the guilt phase. She was extremely upset when the jury convicted Mr. Jones and she became hysterical. She was brought to the hospital and eventually got more nerve pills. She stated that she did not see a doctor in the emergency room, but was given a shot. None of the lawyers or the court ever questioned Ms. Wooten about the nerve pills.

> Ms. Wooten stated that the bailiff did not want her to go back to the hotel where the other jurors were staying because there was concern that Ms. Wooten would upset all of the other jurors. Eventually, Ms. Wooten was released and her mother, who had been waiting at the hospital, took her home.

> Ms. Wooten stated that she was not aware that there would be a second part of the trial. She said that once she had voted to convict Mr. Jones, she though it would be over. She stated that once she found out the jury would have to come back to sentence Mr. Jones, she realized that she couldn't take anymore. She further stated that given the evidence she had heard, she could not have sentenced Mr. Jones to death. Ms. Wooten stated that this was because she was not convinced that Mr. Jones was more culpable than his codefendant. Also, Ms. Wooten recalled that someone had testified that Mr. Jones had drank some beer the night of the murder, which made her question whether the murder was planned or whether the boys had just lost control. Ms. Wooten stated that she wanted to have more information about the codefendant, and especially wanted to know what sentence he received. Ms. Wooten also recalled that she was the youngest person on the jury, and therefore the closest in age to Mr. Jones.

> Finally, Ms. Wooten recalled that there was a woman on the jury who had a bible, although she could not recall the name of the woman. She also recalled that a few of the jurors had drank beer with a deputy one night during the trial.

Dkt. No. 102-5 at 35-37.

As for the juror Martha Douglas, who was dismissed in the midst of the sentencing phase deliberations, she told state habeas counsel "that she did not wish to speak with anyone about Mr. Jones['s] trial. She stated that the trial had almost given her a nervous breakdown and that it was a very small town." Dkt. No. 102-5 at 37.

Even with this clear evidence that two jurors may have been improperly dismissed from the jury due to their anxiety and doubts about Mr. Jones's culpability and their discomfort with imposing the death penalty, the state habeas court refused to allow Mr. Jones to depose or subpoena the jurors so that he could obtain sworn testimony to support this claim. Dkt No. 99-8 at 1-2; Dkt No. 104-41. The state habeas court ultimately rejected this claim as procedurally defaulted. Dkt. 103-1 at 4.

When Mr. Jones's case entered federal court, Mr. Jones requested leave from this Court to conduct discovery and for an evidentiary hearing so that he could develop the factual record necessary to support this claim. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Finding that Mr. Jones had procedurally defaulted this claim because he failed to raise it at trial or on direct appeal, this Court denied Mr. Jones's requests for discovery and an evidentiary hearing. Dkt No. 37. This Court found that Mr. Jones was unable to show cause or prejudice for the default because he failed to

demonstrate that trial counsel was ineffective for failing to object to the trial court's excusal of the two jurors. *Id.* at 17. In particular, this Court stated that because state habeas counsel had failed to examine trial counsel about this issue during the state habeas proceeding, Mr. Jones could not show that trial counsel's "failure was due to something other than strategic choice." Dkt. No. 37 at 16-17.

Mr. Jones maintains that the trial court's sua sponte dismissal of two jurors who expressed anxiety and doubt over Mr. Jones's guilt and discomfort with the decision to impose the death penalty violated his rights to due process, a fair trial, to be present at all critical stages of his capital murder trial, to a fair and impartial jury, and to be free from the arbitrary infliction of the death penalty. *See Green*, 715 F.2d at 556 (noting that dismissal of jurors who expresses hesitation or discomfort with imposing the death sentence may violate *Witherspoon v. Illinois*). Mr. Jones also maintains that trial counsel was ineffective for failing to object to the dismissal of the two jurors outside Mr. Jones's presence and that trial counsel's ineffectiveness serves as "cause" to excuse the default of this claim at trial and direct appeal.[98] *See Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991). Moreover, this Court's reliance on state habeas counsel's failure to directly question trial counsel about this issue is

---

[98] Trial counsel's ineffectiveness is discussed in section ** *infra*.

248

misplaced. Although state habeas counsel had the opportunity to examine trial counsel at a deposition and during the state habeas hearing, trial counsel could not have been relied upon to evaluate his own performance and pronounce his own ineffectiveness. *See Christeson v. Roper*, 135 S. Ct. 891, 892-83 (2015) (ineffective counsel cannot be expected to disclose their own malfeasance). Because trial counsel's explanation cannot be dispositive of the question of his ineffectiveness, this Court should not have inferred that trial counsel was reasonable simply because state habeas counsel did not directly confront him on this issue. Accordingly, Mr. Jones respectfully requests that this Court reconsider its earlier denial of his requests for discovery and an evidentiary hearing and grant Petitioner the opportunity to finally develop the evidence necessary to demonstrate that the trial court's dismissal of the two jurors resulted in prejudice to Mr. Jones.[99]

## VII. MR. JONES WAS DENIED HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE

---

[99] Mr. Jones argued this issue extensively to this Court in his motions for discovery and an evidentiary hearing. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Mr. Jones therefore incorporates herein all of the facts and arguments set forth in the earlier briefing.

