ASHLEY LYNDOL JONES,       )
                          )
    Petitioner,       )
                          )
v.                        )       CASE NO. CV502-116
                          )
BRUCE CHATMAN, Warden Georgia   )
Diagnostic and Classification   )
Center,                   )
                          )
    Respondent.       )
                          )

## O R D E R

Before the Court are the parties' briefings on the merits of Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 138; Doc. 141; Doc. 147.) After careful consideration, Petitioner's petition is **DENIED**. (Doc. 24.) Additionally, Petitioner's Motion for Leave to File Exhibits (Doc. 147) is **DENIED** and Petitioner's Motion Requesting Ruling (Doc. 152) is **DISMISSED AS MOOT**. The Clerk is **DIRECTED** to close this case.

### BACKGROUND

I.   <u>FACTUAL HISTORY</u>

The facts of this case were set forth by the Supreme Court of Georgia.

> Jones and his co-defendant, Allen Bunner, began the crime spree which led to the death of Keith Holland on the night before the murder, when they stole four

cases of beer from a convenience store in Ware County. The co-defendants fled in an automobile with three other companions, who were waiting for them outside the store. The group spent the remainder of the night driving around aimlessly and drinking the stolen beer, until their car broke down, and Jones and Bunner left the others, stating they were going to find a truck.

The co-defendants stole a Ford truck, belonging to Rudolph Melton, which was parked in front of Melton's residence. After driving around for several more hours in the stolen truck, they arrived at the home of the victim, Keith Holland. Bunner knocked on Holland's front door at approximately 5 a.m. and asked Holland's wife Mamie for assistance, on the pretext that the truck's battery was dead. Mamie Holland woke her husband, and he went outside to assist Bunner. As Holland was leaning over to look in the engine compartment of the truck, Jones struck him in the head from behind with a sledge hammer.

Mamie Holland witnessed the first blow from her dining room window and reacted by screaming for Jones to stop and by banging on the window. Jones turned and looked at her but continued to pound the victim, inflicting at least six blows to the head and face, all of which were potentially fatal. Prior to leaving in the victim's truck, Jones got out of the vehicle and hit the victim again, while he was lying on the ground. EMS workers arrived within minutes after the co-defendants' departure. Because of the injuries to the victim's face, EMS workers were unable to perform CPR or intubate the victim, and he died before reaching the hospital.

Jones and Bunner drove to Florida in the victim's truck. They tossed Holland's personal belongings out of the truck along the way, and pawned two chain saws belonging to Melton. Police learned of their whereabouts through telephone calls made by the co-defendants to a friend in Georgia, and they were arrested at a welcome station south of the Georgia-Florida line. The victim's truck, which Jones and Bunner had burned, was found in the woods a short distance away.

Jones v. State, 267 Ga. 592, 592-93, 481 S.E.2d, 823-24 (1997).

## II. PROCEDURAL HISTORY

Petitioner was arrested on the afternoon of March 31, 1993. Seven days later, he was indicted in the Superior Court of Ware County, Georgia for malice murder, felony murder, armed robbery, interference with government property, and theft by taking. (Doc. 96, Attach. 1 at 14.) He pled not guilty. (Doc. 96, Attach. 2 at 133.) His jury trial began on June 8, 1995.[1] (Doc. 24 at 13.) On June 10, 1995, he was convicted of all charges. (Doc. 96, Attach. 2 at 133.) Four days later, he was sentenced to death. (Doc. 24 at 13.)

After a hearing, the trial court denied Petitioner's motion for a new trial. (Doc. 98, Attach. 8 at 29.) On March 10, 1997, the Georgia Supreme Court affirmed Petitioner's convictions and sentences. Jones v. State, 267 Ga. 592, 481 S.E.2d 821 (1997). A petition for writ of certiorari to the United States Supreme Court was denied on November 3, 1997. Jones v. Georgia, 522 U.S. 953, 118 S. Ct. 376, 139 L. Ed. 2d 293 (1997).

On February 5, 1998, the trial court signed an execution warrant and scheduled Petitioner's execution for the time period between February 24 and March 3, 1998. (Doc. 99, Attach. 6 at 7.) In response to the death warrant, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County.

---

[1] Allen Bunner was arrested with Petitioner and charged as a co-defendant. He was tried separately and received a sentence of life without parole. He did not appeal his conviction.

(Id. at 6.) The state habeas court conducted an evidentiary hearing on March 15, 1999 (Doc. 100, Attachs. 1-4; Doc. 101, Attachs. 1-5; Doc. 102, Attachs. 1-3), and ultimately denied the petition, as amended, on January 7, 2000 (Doc. 103, Attach. 1). Further attempts to appeal were unavailing.

After filing a 28 U.S.C. § 2254 petition in this Court (Doc. 5), Petitioner filed a Motion for Discovery seeking the opportunity to depose his trial and sentencing jurors (Doc. 31). The Court addressed Petitioner's request and ultimately denied his motion, concluding that many of his claims were procedurally defaulted. (Doc. 37.) Petitioner subsequently filed a Motion for an Evidentiary Hearing requesting an evidentiary hearing on similar claims to those for which he had requested discovery. (Doc. 50.) The Court dismissed that motion and ordered Petitioner to resubmit his request. (Doc. 54.) The Court denied Petitioner's second motion for an evidentiary hearing (Doc. 58) and ordered the parties to file supplemental briefs addressing Petitioner's request for an evidentiary hearing in light of the United States Supreme Court's decision in Cullen v. Pinholster, 563 U.S. 170 (2011). (Doc. 79.) The parties filed the requested briefs and Petitioner filed a renewed motion for an evidentiary hearing. (Doc. 88.) Thereafter, the Court requested additional supplemental briefing on the issue of procedural default and exhaustion. (Doc. 94.) After careful review, the Court

4

eventually denied Petitioner's request for an evidentiary hearing. (Doc. 112.)

On October 6, 2017, Petitioner filed his Brief in Support of Petition for Writ of Habeas Corpus. (Doc. 138.) Respondent provided a response brief on November 20, 2017 (Doc. 141) and Petitioner filed a reply brief on December 21, 2017 (Doc. 146). Additionally, Petitioner filed a Motion for Leave to File Exhibits, requesting that the Court permit Petitioner to supplement the record with some exhibits that were mistakenly left out of the state court record. (Doc. 147.) Respondent has challenged Petitioner's ability to supplement the record. (Doc. 149.) The parties' briefing on the merits of this case and Petitioner's motion are now ripe for review.[2]

## ANALYSIS

I. STANDARD OF REVIEW

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, 'a bulwark against convictions that violate fundamental fairness.' " Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S. Ct. 1710, 1719, 123 L. Ed. 2d 353 (1993) (citing Engles v. Isaac, 456 U.S. 107, 126, 102 S. Ct. 1558, 1571, 71 L. Ed. 2d 783 (1982) (internal quotations omitted)). Accordingly, "[t]hose few who are ultimately successful [in

---

[2] In light of this Order, Respondent's Motion Requesting Ruling on Petitioner's Petition for Writ of Habeas Corpus (Doc. 152) is **DISMISSED AS MOOT.**

obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." Id. at 634, 113 S. Ct. at 1719 (quoting Fay v. Noia, 372 U.S. 391, 440-41, 83 S. Ct. 822, 850, 9 L. Ed. 2d 837 (1963)) (alteration in original). The notion that habeas relief is an extraordinary remedy is "especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254." McWhorther v. Dunn, 4:13-cv-2150, 2019 WL 277385, at *10 (N.D. Ala. Jan. 22, 2019).

A. Claims Adjudicated on the Merits

The review of a petitioner's claims that were considered on the merits by the state court is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

U.S.C. § 2254(d). Under this provision, "AEDPA 'imposes a highly deferential standard for evaluating state court rulings' and

'demands that state-court decisions be given the benefit of the doubt.' " Bishop v. Warden, GDCP, 726 F.3d 1243, 1253 (11th Cir. 2013) (quoting Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 34 (2010)). Accordingly, the Court must not assess whether it "believes the state court's determination was incorrect, but whether the determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007); see also, Miller-El v. Cockrell, 537 U.S. 322, 341, 123 S. Ct. 1029, 1042, 154 L. Ed. 2d 931 (2003) (discussing that a state court's ruling must be "objectively unreasonable").

A state court decision is "contrary to . . . clearly established Federal law" under § 2254 (d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. E. 2d 389 (2000). A state court decision involves "an unreasonable application of" clearly established federal law under § 2254(d)(1) "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413, 120 S. Ct. at 1523. Within this review, the "federal habeas court . . .

should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409, 120 S. Ct. at 1521. Generally, federal habeas relief is precluded "so long as 'fair-minded jurists could disagree' on the circumstances of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)).

When determining whether a state court decision is based on an unreasonable determination of fact, this Court must presume that the state court's factual findings are correct unless rebutted by clear and convincing evidence. Miller-El, 545 U.S. at 240, 125 S. Ct. at 2325. In defining this standard, the Supreme Court of the United States has noted that "[t]he standard is demanding but not insatiable." Id. "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim, and when a state court's finding was clearly erroneous." Landers v. Warden, Atty. Gen. of Ala., 776 F.3d 1288, 1294 (11th Cir. 2015) (internal citations and quotations omitted).

B. Procedurally Defaulted Claims

In addition to the requirements discussed in § 2254(d), federal courts are also generally not permitted to review claims raised in a federal habeas petition that are procedurally defaulted. Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). "[W]hether a particular claim is subject to the doctrine of procedural default . . . is a mixed question of fact and law." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). There are two general ways in which procedural default can arise to bar a petitioner's claims from federal court review. Bailey, 172 F.3d at 1302-03.

First, federal courts are precluded from reviewing "a state court's rejection of a federal constitutional claim on procedural grounds . . . if the state procedural ruling rests upon [an] 'independent and adequate' state ground." Judd, 250 F.3d at 1313 (citing Coleman v. Thompson, 501 U.S. 722, 729—30, 111 S. Ct. 2546, 2553 (1991)). To determine whether a state court ruling was based on an independent and adequate state law ground, courts employ a three-part test:

> First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Secondly, the state court's decision must rest solidly on state law grounds, and may not be "intertwined with an interpretation of federal law." Finally, the state procedural rule must be adequate;

> *i.e.,* it must not be applied in an arbitrary or unprecedented fashion.

Id. (quoting Card v. Dugger, 911 F.2d 1494, 1516 (11th Cir. 1990)). Typically, state court procedural rules are found to be adequate if they are "firmly established and regularly followed." Walker v. Martin, 562 U.S. 307, 316, 131 S. Ct. 1120, 1127, 179 L. Ed. 2d 62 (2011) (internal citation omitted).

In addition, claims are typically procedurally defaulted and precluded from federal review when a petitioner fails to properly exhaust his claims in the underlying state court proceedings. 28 U.S.C. § 2254(b)(1)(A); see also Bailey, 172 F.3d at 1302 ("A state habeas corpus petitioner who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default." (citing Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506-07, 53 L. Ed. 2d 594 (1977))). "Exhaustion requires that 'state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.' " Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732, 144 L. Ed. 2d 1 (1999)). The Supreme Court of the United States has recently explained that the "exhaustion requirement

is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation.' " Davila v. Davis, ___U.S.___, 137 S. Ct. 2058, 2064, 198 L. Ed. 2d 603 (2017) (quoting Rose v. Lundy, 455 U.S. 509, 518, 102 S. Ct. 1198, 1203, 71 L. Ed. 2d 379 (1982) (internal quotation marks omitted)).

As part of the requirement that a petitioner must fully exhaust his claims in the underlying state court, a petitioner must "present his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.' " French v. Warden, Wilcox State Prison, 790 F.3d 1259, 1270-71 (11th Cir. 2015) (quoting Kelley v. Sec'y Dept. of Corr., 377 F.3d 1317, 1344-45 (11th Cir. 2004)). Accordingly, a petitioner cannot "scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick." Kelley, 377 F.3d at 1344-45 (internal quotation omitted).

"[T]he teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001). While federal courts are

permitted to dismiss habeas petitions that contain unexhausted claims to allow proper exhaustion of those claims in the state court, federal courts are not required to do so "when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default." Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998). In other words, "[w]here a return to state court would be futile—because the petitioner's claims would clearly be barred by state procedural rules—a federal court can 'forego the needless judicial ping-pong' and treat unexhausted claims as procedurally defaulted." Hittson v. GDCP Warden, 759 F.3d 1210, 1260 n.56 (11th Cir. 2014) (quoting Snowden, 135 F.3d at 736 (internal quotations omitted)).

Although federal courts are typically prevented from considering claims that are deemed to be procedurally defaulted by a state court or not properly exhausted, a petitioner may be able to overcome the procedural default of his claim to allow federal court review in certain limited circumstances. First, the United States Supreme Court has provided that "[a] state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.' " Davila, ___U.S.___, 137 S. Ct. at 2064-65 (quoting Wainwright, 433 U.S.

12

at 84, 97 S. Ct. at 2505; Coleman, 501 U.S. at 750, 111 S. Ct. at 2565). Federal courts have found that "[c]ause exists if there was 'some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.' " Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). This external factor to the defense can be shown when there is "evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel." Id. In addition to establishing cause, the petitioner must be able to establish prejudice. Henderson v. Campbell, 353 F.3d 880, 882 (11th Cir. 2003). A petitioner can make this showing by establishing that "there is at least a reasonable probability that the result of the proceeding would have been different" had the constitutional violation not occurred. Id.

In addition to establishing both cause and prejudice, procedural default can be excused if the court finds that enforcing the procedural default would result in a fundamental miscarriage of justice. Typically, this exception only "applies if the petitioner can show that, in light of new evidence, it is probable that no reasonable juror would have convicted him."

Mize, 532 F.3d at 1190 (citing Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867, 130 L. Ed. 2d 808 (1995)). In the death penalty context, however, this exception applies if the petitioner can show " 'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence." Calderon v. Thompson, 523 U.S. 538, 559-60, 118 S. Ct. 1489, 1493, 140 L. Ed. 2d 728 (1998) (quoting Sawyer v. Whitley, 505 U.S. 333, 348, 112 S. Ct. 2523, 2523, 120 L. Ed. 2d 269 (1992)).

## II.  CLAIMS BASED ON THE REPRESENTATION OF HIS ATTORNEYS

### A. Exhaustion

Before discussing the merits of Petitioner's claims, this Court must first address Respondent's argument that many of Petitioner's claims are procedurally defaulted because Petitioner failed to properly exhaust these claims in the underlying state court proceeding. (Doc. 141 at 48, 108-113.) Specifically, Respondent contends that Petitioner failed to raise many of his claims in his initial state habeas pleadings, his post-hearing brief in the state habeas proceedings, or his Application for Certificate of Probable Cause ("CPC application") filed with the Georgia Supreme Court. Respondent alleges that "Petitioner [was required to] present each claim to the state courts in a way that the reasonable reader would understand its 'particular legal basis and specific factual

14

foundation.' " (Doc. 141 at 136 (quoting Hunt v. Comm'r, Ala. Dep't of Corrs., 666 F.3d 78, 730-31 (11th Cir. 2012) (emphasis in original).) By not raising his claims in the underlying state habeas action or his CPC Application with Georgia Supreme Court, Respondent contends that these claims are unexhausted and procedurally defaulted.

For his part, Petitioner argues that his claims are not unexhausted or procedurally defaulted. (Doc. 146 at 3-13.) Petitioner does not directly respond to Respondent's argument that Petitioner failed to raise some of his claims in his initial state habeas briefing. (Id.) Instead, Petitioner focuses his argument on Respondent's contention that Petitioner's claims are procedurally defaulted because Petitioner failed to raise those claims in his CPC Application. (Id.) Petitioner contends that there is no requirement that he must brief all of his claims in a CPC Application. (Id.)

While the Court doubts the fundamental logic of Petitioner's arguments and is inclined to agree with Respondent that petitioners generally have an obligation to raise all of their claims at every stage in the underlying proceedings, ultimately, the Court does not need to determine whether Petitioner failed to properly exhaust his claims in the underlying state proceedings. Rather, this Court finds that Respondent, in its answer to Petitioner's amended petition,

waived any argument that Petitioner's ineffective assistance of counsel claims were not properly exhausted in the state courts. Accordingly, Respondent will not now be permitted to argue that Petitioner has not properly exhausted his ineffective assistance of counsel claims.

In the Eleventh Circuit, it is well established that "[t]he exhaustion requirement is not jurisdictional, but rather, is a procedural rule based in comity." King v. Chase, 384 F. App'x 972, 974 (11th Cir. 2010) (citing Thompson v. Wainwright, 714 F.2d 1495, 1503-04 (11th Cir. 1983)). Accordingly, state attorney generals are permitted to waive the exhaustion requirement in federal habeas proceedings. 28 U.S.C. § 2254; see also Hills v. Washington, 441 F.3d 1374, 1376 (11th Cir. 2006). "[T]he state either may waive exhaustion expressly, or impliedly for failing to raise the issue or arguing that exhaustion would be futile." King, 384 F. App'x at 974 (citing Thompson, 714 F.2d at 1503-04). The district court has the discretion to accept or reject the state's waiver. Esslinger v. Davis, 44 F.3d 1515, 1524 (11th Cir. 1995). "[T]he district court may invoke [the failure to exhaust procedural bar] sua sponte where, notwithstanding the state's waiver, requiring the petitioner to return to state court to exhaust his claims serves an important federal interest." Id.

In this case, Respondent waived his ability to raise any exhaustion challenge to Petitioner's ineffective assistance of counsel claims in 2004. (Doc. 27.) In his answer to Petitioner's amended habeas corpus petition, Respondent provided that all of Petitioner's claims were properly before the Court because "[i]t appears that Petitioner has exhausted his state remedies with respect to the claims raised in his petition for a writ of habeas corpus ." (Id. at 7.) In the Court's view, this is an express waiver of any potential argument that Petitioner's ineffective assistance of counsel claims are unexhausted. See, e.g., Lee v. Upton, No. 5:10-CV-17, 2017 WL 4158643, at *2 n.3 (S.D. Ga. Sept. 19, 2017) (finding that the state waived exhaustion by classifying all claims as "reviewable" in its answer). The Court sees no reason to reject Respondent's express waiver at this time.[3] Due to Respondent's express waiver of any exhaustion requirement in this case, the Court will now consider the merits of Petitioner's arguments.

---

[3] The Court notes that Respondent stated in its answer that it "reserves the right to raise exhaustion of state remedies as to any claim or sub-claim of this petition, if Respondent inadvertently fails to plead lack of exhaustion with respect to any claim or sub-claim." (Doc. 27 at 7.) Despite this attempt to reserve the right to raise an exhaustion defense, Federal Rule of Civil Procedure Rule 8(c) states that "a party must affirmatively state any avoidance or affirmative defense." Because Respondent did not affirmatively raise any exhaustion defense in its initial answer filed over 15 years ago, the Court finds that Respondent waived any opportunity to raise the exhaustion defense.

B. Conflicts of Interest

In his amended § 2254 petition, Petitioner alleges that both of the attorneys appointed to represent him in this case operated under various conflicts of interest which adversely affected their ability to represent Petitioner. (Doc. 27 at 48-55.) Petitioner contends that his first attorney, Martin Eaves, operated under a conflict of interest when he was initially assigned to represent both Petitioner and his co-defendant, Allen Bunner, and represented Mr. Bunner as he made a statement to police that implicated Petitioner. (Doc. 138 at 88-90.) Petitioner also contends that his next attorney, John Thigpen, also operated under a variety of conflicts of interest that impacted his ability to represent Petitioner at trial. (Id. at 90-101.) These conflicts of interest include Mr. Thigpen's (1) concurrent representation of Mr. Bunner in an unrelated DUI matter, (2) prior representation of a key witness at trial, Sally Kimbrell, and (3) prior representation of another trial witness, J.J. Cunningham. (Id.)