**TRIAL COURT FAILED TO MAKE APPROPRIATE INQUIRIES BEFORE EXCUSING TWO JURORS.**

The trial court's decision to privately and unilaterally excuse two jurors during deliberations also amounted to a constitutional violation because the trial court failed to voir dire the jurors or conduct an investigation prior to their excusal. The trial court did not individually question the jurors about their reasons for requesting their release from jury service, nor did it ever question the doctors to ensure that the jurors had valid medical excuses. Because the doctors' notes for both jurors failed to provide any detailed description of their sudden illnesses, the trial court should have questioned the jurors and the doctors to ensure that the jurors were not seeking excusal for an improper purpose. *See Green*, 715 F.2d at 555 ("There must be some 'sound' basis upon which the trial judge exercise[s] his discretion to remove [a] juror. . . . Dismissal of a juror for want of any factual support, or for a legally irrelevant reason is prejudicial.") (internal quotations and citations omitted). Moreover, as discussed in Section ** *supra*, state habeas counsel's brief interviews with Ms. Blevins and Ms. Douglas strongly suggests that both jurors sought excusal from jury service in order to escape the pressure of sentencing Mr. Jones to death.

Mr. Jones raised this claim in his petition for habeas relief in state court, Dkt No. 99-9 at 18-20; Dkt. No. 102-5 at 45-53, and made several attempts to interview, depose, and subpoena the capital trial jurors. Dkt. No. 99-6 at 11; Dkt. 103-28 at 9-10; Dkt No. 104-41. The State interfered with Mr. Jones's ability to interview the

trial jurors by sending all of them letters strongly advising them of their right to refuse to speak with state habeas counsel, Dkt. No. 102-3 at 48-53, 71-72, and also filing a motion for a protective order to prevent Mr. Jones's counsel from deposing any of the jurors. Dkt. No. 103-28. The state habeas court granted the State's request for a protective order and denied Mr. Jones the opportunity to either depose or subpoena the trial jurors. Dkt. No. 99-8 at 1-2; Dkt. No. 104-42. Consequently, Mr. Jones was unable to fully investigate and present evidence in support of this claim. The state habeas court rejected this claim as procedurally defaulted. Dkt. 103-1 at 4.

Mr. Jones then requested leave from this court to conduct discovery and for an evidentiary hearing so that he could develop the factual record necessary to support this claim. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Finding that Mr. Jones had procedurally defaulted this claim because he failed to raise it at trial or on direct appeal, this Court denied Mr. Jones's requests for discovery and an evidentiary hearing. Dkt No. 37. This Court found that Mr. Jones was unable to show cause or prejudice for the default because he failed to demonstrate that trial counsel was ineffective for failing to object to the trial court's excusal of the two jurors without first investigating their medical excuses. *Id.* at 17. In particular, this Court stated that because state habeas counsel had failed to ask trial counsel to explain his reasons for not objecting to the jurors' dismissal, Mr. Jones could not show that trial counsel's "failure was due to something other than strategic choice." Dkt. No. 37 at 16-17.

251

Mr. Jones maintains that trial counsel was ineffective for failing to object to the dismissal of the two jurors without investigating their medical excuses, and that trial counsel's ineffectiveness serves as "cause" to excuse the default of this claim at trial and direct appeal. *See Coleman*, 501 U.S. at 753-54. Moreover, this Court's reliance on state habeas counsel's failure to directly question trial counsel about this issue is misplaced. Although state habeas counsel had the opportunity to examine trial counsel at a deposition and during the state habeas hearing, trial counsel could not have been relied upon to evaluate his own performance and pronounce his own ineffectiveness. *See Christeson*, 135 S. Ct. at 892-83 (ineffective counsel cannot be expected to disclose their own malfeasance). Because trial counsel's explanation cannot be dispositive of the question of ineffectiveness, this Court should not have inferred that trial counsel was reasonable simply because state habeas counsel did not directly confront him on this issue. Accordingly, Mr. Jones respectfully requests that this Court reconsider its earlier denial of his requests for discovery and an evidentiary hearing and grant Petitioner the opportunity to finally develop the

evidence necessary to demonstrate that the trial court's dismissal of the two jurors resulted in prejudice to Mr. Jones.[100]