1. Legal standard

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Hamilton v. Ford, 969 F.2d 1006, 1011 (11th Cir. 1992). Included within this right is the right to have counsel that is not burdened by an actual conflict of interest. Id. ("[W]hen counsel is burdened with a

conflict of interest, she 'breaches the duty of loyalty, perhaps the most basic of counsel's duties' and has therefore failed to provide effective assistance of counsel." (quoting Strickland v. Washington, 466 U.S. 688, 692, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984))). In order to establish a violation of the Sixth Amendment, a petitioner must be able to show that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed. 2d 333 (1980). To show an "adverse effect, a defendant need not show that, but for the conflict of interest, the outcome of the proceeding would have been different. . . . Rather, the defendant merely must demonstrate that his attorney's conflict of interest had an effect upon the representation that he received." Downs v. Sec'y, Fla. Dep't of Corrs., 738 F.3d 240, 265 (11th Cir. 2013) (citing Reynolds v. Chapman, 253 F.3d 1337, 1347 (11th Cir. 2001)).

## 2. Attorney Martin Eaves's prior representation of Allen Bunner

First, Petitioner contends that his Sixth Amendment right to counsel was violated by a conflict of interest between his initial attorney, Martin Eaves, and Mr. Eaves's representation of Petitioner's co-defendant, Allen Bunner. (Doc. 138 at 88-89.) The record shows that Mr. Eaves was initially appointed in this case to represent both Petitioner and Mr. Bunner, Petitioner's

co-defendant. (Doc. 96, Attach. 1 at 21.) Within days of his appointment, Mr. Eaves accompanied Mr. Bunner on an interview with law enforcement where Mr. Bunner, through Mr. Eaves, provided hypothetical answers to certain questions which implicated Petitioner as the more culpable defendant in this case. (Id. at 299.) In his petition, Petitioner complains that Mr. Eaves was operating under a conflict of interest in which he placed Mr. Bunner's interest over Petitioner's interest and should have immediately withdrawn from representing Petitioner in this action. (Doc. 138 at 88-89.) While Mr. Eaves eventually withdrew his representation eight days after the interview (Doc. 96, Attach. 1 at 22), Petitioner asserts that he was already adversely affected by the conflict of interest. (Doc. 138 at 88-89.)

On review, the state court found that Petitioner had procedurally defaulted his claim that Mr. Eaves was operating under a conflict of interest. (Doc. 103, Attach. 1 at 4.) The state court found Petitioner had failed to raise this claim at trial or on direct appeal. (Id.) In his state habeas petition, Petitioner attempted to argue that the court should excuse the procedural default of this claim due to the ineffective assistance of counsel of Petitioner's subsequent counsel, John Thigpen, who should have raised this claim on direct appeal. (Doc. 130, Attach. 1 at 14.) The state habeas court rejected

that position, however, and concluded that Petitioner could not establish that Mr. Eaves actually operated under a conflict of interest with respect to his representation of Mr. Bunner or that the representation adversely affected his lawyer's performance. (Id. at 15.) Moreover, the state habeas court found that Mr. Thigpen was not ineffective for failing to raise the claim on direct appeal. (Id.)

Before considering the merits of Petitioner's claim that Mr. Eaves operated under a conflict of interest, this Court must first consider whether there is any cause and prejudice to overcome the procedural default of his claim. Bailey, 172 F.3d at 1302. In his briefing, however, Petitioner has offered no argument as to why there is cause and prejudice to excuse the procedural default of the claim that his attorney Mr. Eaves acted with a conflict of interest. (Doc. 138 at 89.) Instead, Petitioner seems to suggest that the cause and prejudice can be found in the ineffective assistance of counsel provided by John Thigpen, but otherwise offers no further explanation of how Mr. Thigpen was ineffective for failing to raise this claim on direct appeal. (Id.)

Even if this Court were able to find sufficient cause and prejudice to excuse the procedural default of Petitioner's claim, the Court agrees with the state habeas court's assessment that Petitioner is unable to show that an actual conflict of

interest existed or that it had an adverse effect on Petitioner's case. First, there is no indication in the record that Mr. Eaves ever advised or even spoke to Petitioner. (Doc. 103, Attach. 1 at 15.) There is also no indication that Mr. Eaves obtained any information about Petitioner or used any information that he may have learned during his representation of Mr. Bunner. (Id.) As a result, this Court agrees with the state court that Petitioner has failed to establish that Mr. Eaves was operating under a conflict of interest which adversely impacted his representation of Petitioner. Because there is no cause and prejudice to warrant excusing the procedural default of Petitioner's claim or any reason for this Court to question the state court's findings, Petitioner's claim is denied.

### 3. Attorney John Thigpen's prior representation of Allen Bunner

Next, Petitioner contends that his subsequent attorney, John Thigpen, who would eventually represent Petitioner at trial, also had a conflict of interest arising from his prior representation of Mr. Bunner. (Doc. 138 at 90.) Prior to his appointment to represent Petitioner, Mr. Thigpen had previously agreed to represent Mr. Bunner in an unrelated DUI matter. (Doc. 100, Attach. 3 at 86.) Mr. Thigpen began his representation of Mr. Bunner in December of 1992 and was present for Mr. Bunner's entry of a not guilty plea in that case. (Id.) Now, Petitioner

asserts that Mr. Thigpen should have never agreed to represent Petitioner while he was already representing Petitioner's co-defendant in another case. (Doc. 138 at 90.) Petitioner argues that this conflict of interest adversely impacted his trial because Mr. Thigpen failed to call Mr. Bunner as a witness at trial. (Id. at 91.) As a result, Petitioner contends that the jury never heard that Mr. Bunner received a life sentence for his involvement in the crime, any evidence of Mr. Bunner's violent history, or that Mr. Bunner had "hypothetically" admitted to being the driver of the truck, which other witnesses identified as the more culpable defendant. (Id. at 91-92.)

On review, the state habeas court denied Petitioner's claim. (Doc. 103, Attach. 1 at 6-7.) The state habeas court found that Petitioner had failed to properly establish that there was an actual conflict of interest or that he was adversely affected by his lawyer's performance due to the alleged conflict of interest. (Id.) In the court's view, there was no actual conflict of interest because Mr. Thigpen had only represented Mr. Bunner by signing an arraignment form but had not otherwise appeared on Mr. Bunner's behalf or actually obtained any information from Mr. Bunner which would have affected Mr. Thigpen's ability to represent Petitioner. (Id.)

Additionally, the state habeas court found that even if there was an actual conflict, Petitioner failed to present any

evidence that Mr. Thigpen's representation of Petitioner was adversely affected by the conflict. (Id. at 7.) The court concluded that Mr. Thigpen's representation was not adversely affected by any potential conflict because Mr. Thigpen was unable to call Mr. Bunner at trial because Mr. Bunner locked himself in a room and refused to testify, the alleged hypothetical confession was not made by Mr. Bunner, and evidence of Mr. Bunner's violent history or life sentence would have been inadmissible at trial. (Id. at 7-9.) Accordingly, the state court found that any alleged conflict of interest did not adversely impact Mr. Thigpen's representation of Petitioner. (Id.)

After careful review, this Court finds that the state court's decision was not an unreasonable application of clearly established law, contrary to federal law, or based on an unreasonable determination of the facts. 28 U.S.C. § 2254. In this Court's view, the state habeas court properly considered whether an actual conflict of interest existed in this case and whether that conflict had an adverse effect on the representation Petitioner received. Upon review, the Court agrees that Petitioner has failed to show that an actual conflict of interest existed in this case. Although Mr. Thigpen had consented to representing Mr. Bunner, the record shows that Mr. Thigpen never learned any information about Mr. Bunner that

would have impacted his ability to represent Petitioner. Moreover, the record shows that Mr. Thigpen's involvement in the very early stages of Mr. Bunner's unrelated case was minimal. In addition, this Court agrees with the state habeas court that Petitioner is unable to show that any alleged conflict of interest actually impacted the representation Petitioner received at trial. Petitioner has failed to show that the failure to present any of the testimony or evidence related to Mr. Bunner was due to the alleged conflict of interest and not due to Mr. Bunner's refusal to testify at trial.

Petitioner quarrels with the state court's conclusion that Mr. Bunner was not called to testify at trial because he refused to testify by locking himself in a room. (Doc. 146 at 22.) Petitioner asserts that this conclusion by the state habeas court constitutes an unreasonable determination of fact in light of the evidence presented in the state court proceeding. (Id.) Although Mr. Thigpen testified during the state habeas proceeding that Mr. Bunner locked himself in a room and refused to testify, Petitioner contends that this "claim is patently absurd." (Id.) Petitioner argues that there is evidence in the record which shows that Mr. Bunner was placed under tight security measures during Petitioner's trial and that it is unlikely that Mr. Bunner would have been able to lock himself in a room to avoid testifying at trial. (Id.) Petitioner argues

that the state court's reliance on this fact was an unreasonable determination of the facts based on the evidence presented. (Id.)

After a careful review of the state habeas court's decision, this Court is unable to find that the state habeas court's ruling was based on an unreasonable determination of fact. As previously discussed, this Court must presume that the state court's determination of fact is correct unless Petitioner is able to rebut that presumption by clear and convincing evidence. Miller-El, 545 U.S. at 240, 125 S. Ct. at 2325. In this case, Petitioner has not offered any clear or convincing evidence to rebut the presumption that the state court was correct in finding that Mr. Bunner was unavailable to testify at trial because he locked himself in a room. While Petitioner attempts to convince this Court that it is highly unlikely that Mr. Bunner would be able to lock himself in a room to avoid testifying at trial, Petitioner has not offered any evidence that this occurrence did not happen as testified to by Mr. Thigpen. Most importantly, Petitioner has failed to show that the state court's reliance on Mr. Thigpen's testimony was unreasonable.

Ultimately, Petitioner has failed to establish that the state habeas court made an unreasonable application of law or determination of fact with respect to Mr. Thigpen's

representation of Mr. Bunner. This Court agrees with the state habeas court that there was not an actual conflict of interest and that if there was a conflict, Mr. Thigpen's ability to properly represent Petitioner was not adversely affected. Accordingly, Petitioner's claim is denied.

### 4. Attorney John Thigpen's prior representation of Sally Kimbrell

Petitioner also asserts that his representation by Mr. Thigpen was adversely affected by a conflict of interest arising from Mr. Thigpen's prior representation of Sally Kimbrell. (Doc. 138 at 93.) Ms. Kimbrell was a key witness at trial who testified as an eyewitness to the underlying murder. (Doc. 98, Attach. 2 at 48.) Her testimony was critical in determining whether Petitioner was the person responsible for hitting the victim with a sledgehammer. (Doc. 138 at 97-98.) Prior to his involvement in Petitioner's case, Mr. Thigpen represented Ms. Kimbrell in an uncontested divorce. (Doc. 100, Attach. 1 at 75.)

Petitioner contends that Mr. Thigpen's prior representation of Ms. Kimbrell adversely affected Mr. Thigpen's ability to effectively cross examine Ms. Kimbrell at trial. (Doc. 138 at 93-98.) Petitioner complains that Mr. Thigpen interacted with Ms. Kimbrell as if they were having a "casual conversation" (Id. at 94) and that Mr. Thigpen "failed to elicit information he needed from the witness to show that her trial testimony was

unreliably adorned with details she had gleaned from others . . . and that her initial statements indicated far less certainty than the trial testimony that Mr. Jones was the more culpable defendant" (Id. at 95).

Specifically, Petitioner points to three errors that Mr. Thigpen made in his cross examination of Ms. Kimbrell. (Id. at 96-98.) First, Petitioner argues that Mr. Thigpen failed to challenge Ms. Kimbrell's statement that she did not provide any officer with details of the crime on the morning of the incident, but only provided her name and address. (Id. at 96.) Petitioner contends that there is evidence in the record that Ms. Kimbrell gave a brief statement to police on the morning of the murder. (Id.) Secondly, Petitioner asserts that Mr. Thigpen should have questioned Ms. Kimbrell about inconsistencies between her prior interview statements and inconsistencies in her testimony. (Id. at 96-97.) These inconsistencies, in Petitioner's view, would have shown that Ms. Kimbrell view of the events of the crime were obstructed and that Ms. Kimbrell's testimony had been influenced by inadmissible hearsay. (Id.) Finally, Petitioner contends that Mr. Thigpen should have cross examined Ms. Kimbrell about an earlier statement where she reported to recognize Mr. Bunner. (Id. at 97.) Because Ms. Kimbrell testified that she could only see the driver of the vehicle on the night of the murder and that the person driving

the truck was the person responsible for hitting the victim with a sledgehammer, Petitioner asserts that highlighting that Ms. Kimbrell previously recognized Mr. Bunner was critical to establishing that Petitioner was not the driver of the truck or the most culpable defendant in this case. (Id.)

On review, the state habeas court relied on Culyer, 446 U.S. at 335, 100 S. Ct. at 1708, and found that there was no evidence that Mr. Thigpen maintained a conflict of interest that adversely impacted his ability to cross examine Ms. Kimbrell at trial. (Doc. 103, Attach. 1 at 11-13.) The state court thoroughly reviewed the record and found that Ms. Kimbrell's statements were generally consistent. (Id. at 12.) Additionally, the state habeas court found that "Mr. Thigpen's alleged lack of zealousness in cross-examining Ms. Kimbrell is belied by the actual transcript of the cross-examination colloquy." (Id. at 13.)

After a careful review, this Court finds that the state court's determination that Mr. Thigpen's representation was not compromised by a conflict of interest with respect to Ms. Kimbrell was not based on an unreasonable finding of fact or an unreasonable application of, or contrary to, federal law. In assessing whether Mr. Thigpen was operating under a conflict of interest, the state court properly considered whether there was an actual conflict of interest and whether there was evidence

that the conflict adversely affected Mr. Thigpen's representation of Petitioner. This Court agrees with the state court assessment that Petitioner has not presented evidence of an actual conflict of interest arising from Mr. Thigpen's prior representation of Ms. Kimbrell. Petitioner has not cited any evidence that Mr. Thigpen's prior representation of Ms. Kimbrell gave rise to any active competing interest that would have impacted Mr. Thigpen's ability to represent Petitioner. Merely arguing that a conflict of interest exists because of an attorney's representation in a prior case is insufficient.[4]

Moreover, the Court agrees with the state habeas court that Petitioner has failed to show that Mr. Thigpen's representation was adversely affected by his prior relationship with Ms. Kimbrell. The record shows that Mr. Thigpen did cross examine Ms. Kimbrell and even read a prior statement given by Ms. Kimbrell that undermined some of her testimony at trial. (Doc. 98, Attach. 2 at 36-42.) Petitioner's arguments that Mr. Thigpen should have done more in an effort to cross examine Ms. Kimbrell fail to convince this Court that Mr. Thigpen's ability to cross examine Ms. Kimbrell was compromised because of an unrelated

---

[4] To the extent that Petitioner asserts that a conflict of interest arises from a personal relationship between Mr. Thigpen and Ms. Kimbrell because they are both members of the same small town and knew each other, the Court finds that this form of personal relationship is also insufficient to establish an actual conflict of interest.

prior representation. As a result, Petitioner's claim for relief fails.

### 5. Attorney John Thigpen's prior representation of J.J. Cunningham

Next, Petitioner asserts that he is entitled to relief due to the conflict of interest that existed between Mr. Thigpen and J.J. Cunningham. (Doc. 138 at 98.) Ms. Cunningham was a witness at trial and was present with Petitioner on the night of the murder when Petitioner robbed a convenience store. Prior to his involvement in this case, Mr. Thigpen represented Ms. Cunningham in a contested divorce proceeding, where evidence was presented that Ms. Cunningham was unstable and heavily used drugs. (Doc. 100, Attach. 3 at 2-84.) Petitioner contends that this information should have been used in Petitioner's trial to "impugn her reliability," but was not used by Mr. Thigpen due to the conflict of interest with his former client. (Doc 138 at 100.)

The state habeas court denied Petitioner's claim based on Mr. Thigpen's prior representation of Ms. Cunningham. (Doc. 103 at 9-10.) The state court found that Mr. Thigpen's representation of Petitioner was not adversely affected by his prior representation of Ms. Cunningham because there was no credible evidence that Mr. Thigpen could have used to impeach Ms. Cunningham as a witness. (Id.) The state court concluded

that the only potential evidence identified by Petitioner that Ms. Cunningham was a drug user was hearsay that would have been inadmissible at trial. (Id.)

On review, this Court finds that Petitioner has failed to establish that the state court's ruling with respect to the alleged conflict of interest between Mr. Thigpen and his prior representation of Ms. Cunningham is either contrary to federal law, an unreasonable application of federal law, or based on an unreasonable finding of fact. In this Court's view, Petitioner has failed to establish that an actual conflict of interest existed or that Mr. Thigpen's prior representation of Ms. Cunningham adversely affected his ability to represent Petitioner. The state court's findings warrant deference and this Court can find no reason to question the state court's legal or factual conclusions with respect to Mr. Thigpen's prior representation of Ms. Cunningham. Accordingly, Petitioner's claim is denied.

C. Ineffective Assistance of Counsel

In his petition, Petitioner makes numerous claims that Mr. Thigpen was ineffective at trial. (Doc. 27.) These claims include arguments that Mr. Thigpen was ineffective for failing to (1) conduct a meaningful investigation into Petitioner's background, (2) obtain a mental health expert, (3) present evidence of Mr. Bunner's life sentence, (4) adequately cross

examine Sally Kimbrell, (5) present evidence that Mr. Bunner was the more culpable defendant, (6) present evidence of Mr. Bunner's propensity for violence, (7) object to statements made during the prosecution's closing statement, (8) give an effective closing argument, (9) properly litigate Petitioner's motion for a change of venue, (10) conduct adequate voir dire of potential jurors, (11) strike certain venire persons for cause, and (12) rehabilitate potential jurors who expressed qualms about the death penalty. (Doc. 138 at 101-200.) At the end of his ineffective assistance of counsel claims, Petitioner also lists "additional instances of ineffective representation" for this Court's consideration. (Id.)

### 1. Legal standard

The standard for evaluating ineffective assistance claims was laid out by the Supreme Court of the United States in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In Strickland, the Supreme Court created a two-part test for establishing "[a] convicted defendant's claim that counsel's assistance was so defective as to require a reversal of conviction or death sentence." Id. at 687, 104 S. Ct. at 2064. "Unless a defendant makes both showings [of the two-part test], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

As the first prong of the two-part test, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. To meet this "highly deferential standard," the court must consider whether "in light of all the circumstances, the identified acts or omissions [of the attorney] were outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066. Courts must conduct this analysis with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. at 2065. "Strategic decisions will amount to ineffective assistance only if so patently unreasonable that no competent attorney would have chosen them." Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987).

Under the second prong of the two-part test, the defendant must show that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence

before the judge or jury.' " <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1060 (11th Cir. 2010) (quoting <u>Strickland</u>, 466 U.S. at 695, 104 S. Ct. at 2069). This requires that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." <u>Wong v. Belmontes</u>, 558 U.S. 15, 26, 130 S. Ct. 383, 390, 175 L. Ed. 2d 328 (2009).

When instructing courts as to how to apply the two-part test in <u>Strickland</u>, the Supreme Court emphasized the that "judicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S. Ct. at 2065. The Supreme Court noted that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful to conclude that a particular act or mission of counsel was unreasonable." <u>Id.</u> Accordingly, courts must "not measure counsel against what we imagine some hypothetical 'best' lawyer would do." <u>LeCroy v. United States</u>, 739 F.3d 1297, 1313 (11th Cir. 2014).

In addition to the already deferential standard mandated by <u>Strickland</u>, this Court must also conduct its analysis of Petitioner's claims in light of the procedural posture of this case. As discussed by the Eleventh Circuit,

> it is important to keep in mind that in addition to
> the deference to counsel's performance mandated by
> <u>Strickland</u>, the AEDPA adds another layer of deference-

this one to a State court's decision-when we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the Strickland standard, but he must also show that the State court applied Strickland to the facts of his case in an objectively unreasonable manner.

Williams v. Allen, 598 F.3d 778, 789 (11th Cir. 2010) (internal quotations, alterations, and citations omitted).