### VIII. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S DISMISSAL OF TWO JURORS WITHOUT A PROPER INQUIRY AND OUTSIDE MR. JONES'S PRESENCE DEPRIVED MR. JONES OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The trial court's sua sponte removal of two jurors from Mr. Jones's jury after deliberations had already started should have prompted trial counsel to request the opportunity to question the jurors and investigate their medical excuses. *See Green*, 715 F.2d at 556. The suddenness of the jurors' illnesses, combined with the jury's division over penalty, should have served as red flags to trial counsel that bias or coercion may have been creeping into the jury's deliberations. Given the fundamental nature of Mr. Jones's right to a trial by an unbiased and impartial jury, trial counsel's failure to object to the dismissals and demand the opportunity to investigate is patently unreasonable. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

---

[100] Mr. Jones argued this issue extensively to this Court in his motions for discovery and an evidentiary hearing. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Mr. Jones therefore incorporates herein all of the facts and arguments set forth in the earlier briefing.

Indeed, there is no conceivable strategic justification for trial counsel's failure to at least request the opportunity to investigate further the jurors' reasons for dismissal. *See Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Similarly, trial counsel's failure to rout bias and impartiality from the jury resulted in a breakdown of the adversarial process sufficient to undermine confidence in the outcome of the verdict. *See Virgil v. Dretke*, 446 F.3d 598, 612-13 (5th Cir. 2006).

Mr. Jones raised this claim in his petition for habeas relief in state court, Dkt No. 99-9 at 30; Dkt. No. 102-5 at 46, 51, and made several attempts to interview, depose, and subpoena the capital trial jurors. Dkt. No. 99-6 at 11; Dkt. 103-28 at 9-10; Dkt No. 104-41. The State interfered with Mr. Jones's ability to interview the trial jurors by sending all of them letters strongly advising them of their right to refuse to speak with state habeas counsel, Dkt. No. 102-3 at 48-53, 71-72, and also filing a motion for a protective order to prevent Mr. Jones's counsel from deposing any of the jurors. Dkt. No. 103-28. The state habeas court granted the State's request for a protective order and denied Mr. Jones the opportunity to either depose or subpoena the trial jurors. Dkt. No. 99-8 at 1-2; Dkt. No. 104-42. Consequently, Mr. Jones was unable to fully investigate and present evidence in support of this claim.

The state habeas court rejected this claim, finding that Mr. Jones's counsel was present "when the court informed the parties that it was excusing Juror Blevins," and that Mr. Jones "failed to establish that he was not present for all the proceedings regarding the excusal of" Ms. Douglas. Dkt. No. 103-1 at 20-21. The state habeas court also found that the medical excuses were sufficient to excuse both jurors and that Mr. Jones failed to demonstrate that he was prejudiced by the trial court's substitution of two alternate jurors. Dkt. No. 103-1 at 20-24.

Mr. Jones then requested leave from this court to conduct discovery and for an evidentiary hearing so that he could develop the factual record necessary to support this claim.[101] Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. This Court found that Mr. Jones was unable to demonstrate that trial counsel was ineffective for failing to object to the trial court's excusal of the two jurors without first investigating their medical excuses. Dkt. No. 37 at 17. In particular, this Court stated that because state habeas counsel had failed to ask trial counsel to explain his reasons for not objecting to the jurors' dismissal, Mr. Jones could not show that trial counsel's "failure was due to something other than strategic choice." Dkt. No. 37 at 16-17.

---

[101] Mr. Jones argued this issue extensively to this Court in his motions for discovery and an evidentiary hearing. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Mr. Jones therefore incorporates herein all of the facts and arguments set forth in the earlier briefing.

Mr. Jones maintains that trial counsel was ineffective for failing to object to the dismissal of the two jurors outside of Mr. Jones's presence and without investigating their medical excuses. Moreover, this Court's reliance on state habeas counsel's failure to directly question trial counsel about this issue is misplaced. Although state habeas counsel had the opportunity to examine trial counsel at a deposition and during the state habeas hearing, trial counsel could not have been relied upon to evaluate his own performance and pronounce his own ineffectiveness. *See Christeson*, 135 S. Ct. at 892-83 (ineffective counsel cannot be expected to disclose their own malfeasance). Because trial counsel's explanation cannot be dispositive of the question of ineffectiveness, this Court should not have inferred that trial counsel was reasonable simply because state habeas counsel did not directly confront him on this issue. Accordingly, Mr. Jones respectfully requests that this Court reconsider its earlier denial of his requests for discovery and an evidentiary hearing and grant Petitioner the opportunity to finally develop the evidence necessary to demonstrate that the trial court's dismissal of the two jurors resulted in prejudice to Mr. Jones

## IX.  MR. JONES WAS DENIED HIS RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY WHEN HIS JURY INCLUDED AN INCOMPETENT, MENTALLY ILL JUROR.