### 2. Trial counsel's failure to conduct a meaningful investigation

In his petition, Petitioner first asserts that Mr. Thigpen failed to conduct a meaningful investigation into Petitioner's background in order to develop an effective mitigation strategy for use during the sentencing portion of Petitioner's trial. (Doc. 138 at 103.) Due to Mr. Thigpen's lack of investigation, Petitioner complains that the jury

was wholly unaware of the pervasive lack of care and nurturing he endured during his childhood or the extraordinarily strict, almost militaristic atmosphere maintained at home by his emotionally abusive parents, culminating in his early teens in his virtual imprisonment in his room for months at a time over a period of roughly three years, for no more serious an offense than getting a few C grades. Although he had been a gifted student and a well-behaved child who loved performing in musicals, during this critical period in his adolescence, Mr. Jones understandably struggled with intense feelings of isolation, anger, insecurity, abandonment, and betrayal, which he attempted to quell as early as age 13 by turning to alcohol and self-mutilation. By the time he finished high school, he had become a full-blown alcoholic, his personality had changed, and his behavior decompensated when he was intoxicated. He experienced regular blackouts and consumed upwards of a case of beer per day. He was ultimately expelled from his

home, spent time living under a highway overpass, and was later taken in for a time by caring neighbors. Ultimately, he could not escape his addiction and, while associating with other young people who had similar troubles and substance abuse problems, his substance abuse led to involvement in the criminal justice system, unsuccessful inpatient addiction treatment, and ultimately his arrest for murder.

(Id. at 106-107 (internal citations and footnotes omitted).) Petitioner contends that Mr. Thigpen was ineffective for failing to develop this evidence and present it to the jury at sentencing. After careful consideration, this Court disagrees.

First, this Court finds that Mr. Thigpen's performance was not deficient. In his briefing, Petitioner asserts that national guidelines, as evidenced by ABA guidelines, required that Mr. Thigpen conduct a more thorough investigation into Petitioner's background. (Id. at 110-116.) Petitioner complains that his counsel ignored important areas of investigation that should have been addressed by any competent counsel's preparation for a capital trial. (Id.) Specifically, Petitioner complains that his attorney was deficient by not (1) utilizing an investigative social worker to develop a clear view of Petitioner's background and (2) obtaining records from his stay at a Humana Hospital, where he received treatment for his alcohol addiction ("Humana Records"). (Id. at 120-128.)

At his state habeas proceeding, Petitioner offered evidence that would have been discovered had his trial counsel used an

investigative social worker or obtained the Humana Records. First, Petitioner offered an investigative social worker, Dr. Lee Norton. (Doc. 101, Attach. 3 at 20-27.) Dr. Norton offered testimony about the kind of social history that an investigative social worker could have developed in Petitioner's case. (Id.) As part of his findings, Dr. Norton reported that

> [a]ccounts by Ashley noted in his treatment records indicate that the prolonged isolation caused him to feel rejected by his parents and led to enduring depression that he 'medicated' with alcohol. He reported to several sources that he began drinking at about the age of thirteen to cope with feelings of low self-esteem, loneliness, and embarrassment associated with his long periods of confinement. His serious drinking problem appears to have escalated rapidly while he was still a teen and to have caused significant emotional and behavioral problems which the family was unable to effectively resolve.

(Id. at 22.)

In addition, Petitioner offered the Humana Records at the state habeas proceeding. (Doc. 100, Attach. 3 at 156-86; Doc. 100, Attach. 4 at 1-45.) Petitioner argued at the state habeas proceeding that these records, if properly obtained by Mr. Thigpen, would have revealed

> a plethora of information regarding Mr. Jones's troubled childhood and adolescence, and the origin of his alcoholism in a lengthy, roughly 3-year episode of what turned out to be virtual imprisonment in his room by his parents for getting C grades. Mr. Jones was isolated in his room, not allowed to come out, not allowed to see friends, and at one point, as witnesses described, he was moved to a room with a toilet so that he would not even be able to leave his room to go to the bathroom. During this time, as the records

show, Mr. Jones's sense of isolation and emotional disturbance grew intense, and he began to engage in self-harm, such as punching his fist into walls and cutting his chest. He became hopeless, felt that life was not worth living, and contemplated suicide. His Global Assessment of Functioning (GAF) was rated at 30 indicating "serious impairment in communications or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas. . ." Hospital staff believed that the dysfunction at home necessitated the protective environment of a recovery residence in order to have a chance of avoiding relapse. The Humana records provided graphic context for the development of Mr. Jones's emotional disturbance as an adolescent who suffered from severe alcohol dependency after starting to drink at the age of 13.

(Doc. 138 at 120 (internal citations omitted).)

On review, the state habeas court rejected Petitioner's claims and found that Mr. Thigpen did not act deficiently in his investigation of Petitioner's case. (Doc. 103, Attach. 1 at 40.) The state habeas court found that Mr. Thigpen was an experienced trial lawyer that had previously represented a client in a death penalty case that resulted in the imposition of a life sentence. (Id.) Moreover, the state court found that Mr. Thigpen adequately prepared for trial by reviewing physical evidence, visiting the crime scene, attending portions of Petitioner's co-defendant's trial, meeting with Petitioner frequently, and selecting mitigation witnesses based on their ability to highlight Petitioner's good qualities for the jury's consideration. (Id. at 40-4.)

With respect to the specific allegation that Mr. Thigpen should have conducted a more thorough investigation by using an investigative social worker or obtaining the Humana Records, the state court discredited the value of the testimony offered by Dr. Norton and found that Mr. Thigpen made a reasonable strategic decision to focus his investigation of mitigation evidence on Petitioner's good qualities. (Id. at 49-53; 57-58.) The state court found that it was reasonable for Mr. Thigpen to assess what he knew about Petitioner and determine that a reasonable jury may not have been receptive to evidence related to Petitioner's alcoholism. (Id.) Accordingly, the state court found that it was reasonable for Mr. Thigpen to focus his efforts on developing evidence of Petitioner's redeeming qualities. (Id.)

After careful review, this Court finds that the state court's finding was not contrary to, or an unreasonable application of, federal law based or based on an unreasonable determination of fact. In reviewing the state court's decision, this Court is guided by the Eleventh Circuit's discussion of Supreme Court precedent in Johnson v. Secretary, DOC, 643 F. 3d 907 (11th Cir. 2011). In Johnson, the Eleventh Circuit provided that

> [i]n Cullen v. Pinholster, the Supreme Court stated
> that the Ninth Circuit had misapplied Strickland when
> it drew from the Court's cases a constitutional duty

to investigate and the principle that it is prima facie ineffective assistance for counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. The Court explained that the Strickland test of necessity requires a case-by-case examination of the evidence, and that Strickland itself rejected the notion that the same investigation will be required in every case. As a result, in each case we must determine whether counsel conducted a reasonable background investigation or made a reasonable decision that made conducting a background investigation unnecessary.

Id. at 931-32 (citations and quotations omitted). In this case, the Court must consider Mr. Thigpen's decision not to further investigate Petitioner's background in light of the mandate that "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066.

In this case, the state court found that neither Petitioner nor his parents ever alerted Mr. Thigpen to Petitioner's history or alcoholism. (Doc. 103, Attach. 1 at 52.) To the extent that Mr. Thigpen was made aware of Petitioner's alcoholism by the fact that Petitioner was intoxicated during the commission of his crime, Mr. Thigpen could have reasonably made the strategic decision not to further pursue any investigation into Petitioner's use of alcohol. The Eleventh Circuit has been clear that evidence related to the use of drugs and alcohol is "often

a 'two-edged sword,' that provides an independent basis for moral judgment by the jury." Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir. 2010) (internal quotations and citations omitted). Based on the potentially damaging nature of the evidence of Petitioner's alcoholism, the state court did not err in finding that Mr. Thigpen made a reasonable decision that did not fall below that of competent counsel to not further investigate any allegation related to Petitioner's use of alcohol. This includes not obtaining the Humana Records or making any other inquiry into Petitioner's history of abusing alcohol.

Moreover, there is no indication that Mr. Thigpen had any knowledge of Petitioner's allegedly tragic upbringing. Mr. Thigpen met with Petitioner multiple times and used those interactions to develop Petitioner's mitigation strategy. If Petitioner had indicated that he had a troubled upbringing, Mr. Thigpen would have had a duty to investigate. Based on his interactions with Petitioner, however, Mr. Thigpen was reasonable in deciding to pursue a mitigation strategy that focused on developing Petitioner's positive qualities. Mr. Thigpen would not have needed to use an investigative social worker or obtain records from Petitioner's alcohol treatment facility to develop this strategy.

Even if Mr. Thigpen should have conducted a more thorough investigation by utilizing an investigate social worker or obtaining the Humana Records in this case, the state court found that there was no prejudice as a result of Mr. Thigpen's alleged failure to conduct a more thorough investigation. (Id. at 50-52; 56-57.) After careful review, the Court finds that the state court's decision warrants deference and agrees that the evidence that could theoretically have been produced by an investigative social worker or by the Humana Records would not have affected Petitioner's trial. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

First, with respect to the testimony offered by Dr. Norton, this Court finds that the value of Dr. Norton's testimony is called into question by the state court's finding that his testimony lacked credibility. (Doc. 103, Attach. 1 at 57-58.) The state discredited Dr. Norton's findings because he:

> (1) never personally interviewed Petitioner or any of the witnesses whose testimony he has relied upon in making the determinations; (2) did not receive all the records prior to submitting his "findings" to Petitioner's counsel; (3) has relied upon affidavits which are filled with hearsay statements and statements that are clearly in direct contrast to what these same witnesses previously testified to at Petitioner's and co-defendant Bunner's trials; (4) is

43

a social worker and not a psychologist or psychiatrist; and (5) relies on factual inaccuracies, (e.g., Dr. Norton finds that Petitioner began drinking at age of 18 and bases this on "several sources.") However, the numerous records, including those from Humana Hospital, show that Petitioner himself stated that he began drinking at age 13 or 14.; Dr. Norton finds that Petitioner had an alcoholic blackout when Petitioner stole three trucks from the car dealership in 1992. The evidence in the record of this case shows that Petitioner did not "blackout" on the night he stole the tracks as Petitioner gave a detailed statement of the events upon his arrest.

(Id. (internal citations omitted).)

Petitioner contends that the state court's conclusion with respect to Mr. Norton constituted either an unreasonable application of the law or an unreasonable finding of fact. (Doc. 138 at 118-120.) Specifically, Petitioner quarrels with the state court's findings that Mr. Norton's testimony should be discounted because (1) he is a social worker, (2) his reports were based on hearsay and (3) his conclusions relied on inaccuracies. (Id.) Petitioner contends that Dr. Norton's credibility should not be called into question simply because he is a social worker and that the state court's credibility determination was an unreasonable determination of fact and "discounted to irrelevance" the importance of Dr. Norton's testimony. (Id.)

After careful review, the Court does not find that the state court made an unreasonable credibility determination with respect to Dr. Norton. As an initial matter, the state court did

not discredit Dr. Norton's testimony simply because he was a social worker. Instead, the state court considered the fact that he was not a licensed psychologist or psychiatrist as one of many factors in its decision to find that his testimony not credible. (Doc. 103, Attach. 1 at 58.) Moreover, the state court reasonably questioned Dr. Norton's conclusions because they were based on unreliable sources and hearsay provided by others. (Id.) Additionally, the state court questioned the reliability of his findings because Dr. Norton found that Petitioner had blacked out during an incident when he stole trucks from a dealership in 1992, but evidence in the record supported that Petitioner did not black out during this incident. (Id.) In this Court's view, the state court did not make any unreasonable determination of fact as to the credibility of Dr. Norton's testimony. Upon hearing the testimony, the state court was able to consider the totality of these factors in finding that Dr. Norton's testimony was not credible.

Moreover, given this Court's review of the state court's determination at this time, the Court must give deference to the state court's credibility determination in review of Dr. Norton's conclusions. "In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations." Bishop v. Warden, GDCO, 726 F.3d 1243, 1259 (11th Cir. 2013).

Petitioner asserts that this Court must question the state court's credibility determination with respect to Dr. Norton because the state habeas court made an error in its assessment of his findings. (Doc. 138 at 119-120.) Here, Petitioner claims that the state court incorrectly criticized Dr. Norton's report for noting that Petitioner began to drink alcohol at age 18 instead of at the age of 13. (Id.) Petitioner contends that that state habeas court's critique was patently false because Dr. Norton's report clearly stated that Petitioner began drinking at the age of 13. (Id.) Due to the error by the state court in its review of Dr. Norton's report, Petitioner argues that this Court must discredit the state court's finding with respect to Dr. Norton. (Id.)

Despite this error in the state court's review of Dr. Norton's report, this Court will still not discount the state court's credibility finding with respect to Dr. Norton. The error with respect to the age in which Petitioner testified that he began drinking is one of many factors that the state court listed as its basis for its credibility determination with respect to Dr. Norton. (Doc. 103, Attach. 1 at 57-58.) Moreover, the age difference was only one of the factual inaccuracies that the state court found in Dr. Norton's report. (Id.) As discussed previously, the state court found Dr. Norton's report to also be inaccurate with respect to its

46

finding that Petitioner blacked out during a 1992 truck theft incident. (Id.) Because this Court must afford deference to the state court's determination, this Court cannot find that the state court's credibility determination was unreasonable.

In light of the lack of credibility that should be afforded to Dr. Norton's opinion, this Court agrees with the state habeas court that Dr. Norton's testimony would not have had a significant impact on the jury. Even if this Court did not question the credibility determination with respect to Dr. Norton, however, the Court is unable to find that Mr. Thigpen's failure to utilize and investigative social worker like Dr. Norton would have been prejudicial in light of Mr. Thigpen's sentencing strategy. As stated previously, Mr. Thigpen's trial strategy was to produce evidence of Petitioner's good qualities in an effort to ask the jury to spare Petitioner's life. (Id. at 42.) The state court found that this was a viable and reasonable strategy that Mr. Thigpen implemented during the sentencing phase of Petitioner's trial. (Id.) In light of this conclusion, Mr. Thigpen was not unreasonable in failing to focus his efforts on utilizing an investigative social worker to develop evidence, like the evidence developed by Dr. Norton, that would been directly contradictory to Mr. Thigpen's chosen trial strategy.

In addition to finding that Mr. Thigpen's failure to utilize an investigative social worker did not prejudice the

outcome of trial, the state habeas court also found that the failure to obtain the Humana Records did not result in any prejudice at trial. (Id. at 49-52.) After a careful review of the Humana Records, the state court found that the Humana Records would have been contradictory to Mr. Thigpen's mitigation strategy. (Id.) The state court conducted an exhaustive review of the records and found that, if used at trial,

> the jury would have learned many facts that would not have been mitigating, but would have been detrimental to Petitioner, such as: Petitioner was forced to get alcohol treatment at Humana by his parents and in order to avoid jail on a theft by taking motor vehicle charge; that Petitioner was consistently referred to by the staff and doctors of Humana Hospital as a "very angry young man;" "a spoiled kid," "surly," having a "bad attitude," having "little insight," having "poor judgment," a "narcissistic personality," having "no respect" for others and one who blames his parents' high expectations for his problems; that Petitioner was noted as having "a lot of blaming and not much taking responsibility;" that Petitioner was angry, hostile and general(sic.) disliked his parents; that Petitioner was violent and was aware that he was violent, particularly when he drank, that Petitioner did things out of character when he drank; that Petitioner had "been in many fights which he used to vent his anger and frustration;" that Petitioner admitted to "beating a girl very badly;" that when Petitioner became angry he "hit stuff;" that Petitioner's parents described him as "violent and profane" when drinking; and Petitioner's parents describe him as lying and having a violent temper with no respect for others.

(Id. at 49-50.) The state court went on to find that the jury would have also learned that

> Petitioner's alcohol consumption on the night of the
> murder was not extraordinary for Petitioner as the
> Humana records show that it was not unusual for
> Petitioner to consume a case of beer a day and some
> liquor; that Petitioner was a leader, not a follower
> as Petitioner was acting as a community leader while
> at the hospital; that Petitioner has "no permanent
> damage from his alcohol use;" and that Petitioner was
> diagnosed with anti-social personality disorder and
> narcissistic personality.

(Id. at 50-51.)

In light of the potentially damaging effect of the Humana Records, the state court reasonably found that there was no prejudice to Petitioner that these records were not obtained by Mr. Thigpen or presented at trial. The information in the Humana Records would have directly contradicted Mr. Thigpen's chosen trial strategy. While Mr. Thigpen could have used the Humana Records as the basis for a different mitigation strategy, Mr. Thigpen chose to focus his efforts on painting Petitioner in a positive light. Accordingly, even if the records had been obtained, there is no indication that Mr. Thigpen would have presented them to the jury to contradict his trial strategy. Even if the records were presented to the jury, the evidence would likely have had no effect on the jury's decision to impose a sentence of death.

In total, the Court does not find that the proffered evidence from the Humana Records or Dr. Norton would likely have had any effect on the jury in this case. As noted previously,

this Court must "consider all the evidence—the good and the bad—when evaluating prejudice." Wong, 558 U.S. at 26, 130 S. Ct. at 390. In this case, the jury heard detailed accounts from eyewitnesses as to Petitioner's involvement in a heinous crime. The mitigation evidence of Petitioner's alcoholism or his perceived tragic upbringing would have likely had little impact on the nature of the aggravating facts of this case. A jury could have reasonably viewed evidence of Petitioner's alcoholism as aggravating evidence and construed evidence of Petitioner's home life as an attempt to excuse his behavior. Ultimately, this Court agrees with the state habeas court that Petitioner suffered no prejudice by his counsel's failure to develop and present this evidence at trial.

As a final note, Petitioner attempts to rely on a comparison between this case and Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009). In Porter, the Supreme Court found that a petitioner's counsel was deficient for failing to reasonably investigate and present evidence of the "(1) [petitioner's] heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." Id. at 41, 130 S. Ct. at 454. The Supreme Court

found that the petitioner's trial counsel's investigation fell short of professional standards because "he ignored pertinent avenues for investigation of which he should have been aware." Id. at 40, 130 S. Ct. at 453. Moreover, the Supreme Court found that the counsel's failure to present mitigation evidence was prejudicial because the sentencing jury "heard almost nothing that would humanize [the petitioner] or allow them to accurately gauge his moral culpability." Id. at 41, 130 S. Ct. at 454. In light of the amount of mitigation evidence that was not presented, the Supreme Court found that the petitioner was prejudiced by his attorney's failures. Id. at 44; 130 S. Ct. at 456.

Based on Porter, Petitioner argues that the jury in his case also heard almost nothing that would humanize him. (Doc. 138 at 149.) Petitioner asserts that it was objectively unreasonable for Mr. Thigpen to fail to present mitigation evidence of his trouble upbringing and alcoholism to the jury. (Id. at 150.) Despite Petitioner's argument, this Court disagrees.

In this Court's view, Petitioner's case is materially distinguishable from the facts of Porter. First, the mitigation evidence that was not presented to the jury in Porter is fundamentally different than the evidence that Petitioner now contends should have been presented to the jury in his case. In

*Porter*, the petitioner's trial counsel did not uncover, or present substantial evidence related to acts of heroism by the petitioner during war, the effects of the war on the petitioner's mental health, the petitioner's low functioning IQ, or his extensive history of being physically abused. 558 U.S. at 41, 130 S. Ct. at 454. In contrast, in this case, Petitioner's potential mitigation evidence consisted of evidence including findings that Petitioner's "rigid family life" caused Petitioner to begin to abuse alcohol and evidence of an extensive history of alcohol abuse. Unlike the inherently mitigatory nature of the evidence in *Porter*, most of the evidence that Petitioner argues should have presented to the jury may have been counter-productive to his trial counsel's chosen strategy to highlight Petitioner's good qualities. In this case, Mr. Thigpen conducted an investigation and, based on that investigation, developed a trial strategy to present evidence of Petitioner's good qualities to the jury in a plea for mercy. This strategy was developed in light of the fact that a jury may have viewed evidence of Petitioner's upbringing or alcoholism as aggravating evidence or an attempt to improperly blame others for his criminal actions.

After careful review, this Court agrees with the state habeas court that found that Mr. Thigpen selected a reasonable trial strategy that could have been utilized by any competent

trial attorney. This case stands in stark contrast to the complete lack of investigation and strategy used by the attorney in Porter. The jury in this case was provided with evidence during sentencing that was directed at humanizing Petitioner. Because this Court is satisfied that Petitioner's counsel conducted an adequate investigation and presented a competent mitigation strategy, as found by the state habeas court, Petitioner's general claim that his trial counsel failed to conduct a reasonable investigation or present relevant mitigation evidence is denied.