Petitioner's death sentence should also be reversed because he was tried by an incompetent and mentally ill juror who was unable to serve as a fair and impartial

256

juror. *See Irvin*, 366 U.S. 717; *United States v. Campbell*, 544 F.3d 577 (5th Cir. 2008) (finding no error where trial court dismissed a juror who was incapable of understanding the proceedings). During the course of Mr. Jones's state habeas proceedings, Mr. Jones's legal team attempted to interview juror Roosevelt Gowdy, Jr., but found him incoherent, incomprehensible, and seemingly mentally unstable.

> When state habeas counsel attempted to speak with Mr. Gowdy,
>
> [he] looked directly at us without saying anything. Then, quite suddenly and unexpectedly, he got on the floor and started crawling around on all fours. He crawled around the floor for about 45-60 seconds. He crawled to our left toward the television set. He crawled up to the television set and put his face close to the screen. Then he crawled toward us and stopped immediately in front of my feet. He stood up directly in front of me and began dancing. He danced for several seconds about an inch away from me. Then he stopped dancing and peered at us again.
>
> When he stopped dancing, he said something that we couldn't understand. Then he asked where he knew us from. I explained to him why we were there. His response was unintelligible. His speech was extremely unclear and we could not understand what he was saying. He motioned further into the house. Then he opened the door to an adjacent room and motioned us inside. We went into the room and Mr. Gowdy shut the door behind us. He had not come into the room with us. There was an exit from that room to the outside, so we left the house.
>
> During this entire incident, Mr. Gowdy['s] behavior was bizarre. He appeared incoherent and gave no indication that he understood what I was saying. His speech was difficult to understand, as though he was having trouble forming words. Initially I thought he may have been drunk, but when he stood close to me, I did not smell any alcohol. He appeared as though he might have a mental handicap.

Dkt. No. 99-12 at 180-81.

Mr. Jones raised this claim in his petition for habeas relief in state court, Dkt No. 99-9 at 16-17, and made several attempts to interview, depose, and subpoena the capital trial jurors. Dkt. No. 99-6 at 11; Dkt. 103-28 at 9-10; Dkt No. 104-41. The State interfered with Mr. Jones's ability to interview the trial jurors by sending all of them letters strongly advising them of their right to refuse to speak with state habeas counsel, Dkt. No. 102-3 at 48-53, 71-72, and also filing a motion for a protective order to prevent Mr. Jones's counsel from deposing any of the jurors. Dkt. No. 103-28. The state habeas court granted the State's request for a protective order and denied Mr. Jones the opportunity to either depose or subpoena the trial jurors. Dkt. No. 99-8 at 1-2; Dkt. No. 104-42. Consequently, Mr. Jones was unable to fully investigate and present evidence in support of this claim. The state habeas court did not find this claim to be procedurally defaulted and never adjudicated it on the merits. *See generally* Dkt No. 103-1. This Court should therefore review this claim *de novo*. *See Johnson v. Williams*, 568 U.S. 289, 302 (2013).

Mr. Jones also requested leave from this court to conduct discovery and for an evidentiary hearing so that he could develop the factual record necessary to support this claim. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. This Court rejected this request, finding that Mr. Jones failed to point to any evidence of Mr. Gowdy's incompetence. Dkt No. 37 at 22-23. Mr. Jones respectfully requests that this Court reconsider its earlier denial of his requests for discovery and an evidentiary hearing

because Mr. Jones cannot furnish evidence for this claim without this Court first granting him leave to secure evidence of Mr. Gowdy's incompetence.[102]

## **CONCLUSION**

For the foregoing reasons, and those set forth in Mr. Jones's Corrected Petition for Writ of Habeas Corpus (Dkt. 26), he respectfully requests that the Court grant the writ of habeas corpus.  He further requests, in the event relief is not granted outright, that the Court conduct oral argument on the issues presented herein.

---

[102] Mr. Jones argued this issue extensively to this Court in his motions for discovery and an evidentiary hearing. Dkt. Nos. 17, 18, 19, 31, 32, 50, 58. Mr. Jones therefore incorporates herein all of the facts and arguments set forth in the earlier briefing

This 6th day of October, 2017.

Respectfully submitted,

_____

Brian S. Kammer (Ga. 406322)
Marcia A. Widder (Ga. 643407)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202
Fax: 404-222-9212
grc@garesource.org

COUNSEL FOR PETITIONER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

ASHLEY LYNDOL JONES,           )
     Petitioner,               )
                               )
vs.                            )          Civil Case No. 5:02-CV-116 (WTM)
                               )
WARDEN,                        )
Georgia Diagnostic Prison,     )
     Respondent.               )

## NOTICE OF ELECTRONIC FILING AND CERTIFICATE OF SERVICE

This is to certify that on October 6, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system which will send notification of such filing to the following:

Sabrina Graham, Esq.
Senior Assistant Attorney General
sgraham@law.ga.gov

_____
Brian Kammer (Ga. 406322)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202
Email: grc@garesource.org