### 3. Trial counsel's failure to utilize a mental health expert

Next, Petitioner contends that his trial counsel was ineffective for failing to obtain, and present at trial, an independent mental health evaluation of Petitioner. (Doc. 138 at 129.) Petitioner contends that "psychiatric mitigating evidence has long been held to be critical in death penalty cases." (Id.) At the state habeas proceeding, Petitioner presented two expert witnesses that Petitioner purports could have been used at trial to provide critical mitigation evidence to the jury: (1) Dr. Barry Crown and (2) Dr. Johnathan Lipman. (Doc. 103, Attach. 1 at 58-60.) Dr. Barry Crown testified at the state habeas proceeding that Petitioner suffered from organic brain damage as evidenced by Petitioner's decreasing IQ level, major depression,

and alcohol dependency. (Id.) Dr. Lipman testified that Petitioner likely had a blood alcohol level on the night of the murder between .46 and .49, which would have impaired Petitioner's ability to distinguish between right and wrong on the night of the murder. (Id. at 60.) Petitioner argued at the state habeas proceeding, and again now, that the expert opinion of either Dr. Crown or Dr. Lipman would have been crucial mitigation evidence for the jury in considering whether Petitioner should have received the death penalty in this case. Again, this Court must disagree.

First, Petitioner has failed to establish that Mr. Thigpen's performance was deficient. Petitioner asserts that Mr. Thigpen was deficient in failing to have Petitioner independently examined by a mental health expert at trial. (Doc. 138 at 129.) On review, the state habeas court found that Mr. Thigpen's failure to obtain expert testimony like that of Dr. Crown or Dr. Lipman was not deficient. (Doc. 103, Attach. 1 at 60-61.) In its opinion, the state habeas court rejected Petitioner's argument after finding that " 'a clear overtone to [Petitioner's] argument is the proposition that if a defense attorney has not produced a witness who would agree with the after-the-fact diagnosis presently presented then the attorney is ineffective.' " (Id. at 60 (quoting Poyner v. Murray, 964 F.2d 1404).) The state habeas court went on to provide that

counsel was not deficient because " '[c]ounsel is not required to search for a psychiatrist who will testify in a particular way.' " (Id. (quoting Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).)

After a careful review, the Court finds that the state court's conclusions are not based on an unreasonable finding of fact, contrary to law, or an unreasonable application of federal law. While mental health experts are typically a crucial component in death penalty cases, this Court finds that Mr. Thigpen is not ineffective simply because he did not hire a mental health expert. The facts in this case show that Mr. Thigpen evaluated the competency evaluation provided by the state and made a reasonable determination not to hire a mental health expert. (Doc. 103, Attach. 1 at 41.) This decision was made in light of all of the information he obtained from Petitioner, his family, and Mr. Thigpen's own observations of Petitioner. (Id.) While Mr. Thigpen could have hired a mental health expert, fair-minded jurists could disagree whether his failure to hire a mental health expert caused his representation to fall below the applicable standard of care in this case. Accordingly, this Court does not find the state court ruling to be unreasonable.

Additionally, even if Mr. Thigpen was deficient for failing to have Petitioner evaluated by a mental health expert in this

case, the state court found that there was no prejudice from any alleged failure to utilize a mental health expert. (Id. at 60-61.) As noted previously, an evaluation of prejudice requires weighing aggravating factors in light of any mitigation evidence. Wong, 558 U.S. at 26, 130 S. Ct. at 390. Accordingly, prejudice can only be established by showing that testimony, like that of Dr. Crown and Dr. Lipman, would have created "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. After careful consideration, the Court finds that neither the testimony of Dr. Crown nor Dr. Lipman would have impacted the outcome in this case.

First, the state habeas court found that neither Dr. Crown nor Dr. Lipman offered credible evidence that would have impacted the jury's determination with respect to the death sentence in this case. (Doc. 103, Attach. 1 at 58-60.) The state court found that Dr. Crown's findings were unsubstantiated after finding several inconsistencies within his report. (Id. at 58.) On review, the state habeas court questioned the finding by Dr. Crown that Petitioner suffered from organic brain damage due to a decrease in Petitioner's ability to process information over time. (Id. at 58-59.) The state habeas court considered the numbers presented by Dr. Crown and found that based on a typical

deviation used to measure a person's IQ, there was no evidence that Petitioner's mental functioning actually decreased over time. (Id.) Additionally, the state habeas court found that Dr. Crown's finding that Petitioner suffered from major depression did not comport with the Diagnostic Statistical Manual of Mental Disorders. (Id. at 58.) Finally, the state habeas court found that Dr. Crown's testimony relied on unreliable or inaccurate facts in the record to reach his opinion. (Id. at 59.)

With respect to Dr. Lipman, the state habeas court also discredited his expert opinion as to the effect of the blood alcohol level on the night of the murder. (Id. at 60.) The state habeas court found that there was contradictory evidence in the record which refuted Dr. Lipman's opinion. (Id. at 60.) This evidence included Petitioner's ability to recall the events on the night in question, testimony that Petitioner was not stumbling on the night of the murder, and evidence that Petitioner regularly drank the same amount of alcohol that he did on the night of the murder. (Id.) Due to these inconsistencies, the state court discredited Dr. Lipman's testimony that Petitioner was so intoxicated on the night of the murder that he was unable to know right from wrong. (Id.)

From this Court's review, Petitioner has not offered any sufficient basis to question the credibility determinations of the state habeas court. As discussed previously, this Court must

defer to the state court's findings as to credibility determinations unless there is clear and convincing evidence that the state court improperly found that a witness was not credible. Bishop, 726 F.3d at 1259. In this case, the state court reasonably reviewed the opinions of Dr. Crown and Dr. Lipman and found that their opinions were not credible. Because the opinions offered by Dr. Crown and Dr. Lipman lacked credibility, their opinions would have likely had little to no impact on the jury's determination in this case.

In addition to potential credibility issues, the impact of the mental health testimony offered by Dr. Crown and Dr. Lipman is questionable. For example, even if the jury were to credit the testimony of Dr. Crown, the impact of his testimony related to the Petitioner's decreasing cognitive functioning as a result of alcoholism is minimal. After his assessment, Dr. Crown found that Petitioner had a decreasing mental function as evidenced by Petitioner's decreased IQ scores from a score of 130 to a score of 112. (Doc. 99, Attach. 12 at 82.) However, Dr. Crown's testimony shows that even if Petitioner's brain functioning was decreasing, Petitioner's IQ was still above average.

With respect to Dr. Lipman, his testimony purports to highlight the alcohol use by the Petitioner on the night of the murder. (Doc. 103, Attach. 1 at 60.) Given that Petitioner likely consumed a similar amount on most nights, it is unlikely

that Dr. Lipman's testimony would have any mitigatory effect on the jury. As noted previously, the use of alcohol can be inherently aggravating. Suggs, 609 F.3d at 1231. Mr. Thigpen's strategy was to avoid highlighting the extent of Petitioner's alcoholism at trial. Accordingly, Dr. Lipman's testimony would have been directly contrary to Mr. Thigpen's strategy and may have provided aggravating evidence to the jury.

In light of the credibility issues and minimal value offered by the testimony of Dr. Crown and Dr. Lipman, this Court cannot find that Petitioner was prejudiced by any alleged failure of Mr. Thigpen to utilize a mental health expert and present evidence of Petitioner's mental health at trial. As discussed, the Court must view this potential mitigation evidence in light of the aggravating evidence presented to the jury. Given the credibility issues of each expert offered by Petitioner and the lack of actual mitigation evidence that these opinions provided, the Court finds that the state court was not unreasonable to conclude that Mr. Thigpen's decision not to use a mental health expert at trial was not prejudicial. Petitioner's claim is denied.[5]

_____

[5] Wrapped up in his claim that Mr. Thigpen should have presented evidence provided by a mental health expert, Petitioner asserts that this evidence would have been particularly important in light of the evidence of Petitioner's youth and the impact of his use of alcoholism on his adolescent brain. (Doc. 138 at 138-44.) While this Court has already explained that Mr. Thigpen was

## 4. Trial counsel's failure to present evidence of Mr. Bunner's life sentence

Next, Petitioner asserts that Mr. Thigpen was ineffective for failing to place evidence of Mr. Bunner's life sentence into evidence at Petitioner's trial. (Doc. 138 at 150.) Petitioner argues that evidence that Mr. Bunner received a life sentence would have been highly relevant mitigation evidence that would

---

not ineffective for failing to procure a mental health expert to highlight Petitioner's alcoholism because this evidence would have been contrary to Mr. Thigpen's chosen sentencing strategy and the state habeas court reasonably found the mental health expert's testimony lacked credibility, this Court pauses to address any claim that Petitioner may have solely based on any allegation that Mr. Thigpen was ineffective at trial for failing to offer evidence of Petitioner's youth as mitigation.

In his briefing, Petitioner seems to suggest that Mr. Thigpen should have focused at least some of his mitigation strategy on highlighting that Petitioner was 19 years old at the time that this crime was committed. (See Doc. 138 at 139-41.) (discussing different characteristics of adolescence). To the extent that Petitioner attempts to raise this claim as an independent claim for review, the Court finds that Petitioner's claim must be denied. In this Court's view, Petitioner has not offered any authority which would establish that Mr. Thigpen provided deficient representation because he did not develop any strategy to highlight that Petitioner was 19 years old at the time the crime was committed. While Petitioner has provided case law to establish that the law recognizes that offenders under the age of 18 should be treated differently, Petitioner has not offered any convincing argument that the fact that a defendant was 19 years old—above the age of majority—is considered mitigation evidence that should be highlighted for the jury. See Roper v. Simmons, 543 U.S. 551, 568, 125 S. Ct. 1183, 1193, 161 L. Ed. 2d 1 (2004) (discussing the "differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.") Moreover, Petitioner has failed to show that he was prejudiced by any failure of Mr. Thigpen to highlight Petitioner's age for the jury consideration in mitigation.

have likely caused the jury to impose a sentence of life imprisonment in Petitioner's case. (Id. at 150-51.) Petitioner argues that the jury even inquired about Mr. Bunner's sentence and that this inquiry shows that the fact that Mr. Bunner received a life sentence would have heavily impacted the jury. (Id.)

At the state habeas court, Petitioner did not squarely raise this claim for the state court to consider. (Doc. 99, Attach. 6.) Instead, Petitioner challenged Mr. Thigpen's failure to admit Mr. Bunner's life sentence in the context of his claim that his attorney was operating under a conflict of interest. (Doc. 102, Attach. 5 at 16-17.) On review, the state habeas court rejected Petitioner's claim and found that the evidence of Mr. Bunner's life sentence was inadmissible at trial under Crowder v. State, 268 Ga. 517, 491 S.E.2d 323 (1997) and Barnes v. State, 269 Ga. 345, 496 S.E.2d 674 (1998). (Doc. 130, Attach. 1 at 6-9.)

Now, Petitioner argues that the cases relied on by the state habeas court "were completely misapplied by the habeas court as they do not hold that a co-defendant's life sentence is inadmissible at a capital sentencing trial." (Doc. 138 at 151.) Instead, Petitioner asserts that the "cases cited by the habeas court strongly support the admissibility of testimony regarding

Mr. Bunner's life sentence at Mr. Jones's sentencing." (Id. at 152.) This Court, however, disagrees with Petitioner's argument.

First, Crowder does not support Petitioner's contention that Mr. Bunner's life sentence would have been admissible at trial. In Crowder, the defendant sought to introduce a certified copy of his co-defendant's sentence. 268 Ga. at 520, 491 S.E.2d at 325. After discussing that mitigation evidence is a broad category, the Georgia Supreme Court held that it was "not persuaded at this time that a certified copy of a co-defendant's life sentence is a mitigating circumstance for the jury to consider." Id. Despite Petitioner's assertion, nothing in Crowder supports his argument that evidence of a co-defendant's sentence constitutes mitigation evidence that was admissible at trial. If anything, Crowder directly refutes his argument.

In Barnes, the Georgia Supreme Court considered whether it was appropriate for the state to elicit evidence of a co-indictee's guilty plea and life sentence. 269 Ga. at 354, 496 S.E.2d at 684-85. When reviewing the issue, the Georgia Supreme Court provided that:

> Under O.C.G.A. § 24-3-52, a non-testifying co-indictee's guilty plea is inadmissible at trial under the theory that it is not competent proof of the defendant's guilt. O.C.G.A. § 24-3-52, however, is inapplicable where, as in this case, the accomplice takes the stand and is subject to cross-examination.

Id. Again, nothing in Barnes supports Petitioner's argument that the evidence of his co-defendant's life sentence was admissible at trial. Barnes supports the idea that a co-defendant's sentence is admissible only if a co-defendant testifies at trial. In this case, Mr. Bunner did not testify at trial. Accordingly, Barnes expressly provides that evidence of Mr. Bunner's life sentence would have been inadmissible at trial.

Overall, nothing Petitioner has offered shows that Mr. Thigpen was ineffective for failing to present evidence that Mr. Bunner received a life sentence. Petitioner has provided general citations that mitigation evidence should be construed broadly and that courts should generally admit mitigation evidence. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65, 57 L. Ed. 2d 973 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"). Although the breadth of mitigation evidence that can be offered during the sentencing phase of a trial is expansive, Petitioner has failed to establish that a co-defendant's sentence is relevant mitigation evidence that a jury should use to consider the defendant's sentence.

Additionally, Petitioner has not established that evidence of Mr. Bunner's sentence would fall under the broad category of mitigation evidence. At trial, it was established that Petitioner was the more culpable defendant. Evidence that Petitioner's less-culpable co-defendant received a life sentence would likely have had little mitigatory effect on a jury's sentencing determination. In light of the fact that evidence of Mr. Bunner's sentence was likely inadmissible at trial and that Petitioner has failed to establish that the evidence of Mr. Bunner's sentence constitutes mitigation evidence, Petitioner is unable to show that Mr. Thigpen was deficient for failing to present this evidence at trial.

As a final note, Petitioner also did not ask Mr. Thigpen about his decision not to admit any evidence of Mr. Bunner's sentence during Petitioner's state habeas proceeding. Because Petitioner has not developed any record to explain whether Mr. Thigpen failed to, or decided not to, admit the evidence of Mr. Bunner's sentence, this Court can only speculate as to whether Mr. Thigpen made a strategic decision not to admit the evidence of Mr. Bunner's life sentence. Mr. Thigpen may have reasoned that informing the jury that Petitioner's less culpable co-defendant only received a life sentence would cause the jury to impose a sentence of death in Petitioner's case. Petitioner

cannot rely on a silent record to argue that his counsel was plainly deficient.

Even if Mr. Thigpen's failure to present the evidence of Mr. Bunner's sentence was deficient, this Court finds that Petitioner has not shown any prejudice arising from Mr. Thigpen's failure to admit evidence of Mr. Bunner's sentence at trial. As an initial matter, when the jury inquired into Mr. Bunner's sentence, the trial court refused to provide the information to the jury and provided that the

> jury has no need to know of the current legal status of Allen Bunner, it should have no bearing on your verdict in this case, and you should give no consideration or speculation whatsoever as to what his legal status is or is not. You should decide the case against this defendant, Ashley Jones, based upon the evidence and the law which I have given you in charge . . .

(Doc. 98, Attach. 4 at 153-54.) Accordingly, even if Mr. Thigpen had attempted to offer Mr. Bunner's sentence as evidence, there is no indication that the trial court would have admitted the evidence.

Additionally, as mentioned above, Petitioner has failed to establish that evidence of Mr. Bunner's life sentence would have provided mitigation evidence that would have likely affected at least one juror not to vote for death. The evidence presented at Petitioner's trial showed that he was the perpetrator who first struck the victim with a sledgehammer and then stopped driving

the victim's stolen vehicle to strike the victim again. Petitioner has failed to establish that the jury would not have viewed Mr. Bunner's life sentence as an indication that Petitioner, the more culpable defendant, should receive a sentence of death.

### 5. Trial counsel's failure to admit evidence or Mr. Bunner's hypothetical confession

Next, Petitioner asserts that his trial counsel was ineffective for failing to properly admit evidence of a hypothetical statement made by his co-defendant in which Mr. Bunner purported that he was the driver of the truck on the night of the murder. (Doc. 138 at 158.) The statement at issue occurred when Mr. Bunner agreed to answer hypothetical questions posed by law enforcement. (Doc. 96, Attach. 1 at 299.) During the interview, law enforcement asked hypothetical questions and Mr. Bunner's attorney provided answers to the questions after conferring with Mr. Bunner. (Id.) During the course of this interview, it was reported that Mr. Bunner "was the driver of the vehicle as it was driven away from Mr. Holland's residence after the incident occurred at Mr. Holland's residence on Braganza Loop." (Id.) Now, Petitioner highlights that this statement was important evidence because it was established at trial that the driver of the truck initially struck the victim with a sledgehammer and then stopped the vehicle after beginning

to drive away to hit the victim again. Petitioner asserts that Mr. Thigpen was ineffective for failing to present this statement to the jury and argues that this statement was central to Mr. Thigpen's defense that Petitioner was not the most culpable defendant in this case.

Initially, Petitioner raised this claim during the state habeas proceeding and the state habeas court found that Petitioner had failed to show that Mr. Thigpen was ineffective for failing to present the evidence at trial. (Doc. 103, Attach. 1 at 65-67.) The state court reasoned that the statement was unreliable under Green v. Georgia, 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979). The state court found that the statement in this case was unreliable because it was (1) based on hypothetical questions, (2) in direct contrast to Mr. Bunner's other statements made to police, and (3) not corroborated by any other evidence. (Doc. 103, Attach. 1 at 65-67.) The state court noted that the statement was so unreliable that even the government did not use the statement during Mr. Bunner's own trial. (Id.) Finally, the state court reasoned that Petitioner could not show any prejudice by Mr. Thigpen's decision not to introduce the statement in light of the eyewitness testimony that identified Petitioner as the driver of the truck and Mr. Bunner's other statements which consistently stated that Petitioner was the driver of the vehicle. (Id.)

After careful review, the Court finds that the state court opinion is entitled to deference. In Sears v. Upton, 561 U.S. 945, 951 n.6, 130 S. Ct. 3259, 3264 n.6, 177 L. Ed. 2d 1025 (2010), the United States Supreme Court held that "we have recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." In Green v. Georgia, 442 U.S. 95, 97, 99 S. Ct. 2150, 2150, 60 L. Ed. 2d 738 (1979), the Supreme Court considered a variety of factors in assessing the reliability of the statement made by the co-defendant in that case. These factors included (1) the context in which the statement was made, (2) the evidence corroborating the statement, (3) the fact that the state had relied on the statement in the co-defendant's trial, and (4) the co-defendant's motive for making the statement. (Id.)

In this case, Petitioner has not shown that the state court unreasonably reviewed the statement made by Mr. Bunner's attorney in this case. Mr. Bunner's statement was not corroborated by any other evidence presented at trial and directly contradicted his other statements made to police. Moreover, the statement was given by his attorney in response to hypothetical questioning. Although fair-minded jurists could disagree with the state habeas court's conclusions that the testimony was unreliable, this Court does not find that the

state habeas court's ruling was contrary to law, an unreasonable application of federal law or based on an unreasonable finding of fact. Other than providing a conclusory assertion that Mr. Bunner's statement would have been reliable at trial, Petitioner has failed to convince this Court that the state court erred in reaching its conclusion. Because the statement was unreliable and likely inadmissible at trial, Mr. Thigpen cannot be found ineffective for failing to admit the statement during the trial.

Additionally, this Court agrees with the state court's assessment that Petitioner cannot show any prejudice arising from his trial attorney's failure to admit the statement at trial. If Mr. Bunner had testified at trial, it is most likely, as the state court found, that Mr. Bunner would have testified that he was not the driver of the truck in an attempt to minimize his role in the underlying crime. Moreover, all of Mr. Bunner's other statements made to police provided that Petitioner was the driver of the truck and used a sledgehammer to hit the victim. Placing this evidence squarely in front of the jury, even assuming that Mr. Bunner's statement made under hypothetical questioning was admitted at trial, would likely have had little effect on the jury. The impact of this statement must be considered in light of the eyewitness testimony that identified Petitioner as the driver of the vehicle. Given that one statement made by his co-defendant made under suspect

conditions would have likely had little impact on the jury's determination in this case, the Court agrees with the state court that Petitioner is unable to establish any prejudice in this case.

### 6. Trial Counsel's failure to present evidence of Mr. Bunner's violent history

Petitioner also asserts that Mr. Thigpen was ineffective for failing to investigate or present evidence of Mr. Bunner's history of violence. (Doc. 138 at 165.) First, Petitioner contends that Mr. Thigpen should have presented evidence of Mr. Bunner's criminal history, which includes a charge from a 1991 arrest for underage drinking and reckless conduct after Mr. Bunner shot a gun out of a car, an incident in which Mr. Bunner damaged another's car while intoxicated by using a pipe to smash the car's windshield, and two charges for driving under the influence. (Doc. 100, Attach. 3 at 127-47.) Additionally, Petitioner relies on several affidavits provided by different people who knew Mr. Bunner that claim that Mr. Bunner had a reputation for violence. (Doc. 99, Attach. 12 at 51-52, 183-87.) The affidavits detail several incidents in which Mr. Bunner was involved in fights or seriously injured others. (Id.) Some of the witness affidavits purport that they heard Mr. Bunner say that he wanted to kill someone on the night of the murder. (Id. at 186-87.)

On review, the state court rejected Petitioner's claim that his trial counsel was ineffective for failing to investigate or present this information at trial for two reasons. (Doc. 103, Attach. 1 at 61-65.) First, the state court found that the information offered in the affidavits was contradicted by the record in this case and unreliable. (Id.) The state habeas court reviewed the information in the affidavits and found that the information directly contradicted testimony offered by the same witnesses during Mr. Bunner's trial, Petitioner's trial, or statements given to police. (Id.) Additionally, the state habeas court found that any evidence of Mr. Bunner's propensity for violence was grossly outweighed by evidence presented to the jury of Petitioner's propensity for violence. (Id. at 63.)

After careful review, this Court agrees with the findings of the state court. First, the state court properly questioned the reliability of the affidavits that directly contradicted testimony provided by the same witnesses at Mr. Bunner's trial. The affidavits, provided several years after Petitioner's trial, either contained new information that was not offered at any earlier time or was contradicted by the witnesses' own prior statements.

Additionally, the Court agrees with the state court finding that the failure of his attorney to present the evidence cited by Petitioner with respect to Mr. Bunner's violent propensity

did not result in any prejudice to Petitioner. At trial, the jury heard evidence of Petitioner's violent nature, including incidents that had occurred while incarcerated awaiting trial. Given the totality of the evidence related to Petitioner's violent nature and the facts of this case where Petitioner was identified by eye witnesses as the defendant who hit the victim with a sledgehammer, Petitioner has failed to show that any evidence of Mr. Bunner's violent history would have impacted the jury's determination in this case. Given the direct evidence of Petitioner's violent nature, Petitioner is unable to show that any evidence of Mr. Bunner's violent nature would have changed the outcome in this case. Accordingly, Petitioner was not prejudiced by Mr. Thigpen's alleged failure to present evidence of Mr. Bunner's propensity for violence.

## 7. Trial counsel's failure to object to the prosecutor's improper sentencing phase summation

Petitioner contends that Mr. Thigpen was ineffective for failing to object to certain statements made by the prosecution during their argument at the close of sentencing. (Doc. 138 at 170.) Petitioner alleges that these statements included (1) improper references to Petitioner as evil, (2) attempts to request the death penalty as an obligation to the victim's family or the state of Georgia, (3) unfair comments on Petitioner's decision to exercise his rights, and (4)

72

misstatements about Petitioner's age. (Id. at 170-82.) The Court will consider each of Petitioner's arguments in turn.

a. Prosecution's references to Petitioner as evil

First, Petitioner asserts that Mr. Thigpen should have objected to the prosecution's characterization of Petitioner as "evil" throughout his summation. (Doc. 138 at 170-78.) Petitioner argues that the prosecution improperly referenced to Petitioner as evil and "alluded to the battle between 'good' and evil.' " (Id. at 174.) Petitioner alleges that the characterization of Petitioner as evil constituted an impermissible biblical reference that was "highly improper and rendered the sentencing phase fundamentally unfair." (Id. at 175.)

After careful review, the Court finds that the prosecution's statement were not an improper use of a biblical reference to persuade the jury to vote for a sentence of death. While the state certainly referred to Petitioner as evil and referenced his background in the church, the prosecution never made an appeal to the jury to determine Petitioner's sentence based on the teachings of the bible or any higher authority. See Romine v. Head, 253 F.3d 1349, 1366 (11th Cir. 2001) (finding that a prosecutor improperly used scripture "to persuade the jury in this case: that mercy was out of the question for anyone who murdered his parents; that under the law of God death is the

mandatory penalty for patricide"). In this Court's view, the state's use of the word "evil" and discussion of Petitioner's religious background, which was presented as evidence during sentencing, is not enough to warrant a finding that the prosecution's statements were improper. Because this Court does not agree that the prosecution improperly made a biblical reference or improperly referred to Petitioner as evil, the Court does not find that Mr. Thigpen was ineffective for failing to object to the references. Additionally, the Court finds that Petitioner was not prejudiced by any failure of Mr. Thigpen to object to the references of the word "evil" by the prosecution.

### b. Prosecution's statement that no one would be safe unless the Petitioner was sentenced to death

Next, Petitioner argues that the state improperly argued that society would only be safe if Petitioner was given the death sentence. (Doc. 138 at 176-78.) Petitioner cites the portion of the prosecution's summation in which the prosecution provided that "[n]o one will be safe unless you issue the proper punishment in this case of death. Only the death penalty can put this terror to a stop, to an end. He must be stopped, and a life sentence will not and cannot do it." (Doc. 98, Attach. 5 at 160.)

After careful review, the Court finds that the prosecution's statement with regard to using the death penalty

to protect the community was not improper when viewed in context of the entire summation provided by the prosecution. In his summation, the prosecution was discussing the risk Petitioner posed to society in light of Petitioner's escape attempt from the Ware County Jail while awaiting trial. (Id. ("He has shown his future dangerousness in his ability and willingness to escape from jail.").) In this Court's view, it is not improper for the prosecution to argue that the jury should consider the threat posed by the particular defendant when determining the appropriate sentence.

Moreover, the prosecution's statements, when viewed in context, are materially distinguishable from the authority relied on by Petitioner. In Bates v. Bell, 402 F.3d 635, 648 (6th Cir. 2005), the Sixth Circuit Court of Appeals found that the prosecutor made improper statements to the jury when "[t]he jury was told they would be accomplices to the crime unless they executed him. The prosecutors made it a theme of their summation that the jury's failure to sentence [the defendant] to death would be akin to ordering the execution of [the defendant's] next victim. Voting for a life sentence . . . was equivalent to putting a gun in his hand." Moreover, in Wallace v. Kemp, 581 F. Supp. 1471, 1481-81 (M.D. Ga. 1984), a district court in the Middle District of Georgia found a prosecutor's argument to be improper when the prosecutor argued that the jury should

consider the effect that their sentence would have on police officers attempting to enforce crime in the community. The district court held that "the adverse effect that a recommendation of mercy (as opposed to death) will have on third parties, such as prison guards, youthful offenders incarcerated with the defendant, or the citizenry at large in the event of parole or escape, is an improper argument in a death penalty case." Id. at 1481.

Unlike the overly impassioned plea in Bates or the reference to the more general effect on society in Wallace, the statement made by the prosecution in this case was directly aimed at the particular threat to the community posed by Petitioner. In Wallace, the district court even noted that a proper argument would focus on the "characteristics of the defendant himself or the circumstances of his crime." Id. at 1482. Here, the prosecution did not base its argument on any abstract speculation or assert that Petitioner would affect crime more generally in the community. Instead, the prosecution argued that, based on Petitioner's escape attempt, the potential existed that he could escape and pose a risk to the community in the future. This is not an improper argument. Because the Court finds that the statement was not improper, the Court also finds that Mr. Thigpen was not deficient for failing to object to the

statement. Additionally, there was no resulting prejudice for Mr. Thigpen's failure to object to the statement.

c. <u>Prosecution's reference to Petitioner's age</u>

Next, Petitioner argues that Mr. Thigpen should have objected to the prosecution's repeated misrepresentations as to Petitioner's age. (Doc. 138 at 181-83.) Here, Petitioner cites that the prosecution told the jury that Petitioner was "free and 21" at the time of the crime and that it was "beyond belief that a man 21 years of age, or whatever he was at the time" would have done such a crime. (Doc. 98, Attach. 5 at 149, 158.) Petitioner asserts that this error deprived Petitioner the right to have the jury properly consider the inherently mitigating nature of the fact that he was 19 at the time of the crime. (Doc. 138 at 181.) Accordingly, he contends that his attorney should have objected to the statements at trial. (<u>Id.</u>)

Although the prosecution was incorrect when it stated that Petitioner was 21 years old at the time of the crime, this Court is unconvinced that Petitioner has shown that this error impacted the outcome of his trial or that Mr. Thigpen was plainly deficient for failing to object to the statement. In support of his argument, Petitioner cites to a variety of case law that establishes that youth is an inherently mitigating factor for the jury's consideration. See <u>Roper v. Simmons</u>, 543 U.S. 551, 568, 125 S. Ct. 1183, 1193, 161 L. Ed. 2d 1 (2004)

(holding that a 17-year-old defendant could not be given the death penalty); Miller v. Alabama, 567 U.S. 460, 476, 132 S. Ct. 2455, 2467, 183 L. Ed. 2d 407 (2012) (holding that a 14-year-old defendant could not be awarded a mandatory life sentence). Notably, each of the cases cited by Petitioner consider facts in which a defendant is below the age of 18. Petitioner has not provided any support for the argument that the fact that a defendant is 19 during the commission of the crime is a mitigating factor that must be considered by the jury.

In this Court's view, the misstatement by the prosecution is unlikely to have had an impact on the jury's determination of the facts in this case. Although Petitioner was 19 years old at the time of the murder, and not 21 years old, Petitioner has not shown that there is a material difference between the two ages. Both are considered to be above the age of majority. See Roper, 543 U.S. at 569, 125 S. Ct. at 1195 (discussing the "differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders"). In addition, the misstatement by the prosecutor likely had a minimal effect on the jury because the jury heard evidence of Petitioner's age throughout the trial and was able to consider the fact that Petitioner was 19 years old at the time he committed the underlying crime in this case. Because this Court finds that the error made by the prosecution likely

had a minimal effect on the jury's determination, this Court does not find that Mr. Thigpen was plainly incompetent for failing to object to the statement. In addition, the Court finds that Petitioner was not prejudiced by his counsel's failure to object to the statements.

### d. Prosecution's statements referring to the victim's family and the community

Petitioner also alleges that Mr. Thigpen was deficient because he failed to object to what Petitioner contends was the prosecution's "efforts to align his desire for a death sentence with the wishes of the victim's family and the citizens of Georgia." (Doc. 138 at 170.) Petitioner asserts that the prosecution improperly asked the jury to seek the death penalty in this case as an obligation to the citizens of the state of Georgia and the victim's family. (Id.) The two statements that Petitioner specifically challenges include the prosecution's statement that "[t]he State of Georgia and the family of the victim are confident that you have the wisdom, the courage, the strength and the desire to impose the proper punishment in this case to see that justice is finally done and that the proper punishment is imposed" and the statement that "I leave the verdict, and I leave the peace of mind of the family of the victim, to you, and I pray and hope that it is in good hands." (Doc. 98, Attach. 5 at 143-44, 162.) Based on these improper

requests to the jury, Petitioner asserts that Mr. Thigpen should have objected at trial and prevented the prosecution for making these statements during his closing argument. (Doc. 138 at 171-72.) After careful consideration, the Court finds that Mr. Thigpen was not ineffective for failing to object to the statements made by the state.

First, Petitioner has not offered any controlling authority by which this Court can find that Mr. Thigpen was plainly deficient. Instead, Petitioner relies on a variety of cases, many from other jurisdictions, which are materially distinguishable from this case. For example, Petitioner cites Bosse v. Oklahoma, ___ U.S. ___, 137 S. Ct. 1, 1 (2016), for the proposition "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." While this Court recognizes the authority of Bosse, the decision in Bosse considered whether it was permissible to ask the victim's relatives to recommend a sentence to the jury. Id. This is clearly not the factual scenario currently before this Court.

As more closely related authority, Petitioner cites to United States v. Johnson, 713 F. Supp. 2d 595 (E.D. La. 2010). In Johnson, a district court in Eastern District of Louisiana found that the government made an improper appeal to passion

when the government argued that the victims "all wait for you to give them some justice. The citizens of this parish and surrounding parishes look to you for justice. Justice can only be had, only be had, by imposing the death sentence." Id. at 635. The district court concluded that these arguments were improper. Id. Similarly, in Whittington v. Estelle, 704 F.2d 1418, 1423 (5th Cir. 1983), the Fifth Circuit Court of Appeals condemned a prosecutor from making statements during his closing argument which instructed the jury to consider that they "would be required to explain their verdict to their friends and neighbors and that the jury would want to render a verdict of which they could be proud." Id. While the Fifth Circuit was clear not to approve of the statements made by the prosecutor, the court ultimately held that the statements were not an improper plea for conviction based on community expectations. Id. Instead, the court held that these statements were not improper because they did not mandate that the jury vote for a certain conviction based on community expectations. Id.

In this case, the Court finds that the statements offered by the prosecution in this case are materially distinguishable from the statements offered in Johnson and are more akin to the statements offered in Whittington. In this case, the prosecution did not make any direct statement to the jury that suggested that the jury must award a sentence of death because the victims

or the community demanded such a result. (See Doc. 98, Attach. 5 at 143-44, 162.) Instead, this Court finds that prosecution invoked the victim's family and community as a means to imply that the jury must seriously consider their role as jury members to properly assess the appropriate sentence in this case. In this Court's view, the prosecution's statement did not improperly ask the jury to award a death sentence because the community or the victim's family expected it.

Because the Court finds that the prosecution's statements were not plainly a call to the jury to sentence Petitioner to death because it was mandated by the victim's family's or the community's expectations, this Court cannot find that Mr. Thigpen was deficient because he failed to object to the statements offered at trial. In addition, this Court finds that any such objection would not have had a significant impact at trial. Accordingly, the Court finds that there is no prejudice.

### e. Prosecution's statement that Petitioner should be punished because he exercised his rights

Finally, Petitioner contends that Mr. Thigpen was ineffective at trial for failing to object when the prosecution made an impermissible argument during its closing argument by comparing the rights afforded to Petitioner at trial and the relative lack of rights afforded to the victim on the night of the crime. (Doc. 138 at 151.) Petitioner contends that it

was "grossly improper" for the prosecutor to "urge[] the jury to punish Mr. Jones for the exercise of his right to trial." (Id.) In support of his argument, Petitioner cites a variety of cases which have found similar arguments to be improper. See Goodin v. State, 787 So. 2d 639, 652-53 (Miss. 2001); Brown v. State, 11 So. 3d 866, 918-19 (Ala. Crim. App. 2007); State v. Johnson, 360 S.E.2d 317, 324 (S.C. 1987).

Despite Petitioner's argument, however, this Court does not find that Mr. Thigpen was plainly deficient for failing to object to the prosecution's arguments based on the rights Petitioner asserted at trial. First, Petitioner has failed to cite any controlling authority which finds that a prosecutor's argument addressing the relative rights of the defendant and the victim is improper. Most importantly, most of the cases cited by Petitioner actually did not find that the improper statements made by the prosecution constituted reversible error. See Goodin, 787 So, 2d at 652-53; Brown, 11 So. 3d at 918-19. Instead, the cases cited by Petitioner each found that the prosecution's statement, while an error, did not constitute a plain error. Goodin, 787 So, 2d at 652-53; Brown, 11 So. 3d at 918-19.

In Johnson, the Supreme Court of South Carolina found that the state solicitor errored by making an improper reference to the defendant's testimony at trial. 360 S.E.2d at 324. In that

case, the defendant testified that he did not remember shooting the victim, but that he was sorry if he had shot the victim. Id. At closing, the solicitor cited the defendant's testimony and argued that the jury should consider that fact that defendant failed to apologize in his testimony. Id. On review, the Supreme Court of South Carolina found that the argument by the prosecution was an impermissible comment on the defendant's right to plead not guilty. Id. The court found that "it would be an irreconcilable equivocation for the accused to plead not guilty, present a defense, and simultaneously express remorse for his acts he denied committing." Id.

In contrast to the facts in Johnson, the prosecution in this case did not argue that the jury should draw any adverse inference from the Petitioner's decision to exercise his right to a trial. Instead, the prosecution in Petitioner's case listed the rights that were afforded to Petitioner and argued that the victim did not have any similar protections on the night of the murder. (Doc. 98, Attach. 5 at 151.) This argument, unlike the argument in Johnson, does not ask the jury to draw an inference that Petitioner should be sentenced to death because he exercised his rights. Instead, the inference was directed at highlighting the heinous nature of the crime.

Because the Court finds that the argument in this case did not ask the jury to punish Petitioner because he exercised his

rights to a jury trial and there is no controlling authority which finds that an argument comparing the relative rights of the victim and the defendant is a reversible error, this Court finds that Mr. Thigpen was not deficient for failing to object to the prosecution's statements. Even if Mr. Thigpen were deficient in failing to object to the closing argument, this Court remains unconvinced that Petitioner was prejudiced by Mr. Thigpen's decision not to object to the statements made by the prosecution in this case. In this Court's view, the relatively minimal risk of harm caused by the prosecution's statement does not significantly impact the aggravating nature of the evidence presented to the jury in this case.

### 8. Trial counsel's failure to make an adequate closing statement

Petitioner contends that his attorney failed to make an appropriate closing statement. (Doc. 138 at 183.) Petitioner complains that Mr. Thigpen's closing statement was a quarter of the length of the statement offered by the prosecution and "did virtually nothing to persuade the jurors to consider a life sentence." (Id.) After careful review, the Court disagrees.

It is well established that closing arguments are a critical component of any capital sentencing process. Lawhorn v. Allen, 519 F.3d 1272, 1296 (11th Cir. 2008) ("Because one of the most important functions of the capital sentencing process is

the opportunity to humanize the defendant, the importance of the defense's closing argument cannot, therefore, be overstated."). An attorney can be found to be ineffective for failing "to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." Id.

In this case, the Court finds that Mr. Thigpen did not make an improper closing argument at Petitioner's trial. As an initial matter, the length of Mr. Thigpen's statement does not necessarily show that Mr. Thigpen failed to make a proper argument to the jury during his closing statements. Moreover, the record shows that Mr. Thigpen used his closing statement in an attempt to stress the impact of a death sentence and to make a plea for mercy from the jury. (Doc. 98, Attach. 5 at 160-66 ("Yeah, I'll beg you for his life.").) Additionally, Mr. Thigpen targeted his argument at stressing the psychological impact that awarding a sentence of death may have on the individual jury members. (Id. at 166 ("Legal killing is something you'll have to deal with psychologically from now on. Make peace with your God, and let Ashley Jones live.").)

In this Court's view, Mr. Thigpen's performance during his closing argument at Petitioner's sentencing phase did not fall below the standard expected by reasonable, competent counsel.

Mr. Thigpen focused his argument on asking the jury to spare Petitioner's life. Although Mr. Thigpen could have pursued a different strategy in his closing argument, the chosen strategy he selected is not unreasonable. See Kelly, 820 F.2d at 1176. As a result, Petitioner has failed to show that Mr. Thigpen was deficient in his presentation of a closing argument at trial.

In addition, Petitioner has not provided any convincing argument that the jury would have been affected by a different closing argument tactic. Petitioner relies on conclusory allegations that if Mr. Thigpen had used his closing argument to focus on other mitigation evidence or Petitioner's co-defendant's role in the underlying crime that a jury may have reached a different outcome in this case. Given the weak mitigation evidence that Mr. Thigpen could have presented to the jury or the conflicting evidence of Petitioner's co-defendant's role in the underlying crime, there is no indication that either of the strategies would have been more persuasive than Mr. Thigpen's chosen strategy to ask for mercy. Petitioner has failed to show that he was prejudiced by Mr. Thigpen's closing argument. Petitioner's claim fails.

### 9. Trial counsel's failure to properly cross examine Sally Kimbrel

Petitioner also contends that Mr. Thigpen was ineffective for failing to properly cross examine Ms. Kimbrell at trial.

(Doc. 138 at 156.) Petitioner asserts that Mr. Thigpen failed to impeach Ms. Kimbrell with inconsistencies in prior statements she provided to the police. (Id. at 156-158.) Petitioner contends that this evidence would have undermined Ms. Kimbrell's credibility and raised doubt in the mind of the jury as to whether Petitioner was the more culpable defendant in this case. (Id.)

During the state habeas proceeding, Petitioner asserted his claim that Mr. Thigpen was ineffective for failing to properly cross examine Ms. Kimbrell (Doc. 99, Attach. 9 at 30), but the state habeas court did not reach the merits of the issue in its final order. Rather, the state habeas court only discussed Petitioner's claim that Mr. Thigpen failed to properly cross examine Ms. Kimbrell in the context of Petitioner's argument that Mr. Thigpen's ability to cross examine Ms. Kimbrell was compromised by a conflict of interest. (Doc. 130, Attach. 1 at 11-13.) Because the state habeas court never reached the merits of Petitioner's ineffective assistance of counsel claim based on Mr. Thigpen's cross examination of Ms. Kimbrell, this Court must review this claim de novo. See Cone v. Bell, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784, 173 L. Ed 2d 701 (2009) (finding that a claim must be reviewed de novo after the state court failed to reach the merits of the claim). After careful review, the Court finds that Petitioner is unable to show that Mr. Thigpen's

failure to cross examine Ms. Kimbrell in a different way constituted ineffective assistance of counsel.

First, Petitioner has failed to show that alleged errors in Mr. Thigpen's cross examination of Ms. Kimbrell were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 667, 104 S. Ct. at 2064. The record in this case shows that Mr. Thigpen conducted a cross examination in which he questioned Ms. Kimbrell on her vague physical descriptions of the defendants, her inability to remember the clothing of either defendant, her brief opportunity to observe the crime, and the fact that it was dark outside when the crime was committed. (Doc. 98, Attach. 2 at 44-56.) Moreover, Mr. Thigpen even read to the jury a prior statement given by Ms. Kimbrell which highlighted certain minor inconsistencies within Ms. Kimbrell's testimony at trial. (Id. at 36-42.)

In this Court's view, Mr. Kimbrell conducted an adequate cross examination of Ms. Kimbrell. Although Mr. Thigpen could have attempted to undermine the credibility of Ms. Kimbrell through the use of different techniques, the cross examination in this case was not deficient. Mr. Thigpen attempted to undermine the credibility of Ms. Kimbrell and her identification of Petitioner as the more culpable defendant through the

admission of her prior statement and attempted to establish that Ms. Kimbrell's descriptions were vague and unreliable.

In addition, the Court finds that Petitioner has not shown any prejudice arising from Mr. Thigpen's failure to cross examine Ms. Kimbrell by highlighting minor inconsistencies within her prior statements. First, Petitioner has never contested that he was involved in the murder in this case. Even if Mr. Thigpen had highlighted minor inconsistencies within Ms. Kimbrell's prior statements, the jury was still free to consider Petitioner's role in the crime and find that a sentence of death was appropriate given the heinous nature of the underlying crime. In addition, Ms. Kimbrell was not the only eyewitness to testify that Petitioner was the driver of the truck, initiated the act of beating the victim, and stopped the truck to return to strike the victim. The testimony of Donald Holland and Johnny Hickox each provided testimony which corroborated different portions of Ms. Kimbrell's testimony. (Doc. 98, Attach. 1 at 95-103, 115-24.) Moreover, the testimony of Mamie Holland, another eyewitness, corroborated Ms. Kimbrell's testimony that Petitioner was the driver of the truck and struck the victim with the sledgehammer. (Id. at 69-90.) Given the abundance of other corroborating evidence, the Court is unable to find that Mr. Thigpen's failure to highlight minor inconsistences within Ms. Kimbrell's testimony and prior statements would have

impacted the outcome of trial. Accordingly, the Court finds that there is no prejudice.

### 10. Trial counsel's failure to properly litigate motion for change of venue

Next, Petitioner asserts that his trial counsel was ineffective for failing "to properly litigate his motion to change venue." (Doc. 138 at 186.) Petitioner asserts that his attorney "dropped the ball [by] failing to question numerous prospective jurors about their exposure to pretrial publicity and gossip about the case and failing, ever, to make a record of the prejudicial nature of the pretrial publicity jurors in Coffee County had been exposed to." (Id. at 187.) This Court does not agree.

Prior to Petitioner's trial, Mr. Thigpen filed numerous motions related the issue of venue. First, Mr. Thigpen filed a Motion for Funds for Community Opinion and Prejudice Survey to determine the extent of prejudice in Ware County. (Doc. 103, Attach. 1 at 30-31.) Additionally, Mr. Thigpen filed a Motion for Change of Venue. (Doc. 96, Attach. 1 at 86.) Eventually, Mr. Thigpen agreed to transfer Petitioner's case to Coffee County, Georgia. (Doc. 100, Attach. 1 at 65-66.) Mr. Thigpen testified during the state habeas proceeding that he agreed to transfer the case to Coffee County after he learned that Coffee County had not given the death penalty in 40-50 years. (Id. at 66-67.)

After voir dire began in Coffee County and it was learned that jurors in the first panel had discussed the facts of the case and Petitioner's guilt, Mr. Thigpen moved for a second change of venue. (Doc. 97, Attach. 5 at 142-43.) The trial court eventually denied Mr. Thigpen's request. (Id.)

On review at the state habeas proceeding, Petitioner argued that Mr. Thigpen failed to properly litigate his motion for a change of venue. The state habeas court found that Petitioner failed to establish that Mr. Thigpen was ineffective in his attempts to get a new venue in this case. (Doc. 103, Attach. 1 at 30-31.) The state habeas court assessed Mr. Thigpen's testimony and found that Mr. Thigpen made a reasonable decision to agree to try Petitioner's case in Coffee County because Coffee County had not awarded a death sentence in 40-50 years. (Id.) Moreover, the state habeas court found that Petitioner had not even offered any evidence to show that Coffee County was an improper venue (Id. at 31 (discussing that mere proximity to Ware County does not establish that the trial was inherently prejudicial and that Petitioner had not offered any evidence of a high percentage of jurors who had previously formed opinions about the case).) Because Petitioner did not establish that Coffee County was an improper venue, the state court concluded that there was no prejudice resulting from Mr. Thigpen's alleged failure to litigate a meritless motion to change venue. (Id.)

After careful review, this Court finds that the state court's ruling was not contrary to, or an unreasonable application of federal law, or based on an unreasonable determination of fact. The record plainly shows that Mr. Thigpen initially moved for a change of venue to escape the likely prejudice that existed in Ware County, made a strategic decision to agree to move Petitioner's trial to Coffee County and then again moved for a new venue after discovering that jurors had been discussing the case during voir dire. In this Court's view, Petitioner has failed to show that Mr. Thigpen's actions were deficient as defined in Strickland. 466 U.S. at 690, 104 S. Ct. at 2066, see also Kelly, 820 F.2d at 1176 ("Strategic decisions will amount to ineffective assistance only if so patently unreasonable that no competent attorney would have chosen them."). Mr. Thigpen took reasonable steps to ensure that Petitioner received a fair and impartial jury by twice requesting that the venue in this case should be moved to avoid prejudicial pretrial publicity and gossip. Simply because, as Petitioner argues, Mr. Thigpen may have presented different evidence in litigating his motion to change venue, does not show that Mr. Thigpen's representation fell below the acceptable standard of counsel guaranteed by the Sixth Amendment. Most importantly, Petitioner has failed to show that the state court's findings do not warrant deference.

Additionally, this Court agrees with the state court's findings that Petitioner has failed to show any prejudice resulting from Mr. Thigpen's alleged failure to properly argue his motions for a change of venue. As this Court has more fully explained below, this Court finds that Petitioner has failed to establish that Coffee County was an improper venue in this case. Because this Court finds that the trial court did not err in denying Petitioner's request to move his case to a new venue, Petitioner was not prejudiced by Mr. Thigpen's efforts to litigate a motion for a change of venue.

## 11. Trial counsel's failure to conduct adequate voir dire of prospective jurors

Petitioner next asserts that he was denied his right to effective assistance of counsel at trial by his counsel's failure to conduct "adequate" voir dire. (Doc. 138 at 187.) In this claim, Petitioner complains that his trial counsel "utterly abandoned his obligation to adequately voir dire prospective jurors to ensure the selection of an impartial jury." (Id. at 188.) In support of his argument, Petitioner cites that Mr. Thigpen failed to question 24 of 89 prospective jurors and that 8 of those 24 jurors ended up on the final jury panel. (Id. at 188-89.) Petitioner asserts that Mr. Thigpen's failure to ask these jurors questions was "patently unreasonable" given Mr. Thigpen's knowledge of the discussions between juror members in

the first jury panel on the first day of trial and the pretrial publicity surrounding the trial. (Id. at 189.) Petitioner also contends that Mr. Thigpen should have asked questions of prospective jurors because the trial court's questioning of the jury members was "generic and perfunctory." (Id.)

Even when Mr. Thigpen did ask questions of prospective jurors, Petitioner argues that Mr. Thigpen failed to appropriately ask about the juror's pretrial exposure or bias. (Id. at 191-193.) For example, Petitioner criticizes Mr. Thigpen for his questioning of juror Ann Sheppard. (Id. at 191 n.77.) Petitioner cites that in responding to the trial court's questioning Ms. Sheppard reported that she heard some prospective jurors discussing the case on the first day of jury selection. (Id.) Petitioner contends that Mr. Thigpen failed to ask appropriate follow-up questions to inquire more about the discussions that Ms. Sheppard heard. (Id.) Additionally, Petitioner questions Mr. Thigpen's questioning of juror Ralph Gourley. (Id. at 192-93.) Here, Petitioner criticizes Mr. Thigpen for "having a friendly and casual discussion about their shared experience of sitting in the electric chair at Reidsville prison," instead of more thoroughly questioning Mr. Gourley about his experience as a prison guard. (Id. at 193.)

Petitioner initially raised this claim in his original state habeas petition. (Doc. 99, Attach. 9 at 29.) However, the

state habeas court never squarely adjudicated Petitioner's claim on the merits. (See Doc. 103, Attach. 1.) Accordingly, this Court must conduct a de novo review of Petitioner's claim. Cone, 556 U.S. at 472, 129 S. Ct. at 1784.

From this Court's own review of Petitioner's claim, however, this Court finds that Mr. Thigpen was not ineffective in his questioning, or lack thereof, of prospective jurors in this case. On this point, it is well settled that "part of a guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S 719, 729, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492 (1992) (citing Dennis v. United States, 339 U.S. 162, 171-72, 70 S. Ct. 519, 523-24, 94 L. Ed. 734 (1950)). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S. Ct. 1629, 1634, 68 L. Ed. 2d 22 (1981).

In this case, the Court finds that the questions asked by the trial court, Petitioner's attorney, and the government were sufficient to identify an impartial jury. The record shows that the trial court asked prospective jurors a series of questions about their prior knowledge of the case, any bias they may have had, and whether they could fairly consider awarding a death

sentence or a sentence of life in prison. Despite Petitioner's argument that this questioning was "perfunctory," the trial court's questions were designed to elicit any jurors who had improperly formed opinions about the case. (Doc. 97, Attach. 5 at 64-65.) This line of questioning allowed the trial court to discern whether certain jurors should be struck for cause and whether the parties would need to ask any follow-up questions to the prospective juror. Other than offering conclusory assessments that the trial court's questioning was insufficient, Petitioner has not offered any convincing argument that the questioning of the jurors in this case was insufficient.[6]

Also, this Court finds that Mr. Thigpen was not deficient simply because he did not ask any questions of 24 jurors during voir dire. In light of the questions asked by the trial judge and the government, there is no showing that Mr. Thigpen was required to, or even needed to, ask any additional questions in order to be able to assess each juror's relevant bias or views. On this point, the Court notes that Petitioner has not developed any record to support his claim. During the state habeas proceeding, Petitioner never asked Mr. Thigpen about his decisions not to question certain jurors or whether he had any strategy during the voir dire process. Given that Mr. Thigpen

---

[6] To the extent that Petitioner attempts to raise an independent claim based on the trial court's questioning during the voir dire process, the Court finds this argument to be meritless.

may have had valid reasons for not questioning some of the prospective juror members and this Court cannot make assumptions from a silent record, Petitioner cannot rely on his conclusory assertion that Mr. Thigpen was ineffective simply because he did not ask individual questions to some prospective jury members.

Additionally, the Court finds that Mr. Thigpen's actual questioning of different jurors was not deficient. Again, Petitioner has not offered any evidence as to why Mr. Thigpen selected to ask certain jurors different questions and this Court can only speculate as to why Mr. Thigpen pursued various lines of questioning. Moreover, the Court finds that the record does not support Petitioner's arguments that his questioning of certain jurors was ineffective. For example, with juror Ann Sheppard, who mentioned that she heard other jury members discussing the case on the first day of trial, Petitioner has failed to show that Mr. Thigpen needed to ask Ms. Sheppard any follow-up questions about the discussions she overheard. The record plainly shows that the prosecution asked follow-up questions about what Ms. Sheppard overheard on the first day of trial. (Doc. 97, Attach. 6 at 118-23.) Petitioner has not shown that there was a need for Mr. Thigpen to ask Ms. Sheppard any other questions.

Additionally, Petitioner has not shown that Mr. Thigpen's questioning of Juror Ralph Gourley was ineffective. Although

Petitioner criticizes the fact that Mr. Thigpen asked Mr. Gourley questions about his experience sitting on the electric chair in a "friendly and casual" way (Doc. 138 at 193), Mr. Thigpen's questions about the electric chair elicited information from Mr. Gourley about whether he had witnessed any electrocutions and his knowledge of the process. In this Court's view, this information could have been helpful in determining Mr. Gourley's view on the death penalty. Even if Mr. Thigpen's questioning style was casual, there is no showing that Mr. Thigpen's questioning fell below the standard created by Strickland. 466 U.S. at 687, 104 S. Ct. at 2064.

In addition to Petitioner's failure to show that Mr. Thigpen performed deficiently, Petitioner has also not shown any prejudice that could have resulted from Mr. Thigpen's alleged failure to properly question prospective jury members. On this point, the Court is guided by a finding in the state habeas court. Although the state habeas court did not squarely assess the merits of Petitioner's claim that Mr. Thigpen was ineffective for failing to adequately question prospective jurors, the state habeas did review whether Mr. Thigpen was ineffective in failing to strike certain jurors for cause and failing to object to other jurors that were struck for cause. In this analysis, the state court found that Petitioner had failed to establish any prejudice resulting from his attorney's actions

because Petitioner had presented no actual evidence that any juror on the final jury panel "was so biased that he could not properly perform his duties in accordance with the instructions and his oath." (Doc. 103, Attach. 1 at 35.)

In line with the state court's finding, this Court also finds Petitioner has not shown any prejudice resulting from his alleged trial counsel's failure to more properly question prospective jurors in this case. At best, Petitioner has offered conclusory speculation that Petitioner did not receive a fair trial with an impartial jury because his counsel failed to ask jurors additional questions. Given that the trial court asked jury members about their potential bias, knowledge of the case, and ability to award different sentences, Petitioner cannot show that there is any prejudice arising from his counsel's lack of additional questioning. Petitioner has not cited any evidence that any prospective jury member actually had a bias or information about the case that would have been elicited had his counsel asked additional questions. Petitioner cannot rely on pure speculation to establish prejudice and, accordingly, Petitioner's claim fails.

## 12. Trial counsel's failure to strike certain prospective jurors for cause

Next, Petitioner asserts that Mr. Thigpen was ineffective for failing to strike certain prospective jurors for cause

during voir dire. (Doc. 138 at 194.) Here, Petitioner asserts that his counsel should have struck certain jurors because they either had prior knowledge of the case, a health condition which impacted their ability to participate at trial, or prior experiences with violent crime. (Id. at 194-98.) Two of the jurors that Petitioner contends should have been stuck for cause ended up on the final jury in his case. (Doc. 102, Attach. 3 at 68-69.)

Petitioner raised at least some form of this claim in the state habeas court. (Doc. 99, Attach. 9 at 29.) Although Petitioner did not raise his claim with the same level of specificity that he does now, the state habeas court denied Petitioner's claim that Mr. Thigpen was ineffective for failing to strike jurors for their views on the death penalty or their exposure to pretrial publicity. (Doc. 103, Attach. 1 at 34-35.) The state habeas court concluded that there was no evidence that any juror "was so biased that he could not properly perform his duties in accordance with the instruction and his oath." (Id. at 35.)

Again, this Court finds that the state habeas court's ruling is entitled to deference. Petitioner has failed to show that the state habeas court's ruling was based on an unreasonable finding of fact or contrary to, or an unreasonable application of, federal law. Petitioner has simply not offered any authority that Mr. Thigpen was deficient for failing to strike the jurors that Petitioner now claims should have been struck for cause. Instead, Petitioner relies on conclusory assertions that these jurors should have plainly been struck for cause. After a careful review of the record, however, this Court disagrees that these jurors should have been struck for cause or that Mr. Thigpen was ineffective for not requesting that these jurors should have been struck for cause. [7]

For example, Petitioner contends that Mr. Thigpen should have moved to strike prospective juror Johnny Spell for cause. (Doc. 138 at 194.) Petitioner asserts that Mr. Spell should have

---

[7] The Court has thoroughly reviewed all of the prospective jurors cited by Petitioner and finds that Petitioner has failed to establish that Mr. Thigpen was ineffective for failing to strike any of these jurors for cause. Instead of reviewing all of Petitioner's meritless claims in detail, this Court has elected to specifically discuss only a few of the prospective jurors.

been struck for cause because he reported that he knew information about the prior trial involving Mr. Bunner and "conceded that he would not be able to put out of his mind what he learned about the case form the media." (Id. at 195.) In his argument, however, Petitioner fails to note that Mr. Thigpen heavily questioned Mr. Spell with respect to his prior knowledge of the case and Mr. Spell continually affirmed that he would be able to be impartial in the case and make a decision based on the evidence at trial. (See Doc. 97, Attach. 5 at 111-14.) From this record, the Court cannot find that Mr. Thigpen was plainly deficient by not moving to strike Mr. Spell for cause. Instead, the Court finds that it was reasonable for Mr. Thigpen to instead use a preemptory strike to ensure that Mr. Spell was not on the jury. (Doc. 97, Attach. 9 at 159.)

Petitioner also highlights that Mr. Thigpen should have struck juror Kip Griner for cause. (Doc. 138 at 196.) Here, Petitioner contends that Mr. Griner should have been struck for cause because he "disclosed during voir dire that he and his wife has been to the district attorney's office earlier that

week to discuss a foster care matter, and that he heard rumors about the case while sitting in the jury room on the first day of trial." (Id.) Again, this Court is unconvinced by Petitioner's conclusory assertions. First, the Court is unable to find that Mr. Griner should have been immediately struck for cause simply because he met with the district attorney about a completely unrelated matter. Additionally, the Court cannot find that Mr. Thigpen was ineffective for not striking Mr. Griner for cause simply because he heard about the case on the first day of voir dire prior to the trial court's instruction not to discuss the case. The record shows that Mr. Thigpen questioned Mr. Griner about what he heard in the jury room and Mr. Griner affirmed that he would not be affected by what he heard on the first day of voir dire. (Doc. 97, Attach. 8 at 44.) There is no law that prohibits a person from serving on a jury simply because they have prior knowledge of a case. The important consideration is whether that prospective jury member is able to set aside those influences and consider the evidence at trial. Here, Mr. Thigpen inquired about Mr. Griner's knowledge and Mr.

Griner affirmed that he would not be affected by what he heard. Because there is no basis to support that Mr. Griner should have been struck for cause, Mr. Thigpen is not ineffective for failing to move to have Mr. Griner struck for cause.

Finally, Petitioner also asserts that Mr. Thigpen was ineffective for failing to strike several jurors who had been victims of violent crimes. (Doc. 138 at 195-96.) In his briefing, however, Petitioner fails to provide any authority to support his argument that victims of violent crime must be struck for cause. Moreover, there is no obvious basis to support Petitioner's contentions. Jurors are not ineligible to serve on a jury merely because they have been a victim, or know someone who has been a victim, of a crime in an unrelated matter. Without a showing that these jurors should have been struck for cause, Mr. Thigpen did not err by not moving to have these jurors struck for cause.

Not only does the Court find that Mr. Thigpen was not ineffective for failing to strike these jurors, but the Court also finds that Petitioner has failed to establish any prejudice

resulting from Mr. Thigpen's actions. As an initial matter, only two of the prospective jurors that Petitioner complains should have been struck for cause actually ended up on the jury. (Doc. 102, Attach. 3 at 68-69.) Moreover, Petitioner has not developed any record to show that any of the jurors on the jury harbored any bias or knowledge about the case that impacted their ability to fairly consider the evidence in his case. As a result, Petitioner cannot show any prejudice from Mr. Thigpen's failure to strike certain prospective jurors.

### 13. Trial counsel's failure to rehabilitate potential jurors who expressed qualms about imposing the death sentence

Petitioner also alleges that his trial counsel was deficient for failing to attempt to rehabilitate 10 prospective jurors. (Doc. 138 at 198-200.) These jurors were struck for cause because they expressed that they would not be willing to award a death sentence. (Id.) Petitioner initially raised this claim in his state habeas petition. (Doc. 99, Attach. 9 at 29.) However, Petitioner did not fully develop the claim and the state habeas court never ruled on Petitioner's claim.

Regardless, Petitioner has failed to establish that Mr. Thigpen was ineffective for failing to rehabilitate certain

jurors who were struck for cause due to their refusal to consider the death penalty as a possible sentence in this case. It is well established that the United States Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial" Lockhart v. McCree, 479 U.S. 162, 165, 106 S. Ct. 1758, 1760, 90 L. Ed. 2d 137 (1986). In light of this precedent, there is no obligation for an attorney to attempt to rehabilitate jurors who have clearly expressed their refusal to consider the death penalty.

For instance, prospective juror Jackie M. Bailey expressed during voir dire that she was opposed to the death penalty.(Doc. 97, Attach. 8 at 47-49.) Upon this revelation, the trial court asked a variety of follow up questions to ensure that Ms. Bailey would refuse to consider the death penalty as a possible sentence in this case. (Id.) The relevant portion of the exchange with Ms. Bailey provides:

> Trial Court: Well, you and I aren't on the same wavelength. Let me start over. Do you mean there are certain kinds of cases or certain instances in which you would be in favor of the death penalty?

> Ms. Bailey: You're talking about do I, or I do not believe in sentencing peoples (sic) for

```
                    the death penalty?

Trial Court:    Yes.

Ms. Bailey:     Oh, no, sir, I don't believe in it.

Trail Court:    Then  you  are  opposed  to  the  death
                penalty.

Ms. Bailey:     Yeah, okay.

Trial Court:    You're against the death penalty.

Ms. Bailey:     Yes, I'm against it.

Trial Court:    You're against it –

Ms. Bailey:     Yes, sir.

Trial Court:    --No matter what kind of case it might
                involve?

Ms. Bailey:     Yes, sir.

Trial Court:    If you were a juror and had to make a
                decision  between  giving  a  defendant
                life  in  prison  or  death,  you  would
                automatically vote for life in prison?

Ms. Bailey:     Yes, sir.

Trial Court:    You'd never vote for death?

Ms. Bailey:     No, sir.

Trial Court:    No matter what the case is?

Ms. Bailey:     No, sir.
```

(Id.)

From this record, it is not entirely clear how Mr. Thigpen could have rehabilitated a potential juror like Ms. Bailey.[8] Petitioner offers no explanation as to how Mr. Thigpen should have rehabilitated Ms. Bailey in light of the trial court's thorough questioning and Ms. Bailey's steadfast denial that she would consider the death penalty in this case. In light of the questioning and Ms. Bailey's responses, this Court cannot find that Mr. Thigpen was ineffective due to his failure to attempt to rehabilitate Ms. Bailey.

Moreover, Petitioner has not developed any record to explain why Mr. Thigpen elected not to attempt to rehabilitate these jurors. At the state habeas proceeding, Petitioner had the opportunity to question Mr. Thigpen and did not inquire into Mr. Thigpen's decision not to rehabilitate these jurors. While Mr. Thigpen may or may not have had a strategy to get these jurors removed from the prospective jury pool, Petitioner cannot rely on a silent record to show that Mr. Thigpen's decision not to question these jurors was an unreasonable decision that no competent counsel would have selected. As a result, Petitioner cannot overcome the high threshold by which this Court must review Mr. Thigpen's decisions at trial.

---

[8] The Court offers the exchange with Ms. Bailey merely as an example as to how the trial court attempted to ensure that jurors firmly refused to consider a death sentence as a potential sentence in this case.

In addition, Petitioner has not shown any prejudice resulting from Mr. Thigpen's failure to attempt to rehabilitate certain prospective jurors. Petitioner has not shown that any of these jurors could have been rehabilitated by any further questioning than the thorough questioning offered by the trial judge. As a result, Petitioner cannot show that any attempt to rehabilitate these jurors would have had an impact on the jury selected in this case.

### 14. Additional claims of trial counsel error

Finally, Petitioner lists a variety of miscellaneous ways in which his trial counsel was ineffective at trial. (Doc. 138 at 200-01.) These claims include his trial counsel's failure to object to (1) expert testimony provided by blood splatter testimony, (2) inadmissible hearsay offered by witnesses like Deputy Sheriff Joe Morris and Donna Turner Hill, (3) irrelevant testimony provided by the state's serologist, and (4) the trial court's alleged coercive questioning of the jury foreman about the jury split mid-deliberations. (Id.) Other than listing his claims generally, Petitioner provides no authority or support for his arguments. (Id.) Petitioner contends that the "severe time constraints" prevented these claims from being more fully developed. (Id. at 200.)

Petitioner did not raise any of these claims in the underlying state habeas proceedings. Regardless, this Court

rejects Petitioner's arguments. As established by <u>Strickland,</u> Petitioner must show both cause and prejudice to establish that his counsel was ineffective at trial. 466 U.S. at 697, 104 S. Ct. at 2070. Petitioner's mere list of alleged errors is insufficient to meet this high burden. Petitioner has not shown that his trial counsel's alleged failures on these various points is plainly deficient or that he was prejudiced by his counsel's actions. Accordingly, Petitioner's claims are denied.

III. <u>VICTIM IMPACT STATEMENT</u>

In his briefing, Petitioner contends that the impact statement offered by the victim's wife, Mamie Holland, at trial constituted a due process violation that warrants relief. (Doc. 138 at 202.) The relevant portion of the testimony at issue includes:

> Q: When you close your eyes at night, do you still see his face?
>
> A: Yes, sir, because he looked right at me. I yelled. I yelled for him to stop, and he turned around and looked at me and kept hitting. (Witness Crying)
>
> Q: Do you have any fear?
>
> A: Yes, I do. I fear for my family's life. I fear for my daughter and my son and myself (sobbing).
>
> Q: Do you fear he will return?
>
> A: Yes, sir.

(Doc. 98, Attach. 5 at 87-90.)

At trial, Petitioner objected to the testimony, argued that this testimony "went far and beyond that which the law says can go," and moved for a new trial. (Id. at 90-91.) The trial court denied Petitioner's motion and the Georgia Supreme Court affirmed the trial court's ruling. (Id. at 92; Doc. 99, Attach. 2 at 5-7.) The Georgia Supreme Court found that Mrs. Holland's display of emotion was not excessive and that the content of her testimony did not go outside of the limits of permissible testimony as defined by O.C.G.A. § 17-10-21. (Doc. 99, Attach. 2 at 5-7.)

Now, Petitioner argues that the Georgia Supreme Court's decision was an unreasonable application of United States Supreme Court precedent laid out in Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) and Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987). In Payne v. Tennessee, the Supreme Court of the United States held that "the Eight Amendment erects no per se bar" to the admission of victim impact statements during a capital murder trial. 501 U.S. at 826, 111 S. Ct. at 2609. The Payne Court, however, noted that Court's holding left undisturbed the portion of the Court's earlier opinion in Booth v. Maryland which "held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id.

at 830 n.2, 111 S. Ct. at 2611 n.2. Petitioner asserts that Ms. Holland's testimony "went over the line" of permissible testimony established in Payne and Booth because she was allowed to testify that she "feared for the safety of herself and her family because she believed Mr. Jones would return to hurt her." (Doc. 138 at 204.)

After a careful review, the Court rejects Petitioner's argument that the victim impact statement offered by Ms. Holland constituted a due process violation as detailed by any of the Supreme Court precedent cited by Petitioner. In this Court's opinion, neither Payne nor Booth mandate that this Court find that Petitioner is entitled to any form of relief. In her testimony, Mrs. Holland did not offer her opinion or characterization of the crime or Petitioner. Moreover, Ms. Holland did not ask the jury to impose a specific punishment on Petitioner. Instead, the record shows that the trial court properly limited Ms. Holland's testimony to the impact that the crime had on her and her family. Petitioner has provided no argument, other than conclusory allegations that this testimony "went over the line," that would suggest that a victim is not permitted to testify about the impacts of the crime, even if that testimony includes a lingering fear of the defendant. As a result, the Court finds that Petitioner has failed to offer any

convincing argument that Mrs. Holland's testimony constituted a due process violation.

## IV. TRIAL COURT'S DENIAL OF PETITIONER'S MOTION FOR CHANGE OF VENUE

Next, Petitioner argues that the trial court violated his right to a fair trial by denying his motion for change of venue. (Doc. 38 at 204.) Petitioner asserts that the trial's venue, Coffee County, was "saturated" with pretrial publicity which rendered his trial fundamentally unfair. (Id. at 209.)

The record in this case shows that the trials for Petitioner and Mr. Bunner were initially set to be held in Ware County, Georgia, the same county in which the crime occurred. (Doc. 97, Attach. 3 at 20.) After attempting voir dire in Mr. Bunner's case in Ware County, however, the trial judge declared a mistrial and agreed with the parties that both cases should be transferred to other counties to avoid the extensive pre-trial publicity in Ware County. (Doc. 102, Attach. 3 at 46.) Mr. Bunner's case was eventually transferred to, and heard in, Tift County, Georgia. (Doc. 99, Attach. 9 at 24.) In Petitioner's case, several counties were considered including Emmanuel County, Glynn County, Toombs County, and Dodge County. (Doc. 101, Attach. 4 at 176-17.) Due to scheduling constraints in other courts, however, the parties finally agreed to try the

case in Coffee County, a neighboring county of Ware County. (Doc. 126, Attach. 2 at 3-4.)

In his current briefing before the Court, Petitioner asserts that Coffee County was also an improper venue because it was "saturated" with the same level of pretrial publicity and prejudice as Ware County. (Doc. 138 at 218.) In support of his argument, Petitioner cites to various newspaper articles that Petitioner contends circulated in Coffee County prior to his trial. (Id. at 209-18.) Petitioner asserts that the media clippings contained highly prejudicial information and effected Petitioner's ability to receive a fair trial. (Id.) Specifically, Petitioner contends that the newspaper articles improperly highlighted (1) Petitioner's admission of guilt, (2) the brutality of the crime, (3) the victim's family's grief, (4) the strength of the state's case, and (5) the community's need for safety. (Id.)

In addition to the media publicity, Petitioner asserts that the prejudice in Coffee County was demonstrated throughout voir dire. (Id. at 218-27.) To conduct voir dire, the trial court divided prospective jurors into different panels of twelve members and individually met with prospective jurors while the remaining members of the panel remained in the jury room. (Doc. 97, Attach. 5 at 62-3.) During the first jury panel, it was revealed that the panel of prospective jury members were

discussing the case, Petitioner's guilt, and his potential sentence. (Id. at 137-47.) While none of the jurors from the first panel ended up on the final jury, Petitioner cites that it was clear from the discussions that he could not have received a fair trial in Coffee County. (Id. at 224.) Additionally, Petitioner cites that other jurors also reported hearing rumors about the case during voir dire. (See, e.g., Doc. 97, Attach. 6 at 120-25.)

Given the problems with voir dire and the pretrial publicity, Petitioner argues that the trial court should have granted his motion for a change of venue during the voir dire process in Coffee County. (Doc. 138 at 269.) On direct appeal to the Georgia Supreme Court, Petitioner argued that the trial court committed "reversible error when it failed to grant [Petitioner's] Motion for a Change of Venue, even though venue had already been changed from Ware County, Georgia to Coffee County, Georgia." (Doc. 98, Attach. 9 at 4.) In his briefing, Petitioner argued that his case should have been moved to a new venue because "it was evident from the first pool of jurors that if they had laughed and joked about that if the defendant was as guilty as they say he was, that he was in fact guilty, and that further the death penalty should be imposed, it was clearly evident at that point that the prospective jurors were tainted and that [Petitioner] would be denied his right to a fair and

impartial jury." (Doc. 98, Attach. 9 at 11.) The Georgia Supreme Court denied Petitioner's claim on the merits. (Doc. 99, Attach. 2 at 4.)

During his state habeas proceedings, Petitioner reasserted his claim that he was denied his right to a fair and impartial jury because the trial court denied his motion for a change of venue. (Doc. 99, Attach. 9 at 24.) On review, the state habeas court denied Petitioner's claim as res judicata because the claim had been fully considered by the Georgia Supreme Court on direct appeal. (Doc. 103, Attach. 1 at 241.) Typically, this Court would be required to afford deference to the state court's rulings unless the Court found that the state court reviewing the claim on the merits made an unreasonable determination of fact, based its decision on an unreasonable application of federal law, or made a decision that was contrary to established federal law. Here, however, Petitioner argues that this Court should not afford the state court's decision any deference. (Doc. 138 at 241.) Petitioner asserts that the state habeas court incorrectly concluded that his claim was fully considered by the Georgia Supreme Court. (Id.) Instead, Petitioner argues that he raised an entirely new claim in the state habeas court. (Id.) In light of the state court's refusal to consider the merits of Petitioner's new claim, Petitioner argues that this

Court should conduct a de novo review of his claim that he was entitled to a new venue. (Id.)

Petitioner's argument that he raised a new claim during his state habeas proceeding from the claim that was initially considered at the Georgia Supreme Court is based on the Georgia Supreme Court's ruling in his case. (See Doc. 99, Attach. 2 at 4.) In its discussion of Petitioner's claim, the Georgia Supreme Court provided that

> Jones contends that the trial court erred in denying his motion for a change of venue under Jones v. State . . . . To justify a change of venue under Jones, a defendant must show either that the trial setting was inherently prejudicial as a result or pretrial publicity, or actual bias on the part of individual jurors. . . . Jones does not allege that the trial setting in Coffee County was inherently prejudicial. With regard to the prejudice of individual jurors, Jones offers no proof that a high percentage of jurors had prior knowledge or had formed opinions about the case, based on what they had read or heard, or that there was relatively high excusal rate. . . . Absent proof of factors such as these, Jones was not entitled to a change of venue, and therefore the trial court did not abuse its discretion by refusing to grant the motion.

(Id.) As discussed by the Georgia Supreme Court, Petitioner asserts that he only presented a claim on direct appeal based on the bias of individual jurors and not that the venue in Coffee County was inherently prejudicial. (Doc. 138 at 240.) Now, however, Petitioner contends that his claim is based on the argument that Coffee County was inherently prejudicial in light of pretrial publicity. (Id. at 242-43.) As a result, Petitioner

118

asserts that the state habeas court was incorrect when it held that the Georgia Supreme Court had fully considered the merits of Petitioner's claim. (Id.)

After a thorough review, this Court disagrees with Petitioner's position that the state court erred by finding that Petitioner was asserting the same claim during the state habeas preceding that had previously been considered by the Georgia Supreme Court. In Jones, the Georgia Supreme Court held that a defendant can establish a claim that he or she is entitled to a new venue if the "defendant can make a substantive showing of the likelihood of prejudice by reason of extensive publicity." 261 Ga. 665, 666 409 S.E.2d 642, 643 (1991). While "annouc[ing] this new standard," the Georgia Supreme Court did not provide any guidance as to how a defendant would be able to make this showing. Id. On direct appeal, Petitioner attempted to make a showing of the "likelihood of prejudice by extensive publicity" by presenting evidence of the bias of individual jury members during the voir dire process. Now, however, Petitioner is arguing that the "likelihood of prejudice by extensive publicity" is demonstrated by the media clippings and the bias of individual jury members. In this Court's view, Petitioner's claim is not a new claim, but merely a different way of proving the same claim already considered by the Georgia Supreme Court.

Rather than offering a new claim, Petitioner has simply offered more evidence to support his previously adjudicated claim.

Because the Court finds that Petitioner did not present a new claim for the state habeas court's consideration, the Court finds that the state habeas court did not err in finding that Petitioner's claim was fully adjudicated on the merits by the Georgia Supreme Court. This Court must now review the Georgia Supreme Court's ruling in order to determine whether state court's decision was based on an unreasonable application of law, contrary to federal law, or an unreasonable finding of fact. This Court's review is limited to the record that was presented to the Georgia Supreme Court.[9] Cullen v. Pinholster,

---

[9]    Accordingly, Petitioner's Motion to Supplement the Record (Doc. 147) must be **DENIED**. In his motion, Petitioner requests that he be permitted to supplement the state habeas record with media clippings, which show the pretrial publicity during his initial trial. (Id.) Petitioner contends that his state habeas counsel inadvertently failed to attach the newspaper clippings. (Id.) Petitioner requests that the Court allow Petitioner to add these exhibits to the record in this case. (Id.)

Under Cullen v. Pinholster, however, this Court's review under 28 U.S.C. § 2244 "is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181-82, 131 S. Ct. at 1398. According to the Supreme Court of the United States, "[i]t would be contrary to [the purpose of § 2244] to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." Id. at 182, 131 S. Ct. at 1399. Here, Petitioner attempts to argue that the failure to submit the exhibits should be excused due to his state habeas counsel's ineffectiveness as provided for in Trevino v. Tahler, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013) and Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012).

After careful review, however, Petitioner's argument fails. As the Eleventh Circuit has explained, "[w]hat the Martinez decision did—and the only thing it did—was create a narrow, equitable exception to the general rule that a petitioner cannot rely on the ineffectiveness of collateral counsel to serve as cause for excusing the procedural default of a claim in state court, thereby permitting federal habeas review of the merits of that claim." Chavez, Sec'y, Fla. Dept. of Corrs., 742 F.3d 940, 944 (11th Cir. 2014). The rule announced in Martinez only applies "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Id. Shortly after it decided Martinez, the Supreme Court broadened Martinez's reach and ruled that it also applied in states that "effectively prohibit defendants from raising ineffective-assistance claims on direct appeal." Hittson v. GDCP Warden, 759 F.3d 1210, 1261 (11th Cir. 2014) (citing Trevino, 569 U.S. at 429, 133 S. Ct. at 1921) (alteration in original). However, the Supreme Court has been clear that the exemption to procedural default created by Martinez and extended by Trevino was meant to be limited in nature. See Martinez, 566 U.S. at 16, 132 S. Ct. at 1320 ("The rule [regarding procedural default] governs in all but the limited circumstances recognized here."); Trevino, 569 U.S. at 428, 133 S. Ct. at 1921 (noting that Martinez announced a "narrow exception").

Neither Martinez nor Trevino afford Petitioner the relief he seeks. Petitioner has not shown that he was unable to raise instances of his trial court's alleged ineffective assistance of counsel during his direct appeal or that Georgia law effectively prohibited him from challenging his lawyer's alleged failure to properly litigate his motion for change of venue. Moreover, neither Martinez nor Trevino create any exception which would allow Petitioner to overcome the mandate in Pinholster. The failures of his state habeas counsel to properly ensure that the media clippings were placed on the record during his state habeas proceeding does not relate to any procedural default of an ineffective assistance of counsel claim. Martinez and Trevino do not create some sort of equitable exception which would permit Petitioner to extend their holdings to allow him to supplement the record in this case. See Hamm v. Commissioner, Ala. Dept. of Corrs., 620 F. App'x 752, 776-77 (11th Cir. 2015) (rejecting a petitioner's argument that Martinez "provides for

563 U.S. 170, 181-82, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011).

After a careful review, the Court finds that the Georgia Supreme Court's decision was not contrary to federal law, based on an unreasonable application or federal law, or an unreasonable finding of fact. "The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury." Skilling v. United States, 561 U.S. 358, 377, 130 S. Ct. 2896, 2912-13, 177 L. Ed. 2d 619 (2010). The right to an impartial jury ensures "that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." Patterson v. Colo. ex rel. Attorney Gen. of Colo., 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907) (opinion for the Court by Holmes, J.). A "trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere." Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985). A defendant can establish that the

equitable relief in situations where a petitioner would otherwise not have the substance of claim heard" because this "novel" argument was not supported by any legal authority). Martinez and Trevino simply do not apply here. Because Petitioner has not shown any good cause to overcome Pinholster's instruction, this Court will not permit Petitioner to supplement the record at this time. As a result, Petitioner's motion must be **DENIED.**

trial court was unable to select an impartial jury by showing that the pretrial publicity or inflamed community atmosphere constituted actual prejudice or that there should be a presumption of prejudice. Id.

The requirement that a jury be impartial, however, does not require that jury members must be "totally ignorant of the facts and issues involved in the case." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 751 (1961). On this point, the United States Supreme Court has been clear that

> [t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 723, S. Ct. at 1642-43.

Based on the record before the state habeas court and the Georgia Supreme Court, the Court finds that Petitioner failed to establish that the Georgia Supreme Court's ruling was based on an unreasonable finding of fact, an unreasonable application of federal law, or contrary to federal law. The record considered by the Georgia Supreme Court focuses on the bias of the jury members during the voir dire process. While the record establishes that certain juror members had knowledge of the case or may have discussed the case prior to their questioning during

voir dire, this Court remains unconvinced that the prior knowledge of a few jurors demonstrates that Coffee County was an improper venue. As discussed there is no requirement that jurors have absolutely no knowledge of a case prior to being selected for a jury panel. Rather, the law only requires that jurors must be willing to set aside that opinion to consider only the evidence presented at court. In this case, Petitioner has failed to show that individual jury members were actually biased and would have been unable to set aside any prior knowledge they had of Petitioner's case. All of the potential jury members that may have had such a bias were struck for cause. On the record before the state court, Petitioner has simply failed to demonstrate that the voir dire process revealed that Coffee County was an improper venue.

Even if this Court were to conduct a de novo review of Petitioner's claim and consider the media clippings submitted by Petitioner, the Court still finds that Petitioner's claim fails. In this Court's view, Petitioner has failed to show there was any prejudice which resulted from the pretrial publicity in this case. In his briefing, Petitioner argues that he is entitled to a presumption of prejudice due to the extensive pretrial publicity in Coffee County. (Doc. 138 at 238.)

"In deciding whether a defendant should have been granted a change of venue based on a presumption of juror prejudice . . .

a court must consider the 'totality of circumstances that [a defendant's] trial was not fundamentally fair.' " Price v. Allen, 679 F.3d 1315 (11th Cir. 2012)(quoting Murphy v. Florida, 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975)). The presumed prejudice standard, however, is "rarely applicable," Coleman, 778 F. 2d at 1490 (quoting Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S. Ct. 2791, 2800, 49 L. Ed. 2d 683 (1976)), and "is reserved for an extreme situation," Id. (quoting Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980)). To meet this standard, a Petitioner must show "evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." Mayola, 623 F. 2d at 997 (internal quotation omitted).

In this case, the media clippings do not show that it was virtually impossible for Petitioner to receive a fair trial in Coffee County. In the local newspaper that serves Coffee County, the Douglas Enterprise, Petitioner has only offered two newspaper articles that even reference Petitioner's case. (See Doc. 147, Attach. 2.) One article discusses that Petitioner's trial will be moved to Coffee County and the other article generally discusses the crime without mentioning the names of the victim or the defendants. (Id.) In this Court's view, the content of these articles fail to establish that Coffee County

was an inherently prejudicial venue. The information contained was not inflammatory or prejudicial to Petitioner's trial.

Other articles offered by Petitioner also fail to show that the venue in Coffee County was inherently prejudicial. Petitioner heavily relies on articles from the Waycross Journal Herald and the Florida Atlantic Times to establish that there was a clear prejudice in Coffee County. (See Doc. 147, Attach. 1; Doc. 147, Attach. 3.) As an initial matter, however, Petitioner has failed to provide any basis for finding that these articles actually reached the jury pool in Coffee County. In his argument, Petitioner relies on conclusory allegations that some of the residents in Coffee County are served by the Waycross Journal Herald and the Florida Atlantic Times. This Court, however, can only speculate as to the actual distribution of these newspapers and to the extent in which they may have reached residents in Coffee County.

Even if these newspaper articles did reach a substantial number of residents in Coffee County, these clippings do not establish that there should be a presumption that the venue in Coffee County was inherently prejudicial. From the exhibits submitted by Petitioner, there were only two articles published by the Florida Atlantic Times and four articles published by the Waycross Journal Herald in 1993. (Doc. 147, Attach. 1; Doc. 147, Attach. 3.) These articles reported the facts of the underlying

crime and the arrests made in the case. (Id.) In 1994, the exhibits show that the Waycross Journal Herald published nine articles and that the Florida Atlantic Times published four articles about the case. (Id.) These articles focused on different details of Mr. Bunner's trial.

This Court has reviewed these clippings[10] and finds that these articles fail to establish that Petitioner is entitled to a presumption of prejudice in this case. With the exception of one article, the media clippings do not disclose any highly prejudicial or inflammatory information. Most of the articles discuss the facts of the underlying crime, the events of Mr. Bunner's trial, or Mr. Bunner's sentencing. As discussed previously, there is no requirement that potential jurors must be completely ignorant of the facts of the crime and the Court finds that the information contained in these articles does not show that Coffee County was an improper venue.

There is only one article that the Court finds contained at least some prejudicial information. This article was featured in the Waycross Journal Herald on December 3, 1994 and provided that Petitioner confessed to another jail inmate about his role

---

[10] In the exhibit, Petitioner provides additional media articles that covered the evidence presented at his own trial and sentencing. This Court does not discuss these articles as articles published after the jury was selected in his case have no bearing on whether Petitioner was subjected to prejudicial pre-trial publicity.

in the crime. (Doc. 147, Attach. 1.) After careful review, however, this Court remains unconvinced that Petitioner has established that he is entitled to a presumption of prejudice.

In Rideau v. Louisiana, 373 U.S. 723, 724, 83 S Ct. 1417, 1418, 10 L. Ed. 2d 663 (1963), the Supreme Court of the United States found that a defendant was entitled to a change of venue because his confession to a crime was broadcast three times on television to over 53,000 thousand people in the community. The Supreme Court provided that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Id. at 726, 83 S. Ct. at 1419.

While the Court finds that the article at issue in this case does contain prejudicial information in light of Rideau, the Court remains unconvinced that this lone article establishes that the venue in Coffee County was inherently prejudicial as a whole or that Petitioner is entitled to a presumption of prejudice. Unlike in Rideau, where the reach of the defendant's confession was clearly demonstrated in the record, Petitioner has not established that the article in this case reached a large portion of the residents of Coffee County. Moreover, this Court is unconvinced that the prejudicial nature of this lone article is comparable to the clearly prejudicial televised broadcast of the defendant's confession in Rideau. In this Court's view, the article does not constitute evidence of the

type extensive pretrial publicity which would demonstrate "a trial atmosphere that [was] utterly corrupted by press coverage." Price, 679 F.3d at 1324.

Moreover, Petitioner has not offered any showing of actual prejudice by establishing that any member of the jury pool was aware of Petitioner's confession after reading about it in the Waycross Journal Herald. This Court cannot rely on mere speculation that one article is sufficient to show that Coffee County as a whole was an inherently prejudicial venue. Petitioner has simply not offered any basis to support a finding that he is entitled to a presumption of prejudice in this case.

In fact, the argument that there should be a presumption of prejudice in this case is undermined by the questioning of potential jury members during the voir dire process. In his briefing, Petitioner provides that 36 of 89 potential jurors had some knowledge about the case and that only 11 of those jurors were struck for cause. (Doc. 138 at 225.) In a case where there would be a finding that a Petitioner is entitled to a presumption of prejudice, the Court would expect more jurors to have knowledge of the case or strongly held beliefs about the case. Although Petitioner has shown that members of the jury pool did have at least some knowledge of the case, Petitioner has failed to show that Coffee County was an improper venue or

that the trial court erred in failing to grant his second motion for a change venue. As a result, Petitioner's claim is denied.

## V. TRIAL COUNSEL'S AGREEMENT TO TRANSFER THE CASE TO COFFEE COUNTY

Relatedly, Petitioner alleges that his trial counsel was ineffective when he agreed to transfer Petitioner's case to Coffee County, Georgia. (Doc. 138 at 243.) Petitioner asserts that Coffee County was clearly an improper venue, tainted by pretrial publicity and that his counsel should have been aware that Coffee County was an improper venue. (Id. at 243-49.) Petitioner asserts that there was no reasonable basis to support his counsel's decision to agree to move Petitioner's trial to Coffee County. (Id.)

On review, the state habeas court did not squarely address Mr. Thigpen's agreement to transfer the case to Coffee County. (Doc. 103, Attach. 1 at 31.) Rather, the state habeas court addressed Petitioner's claim that Mr. Thigpen was generally ineffective for failing to secure Petitioner a new venue outside of Coffee County. (Id.) In that analysis, the state habeas court found that Mr. Thigpen made a strategic decision to allow Petitioner's case to be heard in Coffee County based on Mr. Thigpen's familiarity with the county and his understanding that no death sentence had been awarded in the Coffee County in 40-50 years. (Id.) Based on this reasoning, the state habeas court

rejected Petitioner's claim that Mr. Thigpen was ineffective for failing to get Petitioner's case moved to a new venue. (Id.)

This Court agrees with the conclusions of the state habeas court. As an initial matter, as discussed above, this Court has found that Petitioner has failed to show that Coffee County was an improper venue in this case. Accordingly, Petitioner is unable to show any prejudice resulting from Mr. Thigpen's agreement to transfer Petitioner's case to Coffee County. Moreover, this Court agrees with the state habeas court that Mr. Thigpen's performance was not deficient. Mr. Thigpen made his decision to transfer Petitioner's case to Coffee County after assessing the likelihood that Petitioner would not receive the death penalty in Coffee County. (Doc. 100, Attach. 2 at 60-67.) While this Court now has the benefit of hindsight to discern that Mr. Thigpen's assessment was incorrect, this Court cannot find that Mr. Thigpen's decision was unreasonable. Mr. Thigpen's strategic decision to move Petitioner's case to Coffee County in hopes that Petitioner would be sparred the death penalty was not a decision that is well outside the possible range for competent counsel. As a result, Petitioner's claim is denied.

VI.  JURY RELATED ISSUES

Finally, Petitioner asserts a variety of claims related to the final jury impaneled in his case. (Doc. 138 at 249-69.) Here, Petitioner alleges that (1) the trial court erred by

dismissing certain jurors from the jury panel outside of the Petitioner's presence; (2) the trial court failed to properly question the excused jurors before dismissing them from the jury panel; (3) his trial counsel was ineffective for failing to object to the trial court's decision to dismiss the two jurors; and (4) a mentally incompetent juror was allowed to serve on the jury. (Id.) After careful review, Petitioner's claims related to the jury in this case must be denied.

## A. Trial Court's Excusal of Jury Members Outside of Petitioner's Presence

In his petition, Petitioner first contends that he was denied his right to be present at all critical stages of his capital trial when the trial court excused two jurors outside of his presence. (Doc. 138 at 250.) Petitioner asserts that "a cloud of secrecy and impropriety hangs over the jury's guilt and sentencing verdicts in this case" because the trial court made a unilateral decision to dismiss the two jurors. (Id.)

The pertinent facts related to Petitioner's claim show that two members of the jury were dismissed by the trial court after the jury returned a guilty verdict. First, Juror Angela Wooten Blevins was dismissed between the jury's pronouncement of a guilty verdict and the beginning of the sentencing phase. (Doc. 98, Attach. 5 at 28.) Before the jury was brought in to begin the sentencing phase, the trial court noted that Ms. Belvin was

dismissed pursuant to a doctor's note, which provided that Ms. Blevins should be excused from jury duty since service would be "detrimental to her mental health." (Id.) The trial court explained that it "acted upon the advice from the doctor, and . . . excuse[d] the juror." (Id.) Petitioner's attorney did not object to the court's dismissal of the juror. (Id.)

Next, Juror Martha J. Douglas was excused during deliberations after the sentencing phase of Petitioner's trial. (Id. at 184.) Here, the record shows that before the jury reconvened to deliberate for a second day, the trial court dismissed Ms. Douglas in light of a doctor's note which provided that Ms. Douglas was "medically unable to participate on jury duty." (Id.) The trial court replaced Ms. Douglas with an alternate juror and directed the jury to begin a new process of deliberation. (Id. at 184-85.)

Now, Petitioner contends that the dismissal of both Ms. Douglas and Ms. Blevins constituted critical stages in which the trial court should have consulted with Petitioner or his trial counsel. (Doc. 138 at 252.) Petitioner asserted this claim during his state habeas proceeding (Doc. 99, Attach. 9 at 20) and attempted to gather evidence to support his claim during the state habeas proceeding by trying to interview, depose, or subpoena different members of the jury (Doc. 99, Attach. 6 at 11; Doc. 103, Attach. 28 at 9-10). The state filed a motion for

protective order (Doc. 103, Attach. 28) and the state habeas court granted the motion (Doc. 98, Attach. 8). Eventually, the state habeas court found that Petitioner's claim was procedurally defaulted because Petitioner failed to properly raise the issue on direct appeal. (Doc. 103, Attach. 1 at 4.)

In federal court, Petitioner filed a motion for discovery (Doc. 31) and, later, a motion for evidentiary hearing (Doc. 88) in which Petitioner requested the opportunity to develop more evidence about the reasons for the juror excusals. On review, however, this Court denied Petitioner's request, finding that Petitioner's claim was procedurally defaulted. (Doc. 37 at 12-18; Doc. 112 at 14-15.) The Court reviewed whether Petitioner had shown any cause or prejudice to warrant excusing the default of his claims and found that Petitioner had failed to establish any basis to excuse the default of his claim. (Id.)

Now, Petitioner asks this Court to reconsider its prior ruling that Petitioner's claim is procedurally defaulted. (Doc. 138 at 257.) Petitioner asserts that the procedural default of his claim should be excused because his attorney was ineffective due to his failure to raise this claim on direct appeal. (Id.) After a careful review, however, the Court finds no reason to reconsider its prior ruling. As noted in this Court's prior order, Petitioner has failed to develop or present any evidence regarding his trial counsel's decision not to object to the

dismissal of the two jurors. (Doc. 37 at 16-18.) Accordingly, the Court cannot determine whether the decision not to object to the dismissal of the two jurors was a strategic decision made by his attorney. Because there is no evidence from which to assess whether his counsel was ineffective for failing to object to the dismissals of the two jurors, Petitioner has failed to establish that no competent counsel would have taken the same action his counsel pursued. Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1243 (11th Cir. 2003). As a result, Petitioner is unable to show that the procedural default of his claim should be excused based on his attorney's failure to raise this issue on direct appeal.

B. Trial Court's Inquiry into the Jury Excuses Prior To Dismissing Jury Members

Relatedly, Petitioner asserts that the trial court failed to properly question the jury members before excusing them from jury service. (Doc. 138 at 258.) Petitioner purports that neither doctor note provided sufficient detail to warrant automatic dismissal of the individual jurors and that the judge should have ensured that the jurors were not simply trying to get out of their duty to serve on the jury. (Id.) Petitioner raised this claim for relief at the state habeas court level (Doc. 99, Attach. 9 at 18-20) and the state habeas court found

that the claim was procedurally defaulted (Doc. 103, Attach. 1 at 4).

On federal review, this Court has also considered the merits of Petitioner's claim in its earlier order denying Petitioner's request for discovery. (Doc. 37 at 14-18.) In that order, this Court concluded that the claim was procedurally defaulted and found that Petitioner had failed to establish any cause or prejudice based on his attorney's ineffective assistance of counsel to warrant excusing that default. (Id.) At this time, this Court sees no reason to revisit its prior holding. Petitioner has not shown that his trial counsel was ineffective for not raising issues related to the trial court's failure to inquire more deeply into the jurors' excuses. In fact, Petitioner has not presented any evidence to show that his trial counsel was ineffective or that prejudice resulted from his trial counsel's failure to object or raise this issue on direct appeal. As a result, this Court finds that Petitioner's claim is procedurally defaulted.

C. Trial Counsel's Failure to Object to the Trial Court's Lack of Inquiry into the Individual Jury Members and Decision to Dismiss Jurors Outside of the Presence of Petitioner

Although Petitioner challenges the trial court's decision to dismiss the jury members outside of his presence and the trial court's failure to ask the jurors questions prior to

dismissal as separate claims, Petitioner also asserts an independent claim based on what he alleges is the ineffective assistance of counsel for his trial counsel's failure to object to the trial court's decisions. (Doc. 138 at 261.) However, as this Court has explained above and in its previous orders (Doc. 37; Doc. 112), Petitioner's claim fails.

First, the state habeas court found that Petitioner had failed to establish any basis to support that his trial counsel was deficient or that his counsel's representation prejudiced the outcome of his trial. (Doc. 103, Attach. 1 at 20-24.) The state court found that the trial court's decision to dismiss the jurors based on medical excuses was legitimate and, therefore, Petitioner's counsel was not ineffective for failing to object to the dismissals at trial. (Id.) Additionally, the state court found that Petitioner could not show how he was prejudiced by the use of the alternate jurors. (Id.)

Moreover, as this Court has already noted in its previous orders, Petitioner has not offered any evidence to show that his trial counsel's decision not to object to the dismissal of the jurors fell below the applicable standard. (Doc. 37 at 14-18; Doc. 112 at 10-13.) Without any evidence as to his trial counsel's decision, this Court can only speculate as to whether it was improper for his trial counsel to remain silent at trial or whether his trial counsel strategically decided not to object

at trial. Petitioner must do more than merely conclude that his counsel is ineffective merely because he did not object. Petitioner must show that his counsel made an unreasonable decision that falls outside "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; 104 S. Ct. at 2065. Petitioner has not met this high burden. Accordingly, Petitioner's claim is denied.

### D. Mentally Incompetent Juror

Finally, Petitioner contends that his sentence should be reversed because he was tried by a jury that included an incompetent and mentally ill juror. (Doc. 138 at 264.) Petitioner supports his claim with an affidavit offered by a member of his legal team, Therese Piazza, who attempted to interview juror Roosevelt Gowdy. (Doc. 99, Attach. 12 at 180-81.) In the affidavit, Ms. Piazza purports that Mr. Gowdy exhibited extremely bizarre behavior that would be consistent with a severe mental health disorder. (Id.)

Petitioner asserted this claim early in these proceedings and requested the opportunity to conduct discovery to develop more evidence of Mr. Gowdy's potential mental incompetence. (Doc. 31; Doc. 32.) The Court, however, denied Petitioner's request. (Doc. 7 at 21-23.) The Court found that Petitioner was not entitled to discovery because Petitioner had failed to show any evidence of Mr. Gowdy's mental state at the time of trial and had only

offered evidence of Mr. Gowdy's mental state three years after the trial had concluded. (Id.) The Court reviewed the evidence of Mr. Gowdy's responses during voir dire and found that there was no evidence that Mr. Gowdy was mentally incompetent at the time of trial. (Id.)

Now, Petitioner requests that this Court reconsider its decision to deny Petitioner the opportunity to develop more evidence with respect to Mr. Gowdy's mental illness. (Doc. 138 at 266-67.) After careful consideration, however, the Court finds no reason to reconsider its prior holding. Again, the Court finds that Petitioner has not shown any basis for allowing Petitioner to inquire into Mr. Gowdy's mental status years after the conclusion of trial.

Other than the affidavit offered by Ms. Piazza, Petitioner has not offered any evidence or further argument that he is entitled to relief because he was allegedly tried and convicted by a jury that included a potentially mentally incompetent juror. Petitioner is not entitled to relief simply based on the mental status of a juror years after the trial has concluded. As a result, this Court must deny Petitioner's claim at this time.

## CONCLUSION

For the foregoing reasons, Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 is **DENIED**. Additionally

Petitioner's Motion for Leave to File Exhibits (Doc. 147) is **DENIED** and Petitioner's Motion Requesting Ruling (Doc. 152) is **DISMISSED AS MOOT**. The Clerk is **DIRECTED** to close this case.

SO ORDERED this 30th day of September 2019.

WILLIAM T. MOORE, JR
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA